UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

JANE A. HALBRITTER,

                Plaintiff,

    -v-

STONEHEDGE ACQUISITION ROME II, LLC
and STONEHEDGE ACQUISITION
CHITTENANGO II, LLC,

                Defendants.

_____

**ANSWER WITH
COUNTERCLAIMS**

Index No. 07-CV-3848
(WHP)

Defendants, STONEHEDGE ACQUISITION ROME II, LLC and STONEHEDGE

ACQUISITION CHITTENANGO II, LLC, answering Plaintiff's Complaint through their

attorneys, McMahon and Grow, state as follows:

1.    ADMIT the allegations in Paragraph 1 of the Complaint that the litigation arises in

connection with Defendants' January 2006 purchase, from Plaintiff and her brother Marc

Rossi, of the capital stock of two corporations that operate residential nursing facilities in

Upstate New York, but DENY that Defendants are liable for breach of contract or unjust

enrichment.

2.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations

in Paragraph 2 of the Complaint, and therefore DENY same.

3.    ADMIT the allegations in Paragraph 3 of the Complaint.

4.    ADMIT the allegations in Paragraph 4 of the Complaint.

5.    DENY the allegations in Paragraph 5 of the Complaint.

6.    ADMIT the allegations in Paragraph 6 of the Complaint to the extent that Defendants

ADMIT they are subject to the personal jurisdiction of the Court; DENY the allegations in Paragraph 6 as being the reasons personal jurisdiction exists.

7.    ADMIT the allegations in Paragraph 7 of the Complaint to the extent that Defendants ADMIT they are subject to the personal jurisdiction of the Court.

8.    DENY the allegations in Paragraph 8.

9.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 insofar as they relate to a time period beginning in 1994, prior to Defendants' entering into a Stock Purchase Agreement with Plaintiff and her brother, Marc Rossi, and therefore DENY same; ADMIT the allegations as being true as of the time Plaintiff, Marc Rossi and Defendants entered into a Stock Purchase Agreement in August 2004 until January 3, 2006.  Defendants affirmatively state, upon information and belief, that by August 2004, Stonehedge Nursing Home Rome, Inc. had changed its name to Stonehedge Health & Rehabilitation Center, Inc.

10.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint, and therefore DENY same.

11.    ADMIT the allegations in Paragraph 11 of the Complaint.

12.    ADMIT the allegations in Paragraph 12 of the Complaint.

13.    ADMIT the allegations in Paragraph 13 of the Complaint.

14.    ADMIT the allegations in Paragraph 14 of the Complaint.

15.    ADMIT the allegations in Paragraph 15 of the Complaint.

16.    ADMIT the allegations in Paragraph 16 of the Complaint to the extent that the closing for the Stock Purchase Agreements was set for January 3, 2006 at the Manhattan offices of

Epstein Becker & Green P.C.; DENY the allegations in Paragraph 16 of the Complaint to the extent they suggest Defendants were given the opportunity to conduct due diligence during this entire period or that the length of time that passed between the signing of the Stock Purchase Agreements and closing was unduly long.

17. ADMIT the allegations in Paragraph 17 of the Complaint to the extent that they attempt to paraphrase the language contained within the Stock Purchase Agreements.

18. ADMIT the allegations in Paragraph 18 of the Complaint to the extent that they attempt to paraphrase the language contained within, as well as quote language from, the Stock Purchase Agreements.

19. DENY the allegations in Paragraph 19 of the Complaint.

20. DENY the allegations in Paragraph 20 of the Complaint.

21. DENY the allegations in Paragraph 21 of the Complaint.

22. DENY the allegations in Paragraph 22 of the Complaint, except to ADMIT that Defendants believed the Net Accounts Receivables/Payables Adjustment was erroneously calculated.

23. DENY the allegations in Paragraph 23 of the Complaint, except to ADMIT that Defendants did assert that a number of stated accounts receivable were uncollectible.

24. ADMIT the allegations in Paragraph 24 of the Complaint to the extent that Plaintiff, her brother Marc Rossi and Defendants signed a separate document called the "Receivables Agreement"; Lack knowledge or information as to the truth of the allegations relative to what Plaintiff and her brother were thinking when they signed the Receivables Agreement, and therefore DENY same.

