# EXHIBIT - A



DEFENDANT'S
EXHIBIT
12|20|07        E
44 pg.          SC

## STOCK PURCHASE AGREEMENT

**STOCK PURCHASE AGREEMENT** (the "Agreement") is made as of the day of August, 2004, (the "Contract Date") by and among: (i) **STONEHEDGE NURSING HOME ROME, INC.,** a New York corporation having an address at 801 North James Street, Rome, New York 13440 (the "Nursing Company"); (ii) **STONEHEDGE REALTY ROME, INC.,** a New York corporation having an address at 801 North James Street, Rome, New York 13440 (the "Realty Company") (the Nursing Company and the Realty Company are collectively called the "Company"); (iii) **JANE HALBRITTER,** an individual currently residing at 100 West Garden Street, Rome, New York 13440 ("Halbritter"); (iv) **MARC ROSSI,** an individual currently residing at 6866 Stokes Westernville Road, Ava, New York 13303 ("Rossi") (Halbritter and Rossi hereinafter referred to collectively as the "Sellers" and each individually as, a "Seller"); (v) **STONEHEDGE ACQUISITION ROME II, LLC,** a New York limited liability company having an address at 14 Hidden Valley Drive, Suffern, New York 10901, the voting members of which are those persons whose names and residential addresses are set forth on Schedule 1 hereto (the "Buyer"); and (vi) **STONEHEDGE ACQUISITION ROME I, LLC,** a New York limited liability company having an address at 14 Hidden Valley Drive, Suffern, New York 10901 (a "Buyer Affiliate" as such term is more specifically defined in Section 6.3(c) hereof) (the  Company, the Buyer, each Buyer Affiliate, and each of the Sellers are referred to individually as a "Party" and collectively as the "Parties").

**WHEREAS**, the Nursing Company is the licensed operator of the 160 bed skilled nursing facility located at 801 North James Street, Rome, New York 13440 and commonly known as "Stonehedge Health and Rehabilitation Center" (the "Nursing Home") and all of the tangible and intangible personal property, which constitutes and is used in connection with the operation of the Nursing Home;

**WHEREAS**, the Realty Company is the owner of the Real Property (as defined in Section 2.2(a) of this Agreement and as more particularly described on Schedule 2.2 hereof) commonly known as 801 North James Street, Rome, New York 13440, on which the Nursing Home is located;

**WHEREAS**, the Sellers own all of the outstanding shares of all classes of the capital stock of the Nursing Company (the "Nursing Company Stock") and the Realty Company (the "Realty Company Stock") (collectively the Nursing Company Stock  and the Realty Company Stock are referred to as the "Company Stock");

**WHEREAS**, the Sellers own all of the outstanding shares of the capital stock of (i) Stonehedge Nursing Home Chittenango, Inc. (the "Chittenango Stock"), the licensed operator of the 80-bed skilled nursing facility located at 331 Russell Street, Chittenango, New York 13037; and (ii) Stonehedge Realty Chittenango, Inc. (the "Chittenango Realty Stock"), the owner of the real property at 331 Russell Street, Chittenango, New York 13037;

**WHEREAS**, concurrently herewith, the Sellers are entering into a Stock Purchase Agreement (the "Chittenango Stock Purchase Agreement") with Stonehedge Acquisition

Chittenango II, LLC, an affiliate of the Buyer pursuant to which Stonehedge Acquisition Chittenango II, LLC has agreed to purchase all of the Chittenango Stock and all of the Chittenango Realty Stock.

**WHEREAS**, the Buyer wishes to acquire all of the Nursing Company Stock and all of the Realty Company Stock from the Sellers, and the Sellers wish to sell all of the Nursing Company Stock and all of the Realty Company Stock to the Buyer, in accordance with the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, the Sellers, the Buyer, the Nursing Company, and the Realty Company, intending to be legally bound, agree as follows:

## ARTICLE I

## SALE AND PURCHASE OF COMPANY STOCK

**1.1    Sale and Purchase of Company Stock.**    Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 4.1) (i) the Buyer shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, assign, transfer and convey to the Buyer, the Nursing Company Stock, and (ii) the Buyer shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, assign, transfer and convey to the Buyer, the Realty Company Stock (collectively, the "Transaction").  The Sellers shall convey all of the Nursing Company Stock and all of the Realty Company Stock to the Buyer, free and clear of all liens, pledges, rights of first refusal, options, restrictions, encumbrances, liabilities, claims, assessments, security interests, mortgages, claims, collateral assignments, leases, attachments, levies, encroachments, rights-of-way, equities, and defects in title of any type whatsoever (each, a "Lien" and collectively, "Liens"), except as set forth on Schedule 5.2. hereto.  The number of shares of Nursing Company Stock and Realty Company Stock being sold by each Seller is set forth on Schedule 5.3 hereto.

## ARTICLE II

## COMPANY ASSETS AND LIABILITIES

The Company Assets consist of the Nursing Assets and the Realty Assets as such terms are defined in Sections 2.1 and 2.2 below.  As used herein, the term "Assets" shall refer to the Nursing Assets and the Realty Assets.

**2.1    Nursing Company Assets.**    Except as set forth in Section 2.2, on the Closing Date (as defined in Section 4.1), the consolidated assets of the Nursing Company (collectively, the "Nursing Assets") will include all of the tangible and intangible personal property which is currently used in the operation of the Nursing Home or the provision of patient care services, including, but not limited to:

(a)    the trade name "Stonehedge Health and Rehabilitation Center";

(b)    any and all major, minor or other equipment, furniture and furnishings located in or on the Real Property, including, but not limited to, those listed on

Schedule 2.1(b), which schedule includes a depreciation schedule as of December 31, 2003 (the "Depreciation Schedule Date");

(c)    all supplies and inventory of the Nursing Company; provided, however, that such supplies and inventory shall be of sufficient amount, quality and type of those supplies and inventory that would be used in the normal course, and as required by applicable statute and regulation of nursing facilities in the State of New York, to operate the Nursing Home for a period of one (1) week following the Closing (collectively, the "Supplies");

(d)    cash, bank and other deposits, and any cash equivalents, and any accrued interest or earnings thereon;

(e)    all Pre-Paid Expenses (as defined in Section 3.2(e) hereof) with regard to the Nursing Assets;

(f)    all documents and records including financial records, equipment records, medical/administrative libraries, catalogs, books, files, operating manuals, the records (including medical records) of each resident of the Nursing Home (each a "Resident" and collectively, the "Residents") and the personnel records of the Nursing Company's employees;

(g)    all of the interest of the Nursing Company and/or the Sellers' (if any) in those commitments, contracts, leases, and agreements outstanding in respect of the Nursing Assets and the operation of the Nursing Home that are specifically set forth and described in Schedule 5.18, herein (each, a "Contract" and collectively, the "Contracts"), including, without limitation, (x) the Nursing Company's Medicare Provider Agreement and the Nursing Company's Medicaid Provider Agreement (each, a "Provider Agreement" and collectively, the "Provider Agreements"), and (y) all leasehold interests held by the Nursing Company including, in particular, the Nursing Company's lease of the Real Property from the Realty Company;

(h)    to the extent assignable, all licenses and permits held by the Nursing Company and/or the Sellers (if any) relating to the ownership, development and operations of the Nursing Assets and the Nursing Home, including any pending or approved governmental, quasi-governmental and related land-use approvals;

(i)    all telephone numbers, fax numbers and all logos, names, trade names, trademarks and service marks (or variations thereof) associated with the Nursing Assets and the Nursing Home, all of which are set forth on Schedule 2.1(i);

(j)    subject to the terms and conditions imposed by lessors and licensors, all computer software, programs and similar systems owned or leased by or licensed to the Nursing Company or used in the operation of the Nursing Home;

(k)    subject to the terms of this Agreement, all insurance proceeds arising in connection with damage to the Nursing Assets occurring after the Contract Date but prior to the Closing Date, except that such insurance proceeds shall be transferred only if repairs have not been made to the damaged Nursing Assets prior to the Closing Date;

(l)    the Nursing Company's goodwill in connection with the Nursing Home;

(m)    the Nursing Company's interest in all personal property, tangible and intangible, arising or acquired in the ordinary course of the operation of the Nursing Home between the Contract Date and the Closing Date;

(n)    trust funds belonging to the Residents and held by the Nursing Company in the ordinary course of business, all of which are set forth on Schedule 2.1(n) (collectively, the "Trust Funds");

(o)    any and all deposits for prepaid room and service charges of the Residents relating to periods on or after the Closing Date, all of which are set forth on Schedule 2.1(o) (collectively, the "Resident Deposits"); and

(p)    all "Closing Date Accounts Receivable" of the Nursing Company (as hereinafter defined in Section 3.2(a) below).

