are presently purchasing continuation coverage from any such Benefit Plan are listed on the attached <u>Schedule 5.21</u>.

(b)     No Benefit Plan maintained by the Company provides post-retirement medical benefits, post-retirement death benefits or other post-retirement welfare benefits.

(c)     All contributions to, and payments from, the Benefit Plans which may have been required to be made in accordance with the Benefit Plans and, when applicable, Section 302 of ERISA or Section 412 of the Code, have been made. The Company has funded or will fund each Benefit Plan in accordance with its terms through the Closing, including the payment of applicable premiums on any insurance contract funding a Benefit Plan for coverage provided through the Closing.

(d)     To the best of the Company's Knowledge, there have been no statements or communications made or materials provided to any employee or former employee of the Company by any Person (including any affiliate or any employee, officer or director of any affiliate) which provide for or could be construed as a contract or promise by the Buyer to provide for any pension, welfare, or other insurance type benefits to any such employee or former employee, whether before or after retirement.

(e)     Except as set for on Schedule 5.21(e) hereof, there are no current or former employees who are: (i) absent on a military leave of absence and eligible for rehire under the terms of the Uniformed Services Employment and Reemployment Rights Act; or (ii) absent on a leave of absence under the Family and Medical Leave Act, which in either case would allow any such employee to obtain continuation of or restoration of any employee benefit plan benefits, contributions or accruals related to the period of such leave.

(f)     With respect to each Benefit Plan, no "<u>prohibited transaction</u>", as defined in Section 406 of ERISA and Section 4975 of the Code, has occurred which could give rise to any liability or tax under ERISA or the Code on the part of the current or future fiduciaries of such Benefit Plan, and no civil or criminal action brought pursuant to part 5 of Title I of ERISA is pending or is threatened in writing or orally against any fiduciary of any such Benefit Plan. Each Benefit Plan is in compliance in all material respects with the presently applicable provisions of ERISA and the Code, including but not limited to the satisfaction of all applicable reporting and disclosure requirements under ERISA and the Code. The Company has filed or caused to be filed with the Internal Revenue Service annual reports on Form 5500 or 5500C and 5500R, as applicable, for each Benefit Plan for all years and periods for which such reports were required. Each of the Benefit Plans has been administered at all times, and in all material respects, in accordance with its terms except that in any case in which any Benefit Plan is currently required to comply with a provision of ERISA or of the Code, but is not yet required to be amended to reflect such provision, it has been administered in accordance with such provision. All of the Benefit Plans which are pension benefit plans have received determination letters from the IRS to the effect that such plans are qualified and exempt from federal income taxes under sections 401(a) and 501(a), respectively, of the Code, as amended, and no determination letter with respect to any Benefit Plan has been revoked nor, has revocation been threatened, nor has any Benefit Plan been amended since the date of its most recent determination letter or application therefor in any respect which would adversely affect its

qualification or materially increase its cost, and no Benefit Plan has been amended in a manner that would require security to be provided in accordance with the Code.

**5.22   Proprietary Rights.**   The Company presently owns, possesses, or lawfully uses in connection with the business of the Company the name "Stonehedge Health and Rehabilitation Center" (the "Name").   Neither the Sellers nor the Company has received any notice from any Person (a) that the Company is infringing on or otherwise acting adversely to the rights of any Person under or in respect of the Name, or (b) of any liability whatsoever to make any payments by way of royalties, fees, or otherwise to any owner or licensee of, or other claimant to, any patent, trademark, trade name, copyright, or other intangible asset on account of the Company's ownership of the Nursing Assets, the Nursing Company Stock or the operation of the Nursing Home.   The Company has not, at any time, authorized any Person to use the Name or any of its derivatives for any purposes whatsoever except on behalf of the Company.

**5.23   No Brokers.**   Neither the Company nor any Seller has engaged any broker, agent or other third party that will have, as a result of the Transaction, any right, interest or valid claim against the Company, any Seller or Buyer for any fee, commission, or other compensation as a finder or broker because of any act or omission by the Company or any Seller or by any agent of the Company or any Seller.

**5.24   True and Complete as of the Closing Date; No Untrue Statement.**   The warranties and representations by the Company and each Seller set forth in this Agreement are true and complete on the Contract Date and shall be true and complete on and as of the Closing Date as though said representations and warranties were made on and as of the Closing Date. To the Knowledge of the Sellers, none of the representations or warranties made pursuant to this Agreement contains any untrue statement of material fact or omits to state a material fact necessary, in light of the circumstance under which it was made, in order to make any such representation or warranty not misleading.

**5.25   Certain Affiliate Transactions.**   Except as set forth in Schedule 5.25, no Seller (each, an "Interested Person") and no member of the immediate family of an Interested Person, directly or indirectly: (a) owns any interest in any corporation, partnership, limited liability company, proprietorship or other entity which sells to or purchases products or services from the Company; or (b) holds a beneficial interest in any contract or agreement relating to the operation of the Nursing Home or to which the Company or any Seller is a party or by which Company or any Seller may be bound.

**5.26   Immigration and Nationality Act.**   The Company is in compliance with the terms and provisions of the Immigration and Nationality Act (the "Immigration Act") for each employee for whom compliance with the Immigration Act is required.   The Company has obtained and has retained a complete and true copy of each of each such employee's Form 1-9 (Employment Eligibility Verification Form) and all other records or documents prepared, procured or retained by the Company pursuant to the Immigration Act.   The Company has not been cited, fined, served with a Notice of Intent to Fire or with a Cease and Desist Order, nor, to the Knowledge of the Company has any action or administrative proceeding been initiated or threatened against the Company or any Seller by reason of any actual or alleged failure to comply with the Immigration Act.

