(c) Any obligations that may arise under the WARN Act with regard to Company or the Transaction subsequent to the Closing Date;

(d) All wages, salaries, bonuses, commissions, rebates, expenses, benefits, and other compensation or fees of any nature accrued and/or payable with regard to the Retained Employees, that arise after the Closing Date;

(e) Any lawsuit, claim, or proceeding against the Sellers based upon any act or omission by the Buyer after the Closing Date; or

(f) All wages, salaries, bonuses, commissions, rebates, expenses, benefits, and other compensation or fees of any nature that accrue after the Closing Date and are payable to any of the Buyer's employees, directors, officers, contractors, agents or representatives, including any Retained Employees.

**12.4 Refunds/Recoveries Relating to Pre-Closing Periods.** Notwithstanding anything to the contrary herein and except to the extent that any such amounts have otherwise been expressly taken into account as a Closing Date Accounts Receivable in connection with computing a Purchase Price Adjustment pursuant to Section 3.2(a) hereof, the Buyer Indemnifying Parties shall be obligated to pay over to Sellers any refund, reimbursement, recovery, return, or any other amount or payment received by the Company or the Buyers from any governmental agency or Payor that relates to a period ending on or prior the Closing Date (including, without limitation, tax refunds, rate appeals, rate rebasing, workers compensation refunds, suits against Payors that result in a refund).

**12.5 Notice of the Sellers' Losses.** The Buyer shall have no indemnification obligation under this Article XII unless a Claim Notice shall be delivered to the Buyer by or on behalf of any of the Sellers in the manner provided below.

**12.6 Tax Indemnification.**

(a) The Sellers shall be jointly and severally responsible for, and shall indemnify and hold the Buyer Indemnified Parties harmless from and against, all Taxes with respect to the income, assets and operations of the Company for all taxable years or periods ending on or before the Closing Date and for the portion of the taxable year or period through and including the Closing Date in the case of any taxable year or period which commences before but ends after the Closing Date (the "Pre-Closing Taxes"). Notwithstanding the foregoing, Sellers shall not indemnify or hold harmless any of the Buyer Indemnified Parties from or against any liability for any Taxes or Buyer's Losses resulting directly or indirectly as a result of: (i) an election under Section 338 of the Code with respect to the Transaction made or deemed to be made by or on behalf of the Buyer, any of affiliate of the Buyer, or any successor, assignee or transferee of the Buyer, or (ii) any other action taken on or after the Closing Date by Buyer, any of affiliate of the Buyer, or any successor, assignee or transferee of the Buyer, including, without limitation, any merger, consolidation, sale, stock or asset transfer, liquidation or dissolution of the Company or the Buyer.

(b) The Buyer Indemnifying Parties shall be responsible for, and shall jointly and severally indemnify and hold the Sellers harmless from and against, all Taxes with respect to the income, assets and operations of the Company, and the business and the assets of

the Company for all taxable years or periods beginning on or after the Closing Date and for the portion of the taxable year or period after such Closing Date in the case of any taxable year or period which commences before but ends after the Closing Date (the "Post-Closing Taxes"). Furthermore, the Buyer Indemnifying Parties shall jointly and severally indemnify and hold the Sellers harmless from and against any and all Taxes and Sellers' Losses resulting directly or indirectly from: (i) any election under Section 338 of the Code made or deemed to be made by or on behalf of the Buyer, any of affiliate of the Buyer, or any successor, assignee or transferee of the Buyer, or (ii) any other tax election action taken on or after the Closing Date by Buyer, any of affiliate of the Buyer, or any successor, assignee or transferee of the Buyer, including, without limitation, any merger, consolidation, sale, stock or asset transfer, liquidation or dissolution of the Company or the Buyer.

(c)     Taxes attributable to a taxable year or period which commences before but ends after the Closing Date shall be calculated and allocated between the Sellers and the Buyer as if the relevant taxable period ended on the Closing Date. Whenever, in accordance with the provisions of this Section 12.6, the Sellers shall be required to pay the Buyer Indemnified Parties an amount in respect of Pre-Closing Taxes, or the Buyer shall be required to pay the Sellers an amount in respect of Post-Closing Taxes, subject to each party's right to dispute the amount of such Taxes, such payments shall be made by wire transfer of immediately available funds no later than ten (10) days after receipt of a written request therefor.

