EXHIBIT - D

Allegaert Berger & Vogel LLP
111 Broadway, 18th Floor
New York, New York 10006
(212) 571-0550
Attorneys for Plaintiff



UNITED STATES DISRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
JANE A. HALBRITTER,

            Plaintiff,

-- against --

STONEHEDGE ACQUISITION ROME II, LLC
and STONEHEDGE ACQUISITION
CHITTENANGO II, LLC,

            Defendants.
------------------------------------------------X

Judge Pauley,

07 CIV 3848

COMPLAINT

       Plaintiff Jane A. Halbritter, for her Complaint in this action, alleges, upon knowledge as to her own acts and status and upon information and belief as to the acts and status of others, as follows:

### Introduction

1.    This is an action to remedy defendants' breaches of contract and unjust enrichment arising in connection with defendants' purchase, from plaintiff and her brother, of the capital stock of two residential nursing facilities in upstate New York in early 2006.

### The Parties

2.    Plaintiff Jane A. Halbritter is a natural person and a resident of the state of Florida. She brings this action to enforce contractual and other rights, and as assignee of

the rights of her brother, Marc Rossi ("Rossi"), accrued by virtue of the facts described below.

3. Defendant Stonehedge Acquisition Rome II, LLC ("Rome Acquisition") is a limited liability company organized under the laws of, and having its principal place of business in, the state of New York. None of its members is a resident of the state of Florida.

4. Defendant Stonehedge Acquisition Chittenango II, LLC ("Chittenango Acquisition") is a limited liability company organized under the laws of, and having its principal place of business in, the state of New York. None of its members is a resident of the state of Florida.

## Jurisdiction and Venue

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. This Court has jurisdiction over the persons of the defendants by virtue of defendants' significant contacts with this district. Among other things, contracts at issue in this action were negotiated and executed in this district; the transactions from which this action arises were consummated at a closing which occurred in this district; defendants' Managing Member is a resident of this district; and contracts at issue herein provide for notices to defendants to be directed to defendants' Managing Member at an address in this district.

7. Additionally or alternatively, defendants would be subject to personal jurisdiction in a court of general jurisdiction of the state of New York, pursuant to New

2

York Civil Practice Law and Rules § 301, in that defendants reside in and are organized pursuant to the laws of the state of New York; pursuant to § 302(a)(1), in that they transact business, and contract to supply goods and services, within the state of New York; and pursuant to § 302(a)(4), in that they own, use or possess real property in the state of New York. Furthermore, the contracts at issue in this case specify that they are to be governed by the laws of New York. Most or all defendants' members are residents of the state of New York.

8. Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(a)(1), in that defendants reside in this district; and/or pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district; and/or pursuant to 28 U.S.C. § 1391(c), in that defendants are subject to personal jurisdiction, and deemed to reside, in this district.

<u>Facts</u>

9. From approximately 1994 until January 3, 2006, plaintiff and Rossi (collectively, the "Sellers") each owned 50% of the capital stock of each of four corporations: (i) Stonehedge Nursing Home Rome, Inc. ("Rome Nursing"), which was the licensed operator of, and owned the all the tangible and intangible personal property used in the operation of, and provision of patient care services by, a 160-bed skilled nursing facility in Rome, New York; (ii) Stonehedge Realty Rome, Inc., ("Rome Realty"), which owned the real property on which the Rome nursing facility was situated; (iii) Stonehedge Nursing Home Chittenango, Inc. ("Chittenango Nursing"), which was the licensed operator of, and owned the all the tangible and intangible personal property used in the operation of, and provision of patient care services by, an 80-bed skilled

3

nursing facility in Chittenango, New York; and (iv) Stonehedge Realty Chittenango, Inc., ("Chittenango Realty"), which owned the real property on which the Chittenango nursing facility was situated. (Rome Nursing, Rome Realty, Chittenango Nursing and Chittenango Realty are referred to collectively herein as the "Acquired Corporations".)

10. During the period in which the Sellers owned the Acquired Corporations, plaintiff served as their President and actively oversaw and directed every aspect of their operations on a day-to-day basis.

