1                          J. Halbritter            52

2        A    Yes.

3        Q    A lot of it's been redacted.

4             MR. RIMBERG:  I think counsel will

5             agree.

6             MR. CRACO:  Yes.  I will represent

7             for the record that I redacted all but

8             the first page and the last page and

9             portions of the first page.

10            MR. RIMBERG:  My question is, are

11            these two pages, being the first more

12            particularly, the only one that has an

13            address on it?

14            MR. CRACO:  That's correct.

15       Q    On the second page --

16            MR. CRACO:  The only one that has

17            plaintiff's address on it.

18            MR. RIMBERG:  Plaintiff's address.

19       Q    On the second page, there's a client

20   certification.  Do you recognize your signature on

21   this page?

22       A    I do.

23       Q    That's your signature, the top one above

24   that says, Jane Halbritter?

25       A    Yes, it is.

                   LEX REPORTING SERVICE

```
 1                        J. Halbritter              53

 2           Q        Before you signed the statement of net

 3      worth, you went through this?

 4           A        Apparently not as well as I should have.

 5           Q        But were you given the opportunity to go

 6      through it?

 7           A        I was.

 8           Q        When you filled it out, were you

 9      represented by counsel?

10           A        Yes, I was.

11           Q        On it; it had your address as of April

12      24, 2007, when you signed this?

13           A        Yes.

14           Q        It lists your address up in Rome, New

15      York?

16           A        Yes.

17           Q        Since April 24th of 2007, have you

18      filled out any subsequent statements of net worth?

19           A        I've been trying to, if I could get my

20      lawyer to -- I've been about to amend that, but we

21      haven't since then.

22           Q        So it hasn't been amended?

23           A        It has not been, yes.

24                    MR. CRACO:  I just want to note my

25                    objection for the record.
```

```
 1                    J. Halbritter              54

 2                    I believe there's a question that

 3                    Mr. Rimberg asked a question or two ago

 4                    that perhaps is not accurately

 5                    characterize what hte document says.

 6                         The document was executed on April

 7                    24, 2007.  But I believe on the face of

 8                    the document, it says it's accurate as

 9                    of April 1, 2007.  Just note that for

10                    the record.

11                         MR. RIMBERG:  Okay, that is

12                    correct.

13          Q         It says on the top here, so as of April

14     1, it list your address in Rome, New York; is that

15     correct?

16          A         Yes.

17          Q         This was executed, which means that you

18     signed it on April 24, 2007; is that correct?

19          A         Yes.

20          Q         Do you have a real estate license?

21          A         No.

22          Q         Do you have any other professional

23     licenses?

24          A         No.

25          Q         Are you attending school anywhere right
                         LEX REPORTING SERVICE
```

```
 1                        J. Halbritter          55

 2     now?

 3          A     No.

 4          Q     Back in May of 2007, were you attending

 5     school anywhere?

 6          A     I don't think so.

 7                    MR. RIMBERG:  Off the record.

 8                    (Whereupon, a discussion was held

 9               off the record.)

10                    MR. RIMBERG:  Would you mark this

11               as Defendant's Exhibit G, please?

12                    (Whereupon, five pages

13               ^ Description was marked as Defendant's

14               Exhibit G, for identification, as of

15               this date.)

16          Q     I'm going to show you what's marked as

17     Defendant's Exhibit G for identification, which is

18     entitled State of New York Executive Department Office

19     of General Services real estate planning, Mayor

20     Erastus Corning, second tower.  I ask you if you could

21     take a look at this?

22          A     Yes.

23          Q     What is this?

24          A     I believe it's a lease for that Gore

25     Road school.
```

LEX REPORTING SERVICE

```
 1                          J. Halbritter           56

 2          Q      Gore Road school?

 3          A      The property that I said I owned.  I

 4     call it Gore Road L.L.C., I call it.  It was formerly

 5     an elementary school that I lease out.

 6          Q      As of May, was it a lease, was it to the

 7     elementary school still, or was it --

 8          A      No.  It was an elementary school.  Now

 9     it's just an an office building that I lease to the

10     State of New York and a couple other tenants.

11          Q      So one of the tenants is pursuant to

12     this lease; is that correct?

13          A      Yes.

14          Q      The other tenant haves lease as well?

15          A      Yes.

16          Q      Do you have copies of those leases?

17          A      I think you have them.

18          Q      Okay.

19                      MR. RIMBERG:  Can you mark this as

20                 Defendant's Exhibit H, please?

21                      (Whereupon, three pages

22                 ^ Description was marked as Defendant's

23                 Exhibit H, for identification, as of

24                 this date.)

25          Q      I want you show you what's been marked
                        LEX REPORTING SERVICE
```

```
 1                    J. Halbritter          57

 2     as Defendant's Exhibit H for identification.  It's a

 3     lease between Jane Halbritter and Mohawk Valley

 4     Community Action Agency.  Ask if you've seen this

 5     before?

 6          A     I believe so.  Yes.

 7          Q     Is this one of the other tenants in the

 8     Gore property?

 9          A     Yes.

10          Q     Is the Gore property owned under your

11     name individually?

12          A     Yes.

13          Q     Okay.

14          A     Well, I mean as an L.L.C., so I'm a sole

15     partner.  So --

16          Q     What's the name of the L.L.C.?

17          A     Gore Road, L.L.C.

18          Q     And the leases were entered under your

19     name, individually; is that correct?

20          A     I'd have to ask my counsel, I guess.

21          Q     Well, what it says, based on --

22               MR. CRACO:  Tjhe document speaks

23               for itself --

24               THE WITNESS:  Yes.

25               MR. CRACO:  -- and lists, lessor
```

```
1                         J. Halbritter              58

2                    Jane Halbritter.

3                         MR. RIMBERG:  Can you mark this as

4                    Defendant's Exhibit I, please?

5                         (Whereupon, two pages

6                    ^ Description was marked as Defendant's

7                    Exhibit I, for identification, as of

8                    this date.)

9         Q        I want to show you what's been marked as

10   Defendant's Exhibit I for identification.  It's

11   another lease agreement, dated August 31st of 2006.

12   And ask if this is also a lease in the Gore Road

13   property?

14        A        Yes.

15        Q        Do you have any correspondence with any

16   of these three tenants from January 1, 2007 to the

17   present?

18                       MR. CRACO:  Does she have any

19                  correspondence from them to --

20                       MR. RIMBERG:  From them to her,

21                  from her to them, either way.

22        A        I would have to look and see.  But I

23   mean, I don't know.

24                       MR. RIMBERG:  I would call for

25                  production, if any exists.

                    LEX REPORTING SERVICE
```

```
1                        J. Halbritter          59

2          Q     On the last page of Exhibit H, there's a

3    signature above Jane Halbritter.  Is that your

4    signature?

5          A     Yes.

6          Q     You signed this on January 2, 2007; is

7    that --

8          A     No.  I believe that's when she signed

9    it.

10         Q     When did you sign it, do you know?

11         A     I really don't, because there's no date

12   on it, and it's not notarized.  So I don't know.

13         Q     Exhibit I, is this the complete

14   document?

15                    MR. CRACO:  Let me see.

16                    MR. RIMBERG:  (Handing.)

17         A     No, I don't think so.

18                    MR. RIMBERG:  All right.  If I can

19               get the complete document.

20                    THE WITNESS:  I thought I had it.

21                    MR. CRACO:  I intended to turn

22               over the complete document.  If I

23               didn't, I will look into it.

24                    Off the record.

25                    (Whereupon, a discussion was held
```

```
 1                          J. Halbritter              60

 2                   off the record.)

 3                        MR. RIMBERG:  Would you mark these

 4                   as Defendant's Exhibits J, K and L,

 5                   please?

 6                        (Whereupon, two pages^ Description

 7                   was marked as Defendant's Exhibit J, for

 8                   identification, as of this date.)

 9                        (Whereupon, four

10                   pages^ Description was marked as

11                   Defendant's Exhibit K, for

12                   identification, as of this date.)

13                        (Whereupon, three

14                   pages^ Description was marked as

15                   Defendant's Exhibit L, for

16                   identification, as of this date.)

17         Q     I want you to show you what's been

18    marked as Defendant's Exhibit L, which is an indenture

19    dated March 1st of 1983.  I'm going to ask if you've

20    seen that before?

21         A     This looks like, yeah, I think -- well,

22    I don't remember seeing it.  But I think I know what

23    it is.

24         Q     This is a deed, correct?

25         A     I guess.
```

```
1                          J. Halbritter              61

2          Q       For which property?

3          A       It was a piece of property my dad gave

4     me, long time ago, that I owned with my ex-husband.

5     And I think he recently sold it.

6          Q       Are you Ms. Jane Reese on this?

7          A       Well I was, yes.

8          Q       Was, at one point?

9          A       Yes.

10         Q       That's your maiden name?

11         A       Well, it's my former married name.  My

12    maiden name is not that.

13         Q       So my question is, if it was sold, were

14    you contacted it was sold; or you don't know if it was

15    sold?

16         A       Yeah.  He called me.

17         Q       And said he was selling it?

18         A       Yes.

19         Q       Did you get any proceeds from this?

20         A       Yes.

21         Q       I want to show you what's been marked as

22    Defendant's Exhibit K for identification.  And this is

23    a deed.  Once again, appears to be two pages, dated

24    July 6, 1987.  Ask if you've seen that before?

25         A       Yes.
```

```
 1                        J. Halbritter              62

 2          Q     Which property is this?

 3          A     I really don't know.  Is this the Gore

 4   Road?  Yeah, this looks like it's Gore Road.  Yes.

 5          Q     This you still own?

 6          A     That's at Gore Road, yes.

 7          Q     I want to show you what's been marked as

 8   Defendant's Exhibit K?

 9                     MR. CRACO:  If I may, just for the

10                     sake of accuracy, is it your testimony

11                     that you own this property, or is it

12                     more accurate to say that you are the

13                     sole owner of Gore, L.L.C. --

14                     THE WITNESS:  That's correct.

15                     MR. CRACO:  -- which owns this

16                     property?

17                     THE WITNESS:  Yes, exactly.

18          Q     This deed has the transfer going from

19   George Rossi to Jane Reese.

20          A     Right.

21          Q     Is there a subsequent deed transferring

22   it from Jane Reese to another person or entity?

23          A     I believe that it was put into the

24   L.L.C.  I think, I don't know.

25          Q     Now the Gore Road, L.L.C. that you've
```

