UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE A. HALBRITTER,

                              Plaintiff,

        -v-                                              Index No. 07-CV-3848
                                                         (WHP)

STONEHEDGE ACQUISITION ROME II, LLC
and STONEHEDGE ACQUISITION
CHITTENANGO II, LLC,

                              Defendants.

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

McMAHON and GROW
By: Julie Grow Denton, Esq.
Bar Roll No. JD8580

Attorneys for Defendants
Office and Post Office Address
301 North Washington Street
Post Office Box 4350
Rome, New York 13442-4350
Telephone: (315)336-4700
Fax: (315)336-5851
E-mail: jgdenton@mgglaw.com

**TABLE OF CONTENTS**

DISCUSSION                                                                          2

    I. A Liberal Standard of Review is Applied to Pleadings                    2

    II. Defendants Have Alleged that Sufficient Notice Was
    Given to Plaintiff                                                          3

    III. Defendants Have Sufficiently Alleged Plaintiff's Waiver
    of Notice of Claims under the Stock Purchase Agreements                     6

        A. The Counterclaims Sufficiently Allege Plaintiff's
        Waiver of Any Insufficient Notice by Defendants             7

        B. The Counterclaims Sufficiently Allege that The
        Parties Never Strictly Followed the Contractual Notice
        Provisions for Post-Closing Matters                         8

    IV. Defendants' Counterclaims Are Meritorious Under the
    Terms of the Stock Purchase Agreements                                      11

        A. The Alleged Defects in the First Counterclaim
        Could Be Corrected with an Amended Pleading                 12

        B. The Second Counterclaim Is Consistent with
        the Stock Purchase Agreements                               12

        C. The Fourth, Fifth and Sixth Counterclaims Allege
        Plaintiff's Failure to Make Adequate Provision for
        the Preparation and Filing of Required Forms, in
        Conformity with the Stock Purchase Agreements               13

        D. The Seventh Counterclaim Is In Accord with the
        Stock Purchase Agreements Relative to Calculating
        the Final Purchase Price                                    16

CONCLUSION                                                                          18

# TABLE OF CASES

Bank of New York Trust v. Franklin Advisors, Inc., No. 07 Civ. 1746,
2007 WL 4116225 (S.D.N.Y. Nov. 16, 2007)                                          13

Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007)                             2

Buckley v. Pomerantz, 145 A.D.2d 523, 536 N.Y.S.2d 85 (2d Dept. 1988)             8

Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918 (2dCir. 1977)     3, 11

Friedl v. City of New York, 210 F.3d 79 (2d Cir. 2000)                           12

Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Management, L.P.,
7 N.Y.3d 96, 817 N.Y.S.2d 606 (N.Y. 2006)                                         7

Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165 (2d Cir. 2006)        7

Leibowitz v. Cornell Univ., 445 F.3d 586 (2d Cir. 2006)                           2

Musica Latina Int'l, Inc. v. Blades, No. 84 Civ. 0719, 1984 WL 336 (S.D.N.Y. May 21, 1984)  4

RBFC One, LLC v. Zeeks, Inc. d/b/a *NSYNC, 367 F. Supp. 2d 604 (S.D.N.Y. 2005)   3, 4

Schwartz v. Fortune Magazine, 89 F. Supp. 2d 429 (S.D.N.Y. 1999)                  4

Suarez v. Ingalls, 282 A.D.2d 599, 723 N.Y.S.2d 380 (2d Dept. 2001)              5, 6

Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119 (2d Cir. 2005)   13, 16

McMahon and Grow
301 North Washington Street
Post Office Box 4350
Rome, New York 13442-4350
(315)336-4700
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE A. HALBRITTER,

                              Plaintiff,

                                                          Index No. 07-CV-3848
            -v-                                                  (WHP)

STONEHEDGE ACQUISITION ROME II, LLC
and STONEHEDGE ACQUISITION
CHITTENANGO II, LLC,

                              Defendants.

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO

## PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

Plaintiff Jane A. Halbritter has filed a motion to dismiss the counterclaims asserted by

Defendants Stonehedge Acquisition Rome II, LLC and Stonehedge Acquisition Chittenango II,

LLC in their Answer to Plaintiff's Complaint.  Plaintiff seeks relief pursuant to Fed. R. Civ. P.

