# McMahon and Grow

301 NORTH WASHINGTON STREET
P. O. BOX 4350
ROME, NEW YORK 13442-4350

TELEPHONE (315) 336-4700
FAX (315) 336-5851
www.mgglaw.com

RICHARD H. McMAHON
DAVID C. GROW
JULIE GROW DENTON

JOHNSON D. McMAHON 1914-1963
ABRAHAM H. BAKER 1934-1995

OF COUNSEL
GEORGE B. GROW
RICHARD D. SIMONS

March 7, 2007

Louis A. Craco, Jr.
Allegaert Berger & Vogel LLP
111 Broadway, 18th Floor
New York, New York 10006

**VIA FEDERAL EXPRESS**

Re:   Stonehedge Acquisition Chittenango II, LLC
      Stonehedge Acquisition Rome II, LLC

### CONFIDENTIAL AND FOR SETTLEMENT PURPOSES ONLY

Dear Mr. Craco:

Our office represents the above-named clients. They have forwarded for our review your letters of February 5, 2007 and March 2, 2007. Our reading of the Stock Purchase Agreements suggests that the sellers of the Stonehedge properties are in fact liable toward the purchasers for the identified post-closing costs, and I hope this letter facilitates an amicable settlement of all issues.

### CMI Adjustment ($234,933.92)

You have identified § 3.2(b) of the Stock Purchase Agreement as being controlling on this issue. While certainly this section determined what process would be used to settle on a projected Medicaid reimbursement rate adjustment for purposes of closing, it is not determinative as to what would happen when the purchasers learned of an actual reimbursement rate adjustment after the closing.

The situation in which the purchasers presently find themselves is instead governed by § 12.12 of the Stock Purchase Agreements. This section is entitled "Overpayments and Audit Liabilities." Subsection (a) sets forth the purchasers' responsibility relative to "judgments, claims, reimbursements and overpayment and/or repayment demands or liabilities arising under Medicare, Medicaid and/or any other third party payor programs ('Payors') for all periods whether ending prior to, on, or after the Closing Date, including third party payor settlement payments and/or retroactive adjustments ('Payor Liabilities')." The section goes on to state that notwithstanding this responsibility, the Sellers are to indemnify the purchasers "for all Payor Liabilities for reporting or claims periods beginning on or after the date which is three (3) years immediately prior to the Closing Date and ending on or prior to the Closing Date." The aggregate floor for indemnification is $100,000 and the aggregate ceiling is $1,000,000.

Clearly, the $234,933.92 adjustment now being sought by Medicaid fits within the definition of Payor Liabilities. It is of no matter that the pre-closing adjustment is not a certification by the sellers. Section 12.12 is an independent indemnity provision, designed specifically to account for the kind of reimbursement the purchasers now seek.

Accordingly, the contract clearly supports the purchasers' claims for monies from the sellers in connection with this adjustment.

### Payroll Expense ($14,232.14)

Although the parties agreed to an aggregate $100,000.00 reduction in the purchase price for payroll expense, the actual amount of accrued, earned but unused sick and vacation time during the sellers' ownership of the nursing home facilities was $114,232.14. Section 3.2(c) of the Stock Purchase Agreements provides that the "Balance Payment shall be reduced by the amount which the Closing Date Employee Accruals [subsequently defined] exceeds the Contract Date Employee Accruals" (emphasis added). The purchasers agreed to the $100,000.00 reduction because they were denied access to the facilities' books and records prior to closing. They now simply seek an adjustment to reflect the actual amount of employee accruals.

It is important to note that the $100,000 adjustment was not for purposes of covering payroll for the week ending December 31, 2005. That liability was the sellers' responsibility, which Ms. Halbritter covered by depositing $125,000.00 in funds with the facilities. Purchasers therefore maintain there is no basis for returning those monies to Ms. Halbritter.

### Pre-Closing Tax Liabilities ($31,424.42)

These monies relate to the 2005 fourth quarter payroll taxes unpaid by the sellers. Indemnification for taxes is treated in a separate section under Article XII, namely § 12.6. This section provides the "Sellers shall be jointly and severally responsible for, and shall indemnify and hold the Buyer Indemnified Parties harmless from and against, all Taxes with respect to the income, assets and operations of the company for all taxable years or periods ending on or before the Closing Date." Section 12.9 provides that the indemnification obligations of the parties with respect to taxes shall survive until the expiration of the applicable statute of limitations.

Our clients are willing to turn over the documentation establishing this tax liability.

### Tax Penalties ($12,852.39)

The tax penalties sought to be reimbursed were imposed as a result of the late filing of payroll taxes for the fourth quarter of 2005. I gather there is no dispute that the taxes were the responsibility of the sellers. Once the tax returns were prepared using information maintained by the sellers, this paperwork was forwarded to Bernard LaClair. Mr. LaClair subsequently received several duplicate copies of the paperwork at his request. When the purchasers received delinquency notices, they forwarded those notices to Mr. LaClair as well. Marc Rossi came to the facility at Mr. LaClair's instruction on April 26, 2006 to sign the returns.

At no point did Mr. LaClair indicate the sellers would not sign the returns or should not be signing the returns. The purchasers were insistent on having either Mr. Rossi's signature or Ms. Halbriter's signature on the paperwork because all of the underlying information originated from their management of the facilities.

### Professional Fees ($11,000.00)

We call your attention to § 11.2 of the Stock Purchase Agreements. This section requires the selling companies "to prepare and timely file all required reports relating to the Compan[ies] for periods ending on or prior to the Closing Date." The purchasers are asking to be reimbursed for monies spent to prepare reports that were the obligation of your clients pursuant to this section.

Since the reports could not have been compiled as of the closing date, the purchasers cannot be said to have waived any right to indemnification under § 12.10 because this claim was not reasonably discoverable prior to closing.

### Disputed Receivables

The purchasers insist the issue of Disputed Receivables cannot be resolved without also examining the adjustment for Accounts Payable on the closing statement. They maintain the adjustment for Accounts Payable was too low, and that they have had to pay much more for expenses incurred during the time the sellers operated the facilities. Nor did the purchasers have the information to address this issue prior to closing, as the sellers cut off access to the facilities' business records.

The purchasers further inform me that the issue of Disputed Receivables was a point of contention at closing, with the parties disagreeing as to what amount of the receivables accounts were actually collectable. I gather that a separate post-closing document to resolve this issue was drafted, but it is unclear whether the final version was signed by all. If your analysis is based on any such agreement, could you please supply me with a copy?

It is also unclear to me why Ms. Inkawich needs to speak with personnel who may have provided care to any of the persons to whom the Disputed Receivables relate, as well as medical records. I am unsure whether the purchasers can make this information available without violating the Health Insurance Portability and Accountability Act of 1996. Perhaps you could explain why such access is thought to be necessary, and I can then research the relevant portions of the federal statute.

In any event, relative to the matters set forth in purchasers' original submission in December 2006, it is manifest that your client bears responsibility. Your prompt response is appreciated.

Sincerely yours,

Julie Grow Denton

cc: Stonehedge Acquisition Chittenango II, LLC
    Stonehedge Acquisition Rome II, LLC