**Allegaert Berger & Vogel LLP**

Writer's e-mail: lcraco@abv.com

ATTORNEYS

111 Broadway, 18th Floor
New York, New York 10006
212.571.0550
212.571.0555 Fax

475 Wall Street
Princeton, New Jersey 08540
609.688.9700
609.688.9701 Fax

www.ABV.com

April 10, 2007

**FOR SETTLEMENT PURPOSES
WITHOUT PREJUDICE**

VIA FACSIMILE AND FEDERAL EXPRESS

Julie Grow Denton, Esq.
McMahon and Grow
301 North Washington Street
Rome, New York 13442-4350

Halbritter adv. Stonehedge Acquistion

Dear Ms. Denton:

      Thank you for your letters of March 7 and April 3. We welcome the fact that your clients have chosen to bring in reputable outside counsel, as we think it is in everybody's best interests for them to be well advised.

      As a preliminary item, we need to bring to your attention the fact your firm previously represented Ms. Halbritter in connection with the preparation of her will and related matters. During the course of that representation, information about Ms. Halbritter and her financial and business affairs -- some of it, presumably, of a private nature -- was communicated to your firm. We do not take the position, at this point, that any conflict exists, but we did want to raise the issue so that you could review your firm's past services for Ms. Halbritter and satisfy yourself, and confirm to us, that your ongoing representation of the prospective defendants here does not create the potential for, or appearance of, any problem.

      That said, we turn to the substantive issues at hand.

**ABV Allegaert Berger & Vogel LLP**

Julie Grow Denton, Esq.
April 10, 2007
Page 2

<u>The Receivables Agreement</u>

As you requested, I enclose a copy of the fully executed Receivables Agreement. I was surprised to learn that your clients had not previously supplied it to you, as it is the critical document for purposes of Ms. Halbritter's dispute with them. Once you have had the opportunity to review it, I am confident you will see that your clients' insistence on linking Ms. Halbritter's claims under the Receivables Agreement to some further adjustment of the accounts payable is misguided.

What happened, in a nutshell, is this: § 3.2(a) of each Stock Purchase Agreement ("SPA") provided that, at closing, the purchase price would either be increased by the amount by which outstanding receivables exceeded payables, or decreased by the amount by which payables exceeded receivables. The parties concurred that, as of the closing date, receivables significantly exceeded payables at both Rome and Chittenango and, therefore, that increases in the purchase prices were required. At the closing, however, your clients took the position that some of the receivables carried on the closing date balance sheets were uncollectible and ought not to be considered in computing the purchase price increases. Given her own historically high collection rate, Ms. Halbritter disagreed.

The Receivables Agreement was executed in order to get past this issue. The parties agreed to increase the purchase prices by the amount that the receivables your clients did not dispute exceeded the payables. The disputed receivables were assigned to the sellers and, obviously, were not considered in the computation of the purchase price adjustments. The disputed receivables initially assigned had a face value of $473,884 but the parties later added more, upping the total value to $657,229. (In the days that followed, your clients proffered several revised versions of the Receivables Agreement but those revisions were unacceptable to the sellers and were never executed by them.)

As you will see, the Receivables Agreement required your clients to provide the sellers with information and other assistance in connection with the collection of the Disputed Receivables. They have consistently failed to do so, despite repeated demands from Ms. Halbritter. (At our December 20 meeting, your clients made no effort to dispute this.)

We have previously invited your clients, and we now invite you, to provide us with any information you think shows the payables figures used to compute the closing adjustments under § 3.2(a) were too low. We will consider any such information in good faith. But we expect the record to show that your clients had ample

2

**ABV  Allegaert Berger & Vogel LLP**

Julie Grow Denton, Esq.
April 10, 2007
Page 3

access to the books and records of the facilities before closing[1] and, accordingly, that § 12.10(b) of the SPAs would cut off any claim by them for indemnification with respect to the payables. That subsection states:

> Buyer's decision to consummate the closing of the transactions contemplated hereunder shall constitute a waiver of any claims that either Buyer, any Buyer affiliate, or their successors and assigns may have against the Sellers or the Company.

Furthermore, even if your clients were able establish a valid claim pursuant to the SPAs with respect to understated payables, it would have nothing to do with the Receivables Agreement and would not justify their ongoing breach of that separate, free-standing agreement.

