UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
)
JANE A. HALBRITTER,                                          )
)
                Plaintiff,                  )
)      07 Civ. 3848 (WHP)
      -- against --                                         )
)
STONEHEDGE ACQUISITION ROME II, LLC      )
and STONEHEDGE ACQUISITION                        )
CHITTENANGO II, LLC,                                       )
)
              Defendants.                )
)
-------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Louis A. Craco, Jr. (LC-9786)
ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 20th Floor
New York, New York 10006
Telephone: (212) 616-7055
Facsimile:  (212) 571-0555
E-mail:      lcraco@abv.com

Attorneys for Plaintiff Jane A. Halbritter

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Point I:        Halbritter Has Been A Florida Domiciliary
                Since Before She Commenced This Action. . . . . . . . . . . . . . . . . . . . . . . . . . 2

Point II:       Defendants' Argument that Halbritter is Not
                a New York Domiciliary is Based on Factual
                Assumptions that Are Outdated, Incomplete or Incorrect. . . . . . . . . . . . . . . . . 11

Point III:      The Assignment Agreement Between Halbritter and
                Rossi is Not a Collusive Assignment to Manufacture
                Subject Matter Jurisdiciton. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

## TABLE OF AUTHORITIES

### <u>Cases</u>

<u>Airlines Reporting Corp. v. S and N Travel, Inc.</u>,
58 F.3d 857 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

<u>Bank of India v. Subramanian</u>,
Slip Copy No. 06 Civ. 2026 (WHP), 2007 WL 1424668 (S.D.N.Y. May 15, 2007) . . . . . . . . . . 2

<u>Bell v. Gordon</u>,
Slip. No. 05 Civ. 2163(NRB), 2005 WL 2087822 (S.D.N.Y. Aug. 30, 2005) . . . . . . . . . . . . . 10

<u>Click Model Management Inc. v. Rhoda</u>,
Slip. No. 06 CV 660 (LBS), 2006 WL 1722578 (S.D.N.Y. June 22, 2006) . . . . . . . . . . . . . . . 5

<u>Hicks v. Brophy</u>,
839 F.Supp. 948 (D.Conn.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Lindaros v. Fortuna</u>,
157 F.3d 945 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>National Artists Management Co., Inc. v. Weaving</u>,
769 F.Supp. 1224 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Oscar Gruss & Son, Inc. v. Hollander</u>,
337 F.3d 186 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

<u>Palazzo v. Corio</u>,
232 F.3d 38 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Peterson v. Allcity Ins. Co.</u>,
472 F.2d 71 (2nd Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Prudential Oil Corp. v. Phillips Petroleum Co.</u>,
546 F.2d 469 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Transcontinental Oil Corp. v. Trenton</u>,
560 F.2d 94, 103 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

### <u>Statutes</u>

28 U.S.C § 1359 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

ii

Allegaert Berger & Vogel LLP
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                    )

JANE A. HALBRITTER,              )
                                    )

              Plaintiff,       )
                                    )     07 Civ. 3848 (WHP)
       -- against --        )
                                    )

STONEHEDGE ACQUISITION ROME II, LLC  )
and STONEHEDGE ACQUISITION       )
CHITTENANGO II, LLC,           )
                                    )

              Defendants.    )
                                    )
------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

        Plaintiff Jane Halbritter ("Halbritter") respectfully submits this Memorandum of

Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.

        Defendants' motion must be denied.  This Court clearly has diversity jurisdiction

over this suit.  In Point I below, we demonstrate that Halbritter has been a Florida domiciliary

since well before the commencement of this action on May 18, 2007.  In Point II, we show that

defendants' argument that Halbritter was still a New York domiciliary on that date is based on

information that is outdated, incomplete, taken out of context and, in some instances, simply

incorrect.  In Point III, we rebut defendants' argument that the Assignment Agreement between

Halbritter and Marc Rossi was collusive under 28 U.S.C. § 1359.

