Allegaert Berger & Vogel LLP
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550
Attorneys for Plaintiff

UNITED STATES DISRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            )
JANE A. HALBRITTER,                                         )
                                                            )
                    Plaintiff,                              )
                                                            )   07 Civ. 3848 (WHP)
            -- against --                                   )
                                                            )
STONEHEDGE ACQUISITION ROME II, LLC                         )
and STONEHEDGE ACQUISITION                                  )
CHITTENANGO II, LLC,                                        )
                                                            )
                    Defendants.                             )
                                                            )
------------------------------------------------------------X

**AFFIDAVIT OF JANE A. HALBRITTER IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

STATE OF FLORIDA    )
                    )
COUNTY OF COLLIER   ) SS.

Jane A. Halbritter, being duly sworn, deposes and says:

      1.    I am the plaintiff in this action. I make this affirmation in opposition to defenants' motion to dismiss the complaint for lack of subject matter jurisdiction.

      2.    As I explain in more detail below, since at least early 2006, Naples, Florida has been my primary and permanent residence. I have set down roots there and, in the fourteen months before the commencement of this action, spent the great majority of my time there. I expect and intend to continue to do so in the future. The information upon which

defendants rely in their motion, seeking to portray me as a New York domiciliary, is outdated, incomplete, taken out of context and, in some instances, just wrong. Since early 2006, I have returned to Rome, New York from time to time to see family and friends and to attend to (and mostly to wind down) various family business affairs. But since early 2006, New York State has only been a place I visit. Naples, Florida has been the place I consider my home.

### Background

3. I do not dispute that, prior to late 2005, I was a New York domiciliary. I had grown up and spent much of my adult life in Rome, New York. Obviously, I had family and many friends and connections in the area. Furthermore, together with my brothers, Marc and George Rossi, I held ownership interests in a number of businesses and other properties in that area. These interests had mostly been acquired from our late father. They included the interests in the Stonehedge Health and Rehabilitation Centers in Rome and Chittenango, New York, of which I was President and a 50% owner for many years, until approximately December 31, 2005. My brothers and I also owned varying interests in a number of other businesses in the area, including a linen supply company, a residential trailer park, a construction company, a multi-purpose management vehicle (called James Street Management, Inc.) and numerous real properties held for investment purposes.

4. Upon marrying my husband, Ray Halbritter, in 1998, we lived together in a house on North George Street in Rome. About a month before my ailing father passed away in 2001, we moved into his house at 100 West Garden Street, Rome to look after him. After his death, Ray and I bought and began to renovate another house on North George Street, into which we had intended to move.

5. In late 2005, however, my husband and I separated and he moved out. This

happened around the same time that I was attempting to close the sale of the nursing homes to defendants. Between the effective end of my marriage and the sale of the businesses which had been my main occupation, I decided the time had come to start a new phase of my life in a different part of the country.

  6. It should be noted that Ray is Tribal Leader of the Oneida Indian Nation and Chief Executive Officer of the Turning Stone Casino, which makes him a very prominent and influential figure in New York business and political circles. When our marriage collapsed, I immediately resolved to relocate outside leave New York state, to escape his very long shadow. Indeed, before I even had a place to move, I had packed up all of my possessions for shipping out of Rome.

### I Have Been A Florida Domiciliary Since Early 2006.

  7. I had long been fond of the Naples, Florida area, and in 2004 my husband and I purchased a condominium unit there, at 8321 Bay Colony Drive, Apartment 1702. Although we initially expected to use this condo as a vacation home, after we separated, I decided, (initially with his agreement, but see paragraph 24 below) to make it my permanent home.

  8. In anticipation of moving into the Naples condo on a permanent basis, I arranged, starting in or around late 2005 or early 2006, for a very significant renovation of it (which eventually cost me approximately $400,000).

  9. I was extremely eager to leave Rome and did not wish to wait until the condo renovations were complete to make my move to the Naples area. Accordingly, starting in February 2006, I entered into a series of short-term housing arrangements in and around Naples.