3

25.   DENY the allegations in Paragraph 25 of the Complaint to the extent that they create a

false impression relative to the obligations of the Receivables Agreement. Defendants

affirmatively state that one of the recitation clauses of the Receivables Agreement states

as follows: "WHEREAS, Sellers [Plaintiff and Marc Rossi] are willing to agree to this

purchase price reduction [of $473,884] on the conditions that the Buyers [Defendants]: (i)

pay the face value for those accounts receivables that are not in dispute (*i.e.*, $1,549,977),

(ii) convey to the Sellers any and all amounts that are collected from time to time in the

future with respect to the Disputed Receivables, (iii) hereby appoint the Sellers and their

designated agents, individually and collectively, as agents for the Buyers for purposes of

collecting the Disputed Receivables, and (iv) shall fully cooperate with, and assist, the

Sellers in their collection efforts." Defendants further affirmatively state that the

contractual clauses of the Receivables Agreement provide, among other things, that:

"Buyers hereby nominate and appoint the Sellers and their designated agents as the

Buyers' agents and attorneys-in-fact for the sole purpose of collecting the Disputed

Receivables"; "Sellers shall have the authority . . . to take any and all actions that, in the

opinion of the Sellers ought to be taken, to collect the Disputed Receivables"; "Buyers

shall provide to Sellers [within ten days after the close of each month] a list of the

outstanding Disputed Receivables"; "Buyers shall notify Sellers immediately upon receipt

of any payment on a Disputed Receivable, and Buyers shall remit any and all such

payments to Sellers within three (3) business days of their receipt"; "Sellers shall have the

right, upon ten (10) days prior written notice to Buyers, to conduct an audit of Buyers'

4

books and records to insure compliance with the terms of this Agreement so long as such audits shall only cover one (1) time per fiscal quarter"; Buyers promised "[t]o act in good faith and reasonably cooperate with the Sellers in their efforts to collect the Disputed Receivables"; Buyers promised "[t]o provide Sellers, upon Sellers' request, with specific information necessary for the collection of the Disputed Receivables to the extent that such information is in Buyers' control or possession or with respect to which Buyers have knowledge"; and Buyers promised "[t]o make commercially reasonable efforts to assist Sellers with collection of the Disputed Receivables."

26.     ADMIT the allegations in Paragraph 26 of the Complaint to the extent that prior to closing on the Stock Purchase Agreements, Defendants requested the amounts of additional accounts receivable be deducted from the stock purchase price; ADMIT the allegations in Paragraph 26 of the Complaint to the extent that the credit for the Receivables Allowance on the closing statement was in the amount of $657,229.00; Lack knowledge or information sufficient to form a belief as to the truth of the allegations relative to what Plaintiff and her brother were thinking, and therefore DENY those allegations relating to their state of mind; DENY the remaining allegations in Paragraph 26.

27.     ADMIT the allegations in Paragraph 27 of the Complaint to the extent that they state the purchase price was reduced at closing; DENY the remaining allegations in Paragraph 27 insofar as they imply Defendants engaged in wrongdoing to effect this reduction in the purchase price.

28.     DENY the allegations in Paragraph 28 of the Complaint, except to ADMIT that monthly

summaries of the outstanding Disputed Receivables were not provided because Defendants were taking no action with respect to these accounts, and it was Defendants' understanding that collection efforts underway were being conducted at the direction of Plaintiff and/or her agents and attorneys-in-fact. Defendants affirmatively state: (a) counsel for Plaintiff in Utica, New York, on his own initiative, turned over monies collected on Disputed Receivables to Stonehedge Acquisition Rome I, LLC, which remain in possession of the LLC; (b) in April 2006, an agent of Plaintiff was given full access to the offices of the nursing home for purposes of conducting an audit; (c) a work area has been made and remains available to Plaintiff for purposes of accessing the nursing home facilities; (d) paperwork relative to certain Disputed Receivables was copied and offered to Plaintiff's counsel in the instant litigation, conditioned only on a request that information be used for the sole purpose of collecting the Disputed Receivables and that Plaintiff would indemnify Defendants for any breach of confidentiality.

29.    DENY the allegations in Paragraph 29 of the Complaint. Defendants affirmatively state that upon information and belief, Plaintiff's counsel in Utica, New York has collected monies relative to certain of the Disputed Receivables at the direction of Plaintiff's accountant. Defendants further affirmatively state that upon information and belief, Plaintiff and/or her agents have either directly collected or waived payment of at least one of the Disputed Receivables.

30.    ADMIT the allegations in Paragraph 30 of the Complaint insofar as they attempt to paraphrase language contained within the Stock Purchase Agreements.