2.2    **Realty Company Assets.**  Except as set forth in Section 2.3, on the Closing Date (as defined in Section 4.1), the consolidated assets of the Realty Company (collectively, the "Realty Assets") will consist of:

(a)    The land located at the address commonly known as 801 North James Street, Rome, New York 13440, as more particularly described on Schedule 2.2 hereof, together with all: (i) buildings and improvements thereon, (ii) easements, private roads and streets, ways, and all rights of ingress and egress relating thereto, and (iii) fixtures (inclusive of trade fixtures) and plumbing, heating, electrical, sewage and HVAC systems (inclusive of all pipes, ducts, wires and all fixtures and trade fixtures used directly in connection therewith) (collectively, the "Real Property"); and

(b)    all right, title and interest, if any, of the Realty Company in and to any land lying in the bed of any street, road or avenue opened or proposed, in front of or adjoining the Real Property, to the center line thereof, and all right, title and interest of Realty Company in and to any award made or to be made by reason of any taking by condemnation and any unpaid award for damage to the Real Property by reason of change of grade of any street.

2.3    **Excluded Assets.**  The assets to be acquired by the Buyer as part of the Transaction shall not include any: (a) proceeds of any appeals regarding rate revision addressed to either the Medicare program ("Medicare") or the Medicaid program ("Medicaid") relating to periods ending on or prior to Closing Date regardless of whether such proceeds are paid or otherwise received prior to, on, or after the Closing Date, or (b) tax refunds for the account of the Company and/or either of the Sellers relating to taxable periods ending on or prior to the Closing Date regardless of whether such refunds are paid or otherwise received prior to, on, or after the Closing Date (collectively, the "Excluded Assets").

2.4    **Liabilities to be Assumed by Sellers.**  (a)All liabilities of the Company, other than those liabilities expressly being assumed by the Sellers pursuant to this Section 2.4 shall remain liabilities of the Company after the Closing Date. Notwithstanding the foregoing, on or prior to the Closing Date, the Sellers shall either fully satisfy or shall assume, and neither

the Company nor the Buyers shall be obligated to pay (i) the liabilities of the Company set forth below to the extent such liabilities arose during or relate to any period prior to the Closing Date, or (ii) any other obligation of the Sellers as otherwise expressly provided for herein (collectively, the "Assumed Liabilities"):

(i)    all mortgage indebtedness, if any, of the Company;

(ii)    all bank loans and similar indebtedness of the Company (excluding payables incurred by the Company in the ordinary course of business);

(iii)    the Excluded Contracts (as defined in Section 5.19 hereof);

(iv)    Pre-Closing Payor Liabilities (as defined in Section 12.12 hereof), but only to the extent and subject to the limitations set forth in said Section 12.12; and

(v)    the Company's obligations under the Rossi Redemption Agreements (as defined and more specifically addressed in paragraph (b) of this Section 2.4).

(b)    The Company is a party to certain stock redemption agreements with George A. Rossi, Jr. pursuant to which the Company, as of the Closing Date of this Agreement, remains obligated to make certain payments to George A. Rossi, Jr. in satisfaction of the Company's obligation to pay the purchase price for the redemption of George A. Rossi, Jr.'s shares of stock in the Company (the "Rossi Redemption Agreements"). Copies of the Rossi Redemption Agreements are attached to Schedule 2.4(b) hereof. Prior to Closing, the Company shall, pursuant to an assignment agreement substantially in the form attached to Schedule 2.4(b) hereof, assign the Company's obligations under the Rossi Redemption Agreements to James Street Management, Inc., a corporation all of the stock of which is owned by the Sellers. In accordance with Section 12.1(b) hereof, the Sellers shall indemnify and hold the Company and the Buyer harmless against any claims that George A. Rossi, Jr. or his successors or assigns may assert against the Company arising solely in connection with the Rossi Redemption Agreements.

2.5    **Third Party Consents; Indemnification**.    The Sellers shall use reasonable commercial efforts to obtain, prior to the Closing Date, the written consent of each third party where such written consent is or may be required by the terms of any Contract (each, a "Third Party Consent" and collectively, the "Third Party Consents"). The Buyer and the Buyer Affiliates shall in good faith engage in reasonable commercial efforts to fully assist and cooperate with the Sellers in obtaining such Third Party Consents. The Sellers shall terminate any Contract for which the Sellers are unable, despite their commercially reasonable efforts, to obtain a Third Party Consent prior to the Closing, and shall satisfy and indemnify and hold the Buyer harmless from and against any fees, costs, expenses, penalties or other amounts arising by reason of the termination of such Contracts.

## ARTICLE III

## PURCHASE PRICE AND ADJUSTMENTS

3.1    **Determination and Payment of Purchase Price**. Subject to adjustment pursuant to Section 3.2 hereof, the aggregate purchase price to be paid by the Buyer to the Sellers for the Company Stock (the "Purchase Price") shall be Eight Million Six Hundred and

Sixty-Seven Thousand Dollars ($8,667,000), to be allocated between the Nursing Company and the Realty Company in such amounts as the Sellers may determine in their sole and absolute discretion, and payable as follows:

(a)    One Hundred Twenty Five Thousand Dollars ($125,000) (the "Initial Deposit") by a payment made to the order of the Seller's counsel, Epstein, Becker & Green, P.C. (the "Escrow Agent" or "Seller's Counsel"), payable upon execution of this Agreement. The Escrow Agent will hold the Deposit in Escrow according to the terms of the Escrow Agreement in the form attached as Schedule 3.1(a) hereto.

(b)    One Hundred Twenty Five Thousand Dollars ($125,000) (the "Secondary Deposit", and together with the Initial Deposit, the "Deposit") by a payment made to the order of the Escrow Agent on the day the Buyer files its Certificate of Need Application for approval of the change of ownership of the Nursing Company contemplated hereby with the New York State Department of Health (the "Department of Health").  The Deposit will be deposited in an interest bearing account, certificate of deposit or one year Treasury Bills at the discretion of the Escrow Agent as set forth in the Escrow Agreement.  The accrued interest on the Deposit will be credited against the Purchase Price and, accordingly, the Balance Payment (as defined in Section 3.1(c)) due by the Buyer at Closing shall be reduced by the amount of such accrued interest.

(c)    An amount equal to Eight Million Four Hundred and Seventeen Thousand Dollars ($8,417,000) (the "Balance Payment") (i) reduced by the amount of the interest accrued on the Deposit through the Closing Date and (ii) adjusted for any reductions or increases required to be made to the Purchase Price pursuant to Section 3.2 hereof, will be paid by the Buyer to the Sellers at the Closing in immediately available funds by wire transfer or by certified or unendorsed bank cashier's check, drawn on a bank that is a member of the New York Clearinghouse, payable to the order of the Sellers (or as otherwise directed by the Sellers by written notice to the Buyer received by the Buyer not less than two (2) business days prior to the Closing Date).

**3.2    Purchase Price Adjustments**.

Attached hereto as Schedule 3.2 is each Company's balance sheet as of the date hereof determined in accordance with generally accepted accounting principles ("GAAP"), applied consistently with past practices of the Company, certified by the Company's President and chief financial officer (the "Contract Date Balance Sheet").

(a)    Net Accounts Receivable/Payable Adjustment.

(i)    At the Closing, the Company shall deliver to the Buyer the unaudited balance sheet of the Company dated as of the Closing Date, certified by the Company's President and Chief Financial Officer (the "Closing Date Balance Sheet").  The Balance Payment shall be subject to adjustment as follows:

(x)    the Balance Payment shall be increased by the amount, if any, by which the Closing Date Net Accounts Receivable (as defined below) exceeds the Closing Date Net Accounts Payable (as defined below), or

(y)    the Balance Payment shall be <u>decreased</u> by the amount, if any, by which the Closing Date Net Accounts Receivable are less than the Closing Date Net Accounts Payable.

(ii)    "<u>Closing Date Net Accounts Receivable</u>" shall mean the excess (if any) of:

(x)    the bona fide, valid and binding claims of the Company against third parties arising in the ordinary course of the Company's business that are outstanding as of the Closing Date, and not subject to any valid counterclaim or set-off, at the aggregate recorded amount thereof on the Closing Date Balance Sheet (the "<u>Closing Date Accounts Receivable</u>"), over

(y)    the <u>product</u> of the Closing Date Accounts Receivable (as defined immediately above in subclause (x)) multiplied by the Non-Collectible Receivables Percentage (as defined below).