**5.27    Effectiveness of Representations and Warranties as to the Company Prior to Closing Date.**  The Buyer and each Buyer Affiliate hereby affirmatively acknowledge and agree that notwithstanding any statement herein to the contrary, all representations and warranties set forth herein are made to the actual Knowledge of the Sellers only and shall not, to the extent so provided herein, be applicable or otherwise effective as to the Company until the Closing Date.

**5.28    Nonmaterial Breach of Sellers' or Company's Representations and Warranties.**  Notwithstanding anything herein to the contrary, the Buyer affirmatively acknowledges and agrees that the Sellers shall not be in breach of this Agreement or any representation or warranty hereof, and that Buyer shall not have the right to terminate this Agreement or otherwise not fully consummate the transactions contemplated hereby, in the event that any breach of any of Sellers' or Company's representations or warranties herein does not result in any material adverse effect to either the Buyer or the Company.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Buyer and each Buyer Affiliate (as defined in Section 6.3(c) hereof), each as to itself, hereby jointly and severally represents and warrants to the Company and the Sellers that the following facts and circumstances are now, and, except as contemplated by this Agreement, covenants that they will be on and as of the Closing Date, true and correct:

**6.1    Organization and Standing.**  The Buyer and Stonehedge Acquisition Chittenango I, LLC are each a limited liability company, duly organized and validly existing in good standing under the laws of the State of New York.  The Buyer and each Buyer Affiliate possesses all requisite power and authority to execute, deliver and perform its obligations under the Buyer's Transaction Documents.  The Buyer and Stonehedge Acquisition Chittenango I, LLC have taken all requisite limited liability company action to authorize the execution, delivery and performance of the Buyer's and Stonehedge Acquisition Chittenango I, LLC's respective obligations under this Agreement.  Copies of the Buyer's and Stonehedge Acquisition Chittenango I, LLC's articles of organization, operating agreement, and all amendments thereof to date, shall be delivered to the Sellers within thirty (30) days of the Contract Date and shall be correct and complete as of the Closing Date.

**6.2    Authority; Binding Effect.**  The Buyer and each Buyer Affiliate has taken all actions necessary to approve and implement the execution and delivery of this Agreement, and each of the Buyer's Transaction Documents to be executed by or on behalf of the Buyer and Stonehedge Acquisition Chittenango I, LLC, and the performance of the transactions contemplated hereby and thereby.  The Buyer and each Buyer Affiliate has full power and authority to enter into, consummate and perform the Buyer's Transaction Documents and to carry out all of the terms and provisions hereof and thereof.  Each of the Buyer's Transaction Documents to be executed by or on behalf of the Buyer or any Buyer Affiliate is a valid and binding obligation of the Buyer and such Buyer Affiliate, enforceable against the Buyer and such Buyer Affiliate in accordance with its terms.  Except as provided herein, no consents of any third party are required for the Buyer or any Buyer Affiliate to consummate the transactions contemplated hereby or to execute and deliver any document to be executed and delivered by the Buyer or any Buyer Affiliate hereunder.

### 6.3    No Violation of Law; No Breach.

(a)    The Buyer and each Buyer Affiliate is in compliance with all applicable statutes, regulations or ordinances, building or zoning laws, or other laws applicable to the Buyer and such Buyer Affiliate, as the case may be, with respect to the Buyer's or any Buyer Affiliate's ownership or operation of any other nursing home or health care facility or otherwise. No notice from or on behalf of any governmental body, insurance carrier or other party has been received by the Buyer or any Buyer Affiliate claiming any violation or calling attention for the necessity of any work, repairs, construction, alterations or installations on or in connection with any of the foregoing with respect to the Buyer's or any Buyer Affiliate's ownership or operation of any other nursing home or health care facility or otherwise, which has not been materially complied with, and neither the Buyer nor any Buyer Affiliate knows or has any grounds to believe that any such notice is threatened or contemplated.

(b)    The execution and delivery of this Agreement and the Buyer's Transaction Documents do not, and the consummation of the Transaction and the Buyer's Transaction Documents and the compliance with the terms, conditions and provisions of the Buyer's Transaction Documents by the Buyer or any Buyer Affiliate will not: (i) contravene any provision of the Buyer's or any Buyer Affiliate's articles of organization and operating agreement; (ii) conflict with or result in a breach of or constitute a default (or an event which might, with the passage of time or the giving of notice or both, constitute a default) under any of the terms, conditions or provisions of any indenture, mortgage, loan or credit agreement or any other agreement, instrument or contract to which the Buyer or any Buyer Affiliate is a party or by which Buyer or any Buyer Affiliate or any of their assets may be bound or affected, or any judgment, license, decree, approval, authorization or order or any other requirement of or commitment to any court or government department, commission, board, agency or instrumentality or any applicable law, rule or regulation; (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon the Assets or give to others any interests or rights therein; or (iv) result in the termination or loss of any right (or give others the right to cause such a termination or loss) under any agreement, instrument or contract to which either the Buyer or any Buyer Affiliate is a party or by which it may be bound.

(c)    For purposes of this Section 6.3, the term Buyer Affiliate shall include (i) Stonehedge Acquisition Chittenango I, LLC, (ii) each of the voting members of the Buyer and Stonehedge Acquisition Chittenango I, LLC, and (iii) any legal entity in which any such Person has a financial or ownership interest (collectively a "Buyer Affiliate").