**12.7    Notice and Procedure.** All claims for indemnification by any Person against whom claims of indemnification are being asserted (an "Indemnifying Party") under this Agreement shall be asserted and resolved as follows:

(a)     In the event that any claim or demand is asserted by a Person other than a Party (the "Third-Party Claim") for which an Indemnifying Party may be liable for the Buyer's Losses or the Seller's Losses, as the case may be (either the Buyer's Losses or the Seller's Losses, the "Losses"), under this Agreement, the Party claiming indemnification (the "Indemnified Party") shall, within twenty (20) calendar days of the receipt of notice of the Third-Party Claim, deliver a Claim Notice to the Indemnifying Party. If the Indemnified Party fails to provide the Indemnifying Party with the Claim Notice within the foregoing time period, the Indemnifying Party shall have no indemnification obligations with regard to such Third-Party Claim. The Indemnifying Party shall notify the Indemnified Party within thirty (30) business days of receipt of the Claim Notice whether it shall, at the Indemnifying Party's sole cost and expense, defend the Indemnified Party against such Third-Party Claim. If the Indemnifying Party (i) does not respond within thirty (30) business days of receiving the Claim Notice; or (ii) notifies the Indemnified Party that it shall not defend such Third-Party Claim, the Indemnifying Party shall be deemed (x) to have refused, and shall have no further right except as otherwise provided in this Agreement, to participate in the defense of such Third-Party Claim; and (y) such Third-Party Claim shall be conclusively deemed to be an indemnification liability of the Indemnifying Party. Notwithstanding the foregoing, the Indemnified Party shall promptly notify the Indemnifying Party, in writing, if the Indemnified Party enters into settlement negotiations with regard to such Third-Party Claim. Upon receipt of such notice, the Indemnifying Party shall have a period of fifteen (15) business days to notify the Indemnified Party whether it wishes to participate in the settlement discussions. Failure of the Indemnifying Party to respond within such fifteen (15) day period shall be deemed to mean that the Indemnifying Party does not wish to participate in the settlement negotiations and, in such event,

the Indemnified Party may participate in settlement negotiations and enter into a settlement agreement without further notice to the Indemnifying Party. If the Indemnifying Party promptly notifies the Indemnified Party it wishes to participate in settlement negotiations, it may do so at its sole cost and expense.

(b) If the Indemnifying Party notifies the Indemnified Party, in a timely manner, that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this Agreement, the Indemnifying Party shall have the right to defend, at its sole cost and expense, such Third-Party Claim by all appropriate proceedings, which proceedings shall be (i) diligently prosecuted by the Indemnifying Party to a final conclusion; or (ii) settled at the discretion of the Indemnifying Party (with the consent of the Indemnified Party, which consent shall not be unreasonably withheld). The Indemnifying Party shall have full control of such defense and proceedings. The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim. Notwithstanding the foregoing: (A) the Indemnifying Party may not assume the defense if the named parties to the Third Party Claim (including any impleaded parties) include both the Indemnifying Party and any Indemnified Party and representation of both such parties by the same counsel would be inappropriate due to actual or potential differing interests between them, in which case any Indemnified Party shall have the right to defend the Third Party Claim and to employ counsel at the expense of the Indemnifying Party; (B) if there is a reasonable probability that a Third Party Claim may materially and adversely affect the Indemnified Party and such damage will either be irreparable, or not compensable by money damages, or if compensable by money damages, such money damages would be difficult or impossible to calculate, the Indemnified Party shall have the right, at its own cost and expense, to defend, compromise and settle such claim; and (C) the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any Third Party Claim or consent to the entry of any judgment which does not include as an unconditional term the release by the claimant of the Indemnified Party from all liability in respect of such Third Party Claim.

(c) If the Indemnifying Party either: (i) fails to notify the Indemnified Party in a timely manner that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Agreement; or (ii) fails to prosecute diligently or settle the Third Party Claim, then the Indemnified Party shall have the right (but not the obligation) to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings shall be (A) promptly and vigorously prosecuted by the Indemnified Party to a final conclusion; or (B) settled at the discretion of the Indemnified Party. The Indemnified Party shall retain full control of such defense and proceedings, including any related compromise or settlement; provided, however, that if requested by the Indemnified Party, the Indemnifying Party shall, at the sole cost and expense of the Indemnifying Party cooperate with the Indemnified Party and its counsel (x) in contesting any Third Party Claim which the Indemnified Party is contesting; or (y) if appropriate and relating to the Third Party Claim in question, in making any counterclaim against the Person asserting the Third Party Claim, or any cross-complaint against any Person (other than the Indemnifying Party or any of its affiliates). Notwithstanding the foregoing provisions, if the Indemnifying Party has notified the Indemnified Party with reasonable promptness that the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party, the Indemnifying Party shall not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this subparagraph or of the

Indemnifying Party's participation in such defense at the Indemnified Party's request, and the Indemnified Party shall reimburse the Indemnifying Party, in full, for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation. The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this subparagraph, but the Indemnifying Party shall bear its own costs and expenses with respect to such participation.