<u>The Stock Purchase Agreements</u>

11. Prior to August 2004, the Sellers entered into negotiations with defendants for the sale to defendants of the Sellers' interests in the Acquired Corporations.

12. In or about August 2004, the parties entered into two Stock Purchase Agreements ("SPAs").

13. One of these (the "Rome SPA") was entered into by defendant Rome Acquisition, the Sellers, Rome Nursing and Rome Realty. The Rome SPA provided for the sale of all capital stock of Rome Realty and Rome Nursing to Rome Acquisition for a contract purchase price of $8,667,000.

14. The other SPA (the "Chittenango SPA") was entered into by defendant Chittenango Acquisition, the Sellers, Chittenango Nursing and Chittenango Realty. The Chittenango SPA provided for the sale of all capital stock of Chittenango Nursing and Chittenango Realty to Chittenango Acquisition for a contract purchase price of $4,333,000. (The Rome and Chittenango SPAs, together with relevant schedules (but without other schedules not relevant to this action) are annexed as Exhibits 1 and 2 to this Complaint, respectively, and are incorporated herein by reference.) The Rome and

4

Chittenango SPAs are substantially identical, except for differences in price between the two transactions.

15. The Rome and Chittenango SPAs both specified that deposits would be provided by the buyers and released to the Sellers upon the occurrence of specified events and that, upon closing, defendants would pay the Sellers the balances of the purchase prices, subject to certain closing adjustments (the "Balance Payments").

16. After a lengthy due diligence period, the closing for both transactions was set for January 3, 2006 at the Manhattan offices of Epstein Becker & Green P.C., the Sellers' attorneys.

### The Net Accounts Receivable/Payable Adjustments

17. Among the contemplated closing adjustments were "Net Accounts Receivable/Payable Adjustments". Section 3.2(a) of the Rome SPA provided that the Balance Payment would either be increased by any amount by which Rome Nursing's accounts receivable exceeded its accounts payable, or decreased by any amount by which its accounts payable exceeded its accounts receivable, as carried on Rome Nursing's financial statement as of the closing date. Section 3.2(a) of the Chittenango SPA provided for the same adjustment with respect to the Chittenango transaction.

18. For purposes of computing these adjustments, the SPAs provided that the value of the accounts receivables would be discounted by a "Non-Collectible Receivables Percentage". The SPAs defined the Non-Collectible Receivables Percentage as "the average percentage of the Company's accounts receivable that were deemed non-collectible or discounted pursuant to the Company's audited financial statements for the five (5) full fiscal years prior to the Closing Date".

5

19. As of January 3, 2006, Rome Nursing had accounts receivable of $1,573,702. Its Non-Collectible Receivables Percentage was 2.90%, application of which yielded a discounted accounts receivable value of $1,528,039.69. Its accounts payable were $257,209. Thus, § 3.2(a) of the Rome SPA required an increase in the Balance Payment of $1,270,830.69.

20. As of January 3, 2006, Chittenango Nursing had accounts receivable of $833,527. Its Non-Collectible Receivables Percentage was 1.25%, application of which yielded a discounted accounts receivable value of $823,107.91. Its accounts payable were $116,675. Thus, § 3.2(a) of the Chittenango SPA required an increase in the Balance Payment of $706,432.91.

21. In the aggregate, the Net Accounts Receivable/Payables Adjustments required an increase in the Balance Payments of $1,977,263.60.

<u>Defendants Disregard the SPA and Threaten to Refuse to Close</u>

22. Shortly before the closing, however, defendants decided that the foregoing aggregate increase required by the Net Accounts Receivables/Payables Adjustment provisions of the SPAs was more than they cared to pay. Notwithstanding the Sellers' contractual entitlement to such an increase, defendants insisted on reduced Net Accounts Receivables/Payables Adjustments and indicated they would refuse to close unless the Sellers acquiesced.

23. Defendants initially attempted to justify this eleventh-hour departure from the terms of the SPA by asserting that several hundred thousand dollars' worth of the Acquired Corporations' receivables were uncollectible. This assertion was pretextual and false. The vast majority of the questioned receivables were, indeed, collectible.