LEX REPORTING SERVICE

```
 1                        J. Halbritter              63

 2     been mentioning, is there an operating agreement?

 3            A     I don't know what you mean.

 4            Q     Do you know when Gore Road was created,

 5     Gore Road, L.L.C. was created?

 6            A     I really don't.  I'd have to look in my

 7     records and see.  My accountants could probably answer

 8     that.

 9                        MR. RIMBERG:  I leave a space as

10                   to when it was created.

11

12     (INSERT)

13

14                        I'd also demand if there's any

15                   operating agreements, I get a copy of

16                   the operating agreement.

17            Q     I want to show you as what's been marked

18     as Defendant's Exhibit K for identification.  Ask if

19     you've ever seen this before?

20            A     I must have, but I'm just trying to

21     figure out what it is.  I don't know how to read

22     deeds, I think they're kind of hard to read.

23                        MR. CRACO:  I'm just going to

24                   remind the witness to just wait for a

25                   question and then just answer the

                   LEX REPORTING SERVICE
```

```
1                    J. Halbritter              64

2                question that's asked.

3        A      I said, I guess I've seen it, but I

4   don't really know what it's for.

5        Q      The Tuxedo Mobile Homes, is that the

6   deed for it, or you don't know?

7        A      I don't know.

8        Q      What's the listed owner of Tuxedo Mobile

9   Homes?

10       A      What's the listed owner?

11       Q      Who's the owner, who's the owner of

12  Tuxedo Mobile Homes?

13       A      Well, as I mentioned, through my dad's

14  will, my brother Marc, my brother George and myself.

15       Q      So this is just a piece of property it

16  seems that you own individually?

17                MR. CRACO:  Objection.

18       A      Why are you saying this is Tuxedo?

19       Q      I was asking if it was Tuxedo.  I don't

20  know where it was.

21       A      No, I don't think this is Tuxedo.

22       Q      Is there another property, you told us

23  your ownerships include the construction company,

24  Tuxedo Mobile Homes, Universal Linen, Gore Road, James

25  Street Management.  Is there something else you own?
```

```
 1                      J. Halbritter            65

 2          A     If I gave it to you, I must.

 3          Q     You're not sure where, though?

 4          A     I can't tell by the --

 5          Q     What's the name of the entity, if there

 6     is an entity, that owns the property at Tuxedo Mobile

 7     Homes?

 8          A     Tuxedo Mobile Homes, Inc. I think.

 9          Q     You're not sure?

10          A     Not really.

11                      MR. RIMBERG:  I ask that a space

12                be left for the correct corporate name

13                that owns it.

14          Q     I'm sure you have records that reflect

15     that.

16          A     Yes.

17

18     (INSERT)

19

20

21                      MR. RIMBERG:  Would you mark these

22                as Defendant's Exhibits L and M, please?

23                      (Whereupon, ^ Description was

24                marked as Defendant's Exhibits L and M,

25                for identification, as of this date.)

                   LEX REPORTING SERVICE
```

1                       J. Halbritter                    66

2           Q      I want to go ahead and show you what's

3     been marked as Defendant's Exhibit L for

4     identification.  Ask if you've ever seen this before,

5     dated September 14, 2006?

6           A      I think I know what this is

7     (indicating).  I'm sorry.

8           Q      You're looking at what's been marked as

9     Defendant's Exhibit K.  While you were looking at it,

10    did something refresh your recollection as to what

11    property this goes with?

12          A      Yes.  I think it's a piece of property

13    on Route 233 that I do own that I'd forgotten.

14          Q      Is this vacant?

15          A      Yes.

16          Q      Who oversees the property?

17          A      There's no oversight because it's just

18    farmland.

19                       MR. CRACO:  A bunch of raccoons.

20          Q      There are tax bills that have to be paid

21    on it?

22          A      Yes.

23          Q      Where are those tax bills sent?

24                       MR. CRACO:  If you know.

25          A      I don't know.

                      LEX REPORTING SERVICE

1            J. Halbritter        67

2            MR. RIMBERG:  I call for

3      production of the most recent tax bills.

4           And in fact I call for production

5      of the most recent tax bills for all the

6      real property that's been discussed so

7      far in today's deposition.

8           MR. CRACO:  Off the record.

9           (Whereupon, a discussion was held

10     off the record and a brief recess was

11     held at this time.)

12          MR. RIMBERG:  I'm going back to

13     Defendant's Exhibit I.  Counsel's

14     gracious enough to have to have his file

15     brought over from his office.  Since he

16     is next door, it makes things easy, to

17     check and see if this two page document

18     is the entire lease agreement.

19          He's represented he's given to me

20     what he has in his file, which is fine.

21     The lease agreement on the first page

22     has items one and two, which is the

23     premise and consideration.  The second

24     page goes right to the acknowledgments.

25          So there's definitely something in

1               J. Halbritter                68

2               the middle that exists.  We just need a

3               copy of it.

4                    MR. CRACO:  I will go back and

5               double check my files to make sure I

6               have not omitted to produce to

7               Mr. Rimberg anything that was provided

8               to me by my client.

9                    MR. RIMBERG:  All right.  And I

10              ask that if you have produced

11              everything, and there was an omission on

12              your part, that if you can, Ms.

13              Halbritter, to go ahead and check your

14              files to see if you have a complete

15              lease document.

16                   MR. CRACO:  So make sure you gave

17              me everything you have, and I'll make

18              sure I give everything to Mr. Rimberg.