12(b)(6), arguing that Defendants have failed to state a viable cause of action in any of their

counterclaims for two main reasons: (1) Defendants did not give notice strictly in accordance

with the terms of the Stock Purchase Agreements governing the relationship between the parties;

and (2) the Stock Purchase Agreements do not support the causes of action alleged by

Defendants. Defendants submit this memorandum of law in opposition to Plaintiff's motion,

emphasizing that under the liberal rules for pleading, each of their counterclaims should be

allowed to proceed.

## DISCUSSION

### I. <u>A Liberal Standard of Review Is Applied to Pleadings</u>

On a motion to dismiss for failure to state a claim, all pleadings are to be liberally construed in favor of the pleader and all factual allegations are to be accepted as true. <u>Leibowitz v. Cornell Univ.</u>, 445 F.3d 586, 590 (2d Cir. 2006). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1969 (2007).[1]

On a Rule 12(b)(6) motion, the allegations at issue become the focal point for the Court's analysis. In addition to the allegations made within the counterclaims, which will be analyzed in detail throughout the Discussion section of this memorandum, Defendants ask the Court to consider the correspondence attached as exhibits to the Affirmation of Julie Grow Denton, submitted in connection with this brief. Two of the letters are written by Plaintiff's counsel, Louis A. Craco, Jr., Esq., and one is written by defense counsel in response to Mr. Craco. The letters refer to a meeting held between Defendants and Mr. Craco (and, upon information and belief, another of Plaintiff's attorneys, Eric Facer, Esq.) in December 2006 to discuss the claims now being asserted by Defendants, as well as the analysis of the parties with respect to those claims. Defense counsel relied on these letters when drafting the counterclaims, which permits the documents to be considered with respect to the motion to dismiss, even though the letters

---

1 This case is the only one cited in Plaintiff's brief; a fact that is telling. <u>Twombly</u> discusses the standards for a pleading to survive a Rule 12(b)(6) dismissal in the specific context of an antitrust case under the Sherman Act. It contains no discussion of contract law and no discussion of notice requirements. In contrast, Defendants' analysis in this brief will cite numerous cases demonstrating why each counterclaim survives Plaintiff's motion. Considering that Plaintiff cannot raise arguments for the first time in a reply brief, Defendants' reliance on caselaw and

were not formally incorporated by reference. <u>See</u> <u>Broder v. Cablevision Sys. Corp.</u>, 418 F.3d 187, 196 (2d Cir. 2005).

## II. <u>Defendants Have Alleged that Sufficient Notice Was Given to Plaintiff</u>

The Second Circuit has resisted interpreting notice provisions in a contract so strictly as to bar claims when a notice is given without having followed the exact requirements of said provisions. <u>See</u> <u>Contemporary Mission, Inc. v. Famous Music Corp.</u>, 557 F.2d 918, 925 (2d Cir. 1977) ("We decline to construe the notice provision as if it were a common law pleading requirement under which every slip would be fatal."). Federal courts instead have analyzed fact patterns to determine whether information pertaining to a given claim had been communicated by one party to the other in advance of litigation. Where such communication existed, the claim was allowed to go forward on the merits.

For example, in <u>RBFC One, LLC v. Zeeks, Inc. d/b/a *NSYNC</u>, 367 F. Supp. 2d 604 (S.D.N.Y. 2005), the Court engaged in a careful examination of whether the plaintiff had given adequate notice of its claims to the parties listed in the notice provision of the contract at issue. The contract in that case provided the defendants would not be in breach unless written notice were first provided. Notices were to be sent by either certified mail, hand delivery or overnight courier. <u>See</u> <u>id</u>. at 610. The plaintiff in <u>RBFC One</u> did not claim to have sent notices in accordance with these exact procedures. <u>See</u> <u>id</u>. at 611. The Court nevertheless considered whether sufficient notice had been given for each of the alleged breaches, <u>see</u> <u>id</u>. at 613-18, which approach defeats Plaintiff's argument in this case that Defendants' counterclaims should be automatically dismissed for no other reason than failure to abide by the strict notice terms of the

---

specific allegations should carry more weight than Plaintiff's summary conclusions.

3

Stock Purchase Agreements. See also Musica Latina Int'l, Inc. v. Blades, No. 84 Civ. 0719, 1984 WL 336, at *3 (S.D.N.Y. May 21, 1984) (permitting counterclaim to survive Rule 12(b)(6) motion even though the pleading party had not followed the exact letter of a contract notice provision).