We understand that you have not, until now, had the benefit of seeing the Receivables Agreement and, in particular, those of its provisions that require your clients to provide information relating to the disputed receivables and to assist in the sellers' collection efforts. Review of those provisions should answer your inquiry of March 7 about why KimAnn Inkawich needs certain information concerning the disputed receivables. Also, because the Receivables Agreement unconditionally entitles Ms. Halbritter to that information and commits your clients to provide it to her, we see no reason for her to enter into the proposed "Confidentiality and Indemnification Agreement" that accompanied your letter of April 3.

CMI Adjustment

We disagree that the $234,933.92 adjustment your clients contend is now being demanded by Medicaid should be offset against the amounts they owe Ms. Halbritter. Section 12.12(a) of the SPAs only requires the sellers to indemnify the buyers for pre-closing payor liabilities "in accordance with the indemnification *and notice* provisions set forth below". Section 12.12(b), in turn, provides:

---

[1] Ms. Halbritter strenuously disputes your assertion that your clients were ever "denied access to the facilities' books and records" but we invite you to supply us with any specific information you have to support that allegation. (*E.g.,* on what occasions, exactly, did your clients seek access to books and records? To what books and records, specifically, did they seek access, and what information did those books and records contain concerning accounts payable, pre-closing employee compensation accruals, or anything else for which your clients now claim a right to indemnification? How, when and by whom was access to any books or records denied?)

3

**Allegaert Berger & Vogel LLP**

Julie Grow Denton, Esq.
April 10, 2007
Page 4

> In the event that the Company or the Buyer receives any notice, claim, demand or other written document from a Payor or other party that potentially could give rise to or that otherwise relates to a Pre-Closing Payor Liability, the *Buyer shall deliver to the Sellers a copy of such notice no later than five (5) business days after the receipt thereof.*

Section 12.12(c) makes the sellers responsible for Payor Liabilities of the buyers "*[p]rovided the Buyer had given timely and proper notice to the Sellers as provided for in paragraph (b).*" (*Emphasis added*). The method by which all notices under the SPAs -- including, of course, notices to the sellers pursuant to § 12.12 -- must be given is set forth in precise detail in § 14.7 and requires delivery, by specified means, to Jane Halbritter, Marc Rossi and Epstein Becker & Green.

Your clients never provided a copy of any Medicaid demand for a CMI adjustment to the sellers at all, let alone within the time frame and by the means required in the foregoing provisions of the SPAs. Accordingly, even if one were to consider the proposed CMI adjustment to be a "Payor Liability" subject to the indemnification provisions of § 12.12 (which we do not) your clients' failure to provide the requisite notice would cut off any right to indemnification from the sellers.

Payroll Expenses

Your March 7 letter concedes that your clients agreed at closing to the aggregate reduction of $100,000, but nonetheless demands "an adjustment to reflect the actual amount of employee accruals." The adjustment you propose is precluded by the express language of § 12.1(d) of the SPAs, which specifically limits the sellers' obligation to indemnify the buyers for pre-closing employee compensation to those portions of such compensation "which have not been reserved or reflected on the Closing Date Balance Sheet *or otherwise taken into account for purposes of computing the adjustment to the purchase price provided for in Section 3.2(c) hereof.*" (*Emphasis added*). The agreed-upon $100,000 aggregate adjustment was the means by which the parties took account of employee compensation accruals for purposes of computing the adjustment to the purchase price under § 3.2(c).

Even if your clients had not had full access to the books and records, their decision to close anyway would, pursuant to § 12.10(b)(ii), preclude them from obtaining any further payroll adjustment now.

Your March 7 letter also states that the $100,000 closing adjustment "was not for purposes of covering payroll for the week ending December 31, 2005." You cite, and we can find, no support whatsoever for that assertion in the SPAs, and it would

4

Allegaert Berger & Vogel LLP

Julie Grow Denton, Esq.
April 10, 2007
Page 5

appear to contradict the plain language of § 3.2(c), which, unsurprisingly, defines "Closing Date Employee Accruals" as obligations to employees accruing up to and through the closing date. Your contention also appears to defy common sense: why would the payroll adjustment agreed to at closing cover all pre-closing payroll periods except the last one?