Point I

<u>Halbritter Has Been A Florida Domiciliary Since Before She Commenced This Action.</u>

"The existence of federal diversity jurisdiction 'is determined by examining the citizenship of the parties at the time the action is commenced.'" <u>Bank of India v. Subramanian</u>, Slip Copy No. 06 Civ. 2026 (WHP), 2007 WL 1424668 *3 (S.D.N.Y. May 15, 2007) (Pauley, J.) quoting <u>Lindaros v. Fortuna</u>, 157 F.3d 945, 947 (2nd Cir. 1998). A party's citizenship is shown by its domicile. <u>Id.</u> "Domicile is 'the place where a person has his true and fixed home and principal establishment, and to which, whenever he is absent he has the intention of returning.'" <u>Id.</u> quoting <u>Palazzo v. Corio</u>, 232 F.3d 38, 42 (2nd Cir. 2000). Where a party alleges there has been a change of long-term domicile -- as Halbritter does in this case -- that party has the burden of proving that change by clear and convincing evidence. <u>Id.</u> "To effect a change of domicile, two things are indispensable: First, residence in a new domicile; and second, the intention to remain there." <u>Id.</u> "The second element does not require that the person have an affirmative intent to remain permanently in the state, but merely that he has no present intent to move to another state." <u>Hicks v. Brophy</u>, 839 F.Supp. 948, 950 (D.Conn.1993) citing <u>National Artists Management Co., Inc. v. Weaving</u>, 769 F.Supp. 1224, 1227 (S.D.N.Y. 1991).

The clear and convincing evidence, described below and set forth in detail in Halbritter's accompanying affidavit[1], shows that these standards are satisfied here. Halbritter

---

[1]Citations herein are to the accompanying affidavit of Jane Halbritter, sworn to on January 17, 2007 ("Halbritter Aff.") and exhibits thereto; the Memorandum of Law in Support of Defendants' Motion To Dismiss for Lack of Subject Matter Jurisdiction ("Def. Mem."); and the Declaration of Joel S. Schenck in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Schenk Dec.").

2

changed her domicile to Florida around February 2006. She established a permanent residence there, intends to remain there and has no intent to move elsewhere. As she puts it, "since early 2006, New York State has only been a place I visit. Naples, Florida has been the place I consider my home." (Halbritter Aff. ¶ 2).

Halbritter was, to be sure, a New York domiciliary until at least late 2005. She had grown up and spent much of her life in and around Rome, New York. She had family and many friends and connections in the area. She and her two brothers owned interests in a number of businesses, including the Stonehedge Health and Rehabilitation Centers in Rome and Chittenango, New York (of which Halbritter had been President and a 50% owner), a linen supply company, a residential trailer park, a construction company, a multi-purpose management company (called James Street Management, Inc.) and numerous real properties held for investment purposes. Halbritter and her brothers had acquired these interests some years ago from their late father. (Halbritter Aff. ¶ 3).

In 1998 Halbritter married Ray Halbritter, the Tribal Leader of the Oneida Indian Nation and the Chief Executive Officer of the Turning Stone Casino. They lived in a house on North George Street in Rome. Around February 2001, they moved into her ailing father's house at 100 West Garden Street, Rome to care for him. After her father's death, Halbritter and her husband bought another house on North George Street, which they began to renovate and into which they planned to move. (Halbritter Aff. ¶ 4).

In 2005, however, Halbritter and her husband separated and he moved out. This happened around the same time Halbritter was attempting to close the sale of the nursing homes to defendants. Between the end of her marriage and the sale of the businesses which had been

her occupation, she decided to start a new phase of her life in a different part of the country. (Halbritter Aff. ¶ 5). Because of Ray Halbritter's considerable prominence and influence in New York business and political circles, Halbritter determined to relocate outside the state "to escape his very long shadow". She immediately packed up all her possessions for shipping out of Rome. (Halbritter Aff. ¶ 6).

Halbritter had long been fond of the Naples, Florida area and in 2004 she and her husband purchased a condominium unit there, at 8321 Bay Colony Drive, Apartment 1702. After they separated, they agreed that it would become Halbritter's permanent home. In anticipation of moving there, Halbritter arranged, starting in late 2005 or early 2006, for a very significant renovation of the Bay Colony condo, on which she eventually spent approximately $400,000. (Halbritter Aff. ¶¶ 7, 8).