  10. First, I rented an apartment in Naples Florida, about three miles from my

present home, from friends of mine, Wayne and Judy Levi. (Annexed hereto as Exhibit 1 are copies of checks I wrote to Levcon LLC, their company, reflecting rent on the that premises.)

11. On April 4, 2006, I notified the United States Postal Service of my permanent move to Florida, and instructed that all my mail be forwarded from the Rome address to a Post Office box in Florida. (A copy of the Postal Service document, reflecting this Change of Address information, is annexed as Exhibit 2 hereto.) The Postal Service person who assisted me with this change explained to me at the time that the notation "IP" next to "Move Type" in the upper left hand corner of the document reflects a permanent move. Since that time, all mail addressed to me at the West Garden Street address has been automatically forwarded to me in Florida. For this reason, the fact that certain people continue to send mail to the Rome address is of no practical consequence, because it all reaches me in Florida anyway.

12. I subsequently sublet another apartment in Bay Colony complex from Eckhard Kaemmer, so I could be nearby Apartment 1702 to oversee the renovations. I resided full time in Mr. Kaemmer's unit until sometime in the fall of 2006. (Annexed as Exhibit 3 hereto are copies of checks I wrote to Mr. Kaemmer in April and November 2006, for rent on his apartment.)

13. I spent four weeks in Rome at the end of 2006, visiting family and attending to year-end business concerning our family companies. I returned to Naples immediately after the New Year.

14. With my brothers, I also own a house in Marco Island, Florida, which is about ten miles from Naples. At some point in January, while I was there helping to repair some hurricane damage to the house, I had an accident and broke several ribs. The renovations at the Bay Colony condo were not then quite complete, and so I spent February and part of March

convalescing in the Marco Island house.

15. I moved permanently into the Bay Colony condo sometime in March, 2007 and on April 2, I filed a further Change of Address form with the Postal Service, instructing that all mail be forwarded from Rome to the condo. (A copy of that Change of Address form is annexed as Exhibit 4; as with the 2006 change of address, it notes that the "Move Type" is "IP", that is, permanent.)

16. That I considered the Naples, Florida area my primary and permanent home from early 2006 on is evident from, among other things, the amount of time I subsequently spent there. In the roughly fourteen-month period between mid-March 2006 and the commencement of this action on May 18, 2007, I spent approximately <u>forty-one weeks</u> in Naples. (I have confirmed my recollection in this regard by consulting the records of my credit card purchases during this time. Copies of credit card statements I was able to retrieve are annexed as Exhibit 5 hereto; a summary of the dates and locations of purchases, complied by my attorney's office, is annexed as Exhibit 6).

17. By contrast, during this period, I spent only eleven weeks in Rome, New York. (<u>See</u> Exs. 5 and 6). Moreover, seven and a half of those weeks in Rome were around the end of 2006, from the Thanksgiving to New Year holidays, when, as noted above, I was visiting family and attending to year-end business relating to our family's various business interests.

18. I returned to Naples immediately after the holidays (around January 3, 2007) and remained there for the next five months, except for two brief trips to New York City and North Carolina. (<u>See</u> Exs. 5 and 6).

19. In or around August, 2006 – precisely because I wanted a place in the Northeast that was <u>not</u> too close to Rome – I rented an apartment in Cambridge, Massachusetts,

where I spent approximately eight weeks prior to the commencement of this action. (See Exs. 5 and 6). I maintained the Cambridge apartment until August, 2007. During this time, I considered Cambridge, not Rome, my second home.