31.    DENY the allegations in Paragraph 31 of the Complaint. Defendants affirmatively state that the closing statement for the Stock Purchase Agreements reflects a reduction in the purchase price in the following amounts: "Chittenango payroll non-work – $75,000.00" and "Rome payroll non-work – $25,000.00."

32.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 relative to whether Plaintiff and Alicia Carrier had a telephone conversation on January 4, 2006 and what the contents of that conversation may have been, and therefore DENY same.

33.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 relative to what actions Plaintiff or Alicia Carrier may have taken, and therefore DENY same. Defendants affirmatively state they are unaware of any efforts by Plaintiff or Alicia Carrier to contact them relative to the alleged payroll issue.

34.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 relative to Plaintiff's state of mind when she funded the payroll accounts, and therefore DENY same; ADMIT that Plaintiff deposited approximately $111,000.00 into the payroll accounts that she maintained for the nursing home facilities when she operated the nursing home facilities; ADMIT that these monies were used to cover payroll checks for employees of the nursing home facilities for the period ending December 31, 2005, but DENY that the monies were accessed by Defendants. Defendants affirmatively state that neither they nor their agents were given authorization to access the payroll accounts that Plaintiff maintained while she operated the nursing home facilities.

7

35.    DENY the allegations in Paragraph 35 of the Complaint.

36.    ADMIT the allegations in Paragraph 36 of the Complaint insofar as Plaintiff has

demanded return of the monies she deposited into the payroll accounts to cover the

payroll period ending December 31, 2005 and that Defendants have refused to return

those monies; DENY the inference in these allegations that Plaintiff was not required to

deposit these monies into the payroll accounts and that Defendants have acted wrongfully

in not returning these monies.

37.    ADMIT the allegations in Paragraph 37 of the Complaint insofar as Defendants

acknowledge their counsel has been provided with a copy of the purported assignment of

rights from Marc Rossi to Plaintiff; Lack knowledge or information sufficient to form a

belief as to the authenticity of the Assignment or the purpose in executing the

Assignment, and therefore DENY any inference that the Assignment was an appropriate

means by which Plaintiff can assert that diversity jurisdiction exists pursuant to 28 U.S.C.

§ 1332(a)(1).

38.    DENY the allegations in Paragraph 38 of the Complaint.

39.    DENY the allegations in Paragraph 39 of the Complaint.

40.    DENY the allegations in Paragraph 40 of the Complaint.

41.    DENY the allegations in Paragraph 41 of the Complaint.

42.    DENY the allegations in Paragraph 42 of the Complaint.

43.    DENY the allegations in Paragraph 44 of the Complaint.  Defendants note that Plaintiff's

Complaint contains no Paragraph 43.

44.    ADMIT the allegations in Paragraph 45 of the Complaint insofar as Defendants

acknowledge Plaintiff is alleging breach of the Receivables Agreement; DENY that Defendants have breached said Receivables Agreement.

45.    DENY the allegations in Paragraph 46 of the Complaint insofar as they allege breach of the Receivables Agreement by Defendants. Defendants affirmatively state: (a) counsel for Plaintiff in Utica, New York, on his own initiative, turned over monies collected on Disputed Receivables to Stonehedge Acquisition Rome I, LLC, which remain in possession of the LLC; (b) in April 2006, an agent of Plaintiff was given full access to the offices of the nursing home for purposes of conducting an audit; (c) a work area has been made and remains available to Plaintiff for purposes of accessing the nursing home facilities; (d) paperwork relative to certain Disputed Receivables was copied and offered to Plaintiff's counsel in the instant litigation, conditioned only on a request that information be used for the sole purpose of collecting the Disputed Receivables and that Plaintiff would indemnify Defendants for any breach of confidentiality.

46.    DENY the allegations in Paragraph 47 of the Complaint.

47.    DENY the allegations in Paragraph 48 of the Complaint. Defendants affirmatively state that upon information and belief, Plaintiff's counsel in Utica, New York has collected monies relative to certain of the Disputed Receivable at the direction of Plaintiff's accountant. Defendants further affirmatively state that upon information and belief, Plaintiff and/or her agents have either directly collected or waived payment of at least one of the Disputed Receivables.

48.    DENY the allegations in Paragraph 49 of the Complaint.

49.    DENY the allegations in Paragraph 50 of the Complaint.

50.  DENY the allegations in Paragraph 51 of the Complaint.

51.  DENY the allegations in Paragraph 52 of the Complaint, except to ADMIT that Plaintiff's

counsel in Utica, New York, on his own initiative, turned over monies collected on

Disputed Receivables to Stonehedge Acquisition Rome I, LLC, which monies remain in

possession of the LLC.