(iii)    "<u>Non-Collectible Receivables Percentage</u>" shall be the average percentage of the Company's accounts receivable that were deemed non-collectible or discounted pursuant to the Company's audited financial statements for the five (5) full fiscal years prior to the Closing Date.

(iv)    "<u>Closing Date Accounts Payable</u>" means the bona fide, valid and binding claims by third parties against the Company that arose in the ordinary course of the Company's business (commonly known as 'trade payables') that are outstanding as of the Closing Date, and subject to no valid counterclaim or set-off, at the aggregate recorded amount thereof on the Closing Date Balance Sheet.

(v)    For purposes of the Purchase Price adjustment contemplated pursuant to this Section 3.2(a), the computation of Closing Date Accounts Receivable and Closing Date Accounts Payable shall not include any item which is properly taken into account for purposes of computing the Purchase Price adjustment provided for in Section 3.2(b) or (c) hereof.

(b)    <u>Estimated PRI Adjustment</u>. At or prior to the Closing, the Parties, with the assistance of their respective independent accountants, shall mutually agree on the amount of the Nursing Company's projected Medicaid reimbursement rate adjustment relating to the Nursing Company's Patient Review Instrument and associated Case Mix Indices (the "<u>Estimated PRI Adjustment</u>") for any fiscal period or portion thereof ending on prior to the Closing Date with respect to which the DOH or the Medicaid fiscal intermediary/agent has not, as of the Closing Date, completed its review of the Nursing Company's Medicaid reimbursement rate and issued a final determination or 'issuance' with respect to any adjustment in the Nursing Company's Medicaid reimbursement rate for such period(s) (the "<u>PRI Adjustment Period</u>"); <u>provided</u>, <u>however</u>, that the Estimated PRI Adjustment shall not exceed One Hundred Thousand Dollars ($100,000) (the "<u>PRI Adjustment Limit</u>"). If the Estimated PRI Adjustment is an amount that would result in a reduction in the Nursing Company's Medicaid reimbursement rate for the PRI Adjustment Period, the Balance Payment shall be reduced by the Estimated PRI Adjustment up to the PRI Adjustment Limit. If the Estimated PRI Adjustment is an amount that would result in an increase in the Nursing Company's Medicaid reimbursement rate for the PRI

Adjustment Period, the Balance Payment shall be increased by the Estimated PRI Adjustment up to the PRI Adjustment Limit. The Parties expressly acknowledge and agree that the $100,000 PRI Adjustment Limit provided for in this Section 3.2(b) constitutes an aggregate limitation for the Estimated PRI Adjustments for both this Transaction and the transaction contemplated pursuant to the Chittenango Stock Purchase Agreement collectively, and accordingly, the aggregate PRI Adjustment Limits, and concomitantly the aggregate Estimated PRI Adjustments, under this Agreement and the Chittenango Stock Purchase Agreement shall not exceed $100,000. For example, in the event that circumstances exist that give rise to an Estimated PRI Adjustment under this Agreement in favor of the Buyer in the sum of $80,000 and separately an Estimated PRI Adjustment in favor of the Buyer under the Chittenango Stock Purchase Agreement in the sum of $40,000, the Estimated PRI Adjustments under this Agreement and the Chittenango Stock Purchase Agreement shall not exceed $100,000 in the aggregate.

(c)    Employee Payment Adjustment.  The Balance Payment shall be reduced by the amount by which the Closing Date Employee Accruals (as defined below) exceeds the Contract Date Employee Accruals (as defined below), or the Balance Payment shall be increased by the amount by which the Closing Date Employee Accruals is less than the Contract Date Employee Accruals. "Closing Date Employee Accruals" shall mean the Nursing Company's obligations relating to salaries, wages, bonuses, vacation, sick leave and other paid time off and compensation for services rendered of any nature whatsoever which have accrued up to and through the Closing Date and which are otherwise outstanding on the Closing Date as reflected on the Closing Date Balance Sheet. "Contract Date Employee Accruals" means [_____] Dollars ([$_____]).

(d)    Cash On Hand Adjustment.  The Balance Payment shall be increased by an amount equal to the amount of cash, bank deposit, certificates of deposit or similar deposits, and cash equivalents, plus any accrued interest and earnings thereon, which are on hand or otherwise held in the name of the Nursing Company immediately prior to the Closing.

(e)    Pre-Paid Expense Adjustment.    In the case of any amounts paid by either the Nursing Company or the Realty Company prior to Closing Date with respect to any such items listed on Schedule 3.2(e) hereof ("Pre-Paid Expenses"), which relate to, cover, or otherwise create a benefit to the Company and/or the Buyer for any period after the Closing Date (which shall include any costs incurred by the Nursing Company for such replacement systems, equipment or items referenced in Section 5.7(b) hereof), the Balance Payment shall be increased by a pro rata amount of such Pre-Paid Expenses determined by multiplying the amount of such Pre-Paid Expense by a fraction, the denominator of which is the total number of calendar days covered by a particular Pre-Paid Expense (or in the case of such replacement systems, equipment or items referenced in Section 5.7(b) hereof, the estimated useful life of such items as determined for "book" accounting purposes) (the "Pre-Paid Expense Coverage Period") and the numerator of which is the total number of calendar days within the Pre-Paid Expense Coverage Period which are after the Closing Date.

## ARTICLE IV

### CLOSING; DELIVERIES

**4.1    Time and Place of Closing.** Subject to the satisfaction or waiver by the appropriate Party of all of the Buyer's Conditions Precedent (as defined in Article IX) and the Sellers' Conditions Precedent (as defined in Article X), as the case may be, the consummation of the transactions contemplated herein (the "Closing") shall take place at the offices of the Buyer's financial institution, or such other place as agreed upon by and among the Parties, at 10:00 A.M., as soon as reasonably possible after receipt by the Buyer, or its representative or designee, of the non-contingent written approval of the Department of Health of the Application (as defined in Section 8.3) duly authorizing the Buyer to operate the Nursing Home (the "Closing Date"), provided, however, that in no event shall the Closing occur later than thirty (30) days after the Buyer's receipt of the aforementioned approval of the Department of Health. The Closing will be effective as of 12:00 A.M. of the morning of the Closing Date.

**4.2    Sellers' Deliveries at Closing.** At the Closing and unless otherwise waived in writing by the Buyer, the Sellers shall deliver to the Buyer the following, each of which shall be in a form reasonably acceptable to the Buyer (collectively, the "Sellers' Closing Documents"):

(a)    Stock certificates representing the Nursing Company Stock, accompanied by stock powers duly executed in favor of the Buyer, in proper form for transfer, with appropriate required stock transfer tax stamps, if any, affixed at the expense of the Sellers;

(b)    Stock certificates representing the Realty Company Stock, accompanied by stock powers duly executed in favor of the Buyer, in proper form for transfer, with appropriate required stock transfer tax stamps, if any, affixed at the expense of the Sellers;

(c)    All Third Party Consents required to be obtained with respect to the terms of any Contracts;

(d)    Certificates of incumbency and resolutions, certified as true and of full force as of the Closing Date, duly adopted by each Company and the Sellers, duly authorizing and approving: (i) this Transaction; and (ii) the execution, performance and delivery of this Agreement;

(e)    A certificate executed by each Company and the Sellers, dated as of the Closing Date, certifying that: (i) each covenant and agreement to be performed prior to the Closing Date by the Company and the Sellers pursuant to this Agreement has been performed in all material respects; and (ii) as of the Closing Date, each of the respective representations and warranties contained in this Agreement by or on behalf of the Sellers and the Company is true and correct in all material respects;

(f)    A draft copy of the Nursing Company's final Medicare cost report for the fiscal period ending on the Closing Date;

(g)    A certificate of the Secretary of each Company, certifying that attached to such certificate are true and correct copies of the Certificate of Incorporation and By-Laws of the Company;

(h)    Certificates from the Secretary of State of the State of New York dated no more than ten (10) days prior to the Closing Date certifying that each Company is in good standing in the State of New York;

(i)    NY State Real Property Transfer Tax Form TP-584, and such other documents, including customary affidavits of title, to enable the Title Company to issue the title insurance policy as provided in Section 8.9 below; and

(j)    Such other instruments and documents, including the Third Party Consents, as the Buyer and its counsel for the Transaction as identified in Section 14.6 hereof (the "Buyer's Counsel") reasonably deem necessary or desirable in order to effect the Transaction, and that are material to the Transaction.