### 6.4    Required Consents.
Other than as set forth in this Agreement, no consent, license, approval or authorization of, or filing or registration with, or exemption by, any court or governmental authority (federal, state or local) or any other third party is or will be required to be obtained or made by the Buyer or any Buyer Affiliate in order for the Buyer to consummate the purchase of the Company Stock from the Sellers pursuant to this Agreement.

### 6.5    Litigation and Related Proceedings.
There are no claims, actions, suits, proceedings or investigations by any governmental agency or regulatory body pending or, to the best Knowledge of the Buyer and each Buyer Affiliate, threatened against or affecting the Buyer or any Buyer Affiliate or Buyer's ability to consummate the transactions contemplated herein. Neither the Buyer nor any Buyer Affiliate has received notice of any threatened actions, suits, proceedings or investigations against the Buyer or any Buyer Affiliate, at law or in equity, or

before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located. There are no outstanding judgments against the Buyer or any Buyer Affiliate. Neither the Buyer nor any Buyer Affiliate has any Knowledge of any facts or circumstances which might reasonably form the basis for any such action, suit or proceeding.

      **6.6**    **No Brokers.** Neither the Buyer nor any Buyer Affiliate has engaged any broker, agent or other third party that will have, as a result of the Transaction, any right, interest or valid claim against the Company, any Seller or Buyer or Buyer Affiliate for any fee, commission, or other compensation as a finder or broker because of any act or omission by the Buyer, any Buyer Affiliate or by any agent of the Buyer or any Buyer Affiliate.

      **6.7**    **True and Complete as of the Closing Date; No Untrue Statement.** To the Knowledge of the Buyer and the Buyer Affiliates, the warranties and representations by the Buyer and the Buyer Affiliates set forth in this Agreement are true and complete on the Contract Date and shall be true and complete on and as of the Closing Date as though said representations and warranties were made on and as of the Closing Date. None of the representations or warranties made pursuant to this Agreement contains any untrue statement of material fact or omits to state a material fact necessary, in light of the circumstance under which it was made, in order to make any such representation or warranty not misleading.

## ARTICLE VII

## INFORMATION AND RECORDS CONCERNING THE COMPANY

      **7.1**    **Access to Information and Records before Closing.**

            (a)    **Information.** Commencing on the Contract Date and continuing through the Closing Date or the earlier termination of this Agreement, during normal business hours and after being provided with reasonable notice by the Buyer, the Company shall afford to the officers and authorized representatives and agents of the Buyer: (i) reasonable access to the Company's employees, contractors, agents, payors and intermediaries; (ii) the right to inspect the properties, books, records, and documents of the Company, including, but not limited to, copies of all agreements between the Company and the Residents, including without limitation, admission agreements and transfer agreements, and to make copies of such books, records and documents; and (c) access to, for purposes of inspection and copying by the Buyer, such additional financial and operating data and other information in the Company's possession regarding the Nursing Home as the Buyer may request; provided, however, that the Parties agree to use their best efforts not to make the employees of the Nursing Home aware of the transactions contemplated by this Agreement until such time as the Parties may agree.

            (b)    **Access.** The Company shall: (i) permit the Buyer access to its accountants, auditors, and suppliers for consultation or verification of any information obtained by the Buyer; and (ii) use commercially reasonable efforts to cause such persons to cooperate with the Buyer in such consultation and verification. In the exercise of its rights under this Section 7.1, the Buyer shall use care to avoid undue interruption or interference with the Company's business operations. Any professional fees charged by the Sellers' or the Company's accountants, auditors or suppliers in connection with the foregoing shall be borne by, and promptly paid by, the Buyer.

## ARTICLE VIII

## OBLIGATIONS OF THE PARTIES UNTIL CLOSING

8.1     **Operations of the Nursing Home.**  Commencing on the Contract Date and continuing through the Closing Date or the earlier termination of this Agreement, the Company and the Sellers shall:

(a)     until such time as: (i) mutually agreed to by the Parties; or (ii) otherwise contemplated in this Agreement, continue to operate the Nursing Home in substantially the same manner as prior to the Contract Date, consistent with the Sellers' past business practices and course of conduct and in accordance with all applicable federal and state laws, regulations and rules and refrain from making any material change in the operations, finance, accounting policies, or real or personal property of the Nursing Home;

(b)     subject to Section 8.10 hereof, maintain the Assets, including making necessary repairs, in the same working order and condition as of the Contract Date, ordinary wear and tear excepted;

(c)     fully perform all of the Company's obligations, including making all payments due by the Company in a timely manner, under the Contracts and with any other material agreements that the Company has entered into in the ordinary course of business since the date of this Agreement relating to or affecting the Nursing Home, the Assets or the Company Stock;

(d)     maintain all of its books and records in accordance with past practice;

(e)     keep in full force and effect the Insurance Policies or other comparable policies of insurance currently in effect, or the replacements thereof; in this regard, in the event that any current Insurance Policy of the Company that is an "occurrence" based policy is required to be replaced prior to the Closing Date, Sellers shall attempt to procure such replacement insurance coverage with "occurrence" based terms, but shall have the right to procure, without being in breach of this provision, "claims made" based replacement insurance coverage provided that (i) "occurrence" based coverage is not available on terms substantially comparable to the Company's current insurance costs and (ii) Sellers shall procure on behalf of the Company a tail insurance policy in the event that Seller is not able to maintain an "occurrence" based policy, the costs of such tail insurance policy shall be treated as a Pre-Paid Expense hereunder (for purposes of Section 3.2(e) hereof and otherwise); further, the Sellers shall not do anything within the Sellers' control to cause or to have caused the Company, the Sellers or the Buyer to be unable to maintain insurability, including, but not by way of limitation, malpractice insurability under any blanket policy issued by a reputable domestic insurer;