(d)     In the event any Indemnified Party should have a claim under this Agreement against any Indemnifying Party that does not involve a Third Party Claim, the Indemnified Party shall, within twenty (20) calendar days of gaining actual knowledge of such claim, deliver an Indemnity Notice (as defined below) to the Indemnifying Party. The failure by any Indemnified Party to timely deliver an Indemnity Notice to the Indemnifying Party shall release and discharge the Indemnifying Party from any liability or responsibility pertaining to the respective claim. If the Indemnifying Party does not notify the Indemnified Party within thirty (30) business days following its receipt of an Indemnity Notice that the Indemnifying Party disputes its liability to the Indemnified Party for the underlying claim, such claim shall be conclusively deemed an indemnification liability of the Indemnifying Party. In the event the Indemnified Party is not paid, in full, for its claim in a timely manner, the Indemnifying Party shall have all rights and remedies available to it under applicable law.

(e)     If the Indemnifying Party has timely disputed its liability with respect to a claim for indemnification after delivery of a Claim Notice or Indemnity Notice as provided above, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution of such dispute within sixty (60) calendar days following receipt of a Claim Notice or an Indemnity Notice prior to seeking a judicial determination of liability. In the event the Indemnified Party is not paid, in full, for its claim in a timely manner after the Indemnifying Party's obligation to indemnify has been (i) finally agreed to by the Parties; or (ii) judicially determined, the Indemnifying Party shall have all rights and remedies available to it under applicable law.

(f)     The term "Claim Notice" shall mean written notification of a Third-Party Claim by an Indemnified Party to an Indemnifying Party, enclosing a copy of all papers served, if any, and specifying the nature of and alleged basis for such Third-Party Claim and, to the extent then feasible, the alleged amount or the estimated amount of such Third Party Claim.

(g)     The term "Indemnity Notice" shall mean written notification of a claim for indemnification (other than a Third-Party Claim) by an Indemnified Party to an Indemnifying Party specifying the nature of and specific basis for such claim and, to the extent then feasible, the amount or the estimated amount of such claim.

(h)     Any estimated amount of a claim submitted in a Claim Notice or an Indemnity Notice shall not be conclusive of the final amount of such claim.

12.8    **Required Notice and Cure Rights.**  Notwithstanding anything to the contrary herein, the Sellers shall not be deemed to be in breach or default of any of its representations, warrantees or covenants under this Agreement, until the Sellers have received notice of such breach or default from the Buyer and has been afforded the reasonable opportunity to cure such breach or default at Sellers' cost and expense, which cure shall be commenced by

the Sellers no later than forty-eight (48) hours after receipt of such notice and shall be completed to the reasonable satisfaction of the Buyer no later than twenty (20) days after receipt of such notice or such other reasonable time period as may be warranted under the circumstances.

12.9  **Survival.**  Except with respect to indemnification obligations relating to Pre-Closing Payor Liabilities and Taxes as provided for below, the indemnification obligations of the Indemnifying Parties shall survive the Closing for a period of one (1) year; provided, however, that any claim for indemnification in respect of which notice is given in good faith and with reasonable basis in accordance with the provisions of this Article XII prior to the date that is one (1) year following the Closing Date shall survive with respect to such claim until final resolution thereof. The indemnification obligations of the Indemnifying Parties with respect to any Pre-Closing Payor Liabilities of an Indemnified Party shall survive the Closing for a period of three (3) years, provided, however, that any claim for indemnification in respect of which notice is given in good faith and with reasonable basis in accordance with the provisions of this Article XII prior to the date that is three (3) years following the Closing Date shall survive with respect to such claim until final resolution thereof. The indemnification obligations of the Indemnifying Parties with respect to Taxes shall survive until the expiration of the applicable statute of limitations.