Defendants, moreover, had not undertaken any detailed examination of the Acquired Corporations' receivables or collections history (despite ample opportunity to do so in due diligence) and therefore had no real basis to challenge the collectibility of the receivables. In any event, the possibility that some portion of the Acquired Corporations' receivables might not be collected had already been taken into account by the SPAs' agreed-upon Non-Collectible Receivables Percentages.

<u>Defendants' Insistence on, and Subsequent Breach of, the Receivables Agreement</u>

24. At the closing, the Sellers and defendants signed a separate document called the "Receivables Agreement". The Sellers signed this document only because they feared that, if they did not accede to defendants' demand to a reduced receivables adjustment, defendants would refuse to close, causing the entire deal, which had been sixteen months in the making, to collapse at the last minute with serious adverse economic consequences for the Sellers.

25. The Receivables Agreement initially provided for a reduction of the Balance Payments in the aggregate amount of $473,884 and for the assignment to the Sellers of the right to collect and to keep specified accounts receivable with a total face value of the same amount. According to the Receivables Agreement, the purchase price reduction was explicitly conditioned, among other things, upon defendants': (i) appointing the Sellers as their agents and attorneys-in-fact for the purpose of collecting the assigned receivables and taking any and all actions that, in the opinion of the Sellers, ought to be taken to collect the assigned receivables; (ii) providing the Sellers, within ten days after the close of each month, with a list of the outstanding assigned receivables; (iii) notifying the Sellers immediately upon receipt of any payments of any part of the

assigned receivables and remitting those payments to the Sellers within three days; (iv) allowing the Sellers, upon ten days prior written notice, to conduct audits of defendants' books and records to assure compliance with the Receivables Agreement; and (iv) acting in good faith and to reasonably cooperate with the Sellers in their efforts to collect the assigned receivables, providing specific information necessary for that purpose and making commercially reasonable efforts to assist the Sellers with those collections.

26. Simultaneously with, or immediately after, the Sellers' and defendants' signing of the Receivables Agreement, defendants demanded a further reduction of the Balance Payments and insisted that the Sellers take assignment of still more receivables on the terms set forth in the Receivables Agreement. This time, defendants did not even suggest that these additional receivables were uncollectible, but simply insisted that Sellers take assignment of them and accede to a further Balance Payments reduction. Again, believing they had no practical choice, the Sellers complied. The Sellers and defendants signed a closing statement which effectively amended the Receivables Agreement to effect an aggregate reduction in the Balance Payments of $657,229 and the assignment to the Sellers of receivables with a face value equal to that amount. (A copy of the signed Receivables Agreement, together with the aforementioned closing statement, is annexed as Exhibit 3 to this Complaint and is incorporated herein.)

27. The effect of the foregoing was that the Balance Payments defendants paid Sellers upon closing were, in the aggregate, $601,852 less than they would have been had defendants honored the terms set forth in § 3.2(a) of the SPAs.

28. Beginning almost immediately after the closing, and continuing through the date of this Complaint, defendants have consistently failed and refused to perform

8

their obligations under the Receivables Agreement. Among other things, defendants have: (i) refused to provide the Sellers with monthly lists of outstanding assigned receivables and related information, despite due demand by plaintiff; (ii) received payments on assigned receivables but failed to notify the Sellers of them and refused to remit them to Sellers; (iii) refused to allow plaintiff to conduct an audit of defendants' books and records despite due written demand; and (iv) failed to act in good faith and to reasonably cooperate with plaintiff in her collection efforts by, among other things, withholding information necessary to those collection efforts and denying plaintiff access to the nursing facilities where the necessary records are maintained.

29. As a result of the foregoing breaches of defendants' obligations under the Receivables Agreement, Sellers have been unable to collect any portion of the receivables assigned thereunder.

### The Employee Payment Adjustment, Defendants' Failure to Fund the First Post-Closing Payroll and Plaintiff's Prevention of a Default

30. The Rome and Chittenango SPAs also each provided, at § 3.2(c), for "Employee Payment Adjustments" pursuant to which, at closing, the Balance Payments would be reduced to reflect certain salaries, wages, bonuses, vacation, sick leave and other paid time off and compensation for services rendered up to and through the closing date.