19                   THE WITNESS:  Yeah.

20        Q     I want to show you what's marked as

21   Defendant's Exhibit L, which is a letter dated

22   September 14, 2006 and ask if you've seen that before?

23        A     Yes.

24        Q     What is that letter?

25        A     That's a letter from Governor Pataki

                 LEX REPORTING SERVICE

```
1                        J. Halbritter              69

2    saying that I was nominated for a term on the State

3    Insurance Fund, for a term from September to December.

4         Q       "A term," what, say that again?

5         A       Of three months.

6         Q       That's your understanding of what this

7    letter says?

8         A       It says, pursuant -- it's dated,

9    September.  And it says that I'm to be a member of the

10   board of commissioners for a term that expires

11   December 31, 2006.

12        Q       I want to show you what's marked as

13   Defendant's Exhibit M for identification, which is a

14   letter dated September 15, 2006.  In it, it refers to

15   your oath of office that has to be filled out.  My

16   question is, did you fill out this oath of office?

17        A       I imagine I did.

18        Q       Do you have a copy of this oath of

19   office?

20        A       I apparently don't.  I perhaps just sent

21   in the only copy.

22                    MR. CRACO:  For the record, you

23                    did in response in my request, search

24                    your files for any communications.

25                    THE WITNESS:  I did.  Yeah, I
```

```
                              J. Halbritter              70
 1
 2                pulled out everything I had.
 3        Q        Did you ever attend any meetings for the
 4   State Insurance Fund board?
 5        A        Certainly.
 6        Q        When were those meetings?
 7        A        They generally have them on the third
 8   Wednesdays of the month, every month.
 9        Q        Did you attend them in 2006, after,
10   obviously, September 15th?
11        A        I would have to check my records.   I
12   haven't attended all the meetings.
13        Q        In 2007, did you attend any of the
14   meetings?
15        A        I imagine.  I'd have to check my
16   attendance record.
17        Q        Now when you say you're going to check
18   your "attendance record," what are you going to check?
19        A        I'd look at my calendar.
20        Q        In your calendar, it's a written
21   calendar?
22        A        I'd look at my calendar or my American
23   Express bills, to see if it look like I traveled up
24   here.
25                              MR. RIMBERG:  I call for
```

```
1                          J. Halbritter            71
2                 production of these records to reflect
3                 attendance of these meetings.
4                        MR. CRACO:  I'm not quite sure
5                 that's what the witness indicated that
6                 they would reflect.  But we'll take that
7                 under advisement.
8                        MR. RIMBERG:  I'll clarify.
9          Q      You said that you keep a calendar?
10         A      Well, not an accurate calendar.  I'm
11   somewhat erratic.
12         Q      But there's a possibility, although
13   erratic, that you would have written down if you had a
14   meeting at the State Insurance Fund?
15         A      Well, I would write down when the
16   meetings were.  I wouldn't necessarily write whether I
17   attended it.
18                        MR. RIMBERG:  With regard to the
19                 calendar, I'd ask that it be produced
20                 for calendar year 2006, 2007.
21         Q      Who is Kevin Fahey?
22         A      One of my divorce attorneys.
23         Q      That's a different name than you told us
24   before.
25         A      Yes.  He's the -- I'm sorry, I thought I
```

```
 1                         J. Halbritter           72

 2    mentioned his name.  He's like, I think, an accountant

 3    slash lawyer.

 4         Q      Okay.

 5         A      He doesn't really do the divorce stuff.

 6    He does, I think you know, I think he will be helpful

 7    at some point.

 8         Q      What's at 25 Sydney Street, Cambridge,

 9    Massachusetts?

10         A      My apartment that I had in Boston.

11         Q      Do you still have it?

12         A      I gave it up.

13         Q      When?

14         A      I would say this summer.

15         Q      Was this a rental, or did you own it?

16         A      It's a rental.

17         Q      When did you start renting it?

18         A      I think in July of '06.  I kept it for a

19    year.

20         Q      What prompted you to rent an apartment

21    in Cambridge, Massachusetts?

22         A      I wanted to have a place in Florida and

23    maybe a place in Boston.  I wanted, you know, I just

24    needed a place to live.

25         Q      So you had Boston, Florida.  You had the
```

```
1                        J. Halbritter              73

2     one on the place, the one next to the nursing home,

3     what street is that on?

4           A      Garden Street.

5           Q      Garden Street.

6           A      Well, I don't own that house.  So --

7           Q      But you to use it, though?

8           A      I use it.  But that's only until I, you

9     know --

10                        MR. CRACO:  Just answer the

11                        question he's asked.

12          A      I mean I use it, yes.

13          Q      In the house on James Street, do you pay

14    electric on it?

15          A      On James Street, I don't have a house on

16    James Street.

17          Q      What's the address of the house in Rome?

18          A      Garden Street.

19          Q      On the Garden Street house, that's 100

20    West Garden Street, right?

21          A      Yes.

22          Q      You pay electric on it?

23          A      Yes.

24          Q      Do you pay water on it?

25          A      Yes.
```

```
1                          J. Halbritter              74

2          Q     Do you pay telephone on it?

3          A     Yes.

4          Q     And is there an alarm on the house?

5          A     Yes.

6          Q     Do you pay these bills by check?

7          A     Yes.

8          Q     Is --

9          A     Well no, no.  I tend to pay most of my

10     bills electronically.

11         Q     Now the payments are made.  Are they

12     from Jane Halbritter, or is it from the realty

13     company?

14                     MR. CRACO:  Objection.

15                     Realty company?  You mean James

16                 Street Management company?

17                     MR. RIMBERG:  Yes, management

18                 company.

19                     MR. CRACO:  Who cuts the checks or

20                 for the wire transfers that pay for

21                 those bills?

22                     THE WITNESS:  I believe myself.

23                 But, you know, I think the accountants

24                 make an adjustment for that.  I'm just

25                 not sure about the account things.
```

LEX REPORTING SERVICE

```
1                           J. Halbritter           75

2           Q      Do you have copies of the utility bills

3     I just went through for the last twelve months

4           A      I could look.  I mean I could look.  I'm

5     not the best recordkeeper, but --

6                       MR. RIMBERG:  I call for

7                       production of these records.

8           Q      Where are these bills sent to, the

9     electric bills?

10          A      Can I excuse myself?

11                      MR. RIMBERG:  Sure.

12                      (Whereupon, a recess was taken at

13                      this time.)

14          Q      The utility bills, the electric bill,

15    where is that sent?

16                      MR. CRACO:  This is for the Garden

17                      Street --

18                      MR. RIMBERG:  Yes.  We're

19                      continuing the line of questioning.

20          Q      The Garden Street address.

21          A      I'm not sure.

22          Q      The telephone bill?

23          A      I'm not sure.  I would imagine --

24          Q      The gas bill?  I'm sorry.

25          A      I would imagine Florida, but I'm not
```

```
 1                        J. Halbritter           76

 2    sure.

 3          Q     The gas bill?

 4          A     I think that might go to the office.

 5          Q     Okay.  And the water bill?

 6          A     I don't know.

 7          Q     Tax bill?

 8          A     I think that goes to Florida.

 9          Q     Okay.  Do you have copies of any of

10    these bills?

11          A     I will check.

12          Q     If you don't, do you accountants have

13    it?  Because you said that they reconcile everything?

14          A     I don't know if they have copies of the

15    tax bill to the amount that I paid.  I don't know if

16    they have copies of the bills, but I could ask.

17·                    MR. RIMBERG:  I call for

18                    production of these documents.

19          Q     I'd like to just go back to the State

20    Insurance Fund.  When you did attend meetings, where

21    did you attend these meetings?

22          A     Generally in New York City.

23          Q     When you say "New York City," you mean

24    Manhattan?

25          A     Yes.
```

```
1                          J. Halbritter                77

2          Q        Right down here at 199 Church?

3          A        Yes.

4          Q        Were you ever sent copies of the minutes

5      after the meetings?

6          A        Yes.

7          Q        Are you still sent copies of the minutes

8      every month?

9          A        Yes.

10         Q        Where are these minutes sent to?

11         A        I believe Florida.

12         Q        When you say you "believe," you're not

13     sure?

14         A        I'm fairly sure.  But I'm under oath, so

15     I want to be very careful and be certain, and I'd have

16     to check.

17         Q        Do you have any of these still in the

18     enenvelope?

19         A        I throw them out, I shred them.

20         Q        Do you get copies of newsletters from

21     the State Insurance Fund?

22         A        I think so.

23         Q        Where are these newsletters sent to?

24         A        I'm not sure.

25         Q        Do you receive notices of meetings at
```

J. Halbritter                    78

1

2    the State Insurance Fund?

3        A    Yes.

4        Q    Where are those notices sent to?

5        A    E-mail.

6        Q    Do you currently hold credit cards?

7        A    Yes.

8        Q    Which ones?

9        A    Oh that's a big list.  American Express,

10   which is what I primarily use.  I have Macy's

11   Bloomingdale's, Saks, Neiman's, Visa.

12       Q    The AmEx bill, where is it currently

13   sent?