The Court in RBFC One analyzed the adequacy of notice delivered by means other than that prescribed in the contract. While the plaintiff had delivered written notice to a person other than the primary contact person named in the agreement, this contact person acknowledged during the litigation that he had learned of at least some of the contents of the notice by means of a telephone conversation and acted in response thereto. See 367 F. Supp. 2d at 616-17. The Court reasoned that "[n]otice provisions in a commercial contract should not be construed pedantically." Id. at 617 (citing Contemporary Mission, 557 F.2d at 925). The Court distinguished cases where no notice had been given, or where notice was completely insufficient. Id. at 617 fn.10. Although the plaintiff's claims in this regard were ultimately dismissed, the dismissal was based on either the defendants having cured the alleged breach or the plaintiff's failure to have communicated all of the points of its written notice via its oral conversation with the primary contact person. See id. at 618-21.

Likewise, in Schwartz v. Fortune Magazine, 89 F. Supp. 2d 429 (S.D.N.Y. 1999), the Court noted that strict compliance with a contractual notice provision was not required. The alleged shortcomings with the notice that was given were characterized as an "overly formalistic understanding" of what was needed, and the Court instead explained that "all that was required was for defendant to make a good faith attempt to comply with the contract's . . . provisions." Id. at 434 (citing Contemporary Mission, 557 F.2d at 925).

4

Applying these principles to the case at hand, Defendants' counterclaims survive Plaintiff's motion. In each cause of action, Defendants have alleged that they communicated the liabilities to Plaintiff, her brother Marc Rossi, and/or their agents. See Answer, ¶¶ 67, 83, 102, 109, 118, 128, 141. In addition to the letters showing Defendants met and discussed their claims with Plaintiff's counsel at a face-to-face meeting and through follow-up letters, Defendants anticipate the evidence will show there were other communications in the form of letters, telephone calls, and a meeting with Plaintiff's brother Marc Rossi. Equally important, at no point during the present litigation or in her motion papers does Plaintiff claim she never received notice of Defendants' counterclaims, which would be impossible for her to state since we know from the last page of Attorney Craco's letter dated February 5, 2007, see Denton Affirmation, Ex. C, that he had discussed matters with Plaintiff. See Suarez v. Ingalls, 282 A.D.2d 599, 600, 723 N.Y.S.2d 380, 381 (2d Dept. 2001) ("Strict compliance with the contract notice provisions was not required because the plaintiff does not claim that she did not receive actual notice . . . .").

While Plaintiff's memorandum of law sets forth various protections said to be afforded Plaintiff as a result of the notice provisions in the Stock Purchase Agreements, Plaintiff cannot claim to have been prejudiced by the lack of formal notice because she, through counsel, denied liability for all of the claims made by Defendants prior to the litigation having been commenced. See Denton Affirmation, Ex. A and C. For those claims made by Defendants for monies owed them directly, Section 12.7(d) of the Stock Purchase Agreements provides that a refusal by the sellers to pay such claims triggers a 60-day settlement period. The parties did engage in settlement discussions extending for more than a 60-day period, as evidenced by the meeting held between Defendants and Plaintiff's counsel in December 2006, and the correspondence that

5

followed. For indemnification sought in connection with a Payor Liability, Section 12.12(b) gives the sellers the right either to pay or to contest the claim, neither of which Plaintiff has shown any inclination to do. In fact, her attorney denied any liability on Plaintiff's behalf in his letters of February 5, 2007 and April 10, 2007. Plaintiff in her motion papers has given no reason to believe she would have analyzed the substance of the claims any differently had Defendants' notice strictly followed the letter of the Stock Purchase Agreements, and thus was not prejudiced by Defendants' actual efforts to bring their claims to her attention. See Suarez, 282 A.D.2d at 600, 723 N.Y.S.2d at 381 (explaining that strict compliance with a contractual notice provision is not required where the recipient was not prejudiced by the manner in which notice was actually received).

In light of the foregoing, Defendants maintain that Plaintiff received sufficient notice for each of the counterclaims well in advance of the commencement of this litigation, and thus their causes of action should proceed on the merits.