      Separately, Ms. Halbritter supplied approximately $111,500 to fund that payroll after ownership of the corporations passed to your clients. She did this in response to an emergency plea, on January 4, from Alicia Carrier and to protect the facilities' employees -- her longtime friends and colleagues -- from being stiffed on the first payroll for which your clients were responsible. She did this only after trying, unsuccessfully, to reach your clients and alert them to the crisis caused by their inexplicable failure to fund the payroll accounts. Ms. Halbritter's action spared your clients considerable embarrassment, not to mention possible regulatory sanction, civil liability and criminal charges. See e.g., N.Y. Labor Law § 198-a ("[e]very employer who does not pay the wages of all his employees in accordance with the provisions of this chapter, and the officers and agents of any corporation who knowingly permit the corporation to violate this chapter by failing to pay any of its employees in accordance with the provisions thereof, shall be guilty of a misdemeanor for the first offense and upon conviction therefor shall be fined not less than five hundred nor more than twenty thousand dollars or imprisoned for not more than one year. . . .").

      Your clients must repay this money promptly.

Pre-Closing Tax Liabilities

      I am informed that we are still waiting to receive documentation supporting your clients' claim for $31,424.42 in pre-closing tax liabilities. If and when we receive it, we will review it and get back to you.

Tax Penalties

      We are at a loss to understand the assertion, in your March 7 letter, that "there is no dispute that the [fourth quarter 2005] payroll taxes were the responsibility of sellers". We do indeed dispute that, and my February 5 letter to your clients could not have been clearer on the point: "[u]pon closing, the obligation to timely file payroll tax returns and to pay the corresponding taxes passed to the Buyers."

      We also take issue with your statement that "[a]t no point did Mr. LaClair indicate the sellers would not sign the returns or should not be signing the returns". Quite to the contrary, Mr. LaClair informs me that he and his colleagues repeatedly and emphatically informed your clients that the Sellers should *not* sign the tax returns. Your

Julie Grow Denton, Esq.
April 10, 2007
Page 6

clients' position that only Mr. Rossi or Ms. Halbritter could sign the returns because the "underlying information originated from their management of the facilities" flies in the teeth of well-settled tax law. Our understanding is that Mr. Rossi eventually signed the tax returns only because your clients refused to do so.

### Professional Fees

The assertion in your March 7 letter that § 11.2 of the SPAs requires the sellers to reimburse your clients for professional fees supposedly incurred in connection with the preparation of 2005 RHCF-4s, 1099s and W-2s is also incorrect. That section, in pertinent part, requires the sellers "to prepare and timely file all required reports relating to the Company for periods ending on or prior to the Closing Date . . . ." The 2005 RHCF-4s, 1099s and W-2s were not "required" and could not have been "prepared" or "timely filed" prior to the closing date. Therefore, they plainly fall outside the coverage of § 11.2. To construe § 11.2 as imposing responsibility for these reports on the sellers would be nonsensical because, after closing, the sellers lacked the legal power to prepare or file such documents. That authority and responsibility passed to your clients at closing. Had the parties intended the sellers to indemnify your clients for professional fees incurred in fulfilling that responsibility, § 11.2 would say so. It does not.

Finally, we are unclear as to what you mean when you say "this claim was not reasonably discoverable prior to closing."

    \*       \*       \*       \*       \*

For the foregoing reasons, we are confident that Ms. Halbritter's claims against your clients are unassailable and that, with the possible and relatively minor exception of post-closing tax liabilities, your clients' demands for indemnification from her lack merit. Ms. Halbritter would still prefer to resolve her grievances with your clients privately, but has instructed us to commence litigation if that does not happen in very short order. If your clients have any interest in such a resolution, please call me this week to discuss it.

Sincerely,

Louis A. Craco, Jr.