Owing to the trauma of her marital breakup, and given that she no longer had the nursing homes to run, Halbritter was extremely eager to leave Rome and did not wish to wait until the condo renovations were complete to move to Naples. Accordingly, in February 2006, she began renting an apartment from friends, Wayne and Judy Levi, about three miles from the Bay Colony condo. (Halbritter Aff. ¶ 10 and Ex. 1).

On April 4, 2006, she notified the United States Postal Service of her permanent move to Florida, and instructed that all her mail be forwarded from the Rome address to a Post Office box in Florida. The Postal Service issued her a Change of Address form, which reflected the Postal Service's understanding that this was a permanent move. Since that time, all mail addressed to Halbritter at the West Garden Street address in Rome has been automatically forwarded to her in Florida. For this reason, the fact that certain mail continues to be addressed

4

to her in Rome is of no practical consequence, because it all reaches her in Florida.  (Halbritter

Aff. ¶ 11 and Ex. 2).  See Click Model Management Inc. v. Rhoda, Slip. No. 06 CV 660 (LBS),

2006 WL 1722578*1 (S.D.N.Y. June 22, 2006) (Sand, J.) (emphasizing location of receipt of

mail as an indicator of domicile).

       Moreover, as they have admitted in their Answer, defendants themselves had

communications after closing concerning the redirection of mail "to Plaintiff's Florida address".

See Answer with Counterclaim, ¶ 70.

       After living for a short time in the Levis' apartment, Halbritter entered into a

short-term sublet for another apartment in the Bay Colony complex, owned by a gentleman

named Eckard Kaemmer, so she could oversee the ongoing renovations in her condo.  She

remained in the sublet until November 2006.  (Halbritter Aff. ¶ 12 and Ex. 3).

       Halbritter spent about seven and a half weeks in Rome at the end of 2006, visiting

family and attending to year-end business concerning the family companies.  She  returned to

Naples immediately after the New Year.  (Halbritter Aff. ¶ 14).  She remained in Naples for the

next five months, except for two very brief visits to North Carolina and New York City.

(Halbritter Aff. ¶ 18 and Exs. 5 and 6).

       In January 2007, while helping to repair some hurricane damage to another house

she owns with her brothers in Marco Island, Florida (about ten miles from Naples) Halbritter had

an accident and broke several ribs.  The renovations at the Bay Colony condo were not quite

complete, and so she spent February and part of March convalescing in the Marco Island house.

(Halbritter Aff. ¶¶ 14, 21.j., and Ex. 19).

       Halbritter moved into her Bay Colony condo sometime in March, 2007.  On April

2, she updated her forwarding instructions to require all mail to be forwarded to the condo. Again, the Postal Service issued a Change of Address form reflecting that this was a permanent move. (Halbritter Aff. ¶ 15 and Ex. 4).

In the roughly fourteen-month period between mid-March 2006 and the commencement of this action on May 18, 2007, Halbritter spent approximately <u>forty-one</u> weeks in Naples. By contrast, during that period, she spent only eleven weeks in Rome, seven and a half of which were around the end of 2006, from the Thanksgiving to New Year holidays, visiting family and attending to year-end business relating to the family's various business interests. Because she wanted a residence in the Northeast that was not too close to Rome, she also rented an apartment in Cambridge, Massachusetts in August 2006 and spent approximately eight weeks there prior to the commencement of this action. At the time she began this lawsuit, she regarded Cambridge, not Rome, as her second home. (Halbritter Aff. ¶¶ 16-19 and Exs. 5 and 6).

Prior to the commencement of this action, Halbritter took numerous other steps, and established other relationships, that show she considered Naples to be her permanent and primary home by then. Specifically:

<u>Primary Care Physician</u>. In January 2007, Halbritter paid $5,000 to engage the services of Dr. Kravis and the "Concierge Medicine Program" of Naples Health Care Associates. Dr. Kravis became, and continues to be, her primary care physician. (Halbritter Aff. ¶ 20.a. and Ex. 7).