20. Prior to the commencement of this action, I took numerous other steps, and established other relationships, that show by then I considered Naples to be my permanent and primary home. Specifically:

a. <u>Primary Care Physician</u>. In January 2007, I paid $5,000 to engage the services of Dr. Kravis and the "Concierge Medicine Program" of Naples Health Care Associates. (Annexed as Exhibit 7 are copies of a letter confirming my enrollment in this Concierge Medicine Program and my Patient Advantage Program card.) Dr. Kravis there was, and continues to be, my primary care physician.

b. <u>Dr. Hakikas</u>. I also consulted with James A. Hakikas, M.D., in Naples, starting on March 20, 2006, and had at least eleven office sessions with him prior to the commencement of this action, as well as several since then. (Dr. Hakikas's billing summary, redacted, is annexed as Exhibit 8 hereto.)

c. <u>Gynecologist</u>. I also located a gynecologist in the Naples area, Dr. Krandall and have had two or three visits with him prior to the commencement of this action (and since).

d. <u>Automobiles</u>. As of February 2006, I had two vehicles I used regularly, a BMW sedan and a Range Rover. I moved both of those vehicles to Naples in or around February, 2006. (Annexed as Exhibit 9 is an invoice directed to the Naples address in October 2006 for service on the Range Rover, necessitated when lightening hit it while I was driving it around Naples. Also included is a copy of a check sent by my insurance company to the

Cambridge apartment – not Rome – for related reimbursements.)

  e. <u>Auto Insurance</u>. At some point before December 7, 2006, I notified Traveler's, my auto insurer, of my change of address. (Annexed as Exhibit 10 is a copy of my New York State Insurance Card for the BMW, reflecting my Naples address for insurance purposes for the coverage period beginning December 7, 2006).

  f. <u>Federal and State Income Taxes</u>. I have not yet filed 2006 income tax returns. However, on April 13, 2007, I filed requests with the IRS and the New York State Department of Taxation and Finance for extensions of time to file. Those requests, and subsequent correspondence from the IRS, employ my Naples, Florida address. (These Requests for Extensions, and related correspondence, are annexed as Exhibit 11.)

  g. <u>Banking</u>. I have for many years had a banking relationship with NBT Bank in Rome and its officers and other personnel have become very familiar with my personal and business banking needs. I saw no need to discontinue this relationship when I moved to Florida, especially given that most of my banking transactions in recent years have been conducted by e-mail, phone or through my accountants. At some point prior to March 2007, however, I did instruct NBT to start sending my monthly statements to my Naples home, and NBT did so. (My February 2006 NBT Bank account statement is annexed as Exhibit 12.)

  h. <u>Investment Accounts</u>. As of late 2006, I maintained investment accounts at Investors' Bank & Trust, an arm of State Street Bank & Trust in Boston. Beginning in April 2007, at my request, they sent my statements to my Naples address. (<u>See</u> Exhibit 13.) I also maintained an account at Smith Barney, which sent its 2006 year end summary to the Naples address. (<u>See</u> Exhibit14).

  i. <u>Attorneys</u>. As of May, 2007 I was employing several attorneys in

connection with my various legal affairs. All of them had, by then, directed their bills to me at my Naples, Florida address. These included my counsel in this action, Allegaert Berger & Vogel LLP whose retainer letter was directed to my Cambridge residence. All its other bills were directed, at my instruction, to Naples, except for the December 2007 bill, which I told them to send to Rome because I was there at the time. (These communications are annexed as Exhibit 15). The law firm of Calli, Calli & Cully represents me in other matters, and directed its bills to Naples prior to May 2007; bills in the latter half of 2007 were directed to Rome, again, because I was there at the time (see Exhibit 16). Eric Facer, Esq. has been my attorney on various matters for a number of years. (Annexed as Exhibit 17 is Mr. Facer's declaration, attesting to his firm's billing practice of sending his bills to Florida during the relevant period). Finally, T. Kevin Fahey has provided services in connection with the divorce proceedings commenced by my husband (see Exhibit 18, invoice of T. Kevin Fahey, dated April 11, 2007, addressed to Naples).

    j.  <u>Accountants</u>. In May 2007, and for some years before, I had employed Pinto, Mucenski & Watson, P.C. as accountants for business, personal and family purposes. From time to time in 2006-2007, they sent me materials by UPS. Annexed as Exhibit 19 is a schedule provided to my counsel of the dates and addresses to which they directed UPS packages. It shows that they directed a UPS package to the Bay Colony complex in June 2006 (when I was staying at the Kaemmer apartment); two packages to the Cambridge apartment in October (where I was at the time, see Ex. 6); another package, in March 2007, to the Bay Colony condo, into which I had moved by then (this was the last package prior to the commencement of this action). The only packages sent to the Rome address are in late 2007, and that is because I was there during those months, for reasons I explain at paragraphs 25 through 28 below.