52.  ADMIT the allegations in Paragraph 53 of the Complaint to the extent that Plaintiff is

seeking an accounting; DENY the inference that Defendants have engaged in

wrongdoing.

53.  DENY the allegations in Paragraph 54 of the Complaint. Defendants affirmatively state

that Plaintiff can contact her counsel in Utica, New York to determine the amount of

monies collected to date on the Disputed Receivables. Defendants further state that in

April 2006 they provided one of Plaintiff's agents access to the nursing home facility in

Rome, New York for purposes of conducting an audit, and that they have created and

continue to maintain a work area for Plaintiff to come to the nursing home facility in

Rome, New York for purposes of conducting an audit.

54.  DENY the allegations in Paragraph 55 of the Complaint.

55.  DENY each and every other allegation contained in the Complaint not heretofore

admitted, controverted or denied.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE:

56.  Plaintiff's Complaint fails to state a cause of action for breach of the Receivables

Agreement because Defendants' alleged breaches would not constitute material breaches

10

of the Receivables Agreement.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE,
## DEFENDANTS ALLEGE:

57.     Plaintiff's Complaint fails to state a cause of action for breach of the Receivables

Agreement because, even assuming the allegations as to breach by the Defendants were

true, those alleged breaches did not interfere with Plaintiff's ability to collect Disputed

Receivables.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE,
## DEFENDANTS ALLEGE:

58.     Plaintiff's Complaint fails to state a cause of action for breach of the Receivables

Agreement because Plaintiff's own agent forwarded to Stonehedge Acquisition Rome I,

LLC monies collected on the Disputed Receivables.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE,
## DEFENDANTS ALLEGE:

59.     Plaintiff's Complaint fails to state a cause of action for breach of the Stock Purchase

Agreements because the Receivables Agreement is not an executory accord, but rather an

independent obligation of the parties to that contract.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE,
## DEFENDANTS ALLEGE:

60.     Plaintiff's Complaint fails to state a cause of action for recovery of $657,229.00 because

the written Receivables Agreement signed by all parties recites the sum of $473,884.00.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE,
## DEFENDANTS ALLEGE:

61.     Plaintiff's Complaint fails to state a cause of action for breach of the Stock Purchase

Agreement because Plaintiff waived any claim against Defendants relative to the reduction in price for the Disputed Receivables when she entered into the Receivables Agreement.

### AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE:

62.    The Court lacks subject matter jurisdiction over this litigation because the assignment of rights under the Receivables Agreement by Marc Rossi to Plaintiff is in violation of the express terms of the Receivables Agreement, which prohibits assignment without the express permission of Defendants.

### AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE:

63.    The Southern District of New York is an improper venue because Defendants do not reside in this district, the actions giving rise to the complaint did not occur in this district, and venue is more properly located in the Northern District of New York.

### AS AND FOR A FIRST COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANTS ALLEGE:

64.    Section 12.12(a) of the Stock Purchase Agreement entered into by Plaintiff, her brother Marc Rossi and Defendants for the sale of Nursing Home Rome, Inc. provides that the corporations being purchased would remain liable and responsible for any and all claims, reimbursements and overpayment and/or repayment demands or liabilities arising under Medicare, Medicaid and/or any other third party payor programs (called "Payors") including third party payor settlement payments and/or retroactive adjustments (called "Payor Liabilities").

12

65.    Section 12.12(a) of the Stock Purchase Agreement entered into by Plaintiff, her brother

Marc Rossi and Defendants for the sale of Nursing Home Rome, Inc. further provides

that notwithstanding this obligation of Buyers, Plaintiff and her brother would indemnify

the Buyer and the Company for all Payor Liabilities for reporting or claims periods

beginning on or after the date that is three years immediately prior to the Closing Date

and ending on or prior to the Closing Date, subject to certain conditions.

66.    After closing, Defendants and/or their agents operating the nursing home facility in

Rome, New York received notice from Medicaid that it was owed $234,933.92 as the

result of an adjustment made for a period ending prior to January 1, 2006.

67.    Defendants and/or their agents attempted to communicate this liability to Plaintiff, Marc

Rossi and/or their agents, without response.