**4.3    Resignations**.    All directors and officers of the Company shall have delivered their resignations from their respective positions effective on or before the Closing Date (collectively, the "Resignations") and shall have repaid to the Company any amounts owed by them to the Company as of the Closing Date.

**4.4    Buyer's Deliveries at Closing.**    At the Closing and unless otherwise waived in writing by the Sellers, the Buyer shall deliver to the Sellers the following, each of which shall be in a form reasonably acceptable to the Sellers (collectively, the "Buyer's Closing Documents"):

(a)    The Balance Payment, as adjusted pursuant to Article III hereof, by wire transfer of immediately available funds in United States currency to the Sellers' account pursuant to the wire transfer instructions set forth in Schedule 4.4 attached hereto;

(b)    Certificates of incumbency and resolutions, certified as true and of full force as of the Closing Date, duly adopted by the Buyer, duly authorizing and approving: (i) this Transaction; and (ii) the execution, performance and delivery of this Agreement by the Buyer;

(c)    A certificate of a duly authorized officer or manager of the Buyer, certifying that: (i) each covenant and agreement of the Buyer to be performed prior to or as of the Closing Date pursuant to this Agreement has been performed in all material respects; and (ii) as of the Closing Date, all of the respective representations and warranties by or on behalf of the Buyer contained in this Agreement are true and correct in all material respects;

(d)    Certificate of existence and good standing of the Buyer, issued by the Secretary of State of the State of New York, dated no earlier than ten (10) calendar days prior to the Closing;

(e)    Such other certificates, instruments and documents as the Sellers and Sellers' Counsel reasonably deem necessary or desirable to effect the Transaction.

**4.5    Document Drafts**. The Buyer shall circulate to the Sellers' Counsel and the Sellers shall circulate to the Buyer's Counsel no fewer than ten (10) business days prior to the Closing Date, drafts of, respectively, the Buyer's Closing Documents and the Sellers' Closing Documents.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS AND THE COMPANY

Each Company and each of the Sellers, each as to himself, herself or itself, hereby jointly and severally, represents and warrants to the Buyer as follows:

**5.1    Organization and Standing of the Company**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of New York. Copies of the Company's Certificate of Incorporation and By-Laws, and all amendments thereof to date, have been delivered to the Buyer and are complete and correct. The Company has the power and authority to own the property and assets now owned by it and to conduct the business presently being conducted by it.

**5.2    Ownership of Company Stock**. Except as disclosed on Schedule 5.2 hereto, the Sellers are the lawful record and beneficial owners of all of the Company Stock shown as owned by such Sellers in Schedule 5.3, with good and marketable title thereto, free and clear of all Liens (as defined in Section 1.1 hereof). The Sellers have the full legal power to transfer and deliver the Company Stock in accordance with this Agreement, and the delivery of the Company Stock to the Buyer pursuant hereto will convey good and marketable title thereto, free and clear of all Liens except as disclosed on Schedule 5.2. The shares of Company Stock indicated on Schedule 5.3 as being owned by the Sellers constitute all of the issued and outstanding shares of the capital stock of the Company.

**5.3    Capitalization.** Schedule 5.3 sets forth a complete list and description of the authorized capital stock of the Company and the number of shares issued and outstanding of each class or series of such capital stock as of the Closing Date. Except as set forth on Schedule 5.3, no shares of the Company Stock are held in the treasury of the Company. The Sellers are the record owners of all of the Company Stock and all of such stock is duly authorized, validly issued, and fully paid and non-assessable. There are no preemptive or first refusal rights to purchase or otherwise acquire shares of capital stock of the Company pursuant to the Certificate of Incorporation or By-Laws of the Company or by agreement or otherwise. There are no outstanding any warrants, options, or other rights to subscribe for or purchase from the Company any shares of capital stock of the Company, nor shall there be outstanding any securities convertible into or exchangeable for such shares.

**5.4    Authority; Binding Effect**. The Company and the Sellers have taken all actions necessary to approve and implement (i) the execution and delivery of this Agreement and each of the other Sellers' Closing Documents to be executed by or on behalf of the Company and the Sellers, and (ii) the performance of the transactions contemplated hereby and thereby. The Company and each Seller has full power and authority to enter into, consummate and perform the Sellers' Closing Documents and to carry out all of the terms and provisions hereof and thereof. Assuming the valid execution by the Buyer, if required, each of the Sellers' Closing

Documents to be executed by or on behalf of each Seller is a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms.

      **5.5**    **No Violation of Law; No Breach**. To the Knowledge (as defined in Section 14.5 hereof) of the Sellers and the Company, the Nursing Home and the business of the Company are operating in compliance with all statutes, regulations and ordinances applicable to the Company, except for violations of applicable statutes, regulations or ordinances that would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the operations of the Company. Except as set forth in Schedule 5.5(a), to the Knowledge of the Sellers and the Company, no notice from or on behalf of any governmental body (other than ordinary course survey and certification reports), insurance carrier or other party has been received by the Company or either Seller claiming any violation or calling attention for the necessity of any work, repairs, construction, alterations or installations on or in connection with any of the foregoing which has not been materially complied with, and the Sellers do not know or have any grounds to believe that any such notice is threatened or contemplated. The execution and delivery of this Agreement and the Sellers' Closing Documents do not, and the consummation of the Transaction and the Sellers' Closing Documents and the compliance with the terms, conditions and provisions of the Sellers' Closing Documents by the Sellers will not: (a) contravene any provision of the Company's Certificate of Incorporation or By-Laws; (b) conflict with or result in a material breach of or constitute a material default (or an event which might, with the passage of time or the giving of notice or both, constitute a material default) under: (x) any of the terms, conditions or provisions of any material indenture, mortgage, loan or credit agreement or any other material agreement, instrument or contract to which the Company is a party or by which the Company or any of its assets may be bound or affected, or (y) any judgment, license, decree, approval, authorization or order or any other requirement of or commitment to any court or government department, commission, board, agency or instrumentality; (c) result in the creation or imposition of any Lien whatsoever upon the Company Stock or Assets or give to others any interests or rights therein; or (d) result in the termination or loss of any material right (or give others the right to cause such a termination or loss) under any agreement, instrument or contract to which the Company is a party or by which it may be bound.

      **5.6**    **Required Consents**. Except for the consent and approval from the Department of Health, the receipt of Third Party Consents, and as otherwise provided for herein, to the Knowledge of the Sellers, no consents of any third party are required for the Company or any Seller to consummate the transactions contemplated hereby or to execute and deliver any document to be executed and delivered by any Seller hereunder.

5.7    **Title; Condition of the Assets**.

(a)    The Nursing Company has good and valid title to the Nursing Assets (except for those Nursing Assets leased to the Nursing Company, as to which the Nursing Company has good and valid leasehold interest). Other than the Excluded Assets, the Nursing Assets constitute all of the tangible and intangible assets presently used in or required for the operation of the Nursing Company's business at the Nursing Home, and as of the Closing Date: (i) subject to Section 5.7(b) hereof, the Nursing Assets shall be in good operating condition and repair, ordinary wear and tear excepted; (ii) the Supplies are a sufficient amount, quality and type of those supplies and inventory that would be used in the normal course, consistent with the past practices of the Sellers and as are required by applicable statute and regulation of nursing facilities in the State of New York to operate the Nursing Home for a period of one (1) week following the Closing Date (to be measured based on one (1) week's average usage for the three (3) year period immediately preceding the Closing Date); and (iii) the Assets are not subject to any Liens (except for Permitted Liens (as defined below)).

(b)    Except as set forth in <u>Schedule 5.7(b)</u> hereto, and subject to Section 8.10 hereof, on the Closing Date all of the mechanical and electrical systems, heating and air conditioning systems, plumbing, water and sanitary disposal systems, and all other items of mechanical equipment or appliances, used by the Nursing Home are substantially in the same condition, working order and repair as on the Contract Date, normal wear and tear excepted.