(f)     maintain and preserve the Company's business organizations intact and use commercially reasonable efforts to maintain the Company's relationships and goodwill with physicians, employees, the Residents and the Resident's families, payors, suppliers, customers and others having business relations with the Company and take such actions as are necessary to cause the smooth, efficient and successful transition of the operation of the Nursing Home to the Buyer at the Closing;

(g)     keep in full force and effect all Licenses, including the Nursing Home License, currently in effect unless such License is no longer necessary for the operation of the Nursing Home;

(h)     cause to be paid when due (or withhold and pay over, if required), all taxes, assessments and charges or levies imposed upon any Seller, the Company, the Nursing Home or on any of the Assets;

(i)     promptly advise the Buyer in writing of the threat or commencement against any Seller or the Company of any claim, action, suit or proceeding, arbitration or investigation or any other event that would materially adversely affect the operations, properties, assets or prospects of the Nursing Home;

(j)     notify the Buyer in writing of any event which has had or may be reasonably expected to have a material adverse effect on the business or financial condition of the Nursing Home or may involve the loss of any material contracts with any of the Nursing Home's payors or suppliers;

(k)     provide the Buyer with monthly financial statements of the Company within twenty (20) days of the end of each month after the date of this Agreement; and

(l)     timely submit to the appropriate governmental authorities all submissions, cost reports and survey reports in accordance with applicable law and provide the Buyer with copies of all such materials promptly after submission.

8.2     **Negative Covenants.**   Commencing on the Contract Date and continuing through the Closing Date or the earlier termination of this Agreement, neither Company nor any Seller shall, without the prior written consent of the Buyer, such consent not to be unreasonably withheld:

(a)     dissolve, merge or enter into a share exchange with or into any other entity or make any change to its Certificate of Incorporation or By-Laws;

(b)     except in the ordinary course of business: (i) amend or terminate any of the Contracts; (ii) enter into any contract or commitment or incur or agree to incur any single liability which is greater than Ten Thousand Dollars ($10,000);

(c)     enter into any new, or amend any existing, contract or agreement with any union or other collective bargaining personnel;

(d)     except in the ordinary course of business in accordance with existing personnel policies and employment contracts, or otherwise as necessary to comply with any applicable minimum wage law: (i) increase compensation payable or to become payable; (ii) make a bonus payment; or (iii) otherwise enter into one or more bonus agreements, with any of the Company's employees;

(e)     create or assume any new Lien upon any of the Assets or the Company Stock;

(f)     sell, assign or otherwise transfer or dispose of any Asset (other than cash) except in the ordinary course of business and, if valued in excess of Ten Thousand Dollars ($10,000), without obtaining a comparable replacement;

(g)     enter into any individual leases or contracts for equipment or services which cannot be terminated upon thirty (30) days notice other than in the ordinary course of business or enter into any leases or make any applications for building or alteration permits or zoning changes other than in the ordinary course of business except as specifically set forth herein and not to take any actions which would prevent performance of its obligations under this Agreement;

(h)     other than in the ordinary course of business, renew any expiring Contracts unless cancelable upon thirty (30) days notice;

(i)     change any of the accounting principles followed by the Company or the methods of applying such principles;

(j)     put into place any easements on the property or apply for, or obtain any building or zoning permits that may impair the ability of the Buyer to complete the transaction contemplated by this Agreement; and

(k)     take any other action whatsoever outside the ordinary course of business.

**8.3    Certificate of Need Approval.**  As soon as practicable following the Contract Date, but in no event greater than thirty (30) days after the Contract Date, the Buyer, at its own cost and expense, will submit to the Department of Health a completed Certificate of Need application (*i.e.,* an application relating to a transfer or change of ownership), including all attachments, exhibits, schedules and supporting information commonly required in connection therewith (which would ordinarily be sufficient to cause the Department of Health to issue a project number) (the "Application") seeking establishment and licensure of the Buyer as the Operator of a residential health care facility consisting of one hundred and sixty (160) beds, two (2) respite beds and twenty-five (25) medical model adult day care slots.  Buyer hereby affirmatively acknowledges and agrees that the foregoing requirement to file the Application with the Department of Health not later than thirty (30) days following the Contract Date is a material condition of Sellers' obligations hereunder and that Buyer's failure to satisfy such filing requirement shall constitute a material breach of this Agreement by the Buyer and shall be grounds for immediate termination of this Agreement by the Sellers, in which event Buyer shall forfeit its Initial Deposit in accordance with Section 13.4 hereof.  In this regard, the Buyer shall be required to deliver to the Sellers current drafts of the Application on or before each of the following dates: (i) the Contract Date, and (ii) the fifteenth (15th) day following the Contract Date.  Upon filing the Application, the Buyer shall be required to: (i) deliver to the Sellers a complete copy of the final Application within three (3) business days after such Application has been filed with the Department of Health; (ii) use all commercial reasonable efforts to diligently and expeditiously prosecute the Application, including, without limitation, timely and expeditiously submitting all information requested by the Department of Health or any other agency or authority having jurisdiction in connection with the review, processing, evaluation, assessment and approval of the Application; (iii) deliver to the Sellers all correspondence received from and transmitted to the Department of Health and any other agency or authority

having jurisdiction in connection with the review, processing, evaluation, assessment and approval of the Application; and (iv) act in good faith and use all commercially reasonable efforts to ensure that the Buyer satisfies the requirements for approval of the Application. Neither the Buyer nor any Buyer Affiliate (as defined in Section 6.3(c) hereof) will take any action prior to the Closing Date that might disqualify the Buyer from becoming the established and licensed Operator of the Nursing Home or that might otherwise delay approval of the Application. The Sellers shall assist and cooperate with the Buyer in preparing and submitting the Application.