12.10  **Thresholds and Limitations.**  (a) No claims for indemnification shall be brought by an Indemnified Party against an Indemnifying Party unless such claim is brought in good faith and, except in the case of Pre-Closing Payor Liabilities (which are specifically addressed in Section 12.12(a) hereof) and the Buyer's indemnification obligations with respect to Taxes and Sellers' Losses pursuant to Sections 11.5 and 12.5 hereof, until such claims of the Indemnified Party exceed One Hundred Thousand Dollars ($100,000) in the aggregate and then only for the amount by which such damages exceed One Hundred Thousand Dollars ($100,000) (the "Basket"). In no event shall the aggregate indemnification responsibilities hereunder of any Indemnifying Party exceed Five Hundred Thousand Dollars ($500,000) (the "Indemnification Ceiling"). Notwithstanding their joint and several liability, it is understood and agreed that the Sellers are deemed to be a single Indemnifying Party for purposes of applying the indemnification thresholds and limitations set forth in this Agreement. Buyer acknowledges and agrees that the Basket and the Indemnification Ceiling shall not be applicable to, and shall not limit Buyer's liabilities with respect to Taxes and Sellers' Losses pursuant to Sections 11.5 and 12.5(b). The Parties expressly acknowledge and agree that the $100,000 Basket and the $500,000 Indemnification Ceiling provided for in this Section 12.10(a) hereof constitute aggregate thresholds and limitations for both this Transaction and the transaction contemplated pursuant to the Rome Stock Purchase Agreement collectively, and accordingly, the aggregate indemnification obligations of an Indemnifying Party under this Agreement and the Rome Stock Purchase Agreement shall not exceed $500,000, subject to a single aggregate $100,000 Basket as provided in this Section 12.10(a) and Section 12.10(a) of the Rome Stock Purchase Agreement. For example, in the event that circumstances exist that give rise to the Buyer seeking indemnification from the Sellers under this Agreement for non-Pre-Closing Payor Liabilities in the sum of $300,000 and separately under the Rome Stock Purchase Agreement non-Pre-Closing Payor Liabilities in the sum of $400,000, the Sellers' obligations to indemnify the Buyer under this Agreement and the Rome Stock Purchase Agreement shall not exceed $500,000 in the aggregate.

(b)     Buyer and Buyer Affiliates, and their successors and assigns, hereby expressly acknowledge and agree that: (i) neither the Sellers nor the Company shall have any liability to the Buyer, any Buyer Affiliate, or any successor or assigns thereof, with regard to the Sellers' or the Company's failure to disclose any fact or other information that is required to be disclosed to the Buyer, any Buyer Affiliate, or any successor or assigns thereof pursuant to this Agreement, or which if known by the Sellers, would constitute a breach by the Sellers or the Company hereunder, which fact or other information Buyer or any Buyer Affiliate otherwise had Knowledge of on or prior to Closing or was discovered or reasonably discoverable by the Buyer or any Buyer Affiliate during the conduct of their due diligence review of the Sellers, the Company and the operations thereof; and (ii) Buyer's decision to consummate the closing of the transactions contemplated hereunder shall constitute a waiver of any claims that either Buyer, any Buyer Affiliate, or their successors and assigns may have against the Sellers or the Company.

**12.11  Interest.**  Any indemnification amount due to the Indemnified Party from the Indemnifying Party shall bear interest from the date of the Indemnity Notice until such amount is paid by the Indemnified Party at an annual rate of the "prime rate" of interest as reported in the Wall Street Journal, plus one percent (1%).

**12.12  Overpayments and Audit Liabilities.**

(a)     The Buyer acknowledges and agrees that, notwithstanding anything in this Agreement or any other agreement, arrangement or understanding by and among the parties hereto to the contrary, the Company shall remain liable and responsible for any and all judgments, claims, reimbursements and overpayment and/or repayment demands or liabilities arising under Medicare, Medicaid and/or any other third party payor programs ("Payors") for all periods whether ending prior to, on, or after the Closing Date, including third party payor settlement payments and/or retroactive adjustments ("Payor Liabilities"). Notwithstanding the foregoing, the Sellers shall indemnify the Buyer and the Company, in accordance with the indemnification and notice provisions set forth below, for all Payor Liabilities for reporting or claims periods beginning on or after the date which is three (3) years immediately prior to the Closing Date and ending on or prior to the Closing Date, but only to the extent that such claims (i) are not otherwise collectible by the Company from other payment sources, (ii) in the aggregate, exceed the sum of One Hundred Thousand Dollars ($100,000), and (iii) in the aggregate, do not exceed the sum of One Million Dollars ($1,000,000) ("Pre-Closing Payor Liabilities"). Accordingly, Sellers shall have the obligation to indemnify the Buyer for an amount up to, but in no event exceeding, the sum of One Million Dollars ($1,000,000). The Parties expressly acknowledge and agree that the $1,000,000 limitation on the Sellers' indemnification obligation regarding Pre-Closing Payor Liabilities provided for in this Section 12.12(a) constitutes an aggregate limitation for both this Transaction and the transaction contemplated pursuant to the Rome Stock Purchase Agreement collectively, and accordingly, the aggregate indemnification obligation of the Sellers under this Agreement and the Rome Stock Purchase Agreement for Pre-Closing Payor Liabilities shall not exceed $1,000,000. For example, in the event that circumstances exist that give rise to the Buyer seeking indemnification from the Sellers under this Agreement for Pre-Closing Payor Liabilities in the sum of $800,000 and separately under the Rome Stock Purchase Agreement for Pre-Closing Payor Liabilities in the sum of $400,000, the Sellers' obligations to indemnify the Buyer under this Agreement and

the Rome Stock Purchase Agreement for Pre-Closing Payor Liabilities shall not exceed $1,000,000 in the aggregate.