31. At the closing, the parties agreed to Employee Payment Adjustments in the aggregate amount of $100,000 ($25,000 for Rome and $75,000 for Chittenango) and the Balance Payments were reduced accordingly.

32. On January 4, 2006, the day after the closing, plaintiff received a desperate telephone call from Alica Carrier, the payroll manager of the Acquired

9

Corporations (who plaintiff knew well, and with whom plaintiff had worked closely for years prior to the sale of the Acquired Corporations). Ms. Carrier informed plaintiff that the payroll for the two week pay period ending December 31, 2005 was due to be paid on January 5, 2006 but that defendants had failed to place the necessary funds in the Acquired Corporations' payroll accounts to meet this payroll.

33. Plaintiff and Ms. Carrier both attempted to contact defendants, to bring the situation to their attention, but were unable to reach them.

34. Concerned that Acquired Corporations were about to default on payroll, with the consequence that their employees -- plaintiff's long-time colleagues and friends -- would not be paid, plaintiff caused approximately $111,000 of her own money to be transferred into the Acquired Corporations' payroll accounts. Defendants used those monies to meet the payroll in timely fashion.

35. Plaintiff had no obligation to fund payroll as she did. Pursuant to § 3.2(c) of the SPAs, the Sellers' obligations with respect to employee compensation for pre-closing pay periods had been fully discharged at closing by the $100,000 aggregate reduction in the Balance Payments. Plaintiff funded the payroll as an accommodation to defendants and thereby spared them and their members considerable embarrassment in addition to possible civil liability, regulatory sanction and criminal charges.

36. Plaintiff has demanded that defendants repay the amounts she placed at their disposal to avert what otherwise would have been their unlawful default on the payroll. Defendants have refused to repay her any portion of that money.

### Rossi's Assignment of His Rights to Plaintiff

37. Prior to the commencement of this action, Rossi assigned to plaintiff all his rights under the Rome SPA, the Chittenango SPA and the Receivables Agreement.

### AS AND FOR A FIRST CAUSE OF ACTION
(Breach of the Stock Purchase Agreements)

38. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 37 above, as if fully set forth herein.

39. Pursuant to § 3.2(a) of the SPAs, the Sellers were entitled to the benefit of Net Accounts Receivable/Payable Adjustments to the Balance Payments, computed in the manner set forth in the SPAs.

40. Plaintiffs breached the SPAs by failing to pay that portion of the Balance Payments required by § 3.2(a) of the SPAs. Had defendants honored their obligations under this provision, the Balance Payments received by the Sellers would have been, in the aggregate, $601,852 greater than what defendants actually paid.

41. In addition to breaching their express terms, defendants have breached the covenant of good faith and fair dealing implied in the SPAs. Defendants did this by threatening, immediately before and at the closing, and without any good faith basis, to refuse to close and thereby to subject the Sellers to severe economic harm. Defendants also breached the implied covenant by justifying this bad faith tactic with the specious assertion that a significant portion of the Acquired Corporations' accounts receivables were uncollectible, an assertion that was untrue, that defendants knew or should have known was untrue and that, in all events, was legally irrelevant under the terms of the SPAs. Defendants further acted in bad faith by coercing the Sellers into signing the Receivables Agreement, thereby reaping the benefit of a $657,229 reduction in the

11

Balance Payments and depriving the Sellers of the benefit of $601,852 that should have been received by them as part of the Balance Payments.

42. The Receivables Agreement was an executory accord within the meaning of New York General Obligations Law § 15-501. Defendants have substantially failed to perform their obligations to the Sellers under the Receivables Agreement and, pursuant to General Obligations Law § 15-501(3), plaintiff is thereby entitled to bring suit to enforce her rights to full payment of the Balance Payments pursuant to the SPAs.

### AS AND FOR A SECOND CAUSE OF ACTION
(Breach of the Receivables Agreement)

44. Plaintiff repeats and re-alleges paragraphs 1 through 37 as if fully set forth herein.

45. As an alternative to the relief sought in the foregoing First Cause of Action, plaintiff seeks relief herein for breach of the Receivables Agreement.