14       A    Florida.

15       Q    For how long has it been sent to

16   Florida?

17       A    I would believe probably right from last

18   year.  I would you say last summer.  You know, I'm

19   speculating, but I think -- I would have to look.

20            MR. RIMBERG:  I call for

21                production of some record showing when

22                it was switched down to Florida.

23            MR. CRACO:  Under advisement.

24       Q    What was your incentive to, as you put

25   it, move down to Florida?

LEX REPORTING SERVICE

1                      J. Halbritter              79

2          A      I didn't want to be anywhere near Rome,

3    New York anymore.  Because of the divorce, primarily.

4          Q      Are you in contact with your husband

5    still?

6          A      No.

7          Q      Back when you started the renovation in

8    the Brighton apartment, you were in contact with him?

9          A      We were at that point.

10          Q      The other credit cards that you have

11    let's call it the store credit cards, where are those

12    bills sent?

13          A      I think most to Florida.

14          Q      If I asked you specifically, going down

15    the list on each one where they're sent to, would you

16    know the answer?

17          A      Well, I know everything is sent to

18    Florida.  Because about -- I think about --

19                      THE WITNESS:  I think I gave it to

20                 you --

21          A      -- about a year-and-a-half to two years

22    ago, I went to the post office and changed my address.

23    So even things that I didn't change -- you know, even

24    if I didn't call the company, I knew the bill would go

25    to Florida.  Because that's where all my mail has gone

```
 1                        J. Halbritter              80

 2    for the past year-and-a-half to two years.

 3                        MR. CRACO:  Was that not in the

 4                   package of stuff I sent you?

 5                        MR. RIMBERG:  No.

 6         A      So I can't say that I was always good

 7    about getting everything changed.  But I relied on the

 8    post office forwarding everything to me.  I may have

 9    taken my time or may not have; but for the most part,

10    I changed everything.

11                        MR. CRACO:  I have that.  And if I

12                   neglected to include it in the stuff I

13                   produced, I apoligize.

14                        I was acting in considerable

15                   haste.  But we have a document, a change

16                   of address form, to the post office.

17                   It's in my office; I'll fax it to you

18                   when we're finished.

19                        I don't think my colleagues could

20                   lay hand on it easily.

21         Q      This change of address that you said you

22    submitted to the post office, was this after the

23    divorce started?

24         A      Yeah, I think so.  I mean yeah, I think

25    so.  I don't even know when the divorce was started.
```

1                          J. Halbritter                    81

2    Yeah, I would imagine.

3                        MR. CRACO:  Answer to the best of

4                   your recollection, if you have one.

5         Q    Was the incentive that you went ahead

6    and you changed the address with the post office that

7    you didn't want your husband seeing what you were

8    getting?

9         A    No.

10                       MR. RIMBERG:  Would you mark these

11                  as Defendant's Exhibits N and O, please?

12                       (Whereupon, ^ Description was

13                  marked as Defendant's Exhibits N and O,

14                  for identification, as of this date.)

15        Q    I want to show you what's been marked as

16   Defendant's Exhibit O and ask you what this is?

17        A    That looks like correspondence to me

18   from the IRS.

19        Q    Do you know the date of this

20   correspondence?

21        A    I don't.

22        Q    Do you know what document this came

23   from?

24        A    I really don't.

25        Q    There's, on the top right-hand side,

                     LEX REPORTING SERVICE

J. Halbritter                    82

1

2      handwriting.  Is that your handwriting?

3          A       Yes, looks like.

4          Q       So you have no idea what this document

5      is, aside from that it has some typewritten

6      information on the front?

7          A       That's all I know.

8          Q       Okay.

9                       MR. RIMBERG:  I assume you

10                      redacted everything here?

11                      MR. CRACO:  I didn't redact

12                      anything from that document.  That's the

13                      only copy of that document she sent me.

14         Q       Okay.  So if this is what you sent your

15     attorney, do you know where that came from?

16         A       I don't know.  I'd have to look, I don't

17     even know.

18         Q       I'm going to show you what's been marked

19     as Defendant's Exhibit N.  It says, State of New York

20     Department of Health.  And ask you what this is?

21         A       It was my nursing home administrator's

22     license.

23         Q       Is it still active?

24         A       No.

25         Q       When did it expire?

LEX REPORTING SERVICE

J. Halbritter                    83

1

2        A        It looks like that says it expired in

3   the end of 2005.

4        Q        You didn't renew it?

5        A        No.

6        Q        Do you have any other licenses

7   associated with the running or operation of a nursing

8   home?

9        A        No.

10       Q        In 2007, did you see a dentist?

11       A        I don't know.  If the records say I did

12   or didn't, I don't know.

13       Q        Do you have recollection of seeing a

14   dentist in 2007?

15       A        I don't know if it was 2007.  I don't

16   remember when I go to my doctors.  Show me what you

17   have, and I'll tell you what --

18       Q        No.  It didn't say anything except the

19   name and address.  That's why I'm asking.

20       A        I don't think I went in 2007.

21       Q        At one point you went to Tardugno?

22       A        Tardugno.

23       Q        T-A-R-D-U-G-N-O, dental office?

24       A        Yes, Dr. Tardugno.

25       Q        Do you have a new dentist aside from

J. Halbritter                    84

1

2    him, or that's still your dentist?

3         A    Not yet.  I don't -- would it be

4    possible if I excuse myself?

5                    MR. RIMBERG:  Sure.

6                    (Whereupon, a recess was taken at

7              this time.)

8                    MR. RIMBERG:  Would you mark this

9              as Defendant's Exhibits I-1 and P,

10             please?

11                   (Whereupon, packet ^ Description

12             was marked as Defendant's Exhibit I-1,

13             for identification, as of this date.)

14                   (Whereupon, two pages was marked

15             as Defendant's Exhibit P, for

16             identification, as of this date.)

17        Q    Your attorney just said after the break

18   that you want to clarify something?

19        A    Would you mind asking me the question --

20   you asked me a question about my attendance at the

21   State Insurance Fund meetings?

22        Q    Yes?

23        A    Would you ask me again, what was your

24   question?

25        Q    Well, I asked if you attended any

                    LEX REPORTING SERVICE

```
 1                    J. Halbritter              85

 2   meetings at the State Insurance Fund?

 3        A    Yes.

 4        Q    I asked if you attended any meetings in

 5   2006.

 6        Q    Yes?

 7        Q    I asked you if you attended any meetings

 8   in 2007?

 9        A    Yes.

10        Q    Okay.

11             MR. CRACO:  You had asked her at

12             one point if she recalled when she

13             attended meetings.

14             MR. RIMBERG:  She said she wasn't

15             sure.

16             MR. CRACO:  Right.

17        A    I thought you said, which meetings did I

18   attend.  I thought I had said, they have meetings

19   every third Wednesday of the month.

20        Q    That's right.

21        A    And I thought you were asking me which

22   meetings I attended.

23        Q    You said you didn't know, and you were

24   going to check your calendar.  That's why we're

25   discussing it --
```

LEX REPORTING SERVICE

```
1                      J. Halbritter              86
2                 MR. CRACO:  And we will do that.
3          A      I just though you meant exactly which
4    meetings, and I didn't want to mislead.  I mean, I
5    went to a meeting yesterday.  But I just wanted to be
6    clear that I thought you were asking exactly which
7    meetings I went to.  And admittedly, I've missed some
8    meetings.
9          Q      Let's talk about yesterday.  You said
10   that you went to a meeting yesterday at the State
11   Insurance Fund?
12         A      Yes.
13         Q      That was at 199 Church?
14         A      Yes.
15         Q      What kind of meeting was that?
16         A      Just a commissioner meeting.
17         Q      Were there other people in attendance?
18         A      Yes.
19         Q      Did you talk to anybody while you were
20   there?
21         A      Yeah, sure.  Coffee break, sure.
22         Q      Did anybody mention to you that know
23   about the current lawsuit pending?
24         A      No.
25         Q      Did anybody mention that there was a
```

J. Halbritter                    87

1

2    foil request submitted?

3         A    No.

4         Q    Did you speak to any of the legal

5    attorney at the State Insurance Fund?

6         A    No -- Well, not about anything with me.

7         Q    Did you speak to the secretary of the

8    State Insurance Fund?

9         A    Yesterday?

10         Q    Yes.

11         A    Yes.

12         Q    What was the topic of conversation?

13         A    I don't remember really.  I mean I just

14    don't remember, I'm sorry.