### III. Defendants Have Sufficiently Alleged Plaintiff's Waiver
### of Notice of Claims under the Stock Purchase Agreements

In the alternative, even if the Court were to find the notice from Defendants to be insufficient, Defendants' Answer alleges that Plaintiff, by her own actions and/or the actions of her agents and attorneys, waived the notice requirement in each instance (a) relative to the specific indemnification claims alleged by Defendants and (b) in general as to post-closing matters involving the Stock Purchase Agreements. As is discussed in the sections that follow, these allegations are sufficient to survive a Rule 12(b)(6) motion.

### A. The Counterclaims Sufficiently Allege Plaintiff's Waiver

### of Any Insufficient Notice by Defendants

As alleged repeatedly in the counterclaims, at no point did Plaintiff or her attorneys raise the notice issue until Attorney Craco's letter of April 10, 2007 -- which letter followed his meeting with Defendants in December 2006, his initial letter of February 5, 2007 discussing the merits of each claim, and after receiving correspondence from defense counsel contesting the interpretation of the Stock Purchase Agreements. See Denton Affirmation, Ex. A-C. Even then, the only claim with which the notice issue was raised is with respect to the issue now set forth in Defendants' First Counterclaim.

A waiver "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Management, L.P., 7 N.Y.3d 96, 104, 817 N.Y.S.2d 606, 611 (N.Y. 2006) (internal quotation marks and citations omitted). Considering that 16 months passed between the closing for the Stock Purchase Agreements and the commencement of the instant litigation, during which time Defendants allege they made Plaintiff and/or her agents aware of their claims and actually met with Plaintiff's attorneys who engaged in an exchange of correspondence, the absence of any reservation of the right to raise lack of improper notice as a defense implies a waiver of Plaintiff's ability to do so now. Cf. Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006) (finding no waiver where rights had been repeatedly and expressly reserved in communications with the opposing party).

Moreover, the question of whether a waiver has occurred is often considered a question of fact. Fundamental Portfolio Advisors, 7 N.Y.3d at 104, 817 N.Y.S.2d at 611. Court decisions

suggest these determinations are better evaluated on a summary judgment motion.  See, e.g.,

Buckley v. Pomerantz, 145 A.D.2d 523, 523-24 (2d Dept. 1988) (finding factual issues on

question of waiver).  Accordingly, since Defendants' Answer sufficiently alleges the factual basis

for waiver, this matter should proceed through discovery.  It is of no moment that the Stock

Purchase Agreements provide that a waiver in one instance does not permit the inference of a

waiver in all instances.  Defendants have alleged that Plaintiff and her counsel waived her rights

to assert improper notice with respect to each of the counterclaims.

### B. The Counterclaims Sufficiently Allege that The Parties Never Strictly Followed the Contractual Notice Provisions for Post-Closing Matters

In addition to the notices described in Article XII ("Indemnification") of the Stock

Purchase Agreements, the contracts contained a general Notice provision at Section 14.7.  That

section reads:

> Any notice, demand or communication required, permitted, or
> desired to be given under this Agreement shall be deemed
> effectively given when: (i) personally delivered; (ii) delivered by
> facsimile; (iii) delivered by nationally recognized overnight courier
> or (iv) five (5) days after being sent by certified or registered mail,
> return receipt requested, addressed as follows:
>
> [Addresses of buyer and sellers are listed, with copies to be
> provided to specified counsel]
>
> or to such other address or number, and to the attention of such
> other Person or officer, as any party may designate, at any time, in
> writing in conformity with these notice provisions.
> Notwithstanding the foregoing, notice to the Buyer's Counsel
> and/or the Sellers' Counsel shall not, in and of itself, constitute
> notice for purposes of this Agreement.

The counterclaims state that Plaintiff's attorneys made post-closing demands of Defendants

8

and/or their agents without providing the requisite notice called for by the Stock Purchase Agreements, and the counterclaims provide some examples such as requesting the return of an executed copy of the revised Receivables Agreement and providing Plaintiff with access to her office at the nursing home facility in Rome, New York. See, e.g., Defendants' Answer, ¶¶ 68, 69.

Plaintiff's motion to dismiss summarily states that these matters did not concern a contractual right or obligation under the Stock Purchase Agreements, without any explanation as to how Plaintiff reached this conclusion. This summary statement further ignores a key provision of the Stock Purchase Agreements, as well as the basis for Plaintiff's claim in suing for breach of the Stock Purchase Agreements.