Enclosures

## RECEIVABLES AGREEMENT

This Receivables Agreement (this "Agreement") is made as of December 31, 2005 by and among Stonehedge Acquisition Chittenango II, LLC and Stonehedge Acquisition Rome II, LLC (hereinafter collectively referred to as the "Buyers"), and Jane A. Halbritter and Marc A. Rossi (hereinafter collectively referred to as the "Sellers")

WHEREAS, as of December 31, 2005, Sellers sold to Buyers all of their capital stock in Stonehedge Nursing Home Chittenango, Inc. and Stonehedge Nursing Home Rome, Inc. (hereinafter collectively referred to the as the "Acquired Corporations"); and

WHEREAS, the Acquired Corporations collectively, as of December 31, 2005, carried on their books approximately $2,407,211.00 in accounts receivable; and

WHEREAS, Buyers maintain that $473,884 of those accounts receivable are uncollectible (hereinafter referred to as the "Disputed Receivables," which are itemized on Schedule A of this Agreement) and, therefore, insisted that the purchase price for the Sellers' capital stock be reduced by $473,884; and

WHEREAS, Sellers are willing to agree to this purchase price reduction on the conditions that the Buyers: (i) pay the face value for those accounts receivables that are not in dispute (i.e., $1,549,977), (ii) convey to the Sellers any and all amounts that are collected from time to time in the future with respect to the Disputed Receivables, (iii) hereby appoint the Sellers and their designated agents, individually and collectively, as agents for the Buyers for purposes of collecting the Disputed Receivables, and (iv) shall fully cooperate with, and assist, the Sellers in their collection efforts; and

WHEREAS, Buyers are willing to agree to Sellers' proposal regarding the Disputed Receivables as provided for herein.

NOW, THEREFORE, in consideration of the mutual agreements, covenants and representations contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Sellers and Buyers agree as follows:

1. <u>Appointment of Sellers as Agents.</u> The Buyers hereby nominate and appoint the Sellers and their designated agents as the Buyers' agents and attorneys-in-fact for the sole purpose of collecting the Disputed Receivables. The Sellers shall have the authority, jointly and severally and at the Sellers' sole cost and expense, to take any and all actions, that in the opinion of the Sellers ought to be taken, to collect the Disputed Receivables, including but not limited to:

    a. Demanding, suing for, receiving and collecting the Disputed Receivables;

b. Making, signing, acknowledging, endorsing or delivering any instruments of any nature whatsoever required for the collection of, or to facilitate the collection of, the Disputed Receivables;

c. Compromising, settling or submitting to arbitration any claims associated with the Disputed Receivables and giving releases in connection with such Receivables; and

d. Without limiting the above powers, generally performing any other acts of any nature whatsoever that in the opinion of the Sellers are reasonably necessary for the collection of the Disputed Receivables.

Any person, firm or corporation shall be fully protected in relying upon this delegation of legal authority.

The Buyers hereby ratify and confirm all actions which may be taken by the Sellers with respect to the Disputed Receivables so long as such actions do not interfere with the operation of the business of the Buyers or their respective tenants.

2. <u>Payment to Sellers of Disputed Receivables.</u> All payments, whether partial or in full, received by Buyers on or after the date of this Agreement with respect to any Disputed Receivable shall be the property of the Sellers, and Buyers hereby wave any and all rights and, shall make no claim against Sellers, with respect to such payments. Buyers shall notify Sellers immediately upon receipt of any payment on a Disputed Receivable, and Buyers shall remit any and all such payments to Sellers within three (3) business days of their receipt.

3. <u>Summary of Disputed Receivables.</u> Within ten days (10) after the close of each month, Buyers shall provide to Sellers a list of the outstanding Disputed Receivables, the payments received on any such Disputed Receivables during the preceding month and the date of receipt of such payments. From time to time, Sellers shall provide to Buyers, in writing, a list of any Disputed Receivables which Sellers have determined to be uncollectible and with respect to which Sellers have ceased all collection efforts. Such Receivables shall no longer be considered outstanding.

4. <u>Audit of Books and Records.</u> Sellers shall have the right, upon ten (10) days prior written notice to Buyers, to conduct an audit of Buyers' books and records to insure compliance with the terms of this Agreement so long as such audits shall only cover one (1) time per fiscal quarter.

5. <u>Promises and Covenants of Buyers.</u>  Buyers make the following promises and covenants to Sellers:

    a. To take any additional actions and do anything else that may be required to constitute Sellers and their designated representatives as Buyers' agents and attorneys-in-fact for purposes of collecting the Disputed Receivables;

    b. To act in good faith and reasonably cooperate with the Sellers in their efforts to collect the Disputed Receivables;

    c. To provide Sellers, upon Sellers' request, with specific information necessary for the collection of the Disputed Receivables to the extent that such information is in Buyers' control or possession or with respect to which Buyers have knowledge; and

    d. To make commercially reasonable efforts to assist Sellers with collection of the Disputed Receivables.