<u>Dr. Hakikas</u>. Halbritter consulted with James A. Hakikas, M.D., in Naples, starting on March 20, 2006 and had at least eleven office sessions with him prior to the

commencement of this action, as well as several since then. (Halbritter Aff. ¶ 20.b. and Ex. 8).

Gynecologist. Halbritter located a gynecologist in the Naples area, Dr. Krandall, and has had two or three visits with him prior to the commencement of this action (and since). (Halbritter Aff. ¶ 21.c.).

Automobiles. As of February 2006, Halbritter regularly used two vehicles. She had leased these cars before her separation and registered them in New York. She moved both vehicles to Naples in or around February, 2006. One of these was damaged by lightening while she was driving it around Naples in October 2006 and was serviced there. (Halbritter Aff. ¶ 21.d. and Ex. 9).

Auto Insurance. At some point before December 7, 2006 Halbritter notified Travelers, her auto insurer, of her change of address, and Travelers sent her a New York State Insurance Card reflecting her Naples address for insurance purposes for the coverage period beginning December 7, 2006. (Halbritter Aff. ¶ 21.e. and Ex 10).

Federal and State Income Taxes. On April 13, 2007, Halbritter filed requests with the IRS and the New York State Department of Taxation and Finance for extensions of time to file her 2006 tax returns. Those requests identified the Naples condo as her address. The IRS has subsequently corresponded with her there. (Halbritter Aff. ¶ 21.f. and Ex. 11).

Banking. Halbritter had, for many years before 2005, had a banking relationship with NBT Bank in Rome and its officers and other personnel had become very familiar with her personal and business banking needs. She saw no need to discontinue this relationship when she moved to Florida, especially given that most of her banking transactions in recent years had been conducted by e-mail, phone or through her accountants. At some point prior to March 2007, she

instructed NBT to start sending monthly statements to her Naples home and NBT thereafter did so. (Halbritter Aff. ¶ 21.g. and Ex. 12).

Investment Accounts. As of late 2006, Halbritter maintained investment accounts at Investors' Bank & Trust in Boston. Beginning in April 2007, at her request, statements for that account were sent to the Naples condo. She also maintained an account at Smith Barney, which sent its 2006 year-end summary to the Naples address. (Halbritter Aff. ¶ 21.h. and Exs. 13 and 14).

Attorneys. As of May, 2007, Halbritter was employing four law firms in connection with her various legal affairs. By then, all had sent their bills to her in Naples. (Halbritter Aff. ¶ 21.i. and Exs. 15, 16, 17 and 18).

Accountants. In May 2007, and for many years before, Halbritter had employed Pinto, Mucenski & Watson, P.C., of Potsdam, New York (about 110 miles from Rome) as accountants for business, personal and family purposes. From time to time in 2006-2007, they sent her materials by UPS. In June 2006 they sent one such package to her at the Bay Colony sublet, where she was staying while the renovations on her condo proceeded. In October 2006, they directed two packages to the Cambridge apartment, where she was at the time. They sent packages to the Marco Island house while she was convalescing there, and in March, they sent another package to the Bay Colony condo, into which she had moved by then. This was the last package prior to the commencement of this action. (Halbritter Aff. ¶ 21.j. and Ex. 19).

Bay Colony Club. Halbritter has maintained a membership in the Bay Colony Community Association (essentially a country club for the Bay Colony complex) since well before the commencement of this action. (Halbritter Aff. ¶ 21 and Ex. 20).

<u>Business/Calling Cards and Stationery</u>.  Prior to the commencement of this action, Halbritter had personal business/calling cards and stationery printed reflecting her Naples address.  (Halbritter Aff. ¶ 22 and Ex. 21).

After the commencement of this action but reflecting an intent, formed well beforehand, to make Naples her permanent home, Halbritter registered to vote in Florida; obtained a permanent Florida drivers' license (as opposed to part-time resident, or "snowbird" license) and surrendered her New York driver's license; and obtained a library card at the public library in Collier County, Florida.  (Halbritter Aff. ¶¶ 22, 36 and Ex. 22).