    21.  I have also maintained a membership in the Bay Colony Community

Association (essentially a country club for the Bay Colony complex) since well before the commencement of this action. (See Exhibit 20.)

22. Prior to the commencement of this action, I also had personal business/calling cards and stationery printed reflecting my Naples address. (See Exhibit 21.)

23. After the commencement of this action, but in keeping with an intent formed well beforehand to make Naples my permanent home, I registered to vote in Florida, applied for and received a Florida driver's license and obtained a library card at the public library in Collier County, Florida. (See Exhibit 22.)

24. In connection with the ongoing divorce case initiated by my husband, on December 10, 2007, the Supreme Court of the State of New York, Madison County (Dennis K. McDermott, J.) issued an order which, among other things, denied a motion by my husband for part-time use of the Naples condominium, and issued and interim ruling that I "shall have the exclusive use and occupancy of the Naples, Fla. condominium" (see Ex. 23).

25. In the time since the commencement of this action, I have spent approximately three weeks in Cambridge (the lease on the apartment ran out in August); about four weeks traveling, and most recently, the last three weeks in Naples. The rest of that time, I was in or around Rome. (See Exs. 5 and 6.)

26. That I have been obliged to spend as much time in Rome as I have in recent months does not reflect a permanent return to New York State or mean that I still consider it my domicile. I most definitely do not. To the contrary, I have lately been reluctantly tethered to the Rome area by numerous, mostly unpleasant, obligations. First and foremost of these has been the need to deal with my divorce case, which has required a great deal of my time and attention. The marital estate is very large and complicated, the issues posed by the divorce are

unusually intricate and the amount of time I have had to spend reviewing schedules, responding to motions, making court appearances and assisting my legal team has been considerable.

27. I have also had to spend a lot of time in Rome lately – a great deal more then I'd like – winding up our family's business affairs. Among other things, I have been participating in the dissolution of the linen service, a company with fifty employees (many of whom have worked for us for decades). I have been attending to the closing of the residential trailer park, which, under state law, requires at least a one-year notice period (which we are now about half-way through). I devoted considerable time to the sale of one of our real properties, White Birch Landing, to a charitable concern, and dealing with the consequences when that charity defaulted on its mortgage. I have been engaged in ongoing efforts to sell another commercial real property, the Gore Road School. I have also shown the West Garden Street house to prospective buyers. And I spent a great deal of time in late 2007 preparing and presenting a tax certiorari petition to the state, to reduce the business taxes on our various family businesses, now that they are no longer producing significant income.

28. I cannot wait to be done with these tasks so that I may return to my home in Florida without interruption.

<u>Defendants' Suggestion that I Have Retained my New York Domicile Is Incorrect.</u>

29. Defendants make a number of misguided assertions to suggest that I was still a New York domiciliary as of May 18, 2007. These assertions do not demonstrate that. I wish to address each of them.

30. Defendants note that I am currently engaged in divorce proceedings in New York Supreme Court, Madison County. (Def. Mem. at 8). These proceedings were commenced by my husband. He, not I, chose the forum. That I have engaged lawyers in the area

to represent me in the divorce case hardly means I still consider the area my home. I do not.

31.  Defendants state that "plaintiff is merely using an apartment [in Naples] that she bought with her estranged husband in 2005." (Def. Mem. at 6). I am not, however, "merely using" it – I live there, having spent $400,000 to fix it up. Furthermore, as noted above, the divorce court has recently denied my husband any use of the condo at all, and given me exclusive possession of it.