68.    Defendants did not provide formal notice pursuant to the terms of the Stock Purchase

Agreements because the parties had long before abandoned the notice procedures set forth

in the Agreements.

69.    Upon information and belief, Plaintiff's attorneys made post-closing demands of

Defendants and/or their agents (e.g., return of the executed Receivables Agreement;

providing Plaintiff with access to her office at the nursing home facility in Rome, New

York) without providing the requisite notice provided for in the Agreements, and

Defendants responded accordingly.

70.    Likewise, Defendants and/or their agents communicated directly with Plaintiff's attorneys

and accountants, as well as her brother Marc Rossi, to resolve post-closing matters (e.g.,

preparation and payment of payroll taxes; the redirection of Defendants' mail to Plaintiff's

Florida residence; employee payroll matters), and responses were received without a demand for formal notice.

71. Upon information and belief, at various times between the date of closing and the filing of the instant lawsuit, Plaintiff's attorneys, accountants and agents engaged in opportunities to resolve the issue of the CMI adjustment without raising the issue of proper notice or preserving Plaintiff's claim to raise notice as a defense to liability.

72. Upon information and belief, at no point, until approximately six weeks prior to filing the instant litigation, did Plaintiff, her attorneys, accountants and other agents, or her brother Marc Rossi insist upon formal notice pursuant to the Stock Purchase Agreements.

73. Defendants therefore claim that Plaintiff has waived the requirement for formal notice and breached the Stock Purchase Agreement relative to the purchase of Nursing Home Rome, Inc., and that she is required to indemnify Defendants in the amount of $234,933.32.

## AS AND FOR A SECOND COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANTS ALLEGE:

74. Defendants allege and reallege the allegations contained in paragraphs 64 through 73 of this Answer with Counterclaims as if fully set forth herein.

75. Section 12.1(d) of the Stock Purchase Agreements provides that Plaintiff and her brother Marc Rossi would indemnify Defendants for "[a]ll salaries, wages, bonuses, vacation, sick leave and other paid time off and compensation for services rendered of any type whatsoever accrued and/or payable to the Company's employee's [sic] with respect to periods ending on or prior to the Closing Date which have not been reserved for or

14

reflected on the Closing Date Balance or otherwise taken into account for purposes of computing the adjustment to the purchase price provided for in Section 3.2(c) hereof."

76.    Accrued, earned but unused sick and vacation time accumulated by employees of the nursing home facilities while owned by Plaintiff and her brother Marc Rossi falls within the category described in Section 12.1(d).

77.    The closing statement executed by the parties at closing reflected a line item credit to Defendants for "Chittenango payroll non work" in the amount of $75,000.00.

78.    The closing statement executed by the parties at closing reflected a line item credit to Defendants for "Rome payroll non work" in the amount of $25,000.00.

79.    Upon information and belief, these credits were for accrued, earned but unused sick and vacation time during the ownership of the nursing home facilities by Plaintiff and her brother Marc Rossi.

80.    Upon information and belief, the nursing home facility in Rome, New York sold by Plaintiff and her brother Marc Rossi employed more people than the nursing home facility in Chittenango, New York.

81.    Upon information and belief, the payroll for employees at the Rome, New York nursing home facility was of a greater amount than the payroll for employees at the Chittenango, New York nursing home facility.

82.    Defendants learned post-closing that the actual amount of accrued, earned but unused sick time for employees at both facilities totaled $114,232.14.

83.    Defendants advised counsel for Plaintiff at a meeting held in December 2006 about this adjustment.

84.   Defendants did not provide formal notice of this liability pursuant to the terms of the Stock Purchase Agreement because the parties had long before abandoned the notice procedures set forth in the Agreements.

85.   Nor were Defendants afforded the opportunity to discover this liability prior to closing.

86.   During the time between the signing of the Stock Purchase Agreements and the closing on January 3, 2006, Defendants attempted to conduct a due diligence review of the corporations' books and records.

87.   During a visit to the nursing home facility in Rome, New York, Plaintiff halted the review of records by Defendants' agent and demanded that all further review be subject to videotaping, which was not a condition of the Stock Purchase Agreements.

88.   When Defendants' agents would subsequently request financial information provided for in Article VII of the Stock Purchase Agreement, Plaintiff and/or her agents would condition receipt of the information upon actions of Defendants that were not a condition of the Stock Purchase Agreements.

89.   As a direct consequence of these actions taken by Plaintiff and/or her agents, Defendants were denied access to all of the information that would have disclosed liabilities of the corporations being purchased from Plaintiff and her brother.