(c)    Except as set forth on <u>Schedule 5.7(c)</u>, no tangible personal property used by the Nursing Company in connection with the operation of the Nursing Home is subject to a lease, conditional sale, security interest or similar arrangement. The Nursing Company has delivered to the Buyer a complete and correct copy of each of the leases and other agreements listed on <u>Schedule 5.7(c)</u> (collectively, the "Permitted Liens"). To the Knowledge of the Sellers and the Nursing Company, and assuming valid execution by the other parties thereto, all of said personal property leases are valid, binding and enforceable in accordance with their respective terms and are in full force and effect. To the Knowledge of the Nursing Company is not in material default under any of such leases and there has not been asserted, either by or against the Nursing Company under any of such leases, any written notice of default, set off, or claim of default. To the Knowledge of the Sellers and the Nursing Company, without investigation, the parties to such leases other than the Nursing Company are not in default of their respective obligations under any of such leases, and there has not occurred any event which with the passage of time or giving of notice (or both) would constitute such a default or breach under any of such leases.

(d)    Since the Contract Date, the Company has not sold or otherwise disposed of any Asset (other than cash) except in the ordinary course of business and, in the case of any Asset (other than cash) having a value in excess of Ten Thousand Dollars ($10,000), without obtaining a comparable replacement or obtaining the prior approval of the Buyer which approval shall not be unreasonably withheld.

(e)    No other individual, partnership, corporation, association, trust, joint venture, unincorporated organization, and any government, governmental department or agency or political subdivision thereof (collectively, a "Person") other than the Nursing Company owns any asset located in or used in the operation of the Nursing Home, except for items leased to the Nursing Company, which leased asset is set forth on <u>Schedule 5.7(c)</u>.

**5.8    Licenses and Permits**.  The Nursing Company holds and has the right to assign and/or transfer (to the extent the same are assignable and transferable) to the Buyer pursuant to this Agreement, all licenses, permits, registrations approvals, certificates, contracts, consents, accreditation, franchises and certificates of occupancy required to be held by the Nursing Company to own and lease the Assets, and to conduct and operate the Nursing Home with one hundred sixty (160) beds (collectively, the "Licenses"). Except as set forth in Schedule 5.8(a), to the Knowledge of the Sellers and the Nursing Company, the Nursing Company is in substantial compliance with all applicable laws, regulations and agreements required for participation in the Medicare and Medicaid programs, including, without limitation, all licenses and permits required by the Department of Health and by all other appropriate long term care facility licensing agencies, federal, state, county, or local government authorities, and regulatory agencies. The Nursing Company has the unrestricted right, subject to the Transfer of Ownership Approval, to assign to the Buyer the Nursing Company's license to operate the Nursing Home as a one hundred sixty (160) bed skilled nursing facility in the State of New York (the "Nursing Home License"). The Nursing Home License is in full force and effect and the Nursing Company is not in default under the Nursing Home License. To the Knowledge of the Sellers and the Nursing Company, no notice from any authority with respect to the revocation, termination, suspension, or limitation of any License has been issued or given to the Nursing Company or any Seller, nor is the Nursing Company or any Seller aware of any proposed or threatened issuance of any such notice. Attached as Schedule 5.8 is an accurate list and summary description of, and copies of, all Licenses (including the Nursing Home License), all of which are now, and shall be as of the Closing Date in good standing. None of the Licenses is: (a) provisional, probationary, or restricted in any way except to the extent qualified by any outstanding deficiencies or citations, particulars of which have been set forth on Schedule 5.8; or (b) to the Knowledge of the Sellers or the Nursing Company, subject to any investigation, cancellation, impairment, limitation, order, complaint, proceeding, or suspension. No conditions requiring changes in the operation of the Nursing Home have been imposed, formally or informally, by any License issuer during the past twenty four (24) months, excluding those related to any deficiencies or citations, the particulars of which have been set forth on Schedule 5.8. No principal, director or officer, employee or former employee of the Nursing Company (including any Seller), or any person, firm or corporation other than the Nursing Company owns or has any proprietary, financial or other interest, direct or indirect, in whole or in part in any of the Licenses.

**5.9    Financial Statements**.  The audited financial statements of the Nursing Company for the calendar years 2001, 2002 and 2003, and the unaudited monthly balance sheets and related statements of operations for each month starting January 1, 2004 (the "Financial Statements"), are attached as Schedule 5.9 and: (a) fairly set forth in all material respects the financial condition of the Nursing Company as of the dates indicated; (b) were prepared from the books and records of the Seller in accordance with generally accepted accounting principles ("GAAP") applied on a basis consistent with the Nursing Company's financial statements of prior years; and (c) contain and reflect all necessary adjustments so as to represent a fair and adequate statement of the financial condition as of the dates indicated, including all assets and liabilities of the Nursing Company used in connection with the Nursing Company's business. The Nursing Company has no material debt, liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, or whether due or to become due, including liabilities for or in respect of federal, state and local taxes and any interest or penalties relating thereto, that is not reflected or reserved against in the Financial Statements, except for those that have been

incurred after the date of the Financial Statements or that are not required by GAAP to be included in the Nursing Company's financial statements. All debts, liabilities and obligations incurred after the date of the Financial Statements have been incurred in the ordinary course of business and are usual and normal in amount, both individually and in the aggregate.

**5.10    Litigation and Related Proceedings.**  Except as set forth in Schedule 5.10: (i) neither Company nor any Seller is a party to any litigation or proceedings with respect to the Company Stock, the Assets, the operation of the Nursing Home, any Residents and/or the current or former employees of the Sellers or the Company; (ii) there are no claims, actions, suits, proceedings or investigations by any governmental agency or regulatory body pending or, to the Knowledge of the Sellers and the Company, threatened against or affecting any Seller, the Nursing Home, the Company Stock or any of the Assets; (iii) Seller has not received notice of any threatened actions, suits, proceedings or investigations against any Seller or the Company, or involving the Nursing Home, the Company Stock or any of the Assets, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located; (iv) there are no outstanding judgments against any Seller, the Company or involving the Nursing Home, the Company Stock or any of the Assets; and (v) neither the Sellers nor the Company have any Knowledge of any facts or circumstances which might reasonably form the basis for any such action, suit or proceeding.

**5.11    Orders, Decrees, Rulings and Contracts.**  Except as set forth in Schedule 5.11, neither Company nor any Seller is a party to any order, decree or ruling of any court or administrative agency, federal, state or local, nor does any Seller or the Company have any contracts, formal or informal, with any such agency relating to any Seller, the Company, the Nursing Home, the Company Stock or any of the Assets which could adversely affect the Company's financial condition, the ability of the Sellers to perform their obligations under this Agreement or to conduct its business or the ability of the Buyer, following the Closing, to own the Company Stock and to conduct a nursing home business at the Nursing Home.

**5.12    Compensation; Compensation Policies; Employee Relations.**  Schedule 5.12 lists and the Sellers have provided the Buyer with a copy of the Nursing Company's current compensation and bonus policy applicable to the Nursing Home, and true and correct copies of all written agreements, including all amendments thereto, with all employees, consultants, independent contractors, physicians and any others who provide goods, services or the like to the Nursing Home. Except as set forth on Schedule 5.12, the Nursing Company is not a party to any written or oral employment agreements with any of its shareholders, employees, consultants, independent contractors, agents or other persons, and, except as set forth on Schedule 5.12, each such relationship is terminable by the Nursing Company at will without penalty or cost to the Nursing Company except to the extent of the applicability of any legal restrictions or restraints on the right of an employer to terminate an at will employment relationship, and no representations have been made, whether in policy manuals, handbooks, or other written materials or orally, which alter the at will relationship between the Nursing Company and any of its employees. To the Knowledge of the Sellers, there is no pending, threatened, federal, state or local complaint, charge, proceeding or investigation involving discrimination, sexual or other harassment, immigration violation, unlawful discharge, wage and hour claims, workers compensation, unemployment compensation, or any other claim, proceeding, complaint, charge or the like arising out of or based on the employment relationship or termination of such relationship. Since January 1, 2001, to its Knowledge, the Nursing Company has materially

complied, and will have materially complied up to the Closing, with all laws affecting the employment relationship, including without limitation, the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

**5.13    Insurance.**  Schedule 5.13 sets forth a true and complete list of: (a) all insurance policies or self insurance funds of any nature whatsoever maintained by the Nursing Company covering the ownership and operation of the Nursing Home and the Assets (including, but not limited to, medical malpractice insurance and any state sponsored plan or program for worker's compensation) (the "Insurance Policies"), including the Insurance Policies' numbers, terms, insurers, amounts and coverages; and (b) all bonds, indemnity agreements, and other agreements of suretyship made for or held by the Nursing Company with respect to the ownership or operation of the Nursing Home, including a brief description of the character of the bond or agreement and the name of the surety or indemnifying party.  Except as set forth in Schedule 5.13, (a) neither the Nursing Company or any Seller has received any written notice from any insurance Nursing Company canceling or materially amending any of the Insurance Policies, or failed to give any required notice or present any claim which is still outstanding under any of the Insurance Policies; and (b) for the five (5) year period prior to the Closing Date, the Nursing Company has had an "occurrence-based" professional liability insurance policy in effect with coverage limits of at least $1,000,000 per occurrence and $3,000,000 in the aggregate.