8.4    **Pursuit of Approvals by Sellers.** Between the Contract Date and the Closing Date, Sellers shall: (a) use reasonable efforts to obtain, as promptly as reasonably practicable, any approvals, authorizations and clearances of governmental and regulatory authorities and parties to any of the Contracts required of the Company or the Sellers to consummate the Transaction; (b) provide information and communications in the Company's possession to governmental and regulatory authorities or other parties as the Buyer or such authorities or other parties may reasonably request in connection with the Transaction and obtaining the foregoing approvals and consents; and (c) cooperate with the Buyer in obtaining as soon as practicable, all approvals, authorizations and clearances of governmental and regulatory authorities or other parties required of the Buyer in connection with the Transaction, including the Transfer of Ownership Approval.

8.5    **Exclusivity.** Commencing with the Contract Date and continuing through the Closing Date or the earlier termination of this Agreement, so long as the Buyer is not in default of any provision of this Agreement, neither the Company or any Seller nor any of their respective affiliates, representatives or brokers shall: (a) offer for sale, or solicit offers for the sale of (i) the Nursing Home, the Company Stock, the Assets or any portion of the foregoing, or (ii) any ownership interest in the Company; (b) hold discussions with any party (other than the Buyer or a duly authorized representative of the Buyer) with regard to such an offer or solicitation or with regard to a merger or consolidation of the Company; (c) enter into any agreement with any party (other than the Buyer) with respect to the sale, lease or other disposition of (A) the Nursing Home, the Company Stock, the Assets or any portion of the foregoing, or (B) any ownership interest in the Company; (d) enter into any agreement or with respect to any merger or consolidation of the Company; or (e) furnish or cause to be furnished any information with respect to the Sellers, the Company, the Company Stock, the Nursing Home or the Assets to any Person that the Sellers know or have reason to believe is in the process of considering any such acquisition, merger, or consolidation.

8.6    **Closing Conditions.** Commencing with the Contract Date, each party shall use reasonable efforts to cause the other party's Conditions Precedent over which such party has control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

8.7    **Cooperation.** Prior to the Closing Date, so long as the Buyer is not in material default of any provision of this Agreement, the Sellers shall not take any action that may prevent the fulfillment of the conditions upon the obligation of the Parties to consummate the Transaction, including taking, or causing to be taken, any action that would cause the representations and warranties made by the Company or any Seller in this Agreement to fail to be true, correct, and complete in all material respects as of the Closing Date.

**8.8   Funds of Residents.** The Nursing Company shall provide to the Buyer at Closing an updated list of the Trust Funds and the Security Deposits held by the Nursing Company.  The Buyer shall certify the balances of the Trust Funds and the Security Deposits as of the Closing Date and otherwise comply with the applicable law regarding any change of control or management of such Trust Funds and Security Deposits.  The Buyer shall defend, indemnify and hold the Sellers harmless from any liability arising out of or relating to the Trust Funds and Security Deposits (collectively, the "Trust Fund Obligations").

**8.9   Title Report.**

(a)   Buyer shall, within twenty (20) days upon the execution hereof, request [ *specify existing title company* ] or other title insurance company licensed to do business in the State of New York ("Title Company") to prepare a title report with respect to the Real Property and to deliver to the Sellers a copy of the title commitment.  Buyer will advise the Sellers in writing promptly and in any event no later than sixty (60) days of the Contract Date, of any objections to title (a "Title Objection"), other than the permitted exceptions as set forth in Schedule 8.9 hereof ("Permitted Exceptions").  If Buyer fails to notify Sellers within such time period then Buyer shall be deemed to have waived any objection to such matters shown on the title report and agreed to accept title subject thereto.

(b)   If the Sellers are unable to cause the Title Company to omit or remove any Title Objection or provide the affirmative insurance described as to such matter in Schedule 8.9 by the scheduled Closing Date, Sellers shall be entitled to a reasonable adjournment of the Closing Date for up to ninety (90) days to use its reasonable efforts to have such Title Objection removed or such affirmative insurance issued.  The Sellers shall not be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable the Sellers otherwise to comply with the provisions of this Agreement.

(c)   Buyer at its option may either (i) accept such title as the Realty Company has (or as it may have following the Sellers' reasonable efforts to have any Title Objections removed), without any reduction in the Purchase Price, or (ii) terminate this Agreement as provided in Section 13.1.

**8.10   Obligations regarding Nursing Assets.**   (a)  Notwithstanding anything to the contrary in this Agreement, the Buyer expressly acknowledges and agrees that: (i) the Nursing Company's systems, equipment and other items referred to in Section 5.7(b) hereof are not new, and in the case of certain systems, equipment and items, are in excess of 25 years of age; (ii) Buyer accepts such systems, equipment and items "as is" subject to Sellers' obligation to cause the Nursing Company to perform ordinary repairs and maintenance thereon through the Closing Date, and (iii) except to the extent provided in paragraph (b) of this Section 8.10, neither Seller, Nursing Company, nor Realty Company shall have any obligation hereunder to replace any such systems, equipment or items or to make any major capital improvements thereto or investments therein.