(b) In the event that the Company or the Buyer receives any notice, claim, demand or other written document from a Payor or other party that potentially could give rise to or that otherwise relates to a Pre-Closing Payor Liability, the Buyer shall deliver to the Sellers a copy of such notice no later than five (5) business days after receipt thereof. Sellers shall have fifteen (15) business days from the receipt of such notice to either pay the claim or to inform the Buyer that they intend to contest such claim, unless such claim specifies a shorter time period for responding thereto, in which event the Sellers shall respond within such time period. Should the Sellers intend to contest such claim, the Sellers shall, no later than ten (10) business days from the date Sellers notified the Buyer of its intention to contest the claim, commence, in good faith, the settlement or defense of such claims through legal counsel and representatives of its own choosing and at the Sellers' sole risk and expense; <u>provided, however</u>, that the Buyer and/or the Company shall be entitled to participate in any such settlement discussions or defense, through counsel and representatives of its own choosing at Buyer's cost and expense, but only to the extent that any such defense or settlement discussions could reasonably be considered to have a material adverse impact on the Company's operations or otherwise result in a material liability to the Company for which the Sellers would not be obligated hereunder to indemnify the Buyer or the Company. The Buyer and the Company shall fully cooperate with the Sellers in connection with the settlement, contest and/or defense of any such claims from Payors and provide access to the books and records of the Nursing Home. So long as the Sellers are contesting any such claim in good faith, the Buyer shall not pay or settle any such claim. If the Sellers do not provide the Buyer with the timely written notice of the undertaking as provided above, the Buyer shall thereafter have the right to contest, settle or compromise the claim at its exclusive discretion, at the risk and expense of the Sellers to the full extent set forth herein.

(c) Provided the Buyer had given timely and proper notice to the Sellers as provided in paragraph (b) of this Section 12.12, the Sellers shall be responsible for any judgment or finding in favor of any Payor and against the Buyer or the Company with respect to Pre-Closing Payor Liabilities, plus interest through the date of payment so as to ensure that the Buyer shall be given a Vacateur or Satisfaction of such judgment.

(d) If on or prior to the Closing, the Sellers or the Company has received a notice from a Payor advising that a Payor Liability is due and payable, then:

>    (i) the Buyer shall place in an interest bearing attorney's escrow account the amount specified in such letter or notice, or if no amount is so specified, a good faith estimate of the value of the Payor Liability (the "<u>Retroactive Amount</u>"), to be held in escrow by the escrow agent until such time as the Retroactive Amount is payable, which amount shall be release to either the Payor or the Sellers upon final adjudication or settlement thereof (with all interest earned or otherwise accrued on the Retroactive Amount, being credited and/or distributed for the benefit of the Sellers), or

(ii) at the direction of the Sellers, in lieu of the escrow deposit contemplated under immediately preceding clause (i), the Retroactive Amount shall be credited to the Buyer as an adjustment to the Balance Payment, and the Sellers shall have no further obligation to the Buyer on account of such Retroactive Amount to the extent that such adjustment is taken.

## ARTICLE XIII

## TERMINATION

13.1 **Termination by the Parties.** This Agreement may be terminated at any time at or prior to the Closing by:

(a) the Buyer, if any of the Buyer's Conditions Precedent have not been satisfied by the required Closing Date (as defined in Section 4.1) in accordance with Article IX hereof;

(b) the Sellers, if (i) the Buyer is not able to secure a binding commitment for a loan or other financing arrangement from either HUD or any conventional third-party financing source in an amount up to Eleven Million Five Hundred Thousand ($11,500,000.00) within six (6) months of the Contract Date; or (ii) any of the Sellers' Conditions Precedent have not been satisfied by the required Closing Date (as defined in Section 4.1) in accordance with Article X hereof or of the Rome Stock Purchase Agreement; or

(c) the mutual consent of the Buyer and the Sellers.