46. Beginning shortly after the closing, and continuing through the date of this Complaint, defendants have failed to comply with a number of their express obligations under the Receivables Agreement. Among other acts in breach of the Receivables Agreement, defendants have (i) refused to provide the Sellers with monthly lists of outstanding assigned receivables and related information, despite due demand by plaintiff; (ii) have received payments on assigned receivables but have failed to notify the Sellers of them and have refused to remit them to Sellers; (iii) have refused to allow plaintiff to conduct an audit of defendants' books and records despite due written demand; and (iv) have failed to act in good faith and to reasonably cooperate with plaintiff in her collection efforts, by, among other things, withholding information necessary for those collection efforts and denying her access to, the nursing facilities.

47. In addition to breaching its express terms, defendants have breached the covenant of good faith and fair dealing implied in the Receivables Agreement, by entering into it with no intent to perform it, as evidenced by their immediate, ongoing and substantial breach of its obligations.

48. As a result of the foregoing breaches by defendants of the Receivables Agreement, plaintiff has been injured in that the Sellers have been unable to collect, and continue to be unable to collect, any part of the assigned receivables and have been deprived of the benefit of the Sellers' bargain with respect to the Receivables Agreement.

## AS AND FOR A THIRD CAUSE OF ACTION
(Unjust Enrichment)

49. Plaintiff repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

50. By virtue of the foregoing, defendants have received and/or retained monies which, in equity and good conscience, they should not retain and have been unjustly enriched thereby, including but not limited to: (i) the $657,229 by which the aggregate Balance Payments were reduced in recognition of the assignment of the receivables to the Sellers; and (ii) the approximately $111,000 supplied by plaintiff to fund the payroll and to avert defendants' default.

## AS AND FOR A FOURTH CAUSE OF ACTION
(For An Accounting)

51. Plaintiff repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

52. Defendants have retained and/or caused to be diverted to themselves sums of money properly belonging to the Sellers, the amount of which is presently unknown to plaintiff.

53. Plaintiff seeks an accounting to identify, quantify and recover monies wrongfully retained or diverted by defendants and properly belonging to the Sellers.

54. Prior to the commencement of this action, plaintiff demanded of defendants that they account as to the monies received by the defendants, but defendants, -- under whose exclusive care and control such information is kept and who have a duty to so account to plaintiff -- have refused to do so and have to date failed to provide an accounting of such monies.

55. Plaintiff has no adequate remedy at law.

WHEREFORE, plaintiff demands relief as follows:

On the First Cause of Action, judgment against both defendants and an award of compensatory damages, in an amount to be determined at trial but in no event less than $601,852; or, in the alternative, an order of specific performance, pursuant to § 14.2 of the SPAs, requiring defendants to pay plaintiff the amount of $601,852; an award of attorneys fees pursuant to § 14.2 of the SPAs; together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts awarded;

In the alternative, on the Second Cause of Action, judgment against both defendants and an award of compensatory damages, in an amount to be determined at trial but in no event less than $657,229, together with consequential and punitive damages, in amounts to be determined at trial, and prejudgment interest on all amounts

awarded;

On the Third Cause of Action, judgment against both defendants and an order requiring defendants to pay over to plaintiff all amounts by which they be determined to have been unjustly enriched, in an amount to be determined at trial, but in no event less than $768,229, together with prejudgment interest thereon;

On the Fourth Cause of Action, judgment against both defendants and an accounting of the receipts of defendants from January 3, 2006 to the date of said accounting, together with an award of damages or restitution of such monies as may be determined by said accounting to have been wrongfully withheld from the Sellers, together with interest, the costs and professional or other fees incurred in connection with said accounting, together with prejudgment interest thereon;

On all Causes of Action, costs and fees, including reasonable attorneys' fees, incurred by plaintiff in connection with this action and such other relief as the Court deems just and proper.

Dated:   May 15, 2007

*[signature]*

Louis A. Craco, Jr. (LC-9786)
Allegaert Berger & Vogel LLP
111 Broadway, 18th Floor
New York, New York 10006
Telephone:  (212) 571-0550
Facsimile:  (212) 571-0555
Attorneys for Jane A. Halbritter

15