15         Q    Did you attend last month's meeting?

16         A    No.

17         Q    The month before that?

18         A    I don't know.

19         Q    Okay.  I want to show you what's been

20    marked as Defendant's Exhibit letter I-1.  We did I-1

21    because previously we marked Defendant's Exhibit I a

22    two page document that, I think we all agreed, was not

23    complete.

24              Counsel was kind enough to go next door

25    and pick up the entire lease agreement, which is

J. Halbritter                88

1

2    substantially longer.  I'd like to show you the second

3    to last page, which under Gore Road, LLC, there's a

4    signature.  Ask if you recognize that signature?

5        A    It looks like mine.

6        Q    And this is one of the three tenants at

7    the Gore Road property?

8        A    Yes.

9        Q    I think I asked everything with the

10   other one, so we don't have to go back.

11             MR. CRACO:  Just wanted to give

12             you a complete copy.

13       Q    I want to show you what's been marked as

14   Defendant's Exhibit P for identification, which is a

15   two page document.  This is what appears to be

16   documents filled out with regards to a change of

17   address.  Ask you take a look at that?

18       A    Yes.

19       Q    Have you seen that before?

20       A    I have.

21       Q    What is that?

22       A    It's a copy of the change of address

23   that I filled at the post office.

24       Q    A portion of it appears to be done

25   through a computer printout, and a portion of it on

LEX REPORTING SERVICE

```
 1                        J. Halbritter              89

 2    both pages have handwriting.

 3          A      Right.

 4          Q      Do you recognize handwriting?

 5          A      Looks like mine.

 6          Q      On both pages?

 7          A      Yes.

 8          Q      Did you have to sign this anywhere, on

 9    either page?

10          A      Well, looks like, isn't that my

11    signature?

12          Q      I don't know.

13          A      I think it is, yes.

14          Q      Was this in your records, or did you get

15    this off of a computer?

16          A      No.  I went to the post office to get

17    it.

18          Q      When did you go to the post office to

19    get it?

20          A      A few days ago.

21          Q      When did you fill out this change of

22    address here?

23          A      It would be around these dates.  I think

24    there were two of these.  Because, you know, these are

25    two separate forms; they're not the same form.
```

1                      J. Halbritter                    90

2          Q      Yes.

3          A      And one, I think, looks like four -- one

4   was done in April 4th of '06.  Then one was done April

5   2nd, '07.  One was for a post office box, and then I

6   decided to have it sent to my actual place.

7          Q      Were you living at the same place in

8   April of '06 and April of '07?

9          A      I don't believe so.

10         Q      So you switched, I believe in April of

11  '06, you were renting an apartment at that point

12  still --

13         A      Yes.

14         Q      -- and then you moved to your regular

15  residence?

16         A      Yes.

17         Q      Did you ever receive any mail in the

18  Cambridge, Massachusetts location?

19         A      Oh yes.

20         Q      What kind of mail did you get there?

21         A      Just different things.  I mean bills and

22  things.

23         Q      Now your health insurance, do you have a

24  health insurance card by any chance?

25         A      I do.  It's through my husband.

```
1                      J. Halbritter              91

2         Q      Do you have with you a copy of the

3    health insurance card?

4         A      I don't really -- I don't carry that.  I

5    carry it in a separate binder, kind of, just to not

6    have any more to carry than I have to.

7         Q      What company is it with?

8         A      RemsCo.  I think they're third party

9    administrator.  I think the Nation is self-insured.

10        Q      Okay.  So it's through the Nation?

11        A      Yes.

12        Q      The insurance company, what address do

13   they have listed for you?

14        A      Probably my husband's.  Because I don't

15   think I actually have an address, per se. I mean he

16   pays for it, so I don't think they would have an

17   address, per se.

18               MR. CRACO:  Don't speculate.

19               MR. RIMBERG:  I call for

20                  production of the insurance card and any

21                  mailings from the insurance company in

22                  the last nine months.

23               MR. CRACO:  Okay.

24        Q      You have a Social Security number,

25   correct?
```

```
 1                          J. Halbritter              92

 2           A     Yes.

 3           Q     I'm not interested in what it is.

 4     Normally, I'd ask what it is.  With the Social

 5     Security Administration, did you ever change your

 6     address from Rome, New York to Florida?

 7           A     I don't think so.

 8           Q     Do you have a Social Security card?

 9           A     No.

10           Q     Do you get a statement from the Social

11     Security Administration stated what your Social

12     Security withholdings were at the end of the year?

13           A     I think I've seen something like that.

14     I don't know when, but I think I've seen a document

15     like that.

16           Q     Do you have a copy of that?

17           A     No.

18                 MR. RIMBERG:  I'd ask that a

19                 search be done in case you do have it.

20           Q     Are you on any board at Utica College?

21           A     No.

22           Q     Are you on a business programs advisory

23     council?

24           A     Not that I know of.  Maybe I might have

25     been at some point.  I served on a lot of boards, but
```

1                    J. Halbritter                93

2    I'm not currently.

3         Q    So as of right now, the only board

4    you're still on is the State Insurance Fund, that's

5    it?

6         A    I think so.

7         Q    Okay.  Do you get any minutes or

8    anything like that from the Utica board?

9         A    Not that I'm aware of.

10        Q    The driver's license, you're going to

11   get me a copy of your driver's license?

12        A    Yes.

13        Q    You're going to check as to anything

14   else from the board of commissioners of State

15   Insurance Fund, if you have anything else?

16                    THE WITNESS:  You're going to

17             write all this down, right?

18                    MR. CRACO:  We'll get it at the

19             end of the transcript.

20                    THE WITNESS:  Okay.

21        A    Yes.

22                    MR. CRACO:  Taking all of this

23             under advisement.

24        Q    You've given us all the, and we've gone

25   through all the, property that you own --

                    LEX REPORTING SERVICE

```
 1                       J. Halbritter              94
 2                       MR. CRACO:  Real property.
 3         Q      -- in New York, real property, and in --
 4         A      I believe.
 5         Q      We've discussed all the properties that
 6   you've had leases for in the last few years, correct?
 7         A      I believe.
 8                       MR. RIMBERG:  With regards to tax
 9                       returns, just so it's on the record,
10                       we've stipulated that through 2006, she
11                       used her Rome address?
12                       MR. CRACO:  We've stipulated that
13                       all of the tax returns that she filed as
14                       well as K-1s issued to her for the tax
15                       year ending December 31, 2005, December
16                       31, 2004, December 31, 2003, all reflect
17                       the Rome, New York address for her.
18                       MR. RIMBERG:  Okay.  Thank you.
19                       MR. CRACO:  We have also
20                       represented to you that she has not, to
21                       date, filed a 2006 personal income tax
22                       return; that an extension has been
23                       requested and we undertake to get the
24                       paperwork associated with that
25                       extension.  And we will supply it to you
```

1        J. Halbritter                    95

2        as soon as we have it.

3             MR. RIMBERG:  The other thing is

4        the K-1s for 2006.  I would gather that

5        those were already done and your

6        client's possession, at least some of

7        these were done.

8             So I'd like to see those as well.

9        Not for the numbers, but for the

10       addresses.

11            MR. CRACO:  I understand.  We will

12       follow up on that.  I'm not sure it's

13       true, but we will certainly look into

14       that and give them to you if they exist.

15   Q        Have you been a signatory, with the

16   exception of the extensions we discussed, on any tax

17   return in calendar year 2006 or 2007?

18   A        I don't know.

19            MR. RIMBERG:  I'd ask that a

20       search be conducted.  I ask for that,

21       that may be quarterlies or something

22       else.

23            MR. CRACO:  Can I hear the

24       question reread, please?

25            (Whereupon, the record was read by

LEX REPORTING SERVICE

1              J. Halbritter              96

2              the reporter.)

3              MR. CRACO:  So your request is?

4              MR. RIMBERG:  That you do a check

5              to find out, let me know what's going

6              on.  I'd like to see the document.

7              MR. CRACO:  Okay.

8      Q      We went through your statement of assets

9   net worth, which was Exhibit F.  Were there any other

10  schedules or statements done as part of the divorce

11  proceeding that has a home address for you listed?

12     A      I don't think so, but I don't know.  I

13  don't believe so.