Section 14.6 of the Stock Purchase Agreements, entitled "Cooperation – Further Assistance," provides: "From time to time, as and when reasonably requested by any party hereto after the Closing, the other parties will (at the expense of the requesting party) execute and deliver, or cause to be executed and delivered, all such documents, instruments and consents and will use reasonable efforts to take all such action as may be reasonably necessary to carry out the intent and purposes of this Agreement." If, as Plaintiff argues is the case, the Receivables Agreement is an executory accord, then obtaining signatures on such document would necessarily fall within this definition of post-closing cooperative matters.[2] Defendants maintain that the request by Plaintiff's counsel to allow Plaintiff to access her office at the nursing home facility falls within the same category of post-closing cooperation, as it was never the intent of

---

[2] If, as Defendants contend, the Receivables Agreement is not an executory accord, then Plaintiff herself failed to give proper notice to Defendants of the alleged breach of the Stock

9

the parties under the Stock Purchase Agreements for Plaintiff to abandon her interest in her personal belongings kept within her office. Moreover, the examples provided by Defendants in their counterclaims were not intended to be exhaustive, which is why they are preceded by the shorthand reference "e.g." Defendants anticipate the evidence will show that Plaintiff's counsel utilized e-mail communications with Defendants and their attorneys to address other post-closing issues such as the readjustment of credits given at the closing between the buyer and sellers.

At the same time as Plaintiff's agents were disregarding the formal notice process with respect to their requests, they failed to insist upon formal notice with respect to similar requests received by Defendants or their agents. As pled in the Answer, Defendants have stated that they and/or their agents communicated directly with Plaintiff's attorneys and accountants, as well as her brother Marc Rossi, to resolve post-closing matters such as the preparation and payment of payroll taxes, the redirection of Defendants' mail to Plaintiff's Florida residence, and employee payroll matters. See, e.g., Defendants' Answer, ¶ 70. Although each of these matters can be classified as a post-closing cooperative issue that technically required formal notice, Defendants received responses to their inquiries without any demand for such notice.

---

Purchase Agreements.

The point of the allegations is to establish a pattern between the parties of resolving matters with notice, but perhaps not exactly to the letter of the Stock Purchase Agreements. This case is not one where Plaintiff followed all of the rules and Defendants were rogue in their approach to addressing issues. To the contrary, the allegations show how the parties attempted to engage in efficient means of communication to finalize post-closing matters. Bearing in mind the direction from the Second Circuit to resist the use of a contractual notice provision as a common law pleading requirement, see Contemporary Mission, 557 F.2d at 925, Defendants assert that their conduct in providing notice with respect to their counterclaims was in keeping with the practice of the parties generally after the closing had taken place. Accordingly, they should not be barred from bringing those counterclaims in this litigation.3

## IV. Defendants' Counterclaims Are Meritorious Under the Terms of
## the Stock Purchase Agreements

Plaintiff's memorandum of law sets forth substantive bases for dismissing several of Defendants' counterclaims. As the following discussion demonstrates however, Plaintiff's attempt to dispose of these counterclaims is premature.

---

3 Even if the Court were to reject all of Defendants' arguments regarding the issue of notice and Plaintiff's waiver thereof, Defendants maintain their counterclaims form a legitimate basis for a right of setoff against Plaintiff's claims for recovery. Under this scenario, the counterclaims would not be dismissed but rather converted to additional affirmative defenses. Defense counsel

## A. The Alleged Defects in the First Counterclaim Could Be Corrected

## with an Amended Pleading

Plaintiff takes issue with the form of the pleadings and the amount of damages alleged as due and owing under the First Counterclaim. If the Court were to agree, Defendants could readily amend their pleadings to correct any perceived deficiencies. Fed. R. Civ. P. 15(a)(2) provides that leave to amend pleadings is to be freely given when justice so requires. Moreover, granting such leave in this instance would be neither futile – since an amendment would remove Plaintiff's objections – nor prejudicial – since the parties have been engaging in discovery with respect to the counterclaims and under the assumption that all claims could proceed to trial. See Friedl v. City of New York, 210 F.3d 79, 87 (2d Cir. 2000) ("In general, district courts should not deny leave [to amend pleadings] unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility.").