6. <u>Promises and Covenants of Sellers.</u>  The Sellers make the following promises and covenants to Buyers.

    a. To act professionally, responsibly and in keeping with accepted business practices in collecting the Disputed Receivables;

    b. To act in good faith and reasonably cooperate with Buyers in Buyers' efforts to collect all receivables *other than* the Disputed Receivables;

    c. To provide Buyers, upon Buyers' request, with any information, known to the Sellers and not otherwise known or reasonably available to the Buyers, necessary for the collection of receivables *other than* the Disputed Receivables.

7. <u>Notices.</u>  Any communication or notice required or permitted hereunder shall be in writing and conclusively deemed to have been delivered and effective as of the date it was actually delivered, if hand delivered; the date of confirmed answer, if sent by fax; or on the date it was received, if mailed in a sealed envelope, postage prepaid, by certified or registered mail; all addressed to such party at the following address or fax number (or such other address or fax number as either party may subsequently add or substitute by proper notice hereunder to the other party):

Buyers:



Sellers:

8. <u>Severability.</u> If any part or provision of this Agreement shall be determined to be invalid or unenforceable under the laws of New York, the remaining portions of this Agreement that can be given effect shall nevertheless continue in full force and effect.

9. <u>Modification.</u> This Agreement may not be changed orally, and any modification hereto must be in writing signed by all parties.

10. <u>Binding Effect.</u> This Agreement shall be binding and inure to the benefit of the parties to this Agreement, their legal representatives, successors and assigns.

11. <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between the parties with respect to the Disputed Receivables.

12. <u>Non-waiver.</u> No delay or failure by a party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

13. <u>Assignment.</u> The rights and interests of the parties may not be sold, transferred, assigned, pledged, encumbered or hypothecated by them, unless expressly permitted in writing by the other party, which permission may be withheld for any or no reason.

14. <u>Headings.</u> Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

15. <u>Governing Law.</u> This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

[CONTINUED ON NEXT PAGE]

16 . <u>Term.</u> This Agreement shall be in full force and effect for so long as there are any outstanding Disputed Receivables.

IN WITNESS WHEREOF the parties hereto have signed and sealed this Agreement this 3rd day of January, 2006.

BUYERS:

Stonehedge Acquisition Chittenango II, LLC

By: _____

Stonehedge Acquisition Rome II, LLC

By: _____

SELLERS:

_____
Jane A. Halbritter

_____
Marc A. Rossi

-7-

Combined Closing Statement Purchase of Stock
Total Purchase Price                                    13,000,000.00

Credits Due Seller
Purchase Price                                          13,000,000.00
Accounts Receivable                                      2,468,163.50
Sellers Prepayments                                        135,120.00
Cash                                                    -1,000,000.00
Total Credits Due Seller                                16,603,283.50

Credits Due Buyer
Receivables Allowance                                      657,229.00 B/S
CMI                                                         22,574.00
Chittenango payroll non work                                75,000.00
Rome payroll non work                                       25,000.00
Accounts Payable-Rome                                      257,209.00
Accounts Payable-Chittenango                               116,675.00
Assessment for A/R                                          38,004.00
Downpayment                                                500,000.00
Interest on Downpayment                                      6,131.82
12/30 Water Bill                                             1,314.78
Total Credits Due Buyer                                  1,699,137.60

                                                        14,904,146.90

Balance Sheet Summary
$2,407,229   AR on Books
($657,229.00) Held by Jane
$1,810,934.58 Paid at closing for AR
$135,120.00  Sellers Prepayments
$22,574      CMI Adjustment
$125,000.00  Non Work Adjustment       Owed to State
$373,884.00  Accounts Payable          Owed to Employees
$38,004.00   State Assessement on Accounts  Owed To Vendors
$2,505,516.58 Obligations Assumed on Buyers Balance Sheet  Gross Receipts Tax

To be readjusted to reflect Receivables Allowance



Signatures:
Jane Halbritter
Mark Rossi by Jane Halbritter
Barry Adler
Samuel Kazarnovsky
Joseph Zupnick
Joseph Kazarnovsky
Date of Closing