In December 2006, Ray Halbritter commenced divorce proceedings and, at some point thereafter, moved for an interim order entitling him to part time use of the Naples condo (notwithstanding his earlier agreement that Halbritter would use it exclusively as her permanent home).  On December 10, 2007, the Supreme Court of the State of New York, Madison County (Dennis K. McDermott, J.) issued an order denying that request and ruling that Halbritter "shall have the exclusive use and occupancy of the Naples, Fla. condominium".  (Halbritter Aff. ¶ 24 and Ex. 23).

In sum, Halbritter's presence in Naples for most of the time between March 2006 and the commencement of this action, and the array of connections she had established by that time, clearly and convincingly demonstrate that by then she had both established a permanent residence there, and formed a resolute intention to remain there.  This establishes her Florida domiciliary and, therefore, satisfies her burden of establishing diversity jurisdiction.

Halbritter is in Florida now, but we acknowledge that <u>since</u> the commencement of the action, Halbritter has spent a considerable amount of time back in the Rome area.  A person's

9

whereabouts after the commencement of an action, of course, are not relevant for purposes of the inquiry into domicile. See, e.g., Peterson v. Allcity Ins. Co., 472 F.2d 71, 74 (2nd Cir. 1972). Domicile is maintained, even when an individual is absent from her domicile for a prolonged and indefinite period, if the absence is for a limited, defined purpose. Bell v. Gordon, Slip. No. 05 Civ. 2163 (NRB), 2005 WL 2087822 (S.D.N.Y. Aug. 30, 2005) (Buchwald, J.).

        That was exactly Halbritter's situation in the second half of 2007, when she was "reluctantly tethered to the Rome area by numerous, mostly unpleasant, obligations". These included the need to deal with the divorce case, which involves a very large and complicated marital estate. Halbritter has also "had to spend a lot of time in Rome lately -- a great deal more than I'd like -- winding up our family's business affairs" including the dissolution of the linen service company, the closing of the residential trailer park, the sale of one of the real properties, White Birch Landing, to a charitable concern, and dealing with the consequences when that charity defaulted on its mortgage. She has also engaged in ongoing efforts to sell another commercial real property, the Gore Road School. She has also shown the West Garden Street house to a prospective buyer. She has spent a great deal of time in Rome in late 2007 preparing and presenting a tax certiorari petition to the State to reduce taxes on the family businesses, now that they are no longer producing significant income. In short, Halbritter was in Rome in the latter part of 2007 largely to sever many of her pre-existing connections to New York. She "cannot wait to be done with these tasks so that I may return to my home in Florida without interruption". (Halbritter Aff. ¶¶ 25-28).

<u>Point II</u>

<u>Defendants' Argument that Halbritter is Not a New York Domiciliary is Based on Factual
Assumptions that Are Outdated, Incomplete or Incorrect.</u>

Defendants' efforts to portray Halbritter as a New York domiciliary are

unavailing, and are based on factual assertions that are obsolete, incomplete and, in some

instances, simply untrue.  We will address each of them in turn.

Defendants mention Halbritter's divorce proceedings in New York Supreme

Court.  (Def. Mem. at 8).   These proceedings were initiated, and the forum chosen, by Ray

Halbritter.  That Halbritter engaged lawyers in the area for the divorce case hardly means she still

lives there.  (Halbritter Aff. ¶ 30).

Defendants state that "plaintiff is merely using an apartment [in Naples] that she

bought with her estranged husband in 2005."  (Def. Mem. at 6).  Defendants cite no fact to

support this assertion that she is "merely using" the Naples condo.  As noted above, she spent

$400,000 to renovate it, has moved possessions from Rome into it and recently procured an order

from the divorce court denying her husband any use of it and giving exclusive possession of it to

her.  (Halbritter Aff. ¶ 31).

Defendants erroneously state that Halbritter "owns" the West Garden Street

house.  (Def. Mem. at 6.).  In fact, the West Garden Street house is owned by James St.