32.  Defendants note that in 2006-2007, I maintained an apartment in Cambridge, Mass. (Def. Mem. at 6). As I explained above, I wanted a place in the Northeast that was not near Rome, New York.

33.  Defendants state that I "own" the West Garden Street house. (Def. Mem. at 6.). In fact, the West Garden Street house is owned by James St. Management, Inc., (not by me personally). I am using the West Garden Street house only as a temporary, part-time accommodation until the divorce case is over and I can finish winding up of my business affairs in Rome. As noted above, my husband and I only moved into it to care for my elderly father, and after he passed away we had planned to move out. Since the divorce, I have tried to sell the West Garden Street house. Indeed, around the time they took over the Rome nursing home, defendants themselves asked to buy it, and I told them I would be delighted to discuss that prospect once the sale of the nursing homes was satisfactorily resolved. Unfortunately, that never happened (hence this lawsuit). I have shown the West Garden Street house to at least one other potential buyer recently, but that buyer declined to purchase it because it was on the grounds of the nursing home. I do very much look forward to selling the house in the near future. Until that happens, it should be unsurprising that I pay taxes and utilities on it. Somebody has to. That hardly makes it my permanent or primary residence, which it is not.

34. Defendants mention that, in a schedule in the divorce proceeding, I identified 100 West Garden Street as my "present address". This was filled out by my lawyer, and I signed it without giving any particular thought. I presumably understood it to refer to my "address" in the area where the divorce case was pending. It doesn't matter in truth, because everybody involved in those proceedings knows I consider Florida to be my primary and permanent home.

35. Defendants note that I maintain a membership at the Teugega Golf Club in Rome. (Schenk Aff. Ex. J). I have been a member of this club for twenty-five years, since long before my separation from Ray and my move to Florida. Moreover, the very bills from that club defendants submit in support of their motion show how very rarely I use the Golf Club any more. Indeed, I had an unused "minimum house balance" for both months in question. I make much more frequent use of the Bay Colony Club in Naples.

36. Defendants state that I still hold a valid New York Drivers' license. (Def. Mem. at 7). That is simply false. I was obliged to surrender my New York license when I obtained a permanent Florida Drivers' License. Significantly, the Florida Motor Vehicles people told me that I was required to surrender the New York license _precisely_ because I was obtaining a _permanent_ resident's Florida license – as opposed to a "snowbird" license, which Florida will issue to part-time residents without requiring surrender of their out-of-state licenses.

37. Defendants state that by my "own admission, [I] own" four vehicles registered in New York. (Def. Mem. at 7). Actually, two of these vehicles – the BMW and the Range Rover – were leased, not owned, and as explained above, I kept them both in Florida starting in early 2006. The BMW lease has since expired. The Ford is technically owned by me, but has always been used exclusively by my nephew, who lives in the Rome area. The Porsche is

sitting in Rome unused – I haven't driven it in years. All these vehicles were registered in New York before I made my move to Florida, and there was simply no reason to bother to change those registrations thereafter.

38. Defendants make much of the fact that some bills or other routine correspondence are still addressed to me in the West Garden Street address. As noted above, the Postal Service has forwarded all my mail to Florida since I supplied them with change of address information in April 2006. When something gets mailed to me in Rome, I receive it in Naples.

39. Defendants note that I still own interests in several New York properties and entities. (Def. Mem. at 8). As noted above, I have held these interests for many years, and am now working hard to wind them down or otherwise divest myself of them. That tedious business is largely what kept me in Rome for much of the latter part of 2007.

40. Defendants note that I still use New York based bankers, accountants and some insurance brokers. As noted above, I have longstanding relationships with these people, largely having to do with my family's New York holdings, and I have reposed trust and confidence in them. There was no reason to sever these relationships simply because I've moved to Florida, particularly since almost all my dealings with them are now electronic anyway. Also, I now do have an insurance agent in Florida.