90.   Defendants therefore maintain Plaintiff has waived the formal notice requirement, is in breach of the Stock Purchase Agreements, and is liable to Defendants in the amount of $14,232.14.

**AS AND FOR A THIRD COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANTS ALLEGE:**

16

91. Defendants allege and reallege the allegations contained in paragraphs 64 through 90 of this Answer with Counterclaims as if fully set forth herein.

92. Section 5.17(a) of the Stock Purchase Agreements provides that the corporations have filed all tax returns for all periods prior to and through the Closing Date, and will have timely paid in full or made adequate provision on the closing date balance sheet all taxes shown to be due for periods through the date of the closing balance sheet.

93. Section 5.17(a) of the Stock Purchase Agreements is contained within Article V, entitled "Representations and Warranties of the Sellers and the Company."

94. At the closing on the Stock Purchase Agreements, Plaintiff and her brother Marc Rossi executed certificates on behalf of all of the corporate entities being sold that the warranties and representations contained in the Stock Purchase Agreements were true and correct as of the date of closing.

95. Upon information and belief, no credit for 2005 fourth quarter payroll taxes was given to Defendants on the January 3, 2006 closing statement for the purchase of the corporations.

96. Upon information and belief, the 2005 fourth quarter payroll taxes were not paid by Plaintiff or her brother Marc Rossi at the time of closing on January 3, 2006.

97. Upon information and belief, no provision for the payment of 2005 fourth quarter payroll taxes was made by Plaintiff or her brother Marc Rossi prior to the closing on January 3, 2006.

98. Section 12.6(a) of the Stock Purchase Agreements further provides that Plaintiff and her brother Marc Rossi are jointly and severally liable for "all Taxes with respect to the income, assets and operations of the [corporations] for all taxable years or periods ending

17

on or before the Closing Date."

99.    The 2005 fourth quarter payroll taxes were an obligation incurred as of December 31, 2005, which is a period ending prior to the closing date of January 3, 2006.

100.   Pursuant to the terms of the Stock Purchase Agreement, Plaintiff is liable for the cost of the 2005 fourth quarter payroll taxes.

101.   Defendants however, paid the 2005 fourth quarter payroll taxes for the nursing home facilities because Plaintiff made no provision for payment of these taxes prior to closing.

102.   Defendants and/or their agents have advised Plaintiff's attorneys, accountants and Marc Rossi of this tax liability.

103.   Defendants did not provide formal notice of this liability pursuant to the terms of the Stock Purchase Agreement because the parties had long before abandoned the notice procedures set forth in the Agreements.

104.   Defendants therefore maintain Plaintiff has waived the formal notice requirement, is in breach of the Stock Purchase Agreements, and is liable to Defendants in the amount of $31,424.42.

### AS AND FOR A FOURTH COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANTS ALLEGE:

105.   Defendants allege and reallege the allegations contained in paragraphs 64 through 104 of this Answer with Counterclaims as if fully set forth herein.

106.   As a result of Plaintiff's failure to make provision for the preparation and filing of the returns for the 2005 fourth quarter payroll taxes, Defendants and/or their agents were required to do so.

18

107.  These returns were due only a few weeks after the January 3, 2006 closing.

108.  Payment of this tax liability was late and penalties were incurred.

109.  Defendants and/or their agents provided Plaintiff's accountant with information relative to the preparation of returns for the 2005 fourth quarter payroll taxes.

110.  Defendants did not provide formal notice of this liability pursuant to the terms of the Stock Purchase Agreement because the parties had long before abandoned the notice procedures set forth in the Agreements.

111.  Defendants therefore maintain Plaintiff has waived the formal notice requirement, is in breach of the Stock Purchase Agreements, and is liable to Defendants in the amount of $12,852.39.

## AS AND FOR A FIFTH COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANTS ALLEGE:

112.  Defendants allege and reallege the allegations contained in paragraphs 64 through 111 of this Answer with Counterclaims as if fully set forth herein.

113.  Section 5.17(c) defined Plaintiff's responsibility with respect to taxes to include the filing of any return, report, information return, statement, declaration or other document required to be filed in connection with any determination, assessment or collection of any tax.

114.  The filing of 1099 forms and W-2 forms are required by the Internal Revenue Service.

115.  Defendants and/or their agents prepared the 1099 forms and W-2 forms for the tax year 2005 for the corporations purchased from Plaintiff and her brother Marc Rossi.