**5.14    Cost Reports.**  Schedule 5.14 contains a true and correct copy of all Medicare and Medicaid cost reports for the years ending December 31, 2001, 2002 and 2003. Medicare and Medicaid cost reports for the years 1997 through and including 2003 applicable to the Nursing Company and the Nursing Home are accurate and have all been timely filed, and such reports for earlier years are closed by applicable statutes of limitations.  Neither the Nursing Company nor any Seller has received notice or threat of notice of violations in respect of any such filings and otherwise has no Knowledge of any such violations.

**5.15    Compliance with Medicare/Medicaid Programs; Department Surveys.** The Nursing Company has timely filed such requisite claims and other reports required to be filed by it in connection with Medicare and Medicaid that are due on or before the Closing Date in such manner as to timing and otherwise that is consistent with the Nursing Company's historical practices with regard to the filing of such claims and reports in the ordinary course of business, all of which to the Knowledge of the Sellers or the Nursing Company are complete and correct, except for final cost reports which are due after the Closing Date.  Except as set forth in Schedule 5.15(a), to the Knowledge of the Sellers or the Nursing Company, there are no claims, actions, payment reviews or appeals pending or threatened, nor, is there any basis for the same, before any commission, board or agency, including, without limitation, any intermediary or carrier, the Department of Health, or the Centers for Medicare and Medicaid Services ("CMS"; previously known as the Health Care Financing Administration, or HCFA), with respect to any Medicare or Medicaid claims filed by the Nursing Company on or before the Closing Date or program compliance matters, which would materially adversely affect the Nursing Company, the Nursing Home, the Nursing Company Stock or any of the Assets, their operation or utility or the consummation of the Transaction.  Except for those surveys which are conducted by the Department of Health or the Centers for Medicare and Medicaid Services in the ordinary course of business, no validation review or program integrity review related to the Nursing Company has been conducted by any commission, board or agency in connection with Medicare or

Medicaid and no such reviews are pending or, to the Nursing Company's Knowledge, threatened, against or affecting the Nursing Company, the Nursing Home, the Nursing Company Stock or any of the Assets or the consummation of the Transaction. The most recent survey of the Nursing Home by the Department of Health was conducted on May 5, 2004 (the "Survey"). A copy of the Department of Health's Survey report and all additional communication, documents and reports by the Department of Health and/or the Nursing Company with regard to the Survey are attached to this Agreement as Schedule 5.15(b).

**5.16    Residents; Resident Funds; Resident Agreements.** To the Knowledge of Seller, attached as Schedule 5.16 is a true, complete and accurate summary of the Residents, the annual payments to be made by each Resident in respect of his or her admission or transfer agreement or otherwise and all personal property or things of value (including, but not limited to, the Resident Deposits and the Trust Funds) held in custody by the Nursing Company which belong to the Residents, including an accounting of all Trust Funds. To Seller's Knowledge the Trust Funds represent all of the Residents' funds entrusted to the Nursing Company other than those which the Nursing Company has paid to or on behalf of Residents in accordance with all applicable laws and regulations.

**5.17    Taxes.**

(a)    The Company has, within the time and in the manner prescribed by law (including any applicable extension periods): (i) duly filed with the appropriate federal, state, and local taxing authorities all Tax Returns (as defined below) required to be filed by or with respect to the Company, or with respect to or attributable to the business or the assets of the Company pursuant to the Internal Revenue Code of 1986, as amended (the "Code") or any applicable state or local tax laws for all periods prior to and through the Closing Date, and all such Tax Returns are true, correct and complete in all material respects; (ii) timely paid in full or have made adequate provision for on the Closing Date Balance Sheet all Taxes (as defined below) shown to be due on such Tax Returns or otherwise due and payable with respect to the Company or the business or the assets of the Company for the periods through the date of the Closing Date Balance Sheet, and (iii) complied in all material respects with all applicable laws, rules and regulations relating to the withholding of Taxes and the payment of withheld Taxes.

(b)    The Tax Returns referred to in clause (a) above are not currently the subject of any audit or other proceeding by the Internal Revenue Service or any state or local governmental authority. Such Tax Returns have been finally audited by the Internal Revenue Service or an appropriate state or local authority, or the statute of limitations has expired, and any required adjustments have been paid or provided for, for all periods through the taxable year ended December 31, 1997. There are no outstanding waivers or comparable consents or extensions given by the Company or the Sellers regarding the application of the statute of limitations with respect to such Tax Returns.

(c)    There are no Liens for Taxes upon the assets of the Company except for Liens for Taxes not yet due.

(d)    Except as set forth in Schedule 5.17 hereto, neither Company nor either Seller has received any notice of deficiency or assessment from any federal, state, or local governmental authority with respect to any liability for Taxes of the Company or with respect to the business or the assets of the Company, which liability has not been fully paid or finally

settled, and any such deficiency or assessment shown on such Schedule 5.17 is being contested in good faith through appropriate proceedings. No administrative, judicial or other proceeding is presently pending with respect to any Taxes or Tax Returns of the Company or with respect to the business or the assets of the Company.

(e)     For purposes of this Agreement, the term "Tax" or "Taxes" shall mean all taxes, charges, fees, levies or other assessments, including without limitation all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, social security, unemployment, excise, estimated, severance, property or other taxes, duties, fees, assessments or charges of any kind whatsoever, including any interest, penalties or additional amounts attributable thereto imposed by any federal, state, local or foreign governmental authority. For purposes of this Agreement, the term "Tax Return" shall mean any return, report, information return, statement, declaration or other document (including any related or supporting information) filed or required to be filed with any federal, state, local or foreign governmental authority in connection with any determination, assessment or collection of any Tax or other administration of any laws, regulations or administrative requirements. Notwithstanding any express or implied statement herein to the contrary, nothing in this Section 5.17 shall relate to any matter regarding any individual income tax or tax returns of the Sellers or any other business entity other than the Nursing Company or the Realty Company in which either of the Sellers may have any ownership interest.

5.18    Contracts. Schedule 5.18 sets forth a true and complete list of all of the material Contracts (*i.e.*, Contracts involving or requiring payments in excess of $1,000 per month) and accurately identifies all parties to such material Contracts and, where applicable, specifies the relationship of each such party to the Company and the Sellers or any of their respective affiliates. The Company has delivered a true and correct copy of each such material Contract to the Buyer. Except as disclosed in Schedule 5.18:

(a)     To the Knowledge of the Sellers and the Company, each Contract constitutes valid and legally binding obligations of the parties to such Contract and is enforceable in accordance with its terms;

(b)     The copy of each Contract delivered by the Company to the Buyer constitutes the entire agreement with respect to the subject matter hereof by and between the respective parties to such Contract;

(c)     All obligations required to have been performed by the Company under the terms of each Contract have been substantially performed, and no act or omission of the Company has occurred or failed to occur which, with the giving of notice, the lapse of time, or both, would constitute a default under or material breach of any Contract by the Company;

(d)     To the Knowledge of the Sellers and the Company, no other party or parties to any material Contract is in default under such material Contract, nor has any event occurred which with the giving of notice or the lapse of time, or both, would constitute a default by any other party, with respect to any material term or condition of any material Contract; and

(e)     The Company has not received notice to the effect that, nor does the Company have any actual knowledge that, any party to any material Contract intends to cancel, terminate or amend any material Contract.

**5.19   Excluded Contracts.**   Attached as <u>Schedule 5.19</u> is a true and complete list of all commitments, contracts, leases and agreements, other than the Contracts, to which the Company is a party (collectively, the "<u>Excluded Contracts</u>"), true and complete copies of which have been furnished to the Buyer.   The Contracts and the Excluded Contracts, collectively, constitute all of the commitments, contracts, leases and agreements of any type to which the Company is a party or which relate to the Nursing Home or any of the Assets.   Neither the Company nor the Buyer is assuming and will not be responsible for any liabilities or obligations under the Excluded Contracts.   From and after the Closing Date, and subject to the limitations set forth in Sections 12.7 and 12.8 hereof, the Sellers shall, jointly and severally, defend, indemnify and hold the Buyer's Indemnified Persons, harmless from and against any and all of the Buyer's Losses that may arise out of, or relates in any way to, the Excluded Contracts (the "<u>Excluded Contract Indemnification</u>").