(b)   In the event of a major failure of any such systems, equipment or items which can not be adequately repaired so as to permit Nursing Company to maintain its operating license or to otherwise remain in compliance with applicable regulatory obligations, Seller shall immediately notify Buyer of such fact and shall consult with Buyer as to the manner and method in which such systems, equipment or items shall be replaced.  Buyer shall be

required to promptly respond to Seller's notice, but in no event later than forty-eight (48) hours thereafter, for purposes of coordinating with Seller and Nursing Company as to the selection and installation of such replacement systems, equipment or items. Under such circumstances, Nursing Company shall pay for the replacement of such systems, equipment or items, which shall be treated as a Pre-Paid Expense (as defined in Section 3.2(e)) resulting in a concomitant purchase price adjustment pursuant to Section 3.2(e) hereof. Buyer's failure to promptly respond to Sellers' notice within the aforementioned forty-eight (48) hour period shall be deemed a waiver by the Buyer of its rights hereunder to consult with the Sellers and/or the Nursing Company with regard to the selection and installation of such replacement systems, equipment or items, and the Sellers and the Nursing Home shall have the unilateral right to proceed with the selection and installation of such replacement systems, equipment or items.

(c)     To the extent required by law, Seller shall file any and all applications and/or notices with the DOH for approval of any such repairs, replacements or improvements, including, without limitation applications for 'limited review'. In connection with the preparation and submission of any such application or notice, Sellers shall consult with Buyer and provide Buyer with an opportunity to comment on the content of such application or notice. Sellers shall accommodate Buyer's reasonable comments, suggestions and revisions to the extent such comments, suggestions and revisions are consistent with applicable law.

## ARTICLE IX

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER

The obligations of the Buyer under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of the following conditions, unless waived in writing by the Buyer (collectively, the "Buyer's Conditions Precedent"):

**9.1    Representations/Warranties/Covenants/Schedules.** (a) The Sellers shall have updated the Schedules (the "Updated Schedules") to this Agreement to extent necessary to make the representations and warranties with respect to which such Schedules relate true and correct in all material respects as of the Closing Date and shall have delivered drafts of such Updated Schedules to the Buyer at least ten (10) days prior to the Closing Date and final Updated Schedules on the Closing Date. Buyer and Buyer Affiliates, and their successors and assigns, expressly acknowledge and agree that to the extent that any fact or other information set forth in any Schedule hereof relates or related to a particular representation, warranty or other matter are relevant to any one or more other representations, warranties or Schedules, such fact or information shall be deemed to be disclosed with respect to such other representations, warranties or Schedules and the Buyer and the Buyer Affiliates shall be deemed to have Knowledge thereof, whether or not expressly indicated by a reference to that effect;

(b)     As of the date of the Closing, following delivery of the Updated Schedules, the appropriate officers of each Company, in his or her official capacity, and the Sellers shall have provided the Buyers with a certificate that: (i) the representations and warranties of such Company and the Sellers contained in this Agreement shall be true when made and on and as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date; and (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by such Company and the Sellers on or

before the Closing Date pursuant to the terms of this Agreement shall have been duly complied with and performed.

　　9.2　　**Action/Proceeding.**　As of the Closing Date: (a) no action or proceeding before a court or any other governmental agency or body shall have been instituted or threatened, the result or aim of which would be to restrain or prohibit or obtain damages or other relief with respect to this Agreement or the consummation of the Transaction; and (b) no governmental agency or body shall have taken any other action that would result in a materially adverse effect with regard to the Nursing Home, the Company Stock or the Assets.

　　9.3　　**No Adverse Change.**　No material adverse change in the operations, financial condition or business of the Company or the condition of the Nursing Home or the Assets shall have occurred subsequent to the Contract Date.

　　9.4　　**Recent Agreements and Commitments.**　Each Company shall have delivered to the Buyer an accurate list and detailed description of all agreements relating to the Nursing Home and the Assets entered into by such Company after the Contract Date (the "Additional Contracts"), which list shall be attached to this Agreement as Schedule 9.4.

　　9.5　　**The Sellers' Closing Documents.**　The Company and the Sellers shall have executed and delivered to the Buyer all of the Sellers' Closing Documents, each of which shall be in form and substance reasonably acceptable to the Buyer.

　　9.6　　**Consents to Assignments.**　All material consents, waivers and estoppels of third parties required to be obtained by the Sellers and the Company in connection with the Transaction and the Third Party Consents, shall have been obtained by the Sellers and the Company in form and substance acceptable to the Buyer and provided to the Buyer. The Sellers and the Company shall use their commercially reasonable efforts to obtain all other consents of third parties which are necessary or desirable to consummate the Transaction.

　　9.7　　**Reviewed Financial Statements.**　The Company shall have delivered to the Buyer at least ten (10) days before the Closing Date, Reviewed Financial Statements covering the period beginning on the first day of the current fiscal year and ending the last day of the month ending immediately prior to the Closing Date.

　　9.8　　**Transfer of Ownership Approval.**　The Buyer shall have received the final non-contingent written approval of the Department of Health (the "Transfer of Ownership Approval") to the transfer of ownership of the Nursing Home from the Sellers to the Buyer.