13.2 **Effect of Termination.** If a party terminates this Agreement because one of its conditions precedent has not been fulfilled, or if this Agreement is terminated by mutual consent, or if it is otherwise terminated pursuant to this Article 13, this Agreement shall become null and void without any liability of any party to the other; provided, however, that if such termination is by reason of the breach by any party of any of its representations, warranties or obligations under this Agreement, the other party shall be entitled to be indemnified for any Buyer's Losses or the Sellers' Losses, as the case may be, incurred by it by reason thereof in accordance with Article XI hereof (and for such purposes Article XI shall survive the termination of this Agreement). Further, nothing in this Section 13.2 shall affect the Buyer's right to specific performance of the obligations of the Sellers at the Closing hereunder.

13.3 **Receipt of Transfer of Ownership Approval.** If the Department of Health has not issued the Transfer of Ownership Approval of the Application within fifteen (15) months of the Contract Date (the "Application Period"), the Sellers will have the right to terminate this Agreement upon ten (10) days prior written notice to the Buyer, and the Sellers will be entitled to retain the Deposit as consideration for keeping the Nursing Home off the market and not as a penalty; provided, however, that if the Department of Health places a temporary moratorium on its consideration of certificate of need applications that would directly impact the transactions contemplated by this Agreement, the running of the Application Period shall be tolled during the pendency of such moratorium; and provided further, however, that the Application Period shall be extended for an additional ninety-(90)-day period if the Buyer's Application has received the approval of the State Hospital Review and Planning Council

(SHRPC) during the initial fifteen (15) months of the Application Period, and the Department of Health has indicated that approval of the Application is likely within the additional ninety-(90)-day time frame, and provided that the Buyer is diligently pursuing the approval required by the Application including, but not limited to, taking all steps required by the Department of Health.

**13.4 Default of the Buyer and Loss of Deposit.** In addition to, and not in lieu of, any other remedies that Sellers may be entitled to hereunder, in the event that the Closing does not occur for any reason (including, without limitation, by reason of the termination of this Agreement by Sellers in accordance with Section 13.1(b) hereof) other than due to the fault of, or a breach by, the Sellers, the Buyer shall (i) forfeit the Deposit and the Escrow Agent shall immediately release the Deposit to the Sellers (together with all accrued interest and earnings thereon), in accordance with the terms and conditions of the Escrow Agreement, as liquidated damages for all loss, damage and expenses suffered by the Sellers, and neither Party shall have any further rights or liabilities under this Agreement, and (ii) be obligated to reimburse the Sellers and the Company for reasonable attorney and accounting fees, costs, disbursements and expenses incurred and/or owing by the Sellers in respect of the Transaction.

ARTICLE XIV

MISCELLANEOUS

**14.1 Costs and Expenses.** Except as expressly otherwise provided in this Agreement, the Buyer and the Sellers shall bear their own costs and expenses in connection with this Agreement and the transactions contemplated hereby; provided, however, that no such costs and expenses shall be charged to the Company and its subsidiaries.

**14.2 Performance.** In the event of a breach by any Party of its obligations hereunder, the other Party shall have the right, in addition to any other remedies which may be available, to obtain specific performance of the terms of this Agreement, and the breaching party hereby waives the defense that there may be an adequate remedy at law. Should any party default in its performance, or other remedy, the prevailing party shall be entitled to its reasonable attorneys' fees.

**14.3 Benefit and Assignment.** This Agreement binds and inures to the benefit of each party hereto and its successors and proper assigns. The Buyer may not assign any of its interests, rights, duties or obligations under this Agreement to any other person or entity, including without limitation any Buyer Affiliate, without the prior written consent of the Sellers, which consent shall be provided in the sole and absolute discretion of the Sellers; <u>provided, however</u>, that the Buyer may assign its rights, duties and obligations to file the Application pursuant to Section 8.3 hereof to Stonehedge Acquisition Chittenango I, LLC for the purpose of causing Stonehedge Acquisition Chittenango I, LLC to become established and licensed as the Operator of the Nursing Home. Any assignment by the Buyer that is not expressly authorized by the Sellers in accordance with this Section 14.3 shall be null and void and have no legal force or effect, and any such attempt of assignment shall be a material breach of this Agreement giving the Sellers the right to immediately terminate this Agreement. In the instance of any and all assignments by the Buyer that may be authorized by the Sellers, Buyer shall remain fully responsible for the performance of all of Buyer's duties and obligations hereunder, including the Buyer's duty and obligation to fully perform with regard to the matter that is the subject of such assignment.

14.4    **Effect and Construction of this Agreement.** This Agreement and the Schedules attached hereto, together with the Rome Stock Purchase Agreement and the schedules attached thereto, embody the entire agreement and understanding of the parties and supersede any and all prior agreements, arrangements and understandings relating to matters provided for herein.

14.5    **Knowledge.** For purposes of this Agreement, the term "Knowledge" shall mean the actual knowledge of the person being referred without such person having made any inquiry or having any duty to make any further inquiry in any such regard.