14     Q      Did you do a search or you're --

15     A      I gave you what I had, so --

16     Q      Did you call your attorney to find out

17  if he had something else?

18     A      I got several calls in to him.  I have

19  not received a call back from him.

20             MR. RIMBERG:  I have a continuing

21             request for that.

22             MR. CRACO:  For what, for any

23             other schedules besides the one we've

24             produced here in redacted format as

25             Exhibit F?

              LEX REPORTING SERVICE

```
1                           J. Halbritter          97
2                           MR. RIMBERG:  Yes.
3          Q      Are you a signatory to any operating
4    agreements whatsoever?
5          A      I don't believe so.
6          Q      Are you signatory to any kind of
7    shareholder agreements?
8          A      I mean I don't know what you mean.  Does
9    that mean like, am I a shareholder of a corporation?
10   I mean, are bylaws considered?
11                          MR. CRACO:  Listen carefully to
12                          the question.
13         Q      We went through the companies in which
14   you have ownership today, correct?
15         A      Right.
16         Q      And you told us all of them, correct?
17         A      Right.
18         Q      As part of those companies, or maybe
19   there are other companies you can think of, did you
20   ever sign on a piece of paper that you're a part of
21   those companies?
22         A      That I'm part of those companies?
23         Q      Yes.  That we didn't discuss today.
24         A      I don't think so.
25         Q      Do you have any partnership agreements
                       LEX REPORTING SERVICE
```

J. Halbritter    98

1

2  that you were a signatory to?

3        A      I don't believe so.

4        Q      What was the highest level of education

5  you have?

6        A      Bachelor's degree.

7        Q      From what college?

8        A      Regents college.

9        Q      Where is that?

10       A      In New York.  I went to SU, and then I

11  fishished through the University of the State of New

12  York.

13       Q      I want to show you what's been marked as

14  Defendant's Exhibit B, which is a copy of the

15  assignment of interest and legal claims and ask if

16  you've seen that before?

17       A      I have.

18       Q      Take a minute and look at it.  I don't

19  want you to answer before you've had a chance.

20       A      Yes.

21       Q      On the second page, there are

22  signatures?

23       A      Yes.

24       Q      Do you recognize both of those?

25       A      Yes, I do.

```
1                        J. Halbritter          99

2         Q      The first signature belong to whom?

3         A      My brother, Marc.

4         Q      And the one under that?

5         A      Mine.

6         Q      Did you, this document is dated April

7     12, 2007.  Is that in and around the time that you

8     signed this document?

9         A      To the best of my recollection, yes.

10        Q      Who arranged for its crafting, if you

11    know?

12               MR. CRACO:  Objection.

13                    I'm going to instruct the witness,

14               in her answer, not to reveal any

15               communication she had with any attorney

16               who was representing her.

17               MR. RIMBERG:  Right.

18        Q      I just want to know who arranged for it.

19        A      Who drafted it?

20        Q      That's my second question.  But who

21    arranged for the drafting of this document?

22        A      I did.

23        Q      What's the name, and as your counsel

24    said, I'm not interested in communication with

25    counsel, of the person who drafted this document?
```

LEX REPORTING SERVICE

```
 1                         J. Halbritter          100
 2         A      I would imagine, either Eric Facer or
 3   Lou Craco.
 4         Q      On the top, there's a scroll.  Does that
 5   help refresh your recollection?
 6         A      Looks like Lou Craco.
 7                MR. CRACO:  I'm going to object.
 8                Direct the witness's attention to
 9                the date.
10                THE WITNESS:  Okay.  I really
11                would be speculating if I said I knew.
12         Q      What was the reason that you had this
13   document drafted?
14         A      Just for ease of dealing with litigation
15   matters.  I basically ran a nursing home, and I just
16   knew that I was about to enter a litigation.  I
17   thought it would be easier if I had sole authority to
18   deal with issues.
19         Q      So would it be accurate to say that the
20   reason you entered into this assignment of interest
21   and legal claim was to deal solely with the litigation
22   issues coming up?
23         A      Yes.
24         Q      What was the consideration, if you know
25   what that means, given by you to your brother for this
```

```
 1                    J. Halbritter          101
 2  assignment of interest and legal claim?
 3                 MR. CRACO:  Object to the
 4              question.
 5              The document speaks for itself.
 6                 MR. RIMBERG:  I'm asking her what
 7              she knows.  I'm allowed to do that.
 8                 MR. CRACO:  Objection.
 9       A    I would have said that.  I would have to
10  refer to the document and refresh my memory.  If you
11  want me to read it again, I will.
12       Q    You can, that's fine.
13       A    I don't really -- no.  I'm sorry to say,
14  I just -- I don't see it.  So I don't remember.  I
15  don't recall.
16       Q    Are you aware of the difference between
17  having a lawsuit in state court and federal court?
18                 MR. CRACO:  Objection.
19                 MR. RIMBERG:  As a layman.
20                 MR. CRACO:  Object and instruct
21              the witness not to answer.
22              Anything she would know about
23              that, she would know from communications
24              between me and her or her and Eric
25              Facer.
```

LEX REPORTING SERVICE

```
1                      J. Halbritter            102
2               MR. RIMBERG:  That's a very big
3               jump, thinking that her scope or
4               knowledge is dependent on the last
5               twenty-four months.
6      Q     You can answer.
7               MR. CRACO:  No, you can't.  Other
8               than things you've learned from Eric
9               Facer or me in connection with our
10              provision of legal services to you, do
11              you have any information that's
12              responsive to Mr. Rimberg's question?
13              THE WITNESS:  No, I don't.
14     Q     Did you have discussions with your
15  brother in and around the time this assignment of
16  interest and legal claims was drafted?
17     A     I don't recall.  I imagine.
18     Q     Do you recall what you discussed with
19  your brother?
20     A     I don't recall.
21     Q     Do you have an understanding what your
22  brother gets if there's any monetary result from the
23  lawsuit?
24     A     Well, I would refer to the document
25  again.  I assume that we would divide the proceeds, I
```

J. Halbritter                    103

1

2    would assume.  But I'd have to refer to the document

3    to see that.

4          Q     Was this your idea, to draft an

5    assignment of interest and legal claim?

6                         MR. CRACO:  Objection.

7                         Don't answer that.

8                         MR. RIMBERG:  No.  I didn't ask

9                    who told her.  I asked if it was her

10                   idea.

11                        MR. CRACO:  I understand.  I think

12                   it's close enough to the line, and I'm

13                   instructing the witness not to answer

14                   the question.

15                        MR. RIMBERG:  All right.  We're

16                   just going to end up in Judge Pauley.

17                        MR. CRACO:  Okay.

18                        MR. RIMBERG:  I didn't ask what

19                   was discussed.

20          Q     All right.  Are you and your brother

21    partners in a recovery, if it's monetary, from this

22    lawsuit?

23                        MR. CRACO:  Objection.

24                        Document speaks for itself.

25                        MR. RIMBERG:  I'm asking her what

LEX REPORTING SERVICE

1                         J. Halbritter              104

2                   she knows.

3                         MR. CRACO:  You can answer the

4                   question.

5        A       I would just have to refer to the

6   document to refresh my memory.  And I would -- you

7   know, I can sit here and read it again.

8        Q       Go ahead, if that's what you need to

9   refresh your recollection.

10       A       It says, in exchange for the assignment,

11  I agreed to share equally with Marc the net proceeds

12  of any judgment.  So I would assume that that speaks

13  to what happens, should we recover anything.

14       Q       In your mind, you and him are partners,

15  then, in whatever the recovery is; is that correct?

16                      MR. CRACO:  Objection.

17                      Legal term, partners.  The

18                      document speaks for itself.

19                      MR. RIMBERG:  I'm not talking

20                      about the document.  And you can say

21                      objection without an explanation,

22                      counsel.

23       Q       Aside from the current legal action

24  that's currently pending, are you or your brother

25  currently engaged in any other activities with regards

1                      J. Halbritter              105

2    to the nursing homes that you sold?

3          A      Define activities, I guess.

4          Q      Anything.

5          A      Well I don't own the nursing homes

6    anymore.  So I mean, I don't -- I don't know.  I don't

7    know I guess.

8          Q      So aside from the legal actions, are you

9    performing any duties with regards to the nursing

10   homes you sold?