## B. The Second Counterclaim Is Consistent with

## the Stock Purchase Agreements

As alleged in Paragraph 75 of Defendants' Answer, section 12.1(d) of the Stock Purchase Agreements provides that Plaintiff would indemnify Defendants for:

> [a]ll salaries, wages, bonuses, vacation, sick leave and other paid time off and compensation for services rendered of any type whatsoever accrued and/or payable to the Company's employee's [sic] with respect to periods ending on or prior to the Closing Date which have not been reserved for or reflected on the Closing Date Balance or otherwise taken into account for purposes of computing the adjustment to the purchase price provided for in Section 3.2(c) hereof.

---

can find nothing in the Stock Purchase Agreements to preclude the right of setoff.

Defendants interpret this language to mean they can recover from Plaintiff those monies owed for accrued, earned but unused sick and vacation time for employees at both facilities at the time of closing that exceed the credit given on the closing statement. Considering the difficulty of calculating closing adjustments exactly for an ongoing business, Defendants are not unreasonable in suggesting that section 12.1(d) recognized some post-closing adjustments would need to be made. Plaintiff, on the other hand, argues in her brief that no reimbursement is required because the issue of such employee accruals was addressed on the closing statement and the adjustment agreed to at that time forecloses subsequent post-closing adjustments, no matter how off-base the closing calculations may have been.

These differing interpretations indicate an ambiguity in the contract language, which cannot be resolved on a Rule 12(b)(6) motion. Rather, all ambiguities are to be resolved in favor of the party pleading the cause of action. See Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005). Where the intent of the parties will need to be determined in deciding what the contract language means, the cause of action should be allowed to proceed. See Bank of New York Trust v. Franklin Advisors, Inc., No. 07 Civ. 1746, 2007 WL 4116225, at *4 (S.D.N.Y. Nov. 16, 2007).

### C. The Fourth, Fifth and Sixth Counterclaims Allege Plaintiff's Failure to Make Adequate Provision for the Preparation and Filing of Required Forms, in Conformity with the Stock Purchase Agreements

Article V of the Stock Purchase Agreements is entitled "Representations and Warranties of the Sellers and the Company." Section 9.1(b) of the Stock Purchase Agreements provides that a condition precedent to the buyers' obligations under the contract is the receipt of a certificate

13

from Plaintiff and her brother stating that:

> (i) the representations and warranties of such Company and the Sellers contained in this Agreement shall be true when made and on and as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date; and (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by such Company and the Sellers on or before the Closing Date pursuant to the terms of this Agreement shall have been duly complied with and performed.

Among the representations in Article V is the following found in section 5.17 of the contracts:

> (a) The Company has, within the time and in the manner prescribed by law (including any applicable extension periods): (i) *duly filed* with the appropriate federal, state, and local taxing authorities *all Tax Returns* (as defined below) required to be filed by or with respect to the Company, or with respect to or attributable to the business or the assets of the Company pursuant to the Internal Revenue Code of 1986, as amended ("the Code") or any applicable state or local tax laws *for all periods prior to and through the Closing Date*, and all such Tax Returns are true, correct and complete in all material respects; (ii) timely paid in full or have made adequate provision for on the Closing Date Balance Sheet all Taxes (as defined below) shown to be due on such Tax Returns or otherwise due on such Tax Returns or otherwise due and payable with respect to the Company or the business or assets of the Company for the periods through the date of the Closing Date Balance Sheet, and (iii) complied in all material respects with all applicable laws, rules and regulations relating to the withholding of Taxes and the payment of withheld Taxes.

(italicized emphasis added). A "Tax Return" is defined in section 5.17(e) of the Stock Purchase

Agreements to include "any return, report, information return, statement, declaration or other

document (including any related or supporting information) filed or required to be filed with any

federal, state, local or foreign governmental authority in connection with any determination,

assessment or collection of any Tax or other administration of any laws, regulations or

administrative requirements."

Plaintiff argues that because the filing of payroll tax returns, the filing of 1099 forms and the filing of W-2 forms were not required by government agencies prior to the Closing Date, then the responsibility for the preparation of said forms passed to Defendants at closing. This interpretation however, fails to account for her certification that all such Tax Returns for all periods <u>through the Closing Date</u> were filed. Furthermore, Plaintiff has not proffered any example of a Tax Return that would be due before the Closing Date while covering periods through the Closing Date. Consequently, when drafting the Stock Purchase Agreements, the parties must have considered that the preparation and filing of some Tax Returns for periods including the Closing Date would necessarily be completed after closing. Defendants interpret section 5.17 to mean that Plaintiff bore responsibility for having those forms prepared, which makes logical sense since it would be Plaintiff and/or her accountants who would be most familiar with the information needed to prepare said returns. The Stock Purchase Agreement considered this scenario by providing for "Post-Closing Access to Information" in section 11.1.