Management, Inc., (not by Halbritter personally).  She uses the West Garden Street house only as

a temporary, part-time accommodation until the divorce case is over and she can finish winding

up her business affairs in Rome.  Since the divorce, she has tried to sell it.  Indeed, around the

time they took over the Rome nursing home, defendants themselves asked to buy it, and she told them she would be delighted to discuss that prospect once the sale of the nursing homes was satisfactorily resolved (which, of course, never happened). She has also shown the West Garden Street house to at least one other potential buyer recently, but that buyer declined to purchase it because it was on the grounds of the nursing home. She looks forward to selling the house in the near future. Until that happens, she remains obliged to pay taxes and utilities on it. That hardly makes it her permanent or primary residence. (Halbritter Aff. ¶ 33).

Defendants mention that, in a schedule in the divorce proceeding, Halbritter identified 100 West Garden Street as her "present address". This was filled out by her divorce lawyer, and she signed it without giving it any particular thought. She presumably understood it to refer to her "address" in the area where the divorce case was pending. In any event, everybody involved in those proceedings knows Halbritter considers Florida to be her primary and permanent home. (Halbritter Aff. ¶ 34). As noted above, the Postal Service has forwarded all her mail to Florida since April 2006.

Defendants refer to Halbritter's membership at the Teugega Golf Club in Rome. (Schenk Aff. Ex. J). Halbritter has been a member of that club for twenty-five years. Moreover, the bills from the club defendants submit in support of their motion show how very rarely she uses the Golf Club anymore. Indeed, she had an unused "minimum house balance" for the months to which those bills pertain. She makes much more frequent use of the Bay Colony Club in Naples. (Halbritter Aff. ¶ 35).

Defendants falsely state that Halbritter still holds a valid New York Drivers'

12

license. (Def. Mem. at 7). As she has sworn, she was required to surrender her New York license when she obtained a permanent Florida drivers' license. Indeed, the Florida Motor Vehicles personnel told her that she was required to surrender the New York license precisely because she was obtaining a permanent resident's Florida license -- as opposed to a "snowbird" license, which Florida will issue to part-time residents without requiring them to surrender their out-of-state licenses. (Halbritter Aff. ¶ 36).

Defendants state that Halbritter owns four vehicles registered in New York. (Def. Mem. at 7). All of these vehicles were registered in New York before her move to Florida. Two of them were leased, not owned, and she kept both of those in Florida starting in early 2006. Another of these cars (the Ford) is technically owned by Halbritter but has always been used exclusively by her nephew, who lives in the Rome area. Halbritter has not driven the fourth vehicle (a Porsche) in years. (Halbritter Aff. ¶ 37).

Defendants note that Halbritter still owns interests in several New York properties and entities. (Def. Mem. at 8). As noted above, she has held these interests for many years and is now in the process of divesting herself of them. (Halbritter Aff. ¶ 39).

Defendants note that Halbritter still uses a New York based bank, accountants and insurance brokers. Halbritter has longstanding relationships with these people, largely having to do with her family's New York holdings, and she has long reposed trust and confidence in them. There was no reason to disrupt these relationships when she moved to Florida. Almost all her dealings with these professionals are electronic. She has an insurance agent in Florida. (Halbritter Aff. ¶ 40).

13

Defendants' make much of Halbritter's service as an unpaid member of the Board of Commissioners of the New York State Insurance Fund. Governor Pataki appointed her to that position many years ago. Her term actually expired on December 31, 2006 and she has not been reappointed. She has been notified that Governor Spitzer will name her successor, but so far that has not been done. She has continued in a holdover capacity, receiving invitations to and attending Board meetings (a few times a year) out of a sense of courtesy and obligation to the Board. It was not Halbritter's intent, but even if she violated the letter of the Public Officers' Law by attending a few meetings after she move to Florida, that does not change the fact that she did move to Florida. (Halbritter Aff. ¶ 41).

Finally, defendants state that Halbritter is a member of a "New York based 'think tank'", the Rockford Institute. (Def. Mem. at 9 n.2). That is incorrect. The Rockford Institute is based in Rockford, Illinois. In any event, Halbritter only attended one meeting of this body well over two years ago and has had no other involvement with it. She was surprised to learn at her deposition that the Rockford Institute lists her as a member on its website. (Halbritter Aff. ¶ 42).