41. I was first appointed by Governor Pataki as an unpaid member of the Board of Commissioners of the New York State Insurance Fund many years ago. Defendants state that I "continue to serve" on the Board. (Def. Mem. at 9). Strictly speaking, I believe that is incorrect: my last notice of reappointment indicated that my term would expire on December 31, 2006. I have since been notified by Governor Spitzer that he plans to name my successor, (see Exhibit 24) but I have not been notified that this has been done. In the interim, I have

continued to receive invitations to Board meetings (a few times a year) and I done so, basically as a courtesy and out of a sense of obligation to the Board until my successor is named. If my attendance at these few meetings after December 31, 2006 was, strictly speaking, a violation of the Public Officers' Law, that was certainly not my intent. But even if I should not have continued to perform this unpaid service after my move to Florida, it does not change the fact that I <u>did</u> move to Florida.

42.   Defendants state that I am a member of a "New York based 'think tank'", the Rockford Institute. (Def. Mem. at 9, n.2). That is incorrect. The Rockford Institute is based in Rockford, Illinois. In any event, I only attended one meeting of this body well over two years ago and have had no other involvement with it. I was surprised to learn at my deposition in this matter that it lists me as a member on its website.

<u>Marc Rossi's Assignment Of Claims</u>

43.   Finally, a word about the circumstances under which my brother Marc Rossi assigned to me his rights under the Stock Purchase Agreement and the Receivables Agreement. The Rome and Chittenango nursing homes had been owned and run by my father for many years before 1994. From the time he ceded control and ownership of the nursing homes in 1994, I became their president and exercised complete and total control over every aspect of their business and operations. Marc and I were each 50% owners of the corporations that owned and ran these facilities, but Marc has no experience in or knowledge of the health care industry or any interest in it. He was more than happy to allow me to run these nursing homes, and I did so with his complete acquiescence and approval. From time to time, when I needed him to sign a document in connection with the operations of these facilities, he always did so immediately. When I told him that I thought the time had come to sell them, he approved without question. I

developed the initial contact with the defendants as prospective buyers, selected and directed the lawyers, oversaw the negotiations, and approved the terms of the deals – all with his unquestioning consent.

44. So, when defendants dishonored their commitments to us, and it became clear that a lawsuit over the sale of nursing homes would be necessary, it obviously fell to me to engage counsel, pay for their services and direct the litigation. As with all earlier decisions concerning these institutions, Marc said he'd go along with whatever I decided. I asked him to execute the Assignment Agreement to establish my authority to litigate to recover for the entire injury caused by defendants' breaches of contract, as opposed to half of it. I would have asked for the same Assignment, and Marc would have given it to me, regardless of what forum we brought suit in.

/s/ Jane A. Halbritter

---

**FLORIDA SHORT-FORM INDIVIDUAL ACKNOWLEDGMENT (F.S. 695.25)** No. 5181

STATE OF FLORIDA
COUNTY OF Collier

The foregoing instrument was acknowledged before me this January 17, 2008 (Date) by Jane Halbritter (Name of person acknowledging) who is personally known to me or who has produced _____ (Type of identification) as identification and who did (did not) take an oath.

NOTARY PUBLIC-STATE OF FLORIDA
Barbara E. Waters
Commission # DD469504
Expires: OCT. 17, 2009
Bonded Thru Atlantic Bonding Co., Inc.

/s/ Barbara E. Waters (Signature) Notary Public, Commission No. DD 469504

Barbara E. Waters (Name of Notary typed, printed or stamped)

(SEAL ABOVE)

ATTENTION NOTARY: Although the information requested below is OPTIONAL, it could prevent fraudulent attachment of this certificate to unauthorized document.

THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED AT RIGHT:

Title or Type of Document — Affadavit
Number of Pages — 15   Date of Document January 17, 2008
Signer(s) Other than Named Above — None

©1992 NATIONAL NOTARY ASSOCIATION • 3491-11 Thomasville Rd., #215 • Tallahassee, FL 32308-3437