116.  Pursuant to Section 5.17(a) of the Stock Purchase Agreements, preparation of these forms

19

was Plaintiff's responsibility.

117.  Defendants and/or their agents incurred costs of $4,000.00 to prepare these forms.

118.  Defendants and/or their agents provided Plaintiff's attorneys with information relative to
      the preparation of these forms.

119.  Defendants did not provide formal notice of this liability pursuant to the terms of the
      Stock Purchase Agreement because the parties had long before abandoned the notice
      procedures set forth in the Agreements.

120.  Defendants therefore maintain Plaintiff has waived the formal notice requirement, is in
      breach of the Stock Purchase Agreements, and is liable to Defendants in the amount of
      $4,000.00.

### AS AND FOR A SIXTH COUNTERCLAIM AGAINST PLAINTIFF,
### DEFENDANTS ALLEGE:

121.  Defendants allege and reallege the allegations contained in paragraphs 64 through 120 of
      this Answer with Counterclaims as if fully set forth herein.

122.  Section 11.2 of the Stock Purchase Agreements required the corporations to prepare and
      timely file all required reports for periods ending on or prior to the closing date.

123.  Section 11.2 further provides that Plaintiff and her brother Marc Rossi shall hold
      Defendants harmless from and against any liability arising out of or relating to the reports,
      including their failure to file the reports timely.

124.  New York State requires nursing home facilities to file annually a form known as RHCF-
      4.

125.  At or before closing, Plaintiff did not make provision for the preparation of these forms.

126. Consequently, Defendants and/or their agents prepared and filed the RHCF-4 forms for the nursing home facilities in Rome and Chittenango for the period ending December 31, 2005.

127. Defendants and/or their agents incurred costs of $7,000.00 to prepare and file said forms.

128. Defendants and/or their agents provided Plaintiff's attorneys with information relative to the preparation of these forms.

129. Defendants did not provide formal notice of this liability pursuant to the terms of the Stock Purchase Agreement because the parties had long before abandoned the notice procedures set forth in the Agreements.

130. Defendants therefore maintain Plaintiff has waived the formal notice requirement, is in breach of the Stock Purchase Agreements, and is liable to Defendants in the amount of $7,000.00.

### AS AND FOR A SEVENTH COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANTS ALLEGE:

131. Defendants allege and reallege the allegations contained in paragraphs 64 through 120 of this Answer with Counterclaims as if fully set forth herein.

132. Section 3.2 of the Stock Purchase Agreements sets forth various ways in which the purchase price paid by Defendants at closing would be adjusted higher or lower, depending upon certain factors.

133. According to Section 3.2(a)(i) of the Stock Purchase Agreements, for purposes of calculating net accounts receivable and net accounts payable, Defendants were to be provided at closing with unaudited balance sheets for the corporations dated as of the

closing date and certified by Plaintiff and the corporations' chief financial officers.

134.    Upon information and belief, Defendants were not provided with certified balance sheets.

135.    Section 3.2(a)(ii) of the Stock Purchase Agreements defined "Closing Date Net Accounts Receivable" as "the bona fide, valid and binding claims of the Company against third parties arising in the ordinary course of the Company's business that are outstanding as of the Closing Date, and not subject to any valid counterclaim or set-off."

136.    Prior to closing, Defendants and/or their agents conversed with Plaintiff's accountant relative to the issue of how to account for billing for the nursing home facilities for the month of December 2005.  The issue pertained to how to estimate billing for the closing date of January 3, 2006 when accurate figures relative to billing would not be available until mid-January 2006.

137.    Upon information and belief, the figures used at closing for December 2005 billing were based upon the maximum amount each resident could possibly be billed.

138.    Upon information and belief, Defendants and/or their agents were led by Plaintiff's accountant to believe that a post-closing reconciliation would be required once the final billing figures were known.

139.    The actual billing figures for December 2005 were overestimated for the nursing home facility in Rome, New York by $97,074.05 and for the nursing home facility in Chittenango, New York by $16,277.12.

140.    The final purchase price needs to be adjusted downward to reflect the actual bona fide and valid claims of the corporations relative to resident billing for December 2005.

141.    Defendants and/or their agents provided Plaintiff's attorneys with information relative to

22

the need for this adjustment in the purchase price.

142.   Defendants did not provide formal notice of this liability pursuant to the terms of the

Stock Purchase Agreement because the parties had long before abandoned the notice

procedures set forth in the Agreements.