**5.20   Supplies.**   On the Closing Date, the Supplies shall be: (a) physically located at the Nursing Home; (b) of a quality usable or saleable in the ordinary course of operating a skilled nursing facility; and (c) sufficient in amount and quantity to enable the Buyer to operate the Nursing Home for a period of one (1) week following the Closing consistent with the Company's past practice (to be measured based on one (1) week's average usage for the three (3) year period immediately preceding the Closing Date) and in compliance with all applicable federal and state requirements.

**5.21   Employees' Benefit Plans.**

(a)      Attached to this Agreement as <u>Schedule 5.21</u> is a true and complete list of: (i) all of the Company's employees; (ii) each employee's salary rate, including separately designated base pay and incentive and deferred compensation; and (iii) a list and description of all Benefit Plans (as defined below) maintained by the Company with respect to the Nursing Home.  True and complete copies of: (x) all Benefit Plans, including any insurance contracts under which benefits are provided, as currently in effect, and (y) a summary plan description for each Benefit Plan, if any was required by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), have been prepared and distributed to participants.  As used in this Agreement, a "Benefit Plan" means any deferred compensation, pension, profit sharing, stock option, stock purchase, savings, group insurance or retirement plan, and all welfare (e.g., medical, mental health, vision, dental, and other group health plan benefits), vacation pay, severance pay, incentive compensation, bonus and other employee benefit or fringe benefit plans or arrangements maintained by the Company or any affiliate of the Company effective as of Closing or with respect to which contributions are or were (within six years prior to Closing) made by the Company (including health, life insurance and other benefit plans maintained for retirees).  No Benefit Plan is or was a defined benefit plan subject to ERISA or a "Multi-Employer Plan" within the meaning of section 4001(a)(3) of ERISA.   Neither the Company nor any affiliate currently has any liability to make any withdrawal liability payment to any Multi-Employer Plan.  Each Benefit Plan that provides medical benefits has operated in compliance with all requirements of sections 601 through 608 of ERISA and either (a) Sections 162(i)(2) and 162(k) of the Code and regulations thereunder (prior to 1989) or (b) Section 4980B of the Code and regulations thereunder (after 1988), relating to the continuation of coverage under certain circumstances in which coverage would otherwise cease, as applicable. A listing of all former employees of the Company associated with the Nursing Home or any of the Assets, and/or dependents or former dependents of current or former employees of the Company, who

are presently purchasing continuation coverage from any such Benefit Plan are listed on the attached Schedule 5.21.

(b)    No Benefit Plan maintained by the Company provides post-retirement medical benefits, post-retirement death benefits or other post-retirement welfare benefits.

(c)    All contributions to, and payments from, the Benefit Plans which may have been required to be made in accordance with the Benefit Plans and, when applicable, Section 302 of ERISA or Section 412 of the Code, have been made. The Company has funded or will fund each Benefit Plan in accordance with its terms through the Closing, including the payment of applicable premiums on any insurance contract funding a Benefit Plan for coverage provided through the Closing.

(d)    To the best of the Company's Knowledge, there have been no statements or communications made or materials provided to any employee or former employee of the Company by any Person (including any affiliate or any employee, officer or director of any affiliate) which provide for or could be construed as a contract or promise by the Buyer to provide for any pension, welfare, or other insurance type benefits to any such employee or former employee, whether before or after retirement.

(e)    Except as set for on Schedule 5.21(e) hereof, there are no current or former employees who are: (i) absent on a military leave of absence and eligible for rehire under the terms of the Uniformed Services Employment and Reemployment Rights Act; or (ii) absent on a leave of absence under the Family and Medical Leave Act, which in either case would allow any such employee to obtain continuation of or restoration of any employee benefit plan benefits, contributions or accruals related to the period of such leave.

(f)    With respect to each Benefit Plan, no "prohibited transaction", as defined in Section 406 of ERISA and Section 4975 of the Code, has occurred which could give rise to any liability or tax under ERISA or the Code on the part of the current or future fiduciaries of such Benefit Plan, and no civil or criminal action brought pursuant to part 5 of Title I of ERISA is pending or is threatened in writing or orally against any fiduciary of any such Benefit Plan. Each Benefit Plan is in compliance in all material respects with the presently applicable provisions of ERISA and the Code, including but not limited to the satisfaction of all applicable reporting and disclosure requirements under ERISA and the Code. The Company has filed or caused to be filed with the Internal Revenue Service annual reports on Form 5500 or 5500C and 5500R, as applicable, for each Benefit Plan for all years and periods for which such reports were required. Each of the Benefit Plans has been administered at all times, and in all material respects, in accordance with its terms except that in any case in which any Benefit Plan is currently required to comply with a provision of ERISA or of the Code, but is not yet required to be amended to reflect such provision, it has been administered in accordance with such provision. All of the Benefit Plans which are pension benefit plans have received determination letters from the IRS to the effect that such plans are qualified and exempt from federal income taxes under sections 401(a) and 501(a), respectively, of the Code, as amended, and no determination letter with respect to any Benefit Plan has been revoked nor, has revocation been threatened, nor has any Benefit Plan been amended since the date of its most recent determination letter or application therefor in any respect which would adversely affect its

qualification or materially increase its cost, and no Benefit Plan has been amended in a manner that would require security to be provided in accordance with the Code.

**5.22    Proprietary Rights.**    The Company presently owns, possesses, or lawfully uses in connection with the business of the Company the name "Stonehedge Health and Rehabilitation Center" (the "Name"). Neither the Sellers nor the Company has received any notice from any Person (a) that the Company is infringing on or otherwise acting adversely to the rights of any Person under or in respect of the Name, or (b) of any liability whatsoever to make any payments by way of royalties, fees, or otherwise to any owner or licensee of, or other claimant to, any patent, trademark, trade name, copyright, or other intangible asset on account of the Company's ownership of the Nursing Assets, the Nursing Company Stock or the operation of the Nursing Home. The Company has not, at any time, authorized any Person to use the Name or any of its derivatives for any purposes whatsoever except on behalf of the Company.

**5.23    No Brokers.**    Neither the Company nor any Seller has engaged any broker, agent or other third party that will have, as a result of the Transaction, any right, interest or valid claim against the Company, any Seller or Buyer for any fee, commission, or other compensation as a finder or broker because of any act or omission by the Company or any Seller or by any agent of the Company or any Seller.

**5.24    True and Complete as of the Closing Date; No Untrue Statement.**    The warranties and representations by the Company and each Seller set forth in this Agreement are true and complete on the Contract Date and shall be true and complete on and as of the Closing Date as though said representations and warranties were made on and as of the Closing Date. To the Knowledge of the Sellers, none of the representations or warranties made pursuant to this Agreement contains any untrue statement of material fact or omits to state a material fact necessary, in light of the circumstance under which it was made, in order to make any such representation or warranty not misleading.

**5.25    Certain Affiliate Transactions.**    Except as set forth in Schedule 5.25, no Seller (each, an "Interested Person") and no member of the immediate family of an Interested Person, directly or indirectly: (a) owns any interest in any corporation, partnership, limited liability company, proprietorship or other entity which sells to or purchases products or services from the Company; or (b) holds a beneficial interest in any contract or agreement relating to the operation of the Nursing Home or to which the Company or any Seller is a party or by which Company or any Seller may be bound.

**5.26    Immigration and Nationality Act.**    The Company is in compliance with the terms and provisions of the Immigration and Nationality Act (the "Immigration Act") for each employee for whom compliance with the Immigration Act is required. The Company has obtained and has retained a complete and true copy of each of each such employee's Form 1-9 (Employment Eligibility Verification Form) and all other records or documents prepared, procured or retained by the Company pursuant to the Immigration Act. The Company has not been cited, fined, served with a Notice of Intent to Fire or with a Cease and Desist Order, nor, to the Knowledge of the Company has any action or administrative proceeding been initiated or threatened against the Company or any Seller by reason of any actual or alleged failure to comply with the Immigration Act.

**5.27    Effectiveness of Representations and Warranties as to the Company Prior to Closing Date.**  The Buyer and each Buyer Affiliate hereby affirmatively acknowledge and agree that notwithstanding any statement herein to the contrary, all representations and warranties set forth herein are made to the actual Knowledge of the Sellers only and shall not, to the extent so provided herein, be applicable or otherwise effective as to the Company until the Closing Date.