　　9.9　　**Concurrent Transactions.**　Concurrent with the Closing, the transactions contemplated by the Rome Stock Purchase Agreement shall have been consummated.

　　9.10　　**Receipt of Financing Commitment.**　The Buyer shall have received a binding commitment for a loan or other financing arrangement from either HUD or any conventional third-party financing source in an amount up to Eleven Million Five Hundred Thousand Dollars ($11,500,000.00) relating to the transactions contemplated pursuant to this Agreement and the transactions contemplated in connection with the Rome Stock Purchase Agreement.

### 9.11    Title to the Real Property.

(a)    The Buyer shall have received a binding commitment for title insurance in the amount of the Purchase Price allocated to the Realty Company Stock from the Title Company with regard to the Real Property, without exception for any title defects other than the Permitted Exceptions. The Buyer shall obtain such title insurance at its sole expense.

(b)    If at the date of Closing there may be any liens or encumbrances which the Sellers are obligated to pay and discharge, Sellers may use any portion of the balance of the purchase price to satisfy the same, provided Sellers shall simultaneously either deliver to the Buyer at Closing instruments in recordable form and sufficient to satisfy such liens and encumbrances of record together with the cost of recording or filing said instruments, or, provided that the Sellers have made arrangements with the Title Company employed by the Buyer in advance of Closing, Sellers will deposit with the Title Company sufficient monies, acceptable to and required by it to insure the obtaining and recording of such satisfactions and the issuance of title insurance to the Buyer free of any such liens and encumbrances, none of which shall be deemed objections to the title if Sellers shall comply with the foregoing requirements.

## ARTICLE X

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLERS AND THE COMPANY

The obligations of the Sellers and each Company under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of the following conditions, unless waived in writing by the Sellers (collectively, the "Sellers' Conditions Precedent"):

10.1    **Representations/Warranties/Covenants.**  The following shall be true and the Sellers shall have received a certificate to that effect from the appropriate member/manager of the Buyer, in his or her official capacity: (a) the representations and warranties of such Buyer contained in this Agreement and in the Rome Stock Purchase Agreement shall be true when made and on and as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date; and (b) each and all of the terms, covenants and conditions of this Agreement and of the Rome Stock Purchase Agreement to be complied with or performed by such Buyer on or before the Closing Date pursuant to the terms of this Agreement shall have been duly complied with and performed.

10.2    **Action/Proceeding.**  No action or proceeding before a court or any other governmental agency or body shall have been instituted or threatened to restrain or prohibit or obtain damages or other relief with respect to this Agreement or the consummation of the Transaction.

10.3    **The Buyer's Closing Documents.**  The Buyer shall have executed and delivered to the Sellers all of the Buyer's Closing Documents, each of which shall be in form and substance reasonably acceptable to the Sellers.

10.4    **Transfer of Ownership Approval.**  The Buyer shall have obtained the Transfer of Ownership Approval.

**10.5    Concurrent Transactions.** Concurrent with the Closing, the transactions contemplated by the Rome Stock Purchase Agreement shall have been consummated.

ARTICLE XI

**ADDITIONAL AGREEMENTS.**

**11.1    Post-Closing Access to Information.** The Parties acknowledge that, subsequent to the Closing, each Party may require access to information or documents that remain in the control or possession of the other Party (or its affiliates) for the purposes of concluding the Transaction, audits, compliance with governmental requirements and regulations, and the prosecution or defense of third-party claims (collectively, the "Post-Closing Requirements"). Accordingly, the Parties agree that for a period of five (5) years after the Closing each Party shall, at the expense of the requesting Party and upon written request, make available to the requesting Party's agents, independent auditors and/or governmental agencies such documents and information as may be available relating to the Assets for periods prior and subsequent to Closing to the extent necessary to facilitate the Post-Closing Requirements.

**11.2    Company's Reports.** The Company shall prepare and timely file all required reports relating to the Company for periods ending on or prior to the Closing Date or required as a result of the consummation of the Transaction, including terminating cost reports for Medicare and Medicaid and any other reports required to be filed with governmental agencies (collectively, the "Reports"). The Sellers shall retain all rights and liabilities relating to the Reports, including the right to appeal any Medicare or Medicaid determinations relating to the Seller's cost reports for Medicare and Medicaid. The Sellers shall retain the originals of the Reports, and all correspondence, work papers and other documents that relate to the Reports. The Sellers shall defend, indemnify and hold the Buyer harmless from and against any liability arising out of or relating to the Reports, including the Sellers' failure to timely file any of the Reports.

**11.3    Employee Matters.**

(a)    **Continued Employment.** The Buyer shall continue to employ substantially all of the Company's employees on substantially the same terms (including compensation and benefits) as in effect immediately prior to the Closing for a period of at least nine (9) months after the Closing Date; provided, however, that the Buyer shall have the right to terminate any employee of the Company for valid cause.

(b)    **Workers' Compensation.** The carrier of workers' compensation insurance subscribed to or maintained by the Company shall be contractually liable for any and all covered claims for workers' compensation benefits by employees of the Company accrued prior to the Closing Date (collectively, the "Sellers' Workers' Compensation Obligations"). As of the Closing Date, the Buyer and the Company and/or the carrier of workers' compensation insurance subscribed to or maintained by the Company and/or the Buyer in connection with the operations of the Nursing Home shall become liable for any and all covered claims for workers' compensation benefits by any employees solely to the extent such claims are for injuries or diseases that occurred on or after the Closing Date.