14.6    **Cooperation – Further Assistance.** From time to time, as and when reasonably requested by any party hereto after the Closing, the other parties will (at the expense of the requesting party) execute and deliver, or cause to be executed and delivered, all such documents, instruments and consents and will use reasonable efforts to take all such action as may be reasonably necessary to carry out the intent and purposes of this Agreement.

14.7    **Notices.** Any notice, demand or communication required, permitted, or desired to be given under this Agreement shall be deemed effectively given when: (i) personally delivered; (ii) delivered by facsimile; (iii) delivered by nationally recognized overnight courier; or (iv) five (5) days after being sent by certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| The Buyer: | Stonehedge Acquisition Chittenango II, LLC<br>c/o Joseph Kazarnovsky, Managing Member<br>14 Hidden Valley Drive, Suffern, New York 10901 |
| copy to: | Abrams, Fensterman, Fensterman, Flowers & Eisman, LLP<br>1111 Marcus Avenue, Suite 107<br>Lake Success, New York 11042<br>Attn: Mark Zafrin, Esq. |
| The Sellers: | Jane Halbritter<br>100 West Garden Street<br>Rome, New York 13440 |
| | Marc Rossi<br>6866 Stokes Westernville Road<br>Ava, New York 13303 |
| copy to: | Epstein, Becker & Green, P.C.<br>250 Park Avenue<br>New York, New York 10021<br>Attn: Jay Gerzog, Esq. |

or to such other address or number, and to the attention of such other Person or officer, as any party may designate, at any time, in writing in conformity with these notice provisions. Notwithstanding the foregoing, notice to the Buyer's Counsel and/or the Sellers' Counsel shall not, in and of itself, constitute notice for purposes of this Agreement.

14.8    **Waiver, Discharge, Etc.**  This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by an instrument in writing executed by or on behalf of each of the parties hereto by their duly authorized officer or representative.  The failure of any party to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

14.9    **Rights of Persons Not Parties.**  Nothing contained in this Agreement shall be deemed to create rights in persons not parties hereto, other than the successors and proper assigns of the parties hereto.

14.10   **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, disregarding any rules relating to the choice or conflict of laws.

14.11   **Amendments, Supplements, Etc.**  At any time before or after the execution and delivery of this Agreement by the parties hereto, this Agreement may be amended or supplemented by additional agreements, articles or certificates, as may be mutually determined by the parties to be necessary, appropriate or desirable to further the purposes of this Agreement, to clarify the intention of the parties, or to add to or to modify the covenants, terms or conditions hereof or thereof.  The parties hereto shall make such technical changes to this Agreement, not inconsistent with the purposes hereof, as may be required to effect or facilitate any governmental approval or acceptance of this Agreement or to effect or facilitate any filing or recording required for the consummation of any portion of the transactions contemplated hereby.  This Agreement may not be amended except by an instrument in writing signed by each of the parties.

14.12   **Severability.**  Any provision, or distinguishable portion of any provision, of this Agreement which is determined in any judicial or administrative proceeding to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties waive any provision of law which renders a provision hereof prohibited or unenforceable in any respect.

14.13   **Confidentiality.**  It is understood by the Parties that all of the information, documents and instruments (the "Confidential Information") that shall be delivered by each Party to the other Party (including to its officers, directors, representatives and agents) in connection with the negotiation and consummation of the Transaction, including the existence and the

contents of this Agreement, are of a confidential and proprietary nature. Each Party shall, at all times prior to the Closing, maintain the confidentiality of the Confidential Information, disclosing it only to such Party's duly authorized officers, directors, representatives and agents. Each Party further agrees that if the Transaction is not consummated, each Party shall immediately return to the other Party all originals and copies in its possession of the Confidential Information received from the other Party. Each Party recognizes that any breach of this subparagraph would result in irreparable harm to the other Party and its affiliates and, therefore, each Party shall be entitled to obtain an injunction to prohibit any such breach or anticipated breach, without the necessity of proving actual damages or posting a bond, cash or otherwise, in addition to all of its other legal and equitable remedies. Nothing in this subparagraph, however, shall prohibit the use or disclosure of the Confidential Information as may be required by law or governmental regulations or by either Party to defend itself in a legal proceeding.

**14.14 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall, when taken together, constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have hereunto set their hands and seals the day and year first above written.

**THE COMPANY:**

STONEHEDGE NURSING HOME CHITTENANGO, INC.

By: _____
Name: Jane Halbritter
Title:  President

STONEHEDGE REALTY CHITTENANGO, INC.