11         A      Not that I know of.

12         Q      Okay.  Is your brother doing anything

13   that you're aware of?

14         A      Not that I know of.

15         Q      Okay.  Was this assignment of interest

16   and legal claims signed by you and your brother so you

17   could bring an action in federal court?

18                      MR. CRACO:  Objection.

19                      Don't answer that, to the extent

20               that the answer would reflect anything

21               you discussed with your lawyers.

22                      To the extent that you can answer

23               the question without revealing the

24               content of discussions you've had with

25               your lawyers, you can answer the

                 LEX REPORTING SERVICE

1                          J. Halbritter              106

2                 question.

3      A        Could you repeat the question?

4                     MR. RIMBERG:  Would you read back

5                 the question, please?

6                     (Whereupon, the record was read by

7                 the reporter.)

8      A        I don't really know.

9      Q        Whose suggestion was it to bring the

10   action in federal court?

11                    MR. CRACO:  Objection.

12                    Don't answer that.

13     Q        Was the suggestion to bring it in

14   federal court before or after this assignment of

15   interest and legal claims was signed, and I'm not

16   asking who told you?

17                    MR. CRACO:  Forget it.  Objection.

18                    Do not answer the question.

19     Q        Since signing this assignment of

20   interest and legal claims, have you spoken to your

21   brother about this document at all?

22     A        I don't remember, I don't know.

23     Q        In and around the time that it was

24   signed, do you have any notes or e-mails between you

25   and your brother with regards to the signing of the

                    LEX REPORTING SERVICE

800-608-6085

```
 1                         J. Halbritter              107
 2     assignment of interest and legal claims?
 3              A       No.
 4              Q       I want to show you what's been marked as
 5     Defendant's Exhibit C for identification, which is
 6     entitled, receivables document, which is seven pages.
 7     Ask if you can take a look at that?
 8              A       (Complies.)
 9              Q       Have you taken a look at it?
10              A       Yes.
11              Q       On the last page, there's signatures.
12     Do you recognize those signatures?
13              A       Yes.
14              Q       On the line above where it says Jane
15     Halbritter, do you recognize that signature?
16              A       The line -- oh you mean my signature?
17              Q       Yes.
18              A       Yes.
19              Q       That's only way I can refer to it with
20     the record.  Above the line where it says Marc Rossi,
21     there's a signature.  Do you recognize that one?
22              A       Yes.  But I don't know if this is the
23     real receivables agreement.
24                      MR. CRACO:  That wasn't what he
25                      asked you.  He just asked you if
```

```
1                    J. Halbritter              108

2              recognized the signature.

3        A     Yes.

4        Q     Do you recall when you signed this?

5        A     I would assume at closing.

6        Q     Says on here, January 3, 2006.  Was that

7    the day of the closing?

8        A     Yes.

9        Q     You don't know if this is the real one.

10   What does that mean?

11       A     Well you know, that's subject to

12   litigation, so I would want to have my lawyer look at

13   real one and make sure it's the exact same thing.

14   Because it's not -- there's not signatures on every

15   page.  I mean, I see the signature page.  Do you know

16   what I'm saying?

17                    MR. RIMBERG:  Counsel, can you

18                tell me if this is a full copy?

19                    MR. CRACO:  You've produced this

20                document.  Was this the document that

21                was attached to the complaint?

22                    MR. RIMBERG:  Yes.

23                    MR. CRACO:  I haven't checked

24                every page.  But based on your

25                representation that it is the document
```

```
 1                          J. Halbritter            109
 2                    we attached to the complaint, then we
 3                    will stipulate that it is the
 4                    authoritative version of the
 5                    receivables.
 6                         MR. RIMBERG:  I'm not saying I
 7                    stipulate to it --
 8                         MR. CRACO:  If you took this from
 9                    Exhibit C, then as far as we're
10                    concerned, it's the receivables
11                    agreement.
12                         MR. RIMBERG:  Okay, good.
13          Q     Before the execution of the assignment
14     of of interest and legal claims, did you contact
15     anybody at Stonehedge Acquisition Chittenango II,
16     L.L.C. for written permission to have your brother
17     assign his rights?
18          A     No.
19          Q     Did your brother contact anyone?
20          A     Nope.
21          Q     Did you or your brother contact anybody
22     at Stonehedge Acquisition Rome, Roman numeral II,
23     L.L.C. to get permission for the assignment of
24     interest and legal claims that you and your brother
25     signed?
```

```
1                        J. Halbritter                110

2         A      Yes.

3         Q      Are you aware that the document entitled

4    receiveables agreement requires it?

5                        MR. CRACO:  Objection.

6                        To the characterization, the

7                        document.  If you want to direct her.

8         Q      I'd like you to take a moment and read

9    paragraph thirteen.

10        A      (Complies.)

11        Q      What's your understanding of this

12   paragraph?

13                       MR. CRACO:  Objection.

14        A      I don't really know.

15        Q      You testified previously this was signed

16   at the closing on January 3rd, correct?

17        A      Correct.

18        Q      Do you know who drafted the receivables

19   agreement?

20        A      I don't know.

21        Q      At the closing, were you represented by

22   counsel?

23        A      Yes.

24        Q      Was your counsel present when you signed

25   this document?
```

```
 1                      J. Halbritter            111

 2         A       I had some counsel.  I don't know, yes.

 3   I assume.

 4         Q       You had a counsel present at the

 5   closing, correct?

 6         A       Yes.

 7         Q       And when you signed this, correct?

 8         A       Yes.

 9         Q       I want to show you what's been marked as

10   Defendant's Exhibit E for identification, which is the

11   stock purchase agreement.

12                 MR. RIMBERG:  If you'd like, I can

13                 use the one in the complaint to show

14                 her, or I can use this one.  It's

15                 separated out.

16                 MR. CRACO:  It makes no

17                 difference.  Why don't you use the

18                 separately broken out one?

19         Q       Take a moment to look at that?

20         A       (Complies.)

21         Q       You've looked at it, okay.  If you can

22   go, it's not quite the last page, but if you go to

23   page forty-seven?

24         A       (Complies.)  There is no page

25   forty-seven.
```

```
1                        J. Halbritter            112

2        Q      We lost it in the copying.  So then use

3   the one attached to the complaint.  May have fallen

4   out.  There is signatures on page forty-seven.

5   Underneath Stonehedge nursing home Chittenango, Inc.,

6   there's a signature.  Do you recognize that signature?

7        A      Looks like mine.

8        Q      Is it yours?

9        A      Yes.

10       Q      Under Stonehedge Realty, Chittenango,

11  Inc., there's a signature.  Do you recognize that?

12       A      Yes.

13       Q      Whose signature is that?

14       A      Mine.

15       Q      Under the sellers, there's two

16  signatures.  The first one, whose is that?

17       A      Mine.

18       Q      And under that, there's an another

19  signature above the line that says, Marc Rossi.  Whose

20  is that?

21       A      My brother.

22       Q      This document that's entitled, stock

23  purchase agreement, this was drafted by your counsel?

24                        MR. CRACO:  Objection.

25       A      I think it was collaborative effort.
```

```
1                    J. Halbritter         113

2                    MR. CRACO:  What does this have to

3                    do with the subject matter of

4                    jurisdiction?

5                    MR. RIMBERG:  See in a minute.

6                    Believe me, I didn't want to have to go

7                    into this if I didn't have to.

8          Q    When you signed this stock purchase

9     agreement, were you represented by counsel?

10         A    Yes.

11         Q    Under the agreement, I refer you if you

12    need your recollection refreshed, to section fourteen

13    point three.

14         A    What page would that be?

15                   MR. CRACO:  Take a moment to read

16                   it.

17                   MR. CRACO:  Okay.

18         Q    In the first sentence --

19         A    Can I -- am I allowed to speak with my

20    counsel for a minute or no?

21         Q    No.  I started the question.

22         A    I'm sorry.

23         Q    In the first sentence, it uses the two

24    words, proper assigns.  What's your understanding of

25    those words?
```

```
1                          J. Halbritter              114

2                          MR. CRACO:  Objection.

3                          Calls for a legal conclusion.

4          A      I really don't know.

5                          MR. CRACO:  Do you want to talk

6                   before he asks another question?

7                          THE WITNESS:  May I?  Can I take

8                   this?

9                          (Whereupon, the witness and her

10                  attorney left the room.)

11                         MR. RIMBERG:  Would you read back

12                  the last question and answer, please?

13                         (Whereupon, the record was read by

14                  the reporter.)

15         Q      When you signed the stock purchase

16   agreement, I don't remember if I asked it, you were

17   represented by counsel, correct?

18         A      Yes.

19         Q      Did you ever inquire what proper assigns

20   means?

21                         MR. CRACO:  Don't reflect

22                  anything --

23                         Acquire of who?

24                         MR. RIMBERG:  Anybody.

25                         MR. CRACO:  Don't answer that
```

LEX REPORTING SERVICE

1                        J. Halbritter          115

2                  question with respect to communications

3                  between you and your counsel.