Moreover, we know the parties were aware of circumstances in which it was appropriate to shift responsibility to Defendants for post-closing filings that covered pre-closing periods. In section 5.15 of the Stock Purchase Agreements, the sellers certified their companies had "timely filed such claims and other reports required to be filed by [them] in connection with Medicare and Medicaid that are due on or before the Closing Date . . . all of which to the Knowledge of the Sellers or the Nursing Compan[ies] are complete and correct, *except for final cost reports which are due after the Closing Date*." (italicized emphasis added). Without this same exception appearing in section 5.17, found on the very next page of the contract, Defendants have fairly

15

interpreted the Stock Purchase Agreements to mean the responsibility for preparing the Tax
Returns for periods through the closing date remained with Plaintiff and her brother.

The same analysis holds true for the preparation of form RHCF-4, which form a nursing
home facility is required to file annually with New York State. Section 11.2 of the Stock
Purchase Agreements states "[t]he Company shall prepare and timely file all required reports
relating to the Company for periods ending on or prior to the Closing Date." While Plaintiff
attempts to argue that once the closing took place, the reference to "the Company" equated to a
reference to the buyers, the rest of section 11.2 does not support this interpretation. The
remainder of the section reserves rights and obligations to the sellers in connection with these
reports, including the right to retain the originals and the obligation to defend the buyers and hold
them harmless against any liability resulting from said reports. When read in its entirety, and
again in contrast to section 5.15, section 11.2 clearly assigns Plaintiff the responsibility to control
the information relative to the preparation and consequence of all required reports ending on the
closing date, which would include form RHCF-4.

Bearing in mind that any ambiguity in the contract language is to be resolved in favor of
the pleading party, see Subaru Distributors Corp., 425 F.3d at 122, the difference in
interpretations set forth by Plaintiff and Defendants relative to the Fourth, Fifth and Sixth
Counterclaims should not be resolved on this motion to dismiss.

**D. The Seventh Counterclaim Is In Accord with the Stock Purchase Agreements
Relative to Calculating the Final Purchase Price**

As alleged in the Seventh Counterclaim, section 3.2 of the Stock Purchase Agreements
sets forth various ways in which the purchase price paid by Defendants at closing would be

16

adjusted higher or lower, depending upon certain factors, including an adjustment for Net Accounts Receivable and Net Accounts Payable. Section 3.2(a)(ii) defines "Closing Date Net Accounts Receivable" as "the *bona fide, valid and binding claims* of the Company against third parties arising in the ordinary course of the Company's business that are outstanding as of the Closing Date, and not subject to any valid counterclaim or set-off." (italicized emphasis added). On January 3, 2006, when the closing for the Stock Purchase Agreements took place, no one – not even Plaintiff or her accountants – knew with certainty what the Net Accounts Receivable would be through December 2005. Consequently, as set forth in the counterclaim, the parties used as a figure the maximum amount each resident could be billed, with the understanding that a post-closing adjustment would be required once the exact billing figures were known.

Plaintiff argues in her motion that Defendants are relying on an oral conversation with Plaintiff's accountant as the basis for seeking recovery in their Seventh Counterclaim. Defendants are making no such reliance. Instead, they are relying the language of the Stock Purchase Agreements, which permitted an adjustment in the purchase price for bona fide, valid and binding claims. Since the Company cannot lay claim to monies for which it could not have billed patients in the first instance, Plaintiff cannot benefit from the overbilled figures that were used as a best-case scenario for her when calculating the final purchase price. The counterclaim is a valid cause of action pursuant to the terms of the contract and therefore should not be dismissed.

17

## CONCLUSION

For all of the reasons set forth in this memorandum of law, Plaintiff's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be denied in its entirety.

Dated: January 18, 2008

Respectfully Submitted,

McMAHON and GROW

By: Julie Grow Denton, Esq.
Bar Roll No. JD8580
Attorneys for Defendants

Office and Post Office Address
301 North Washington Street
Post Office Box 4350
Rome, New York 13442-4350
Telephone: (315)336-4700
Facsimile: (315)336-5851
E-mail: jgdenton@mgglaw.com

18