<u>Point III</u>

<u>The Assignment Agreement Between Halbritter and Rossi is Not a Collusive Assignment to Manufacture Subject Matter Jurisdiction.</u>

Defendants assert, incorrectly, that by virtue of Marc Rossi's assignment, Halbritter has been "collusively made or joined" as a party to invoke the diversity jurisdiction of this Court in violation of 28 U.S.C. § 1359. That is not so.

Halbritter was the seller of 50% of the stock defendants purchased and was

14

obviously as much a party to the Stock Purchase Agreements ("SPAs") and the Receivables

Agreement at issue in this case as was Rossi.  She obviously enjoys her own standing to sue for

breaches of those agreements, at least to the extent of her 50% interest.  As demonstrated in

Points I and II above, Halbritter is diverse as to defendants because she is a Florida domiciliary.

Accordingly, her right to invoke the jurisdiction of this Court has not been "created" or

"manufactured" by Rossi's assignment; if Rossi had never assigned his interest, Halbritter would

still be entitled to bring a diversity action to vindicate her own rights.

Cases defendants cite -- as cases holding claims precluded by § 1359 typically do

-- concern the inapposite circumstance in which an aggrieved party who is not diverse as to the

defendant assigns or otherwise delegates the prosecution of the claim to a diverse party with no

"real and substantial interest" in the underlying controversy.  See, e.g., Airlines Reporting Corp.

v. S and N Travel, Inc., 58 F.3d 857 (2nd Cir. 1995) (plaintiff, a not-for-profit corporation created

by a consortium of air carriers to act as a clearing house and collection agent, could not bring a

diversity action to collect unpaid charges owed to carriers from a travel agency; carriers were not

all diverse as to the defendant and the plaintiff did "not seek to protect any corporate interests of

its own"); Prudential Oil Corp. v. Phillips Petroleum Co., 546 F.2d 469 (1976) (§ 1359 barred

claim by wholly-owned corporate subsidiary, which was diverse as to defendant but which

engaged in no business and had no purpose other than prosecution of claim of non-diverse

parent).

Here, by contrast, Halbritter is unquestionably a "real and substantial party" to the

underlying dispute, "who sues not only as an agent, but also as an individual who has [her] own

15

stake in the litigation". <u>Oscar Gruss & Son, Inc. v. Hollander</u>, 337 F.3d 186, 194 (2nd Cir. 2003)

(permitting investment bank to sue client for failure to deliver warrants pursuant to engagement

agreement, despite having assigned most of the warrants to its former employees, one of whom

was not diverse as to the defendant).

Furthermore, Halbritter is a proper plaintiff because it was she, not Rossi, who

directed the operations of the nursing homes during the entire period she and Rossi owned them;

who solicited and negotiated the transactions from which the case arises; who handled the

closing on behalf of sellers; and who would have been the one to collect the assigned receivables

if defendants had not breached the Receivables Agreement.  (Halbritter Aff. ¶¶ 43, 44).  In

keeping with his longstanding practice of complete deference to Halbritter on matters concerning

these companies, Rossi's assignment specifically delegates to Halbritter "the authority to

prosecute all such claims and causes of actions, if at all, in such manner and at such time as she

deems appropriate".  As the Second Circuit noted in <u>Hollander</u>:

> "[W]here multiple parties all have a financial interest in a lawsuit,
> a strategic choice of parties in order to maintain diversity is <u>not</u>
> considered to be collusive so long as the party chosen to bring the
> suit is in fact the <u>master of the litigation</u>."

<u>Id</u>. at 195 (<u>emphasis added</u>) <u>quoting</u> <u>Transcontinental Oil Corp. v. Trenton</u>, 560 F.2d 94, 103 (2nd

Cir. 1977) (permitting one member of a syndicate to maintain a diversity action on its own

behalf, and that of eleven non-diverse syndicate members, because the plaintiff was "master of

the litigation" having negotiated and signed the agreement that was subject of the action; being

most familiar with the matters in the suit; and having a real and substantial interest in the

16

outcome of the litigation).  Rossi's assignment would have been made whether or not Halbritter

had elected to bring suit in this forum (Halbritter Aff. ¶¶ 43 and 44) and is made for a "legitimate

business purpose".  Accordingly, § 1359 does not require dismissal.  See, e.g., Airlines

Reporting, supra at 863 (citing other cases).