143.   Defendants could not have known about December 2005 actual billing amounts at the

time of closing because even Plaintiff and her agents did not know the actual billing

amounts.

144.   As a result of this failure to adjust the purchase price, Plaintiff and her brother Marc

Rossi have been unjustly enriched by the amount of $113,351.17.

145.   In the alternative, Plaintiff has waived the formal notice requirement, is in breach of the

Stock Purchase Agreement, and is liable to Defendants in the amount of $113,351.17.

## AS AND FOR AN EIGHTH COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANTS ALLEGE:

146.   Defendants allege and reallege the allegations contained in paragraphs 64 through 145 of

this Answer with Counterclaims as if fully set forth herein.

147.   Pursuant to Section 12.9 of the Stock Purchase Agreements, Plaintiff's indemnification

obligations with respect to taxes shall survive until the expiration of the applicable statute

of limitations.

148.   Defendants do not intend for the counterclaims in this Answer to be construed as a waiver

of any future indemnification claims against Plaintiff pursuant to the terms of the Stock

Purchase Agreement.

WHEREFORE, Defendants demand relief as follows:

Plaintiff's Complaint be dismissed in its entirety.

On the First Counterclaim, judgment against Plaintiff and an award of compensatory damages, in an amount to be determined at trial but in no event less than $234,933.32; or, in the alternative, an order of specific performance, pursuant to section 14.2 of the Stock Purchase Agreements, requiring Plaintiff to pay Defendants the amount of $234,933.32; together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts awarded;

On the Second Counterclaim, judgment against Plaintiff and an award of compensatory damages, in an amount to be determined at trial but in no event less than $14,232.14; or, in the alternative, an order of specific performance, pursuant to section 14.2 of the Stock Purchase Agreements, requiring Plaintiff to pay Defendants the amount of $14,232.14; together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts awarded;

On the Third Counterclaim, judgment against Plaintiff and an award of compensatory damages, in an amount to be determined at trial but in no event less than $31,424.42; or, in the alternative, an order of specific performance, pursuant to section 14.2 of the Stock Purchase Agreements, requiring Plaintiff to pay Defendants the amount of $31,424.42; together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts awarded;

On the Fourth Counterclaim, judgment against Plaintiff and an award of compensatory

24

damages, in an amount to be determined at trial but in no event less than $12,852.39; or, in the alternative, an order of specific performance, pursuant to section 14.2 of the Stock Purchase Agreements, requiring Plaintiff to pay Defendants the amount of $12,852.39; together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts awarded;

On the Fifth Counterclaim, judgment against Plaintiff and an award of compensatory damages, in an amount to be determined at trial but in no event less than $4,000.00; or, in the alternative, an order of specific performance, pursuant to section 14.2 of the Stock Purchase Agreements, requiring Plaintiff to pay Defendants the amount of $4,000.00; together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts awarded;

On the Sixth Counterclaim, judgment against Plaintiff and an award of compensatory damages, in an amount to be determined at trial but in no event less than $7,000.00; or, in the alternative, an order of specific performance, pursuant to section 14.2 of the Stock Purchase Agreements, requiring Plaintiff to pay Defendants the amount of $7,000.00; together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts awarded;

On the Seventh Counterclaim, judgment against Plaintiff and an order requiring Plaintiff to pay over to Defendants all amounts by which they be determined to have been unjustly enriched, in an amount to be determined at trial, but in no event less than $113,351.17, together with prejudgment interest on all amounts awarded; or, in the alternative, judgment against Plaintiff and an award of compensatory damages, in an amount to be determined at trial but in no

25

event less than $113,351.17; or, in the alternative, an order of specific performance, pursuant to

section 14.2 of the Stock Purchase Agreements, requiring Plaintiff to pay Defendants the amount

of $113,351.17; together with consequential and punitive damages, in amounts to be determined

at trial, and prejudgment interest on all amounts awarded.

On all causes of action, costs and fees incurred by Defendants, to include reasonable

attorney's fees, relative to this action, along with such other and further relief as the Court deems

just and proper.

Dated: September 26, 2007

**McMAHON and GROW**

By      Julie Grow Denton, Esq.
Bar Roll No. JD8580
Attorneys for Defendants

Office and Post Office Address
301 North Washington Street
Post Office Box 4350
Rome, New York 13442-4350
Telephone: (315)336-4700
Facsimile: (315)336-5851