**5.28    Nonmaterial Breach of Sellers' or Company's Representations and Warranties.**    Notwithstanding anything herein to the contrary, the Buyer affirmatively acknowledges and agrees that the Sellers shall not be in breach of this Agreement or any representation or warranty hereof, and that Buyer shall not have the right to terminate this Agreement or otherwise not fully consummate the transactions contemplated hereby, in the event that any breach of any of Sellers' or Company's representations or warranties herein does not result in any material adverse effect to either the Buyer or the Company.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Buyer and each Buyer Affiliate (as defined in Section 6.3(c) hereof), each as to itself, hereby jointly and severally represents and warrants to the Company and the Sellers that the following facts and circumstances are now, and, except as contemplated by this Agreement, covenants that they will be on and as of the Closing Date, true and correct:

**6.1    Organization and Standing.**  The Buyer and Stonehedge Acquisition Rome I, LLC are each a limited liability company, duly organized and validly existing in good standing under the laws of the State of New York. The Buyer and each Buyer Affiliate possesses all requisite power and authority to execute, deliver and perform its obligations under the Buyer's Transaction Documents.  The Buyer and Stonehedge Acquisition Rome I, LLC have taken all requisite limited liability company action to authorize the execution, delivery and performance of the Buyer's and Stonehedge Acquisition Rome I, LLC's respective obligations under this Agreement.  Copies of the Buyer's and Stonehedge Acquisition Rome I, LLC's articles of organization, operating agreement, and all amendments thereof to date, shall be delivered to the Sellers within thirty (30) days of the Contract Date and shall be correct and complete as of the Closing Date.

**6.2    Authority; Binding Effect.**  The Buyer and each Buyer Affiliate has taken all actions necessary to approve and implement the execution and delivery of this Agreement, and each of the Buyer's Transaction Documents to be executed by or on behalf of the Buyer and Stonehedge Acquisition Rome I, LLC, and the performance of the transactions contemplated hereby and thereby.  The Buyer and each Buyer Affiliate has full power and authority to enter into, consummate and perform the Buyer's Transaction Documents and to carry out all of the terms and provisions hereof and thereof.  Each of the Buyer's Transaction Documents to be executed by or on behalf of the Buyer or any Buyer Affiliate is a valid and binding obligation of the Buyer and such Buyer Affiliate, enforceable against the Buyer and such Buyer Affiliate in accordance with its terms. Except as provided herein, no consents of any third party are required for the Buyer or any Buyer Affiliate to consummate the transactions contemplated hereby or to execute and deliver any document to be executed and delivered by the Buyer or any Buyer Affiliate hereunder.

6.3    **No Violation of Law; No Breach.**

(a)    The Buyer and each Buyer Affiliate is in compliance with all applicable statutes, regulations or ordinances, building or zoning laws, or other laws applicable to the Buyer and such Buyer Affiliate, as the case may be, with respect to the Buyer's or any Buyer Affiliate's ownership or operation of any other nursing home or health care facility or otherwise. No notice from or on behalf of any governmental body, insurance carrier or other party has been received by the Buyer or any Buyer Affiliate claiming any violation or calling attention for the necessity of any work, repairs, construction, alterations or installations on or in connection with any of the foregoing with respect to the Buyer's or any Buyer Affiliate's ownership or operation of any other nursing home or health care facility or otherwise, which has not been materially complied with, and neither the Buyer nor any Buyer Affiliate knows or has any grounds to believe that any such notice is threatened or contemplated.

(b)    The execution and delivery of this Agreement and the Buyer's Transaction Documents do not, and the consummation of the Transaction and the Buyer's Transaction Documents and the compliance with the terms, conditions and provisions of the Buyer's Transaction Documents by the Buyer or any Buyer Affiliate will not: (i) contravene any provision of the Buyer's or any Buyer Affiliate's articles of organization and operating agreement; (ii) conflict with or result in a breach of or constitute a default (or an event which might, with the passage of time or the giving of notice or both, constitute a default) under any of the terms, conditions or provisions of any indenture, mortgage, loan or credit agreement or any other agreement, instrument or contract to which the Buyer or any Buyer Affiliate is a party or by which Buyer or any Buyer Affiliate or any of their assets may be bound or affected, or any judgment, license, decree, approval, authorization or order or any other requirement of or commitment to any court or government department, commission, board, agency or instrumentality or any applicable law, rule or regulation; (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon the Assets or give to others any interests or rights therein; or (iv) result in the termination or loss of any right (or give others the right to cause such a termination or loss) under any agreement, instrument or contract to which either the Buyer or any Buyer Affiliate is a party or by which it may be bound.

(c)    For purposes of this Section 6.3, the term Buyer Affiliate shall include (i) Stonehedge Acquisition Rome I, LLC, (ii) each of the voting members of the Buyer and Stonehedge Acquisition Rome I, LLC, and (iii) any legal entity in which any such Person has a financial or ownership interest (collectively a "Buyer Affiliate").

6.4    **Required Consents.**    Other than as set forth in this Agreement, no consent, license, approval or authorization of, or filing or registration with, or exemption by, any court or governmental authority (federal, state or local) or any other third party is or will be required to be obtained or made by the Buyer or any Buyer Affiliate in order for the Buyer to consummate the purchase of the Company Stock from the Sellers pursuant to this Agreement.

6.5    **Litigation and Related Proceedings.**    There are no claims, actions, suits, proceedings or investigations by any governmental agency or regulatory body pending or, to the best Knowledge of the Buyer and each Buyer Affiliate, threatened against or affecting the Buyer or any Buyer Affiliate or Buyer's ability to consummate the transactions contemplated herein. Neither the Buyer nor any Buyer Affiliate has received notice of any threatened actions, suits, proceedings or investigations against the Buyer or any Buyer Affiliate, at law or in equity, or

before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located. There are no outstanding judgments against the Buyer or any Buyer Affiliate. Neither the Buyer nor any Buyer Affiliate has any Knowledge of any facts or circumstances which might reasonably form the basis for any such action, suit or proceeding.

**6.6    No Brokers.** Neither the Buyer nor any Buyer Affiliate has engaged any broker, agent or other third party that will have, as a result of the Transaction, any right, interest or valid claim against the Company, any Seller or Buyer or Buyer Affiliate for any fee, commission, or other compensation as a finder or broker because of any act or omission by the Buyer, any Buyer Affiliate or by any agent of the Buyer or any Buyer Affiliate.

**6.7    True and Complete as of the Closing Date; No Untrue Statement.** To the Knowledge of the Buyer and the Buyer Affiliates, the warranties and representations by the Buyer and the Buyer Affiliates set forth in this Agreement are true and complete on the Contract Date and shall be true and complete on and as of the Closing Date as though said representations and warranties were made on and as of the Closing Date. None of the representations or warranties made pursuant to this Agreement contains any untrue statement of material fact or omits to state a material fact necessary, in light of the circumstance under which it was made, in order to make any such representation or warranty not misleading.

**ARTICLE VII**

**INFORMATION AND RECORDS CONCERNING THE COMPANY**

**7.1    Access to Information and Records before Closing.**

(a)    **Information.** Commencing on the Contract Date and continuing through the Closing Date or the earlier termination of this Agreement, during normal business hours and after being provided with reasonable notice by the Buyer, the Company shall afford to the officers and authorized representatives and agents of the Buyer: (i) reasonable access to the Company's employees, contractors, agents, payors and intermediaries; (ii) the right to inspect the properties, books, records, and documents of the Company, including, but not limited to, copies of all agreements between the Company and the Residents, including without limitation, admission agreements and transfer agreements, and to make copies of such books, records and documents; and (c) access to, for purposes of inspection and copying by the Buyer, such additional financial and operating data and other information in the Company's possession regarding the Nursing Home as the Buyer may request; provided, however, that the Parties agree to use their best efforts not to make the employees of the Nursing Home aware of the transactions contemplated by this Agreement until such time as the Parties may agree.

(b)    **Access.** The Company shall: (i) permit the Buyer access to its accountants, auditors, and suppliers for consultation or verification of any information obtained by the Buyer; and (ii) use commercially reasonable efforts to cause such persons to cooperate with the Buyer in such consultation and verification. In the exercise of its rights under this Section 7.1, the Buyer shall use care to avoid undue interruption or interference with the Company's business operations. Any professional fees charged by the Sellers' or the Company's accountants, auditors or suppliers in connection with the foregoing shall be borne by, and promptly paid by, the Buyer.