(c)     **COBRA.** Effective upon the Closing, the Buyer shall assume all Benefit Plans and obligations thereunder. In addition, Buyer shall assume all obligations under COBRA, including, any COBRA obligations relating to qualified beneficiaries existing prior to the Closing.

**11.4     Accounts Receivable.** In the event that the Buyer shall, following the Closing Date, receive any third party payments with respect to accounts receivable that relate to the period prior to the Closing Date, the Buyer shall remit the full amount of such payment to the Sellers within five (5) days after the receipt thereof.

**11.5     Tax Elections.** The Buyer, in its sole and absolute discretion, shall have the right to make a special tax election pursuant to Section 338 of the Code; provided, however, that the Buyer hereby agrees to indemnify and hold the Sellers harmless from and against any and all Taxes, costs, expenses or liabilities related to or resulting from such election, or resulting from any other federal, state or local tax election or filing, by the Buyer, as set forth in Section 12.6(b) hereof. Further, to the extent the consent of the Sellers is required with respect to any election under Section 338 of the Code or any other tax election, the Sellers, in their sole and absolute discretion, may condition their consent on the Buyer taking all such actions as the Sellers deem necessary to protect the Sellers from any potential taxes, costs, expenses or other liabilities related to or resulting from any such election, including requiring the Buyer placing sufficient funds in escrow to cover any such potential taxes, costs, expenses or other liabilities.

**11.6     Real Property Transfer Tax.** At the Closing the Sellers shall pay by cashiers check or a certified check the New York State Real Property Transfer tax due in accordance with Article 31 of the New York Tax Law, and any other transfer tax payable by reason of the transfer of the Realty Company Stock to the Buyer. Sellers and Buyer shall execute and file NY State form TP-584 and such other returns and forms required By Article 31 as a result of the transfer of the Realty Company Stock. At Seller's option, Buyer shall pay such transfer tax at Closing and receive a credit for the amount paid against the balance of the purchase price due to the Sellers at Closing. The Sellers shall cause such checks and the returns to be delivered to the appropriate office promptly after the Closing.

## ARTICLE XII

## INDEMNIFICATION

**12.1     Indemnification by the Sellers.** Subject to Section 12.9 below, the Sellers jointly and severally shall, from and after the Closing Date, defend, indemnify, and hold harmless the Buyer and the Buyer's members, managers, agents, successors and assigns (collectively, the "Buyer's Indemnified Persons") from and against any claims, costs, damages, expenses or liabilities of any nature whatsoever, including interest, penalties, court costs, reasonable costs of preparation and investigation, reasonable attorneys', accountants', and other professional advisors' fees directly accruing from such damages (collectively, the "Buyer's Losses"), which are incurred or suffered by any of the Buyer's Indemnified Persons in connection with or relating to:

(a)     Subject to Section 12.8 hereof, any material inaccuracy in any representation or certification, or material breach of any warranty of any Seller or the Company

or the non-fulfillment of any material covenant, agreement or other obligation of any Seller or the Company set forth in this Agreement;

(b)    The Assumed Liabilities, including any Excluded Contracts and any Pre-Closing Payor Liabilities (as defined in, and to the extent provided for in, Section 12.12 hereof);

(c)    Any lawsuit, claim, or proceeding against any of the Buyer's Indemnified Persons or the Assets based upon any act or omission by, or obligation of the Sellers prior to the Closing Date;

(d)    All salaries, wages, bonuses, vacation, sick leave and other paid time off and compensation for services rendered of any type whatsoever accrued and/or payable to the Company's employee's with respect to periods ending on or prior to the Closing Date which have not been reserved for or reflected on the Closing Date Balance or otherwise taken into account for purposes of computing the adjustment to the purchase price provided for in Section 3.2(c) hereof;

(e)    All of the express indemnification obligations of the Sellers under this Agreement, including their indemnification obligations with regard to: (i) the Seller's Workers' Compensation Obligations; (ii) the Consent Indemnification Obligations; and (iii) the Reports;

(f)    Any lawsuit, claim or proceeding against any of the Buyer's Indemnified Persons, the Nursing Home or the Assets based upon actions or omissions of the Sellers in connection with the Seller's Accounts Receivables or the Accounts Payable; and

(g)    Any amounts that may be due and owing pursuant to any shareholder, voting or similar agreement or arrangements to which the Sellers are party.

**12.2    Notice of the Buyer's Losses.**  The Sellers shall have no indemnification obligation under this Article XII unless a Claim Notice (as defined in Section 12.6(f)) shall be delivered to Sellers by or on behalf of any of the Buyer's Indemnified Persons in the manner provided below.

**12.3    Indemnification by the Buyer.**  Subject to Section 12.9, below, the Buyer, each Buyer Affiliate, the Company, and the successors and assigns of the Buyer and the Company shall, from and after the Closing Date, jointly and severally defend, indemnify and hold harmless the Sellers from and against any damages, costs, or expenses (including interest, penalties, reasonable costs of preparation and investigation, reasonable attorneys', accountants', and other professional advisors' fees directly accruing from such damages) (collectively, the "Sellers' Losses"), which are incurred or suffered by the Sellers, in connection with or relating to:

(a)    Any inaccuracy in any representation or certification, or breach of any warranty of the Buyer or any Buyer Affiliate or the non-fulfillment of any material covenant, agreement or other obligation of the Buyer or any Buyer Affiliate set forth in this Agreement;

(b)    The Trust Fund Obligations;