By: _____
Name: Jane Halbritter
Title:  President

**THE SELLERS:**

_____
Jane Halbritter, individually

_____
Marc Rossi, individually

**THE BUYER:**

STONEHEDGE ACQUISITION
CHITTENANGO II, LLC

By: _____
Name:  Joseph Kazarnovsky
Title:   Managing Member

BUYER AFFILIATES:

_____
Joseph Kazarnovsky, individually

_____
Samuel Kazarnovsky, individually

_____
Joseph Zupnick, individually

_____
Barry Adler, individually


STONEHEDGE ACQUISITION CHITTENANGO I, LLC

By: _____
Name: Joseph Kazarnovsky
Title:


STONEHEDGE ACQUISITION ROME I, LLC

By: _____
Name: Joseph Kazarnovsky
Title:


STONEHEDGE ACQUISITION ROME II, LLC

By: _____
Name: Joseph Kazarnovsky
Title:


NY:289187v2

## SCHEDULE 3.2

### Balance Sheet of the Company

Attached hereto are the balance sheets of the Company as of July 31, 2004. These will be updated as necessary at signing and at closing.

## STONEHEDGE REALTY CHITTENANGO, INC.

### BALANCE SHEET
August 27, 2004

| ASSETS | | 8/27/2004 |
|---|---|---:|
| **CURRENT ASSETS:** | | |
| Cash and Cash Equivalents | $ | 184,146 |
| Due from Affiliate | | 11,406 |
| Total Current Assets | $ | 195,553 |
| | | |
| **FIXED ASSETS:** | | |
| Land and Land Improvements | $ | 50,253 |
| Buildings and Building Improvements | | 539,501 |
| Total Fixed Assets | $ | 589,754 |
| Less Accumulated Depreciation | | 165,325 |
| Net Fixed Assets | $ | 424,429 |
| | | |
| **TOTAL** | $ | 619,982 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---:|
| **CURRENT LIABILITIES:** | | |
| Accrued Expenses | $ | 100 |
| Accrued Interest | | 56,816 |
| Total Current Liabilities | $ | 56,916 |
| | | |
| **LONG-TERM LIABILITIES:** | | |
| Note Payable | | 250,000 |
| Total Liabilities | $ | 306,916 |
| | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Common Stock (no par value; 300 shares authorized; 60 shares issued and 40 shares outstanding) | $ | 2,552 |
| Treasury Stock (20 shares) | | (1) |
| Additional Paid-in-Capital | | 300,000 |
| Retained Earnings (Deficit) | | 10,515 |
| Total Stockholders' Equity | $ | 313,066 |
| | | |
| **TOTAL** | $ | 619,982 |

The accompanying notes are an integral part of these financial statements.

# STONEHEDGE NURSING HOME CHITTENANGO, INC.

## BALANCE SHEET
### August 27, 2004

|  | 8/27/2004 |
|---|---:|
| **ASSETS** | |
| **CURRENT ASSETS:** | |
| Cash and Cash Equivalents | $ 567,233 |
| Cash-Patient Trust Funds | 18,159 |
| Accounts Receivable | 580,004 |
| Due From Related Parties | 14,408 |
| Inventory | 17,813 |
| Prepaid Expenses | 49,140 |
| Total Current Assets | $ 1,246,757 |
| | |
| **FIXED ASSETS:** | |
| Leasehold Improvements | $ 139,669 |
| Fixed Equipment | 114,896 |
| Movable Equipment | 815,457 |
| Total Fixed Assets | $ 1,070,021 |
| Less Accumulated Depreciation | 776,709 |
| Net Fixed Assets | $ 293,312 |
| | |
| **TOTAL** | $ 1,540,070 |
| | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | |
| **CURRENT LIABILITIES:** | |
| Accounts Payable | $ 56,406 |
| Patient Trust Funds | 18,159 |
| Accrued Payroll and Compensation Pay | 76,609 |
| Accrued and Withheld Payroll Taxes | 324 |
| Due to Related Parties | 5,838 |
| Due to Third Party Payors | 12,930 |
| Current Portion of Long-Term Debt | 10,896 |
| Total Current Liabilities | $ 181,162 |
| | |
| **LONG-TERM DEBT** | 181,515 |
| Total Liabilities | $ 362,677 |
| | |
| **STOCKHOLDERS' EQUITY:** | |
| Capital Stock (no par value; 200 shares authorized, 200 shares issued 133 and 1/3 shares outstanding) | $ 100,000 |
| Treasury Stock (66 and 2/3 shares) | (235,000) |
| Retained Earnings | 1,312,393 |
| Total Stockholders' Equity | $ 1,177,393 |
| **TOTAL** | $ 1,540,070 |

Exhibit 3