4                        Did you ever inquire what it meant

5                  to anybody else?

6                        THE WITNESS:  No.

7          Q      I want to show you what's been marked as

8     Defendant's Exhibit D for identification, which is a

9     one page document entitled, combined closing statement

10    purchase of stock and ask if you've seen that before?

11         A      I believe so, yes.

12         Q      Do you recognize any of the signatures

13    on this page?

14         A      I do.

15         Q      Right above the line that says Jane

16    Halbritter, is that yours?

17         A      Yes.

18         Q      The one above Marc Rossi, is that your

19    brother?

20         A      And this is the closing statement you

21    executed at the closing.

22         A      I believe so, yes.

23         Q      I want to show you the complaint, which

24    is marked as as Defendant's Exhibit A.  And if you can

25    take a look at paragraph two.  It's alleged by you

                    LEX REPORTING SERVICE

```
 1                        J. Halbritter        116

 2    that you're a resident of the state of Florida.  What

 3    does that mean to you, being a resident to the state

 4    of Florida?

 5         A      Well that my body's there and that I

 6    live there.

 7         Q      Anything else?

 8         A      That I'm -- that's where I live.

 9         Q      When the assignment of interest and

10    legal claims was signed by you, was anybody else there

11    when you signed it?

12         A      I don't remember.

13         Q      Was your brother there?

14         A      I don't remember if he was there, or if,

15    you know, it was sent to him.  I don't remember any of

16    that.

17         Q      Do you recall where you signed it?

18         A      I don't recall.  But I would think in

19    Florida.

20         Q      What would make you think that?

21         A      Because that's where I'm mostly at, so

22    law of averages.

23         Q      Do you currently live with anybody in

24    Florida?

25         A      No.
```

1                          J. Halbritter                117

2          Q       How about in May of 2007?

3          A       No.

4          Q       April of 2007?

5          A       No.

6          Q       What prompted you in April of 2007 to

7     renew your change of address with the post office?

8          A       April of '07?

9                        MR. CRACO:  Do you want to put the

10                       document in front of her?

11         A       My recollection is that -- I originally

12    we had a post office box.  And then I just decided it

13    was more trouble than it was worth.  Because I'd, you

14    know, rather just get it right at the building where

15    it was at.

16         Q       Was it at the suggestion of somebody,

17    you submit a new change of address?

18         A       No.

19         Q       Was there any reason, aside from

20    litigation of claims, that you signed this assignment

21    of interest and legal claims?

22         A       Sorry?

23         Q       Other than for litigation purposes, was

24    there any other reason for the assignment?

25                       MR. CRACO:  Was there any other

```
1                    J. Halbritter              118

2              reason for Marc to assign his interest

3              to her?

4                    MR. RIMBERG:  Yes.

5                    MR. CRACO:  Objection.

6        A     I don't know.

7        Q     Did you ask Marc to sign this?

8        A     I don't remember.

9        Q     You don't remember?  Who had this

10  drafted, you did or Marc?

11                   MR. CRACO:  Objection.

12                   You've already asked this.

13                   MR. RIMBERG:  I just want to

14              clarify this.  Then we're done.

15                   MR. CRACO:  What is the point you

16              want to clarify?

17       Q     Who had this drafted?

18       A     I did.

19       Q     You have no recollection of any of the

20  discussions you had with your brother at the time?

21                   MR. CRACO:  Objection.

22       A     I can't remember what I had for lunch

23  yesterday, so I really can't remember exact

24  discussions with my brother about things.

25                   MR. RIMBERG:  At this time I have
```

J. Halbritter                    119

1

2          no further questions.

3                  There's a host of documents still

4          outstanding.  I'm going to ask

5          expedited, as fast as humanly possible.

6          Since the motion's on for January 5th,

7          we're all under the gun to get this

8          done.

9                  MR. RIMBERG:  I will talk to Lex.

10         At this point, I have no further

11         questions.  What I do want to do is just

12         take a minute, make sure we have all the

13         exhibits so I can make copies and get

14         them to you later today.

15

16                          -o0o-

17

18                  (Whereupon, the deposition of JANE A.

19         HALBRITTER was concluded at 1:00 p.m.)

20

21

22                  JANE A. HALBRITTER

23

24

25    Subscribed and sworn to
      before me this        day
                  LEX REPORTING SERVICE

```
 1                          J. Halbritter              120

 2      of               , 2007

 3

 4     NOTARY PUBLIC

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    J. Halbritter                    121

2                    I N D E X

3

WITNESS                    EXAMINATION BY          PAGE

4

JANE A. HALBRITTER      MR. RIMBERG

5

6                              EXHIBITS

7

DEFENDANT'S DESCRIPTION                          PAGE

8

A, B, C, D, E

9    F                                  52
     G                                  55

10   H                                  57
     I                                  58

11   J, K, L                            60
     L and M                            66

12   N and O                            81
     I-1                                84

13   P                                  84

14

                    REQUESTS FOR PRODUCTION

15

DESCRIPTION                                       PAGE

16

Records that would show the comings and

17       goings from Florida to New York          19
     Travelers bill that has the address          21

18   Voter registration and any associated
         documents used to fill it out            23

19   Search for correspondence with any of the
         three Gore Road property tenants         59

20   Operating agreement for Gore Road, LLC       63
     Most recent tax bills for all Ms.

21       Halbritter's real property discussed
         in this deposition                       67

22   American Express bills to reflect attendance
         at State Insurance Fund meetings         71

23   Ms. Halbritter's calendar for years 2006,
         2007                                     71

24   Utility bills for Garden Street house        75
     Telephone, gas, water, tax bills for Garden

25       Street house                             76
     Record showing when AmEx bill was switched
                    LEX REPORTING SERVICE

```
 1                    J. Halbritter              122

 2          to Florida billing address        79
        Insurance card and any mailings from
 3          insurance company in last nine months   92
        Search for statement from Social Security
 4          Administration, stating Ms.
            Halbritter's withholdings at the end
 5          of the year                        92
        K-1s for 2006, if they exist           95
 6      Document indicating if Ms. Halbritter is a
            signatory, with the exception of
 7          extensions discussed, on any tax return
            in 2006 or 2007                     95, 96
 8      Schedules or statements done as part of
            divorce proceeding that has Ms.
 9          Halbritter's home address listed    97

10

11                     INSERTS

12      DESCRIPTION                             PAGE

13      Ms. Halbritter's first address in Florida    9
        Judy Levi's phone number                10
14      Judy Levi's address in New Hartford     10
        Judy Levi's address in Florida          11
15      Date Ms. Halbritter moved into The Brighton
            apartment                           12
16      Date Ms. Halbritter moved out of Mr.
            Kaemmer's apartment                 14
17      Date of last OB/GYN appointment         36
        Bills for visits to Dr. Hellicus' office
18          indicating appointment dates        37
        Date Universal Linens became inactive   45
19      Date Gore, LLC was created              63
        Correct corporate name for Tuxedo Mobile
20          Homes                               65

21

22

23

24

25
```

LEX REPORTING SERVICE

```
 1                    J. Halbritter              123

 2              C E R T I F I C A T E

 3         I, SHANNON CARSON, a shorthand

 4    reporter and Notary Public within and

 5    for the State of New York, do hereby

 6    certify:

 7         That the witness(es) whose

 8    testimony is hereinbefore set forth

 9    was duly sworn by me, and the foregoing

10    transcript is a true record of the

11    testimony given by such witness(es).

12         I further certify that I am not

13    related to any of the parties to this

14    action by blood or marriage, and that I

15    am in no way interested in the outcome

16    of this matter.

17

18

19                    SHANNON CARSON

20

21

22

23

24

25

                 LEX REPORTING SERVICE
```