Defendants suggest that because, Halbritter has promised Rossi 50% of the net

proceeds of this litigation in return for assignment of his rights, Rossi is a "real party in interest".

Defendants imply that this somehow makes the assignment collusive.  In the next breath,

defendants flatly state there has been no "real consideration" given to Rossi -- which they argue

also, somehow, renders the assignment collusive.  (Def. Mem. at 17). Defendants cite no

authority for either of these contradictory notions and neither is correct.  Rossi had an obvious

stake in the enforcement of the SPAs and the Receivables Agreement.  He was entitled to assign

that stake to Halbritter.  Her commitment to remit one-half the net proceeds of this litigation is

real and substantial consideration for Rossi's assignment.  Nothing about this arrangement is

collusive, because Halbritter, too, has her own stake, is diverse as to defendants and is "matter of

the litigation".  See Hollander.

Defendants' observation that the Assignment was executed "only 34 days" before

Halbritter commenced suit is a red herring: there is no dispute that the Assignment Agreement

was executed for purposes of the litigation.  It says so on its face.  The Assignment establishes

Halbritter's complete authority to direct the litigation and forestalls quibbling about her standing

to remedy the entire injury defendants have caused.  But it hardly follows, as defendants suggest,

that the Assignment was a collusive act to manufacture jurisdiction that would not otherwise

exist. It plainly was not.

Finally, defendants' argument that this Court is divested of subject matter jurisdiction by the anti-assignment clause at § 13 of the Receivables Agreement must fail for several reasons. At most § 13 raises a question about this Court's jurisdiction over Halbritter's alternative Second Cause of Action, for breach of the Receivables Agreement; it has no effect on the First Cause of Action, which seeks relief for breach of the SPAs, which have no anti-assignment provision.

Moreover, there can be no question that Halbritter is entitled to sue to enforce her own rights under the Receivables Agreement. Thus, even if § 13 barred Rossi's assignment to Halbritter of his rights under that Agreement, the effect would be, at most, to estop Halbritter from recovering more than 50% of the damages resulting from the breach. It would not deprive this Court of jurisdiction over the subject matter of Halbritter's claim.

Section 13 was plainly intended, moreover, to prevent either the Sellers or the Buyers from assigning their rights or duties under the Receivables Agreement to third parties. It cannot reasonably be read to block assignment of rights from one seller to the other. The clause states, in relevant part, the "rights and interests of parties may not be . . . .transferred, assigned. . . . unless expressly permitted in writing by the other party". The reference in the singular, to "the other party", as opposed to the plural, "the other parties", indicates the parties' intent to treat Buyers and Sellers each as a single, unitary "party" for purposes of the anti-assignment clause, which is inconsistent with any intent to preclude the assignment of rights between the Sellers.

Finally, the Receivables Agreement does not divide or allocate rights between

18

Halbritter and Rossi. (Neither do the SPAs.) Rather, Halbritter and Rossi are treated as joint owners of <u>all</u> the rights of the "Sellers". Accordingly, Halbritter enjoys standing under the Receivables Agreement to sue for all damages caused by its breach, wholly apart from the Assignment Agreement. Thus, even if the Assignment Agreement was rendered partially ineffective by § 13 or, for that matter, if it had never been entered into, Halbritter could still have brought this action and this Court would still have had jurisdiction over its subject matter.

Conclusion

Halbritter was a Florida domiciliary at the time she commenced this case and remains one. Rossi's assignment of his rights of action was an entirely proper strategic choice, with a legitimate business purpose and did not create diversity jurisdiction that would not otherwise exist. This Court has diversity jurisdiction over the subject matter of this action. Defendants' motion must be denied.

Dated: New York, New York
      January 18, 2008

                                        Louis A. Craco, Jr. (LC-9786)
                         ALLEGAERT BERGER & VOGEL LLP
                         111 Broadway, 20th Floor
                         New York, New York 10007
                         Telephone:    (212) 616-7055
                         Facsimile:    (212) 571-0555
                         E-mail:        lcraco@abv.com

19