E X H I B I T   " C - 1 "

# MINUTES OF THE REGULAR MEETING
## OF THE COMMISSIONERS OF THE STATE INSURANCE FUND
### HELD ON FEBRUARY 21, 2007 AT 10:15 A.M.
### AT 199 CHURCH STREET, NEW YORK CITY

**PRESENT**

**Board**

Robert Hurlbut, Chairman
John Carpenter
Jane Halbritter
Charles Loiodice
C. Scott Bowen
William A. O'Loughlin, Jr.
Dennis Ryan, *ex officio*
Albert K. DiMeglio, Assistant Secretary

**Executive Staff**

David P. Wehner, Executive Director
Christopher G. Barclay, First Deputy
    Executive Director & Secretary
Gregory J. Allen, General Attorney
Susan D. Sharp, Chief Fiscal Officer &
    Actuary
Ann Formel, Deputy Executive Director
Miriam Martinez, Chief Investment Officer
Joseph Mullen, Director of Administration

**Other Staff**

Edward Hiller
    Director, Claims

Chairman Hurlbut presided.

The complete agenda with all attachments (except for Investments) is addendum 1.

Vice Chairman DeCarlo advised of his inability to attend and was duly excused in the manner and to the extent required within the meaning of the Public Officers Law.

## Minutes of the January 17, 2007 Regular Meeting

Upon motion by Commissioner Bowen, duly seconded by Commissioner Carpenter, it was proposed that the minutes for the January 17, 2007 meeting be accepted and filed as the official minutes of the Board.
The vote:
    Chairman Hurlbut – yes
    Commissioner Carpenter – yes
    Commissioner Halbritter – yes

P:11/18    TO:18666513196    JAN-1-1998 04:51P FROM: Jim Dunn @ SWRG, Inc

Commissioner Loiodice – yes
Commissioner Bowen – yes
Commissioner O'Loughlin – yes
Commissioner Ryan – yes
Passed unanimously.

## Format of the Board Meetings

Mr. Wehner informed the Commissioners that the format of the Board meetings was
being changed as follows:

(1) Mr. Barclay, in his role as Secretary to the Board, would function as liaison to
the Commissioners and keep all avenues of communication open.

(2) All regular monthly reports to the Commissioners will be forwarded to them
in advance of the meeting, thus giving them adequate time to read the
documents. The person responsible for the report would then be present at the
meeting, would forgo making a presentation but would be available to answer
any questions.

(3) In place of these regular presentations, a senior staff member, on a rotational
basis, will be scheduled to make a detailed report on the workings of his/her
operation. Thus, Mr. Hiller at this meeting will be reporting on claims.

## 2007 NYSIF Policyholders' Educational Forums

Mr. Wehner distributed the schedule for the regional policyholders' educational forums
(addendum 2) to be held in eight locations across the state, beginning on March 28 in
Buffalo. He invited the Commissioners to attend whichever sessions they wanted.

Commissioner Loiodice asked how notifications of the forums were being handled.
Ms. Formel responded by both direct mail and e-mail. Notices are not included with the
bills.

## Extension of TRIA

Mr. Wehner advised the Board that the extension of TRIA (Terrorism Risk Insurance
Act) beyond its expiration date of December 31, 2007 is now on the congressional radar.
AASCIF has conducted extensive lobbying in Washington on this issue which is very
important to the workers compensation industry. Mr. Wehner has also been meeting with
members of the New York congressional delegation in an effort to impress upon them the
connection between TRIA and the State Insurance Fund.

## Underwriting Report

The printed report of workers compensation underwriting activity for January, distributed
with the agenda, is as follows:

| Workers Compensation | January 2007 |
|---|---|
| New Business | |
| a. Number | 2,208 |
| b. Premium | $17,809,002 |
| Cancellations | |
| a. Number | 3,210 |
| b. Premium | $16,925,788 |
| Net Difference | |
| a. Number | (1,002) |
| b. Premium | $883,214 |

The printed report of disability benefits underwriting activity for January, distributed with the agenda, is as follows:

| Disability Benefits | January 2007 |
|---|---|
| New Business | |
| a. Number | 708 |
| b. Premium | $158,426 |
| Cancellations | |
| a. Number | 580 |
| b. Premium | $154,349 |
| Net Difference | |
| a. Number | 128 |
| b. Premium | $4,077 |

The printed report for disability benefits, distributed with the agenda, also included for each year 2005, 2006 and 2007 (January only) monthly comparisons for:

- number of applications received
- number of policies renewed
- total premium for renewed policies
- number of new claims processed

Mr. Wehner advised the Commissioners that, for the first time since the mid-1990's, the Fund's written premium reached $1.7 billion. We also have 37% of the market share. Predictions for 2007 are difficult given the specter of workers compensation reform as well as a possibly benefit increase.

Commissioners Carpenter and O'Loughlin wondered how the $1.7 billion of today compared with the same figure in the mid-1990's, given that there has been some inflation since then, albeit relatively low. Commissioner Carpenter, in particular, said that perhaps we could demonstrate that the rates have actually come down by looking at aggregate workers compensation premium as a percentage of payroll for each year beginning with 1996. Other factors which would have to be considered are:

- the rate of inflation as well as the actual premiums being levied against the policyholders (Ms. Sharp)
- the total number of employees in the workforce and the population of the state (Commissioner Bowen)
- the average cost of each claim (Commissioner Halbritter)

Mr. Wehner stated that our goal is to maintain aggregate premium levels and to increase the number of policyholders by 5%. Chairman Hurlbut asked how the Fund intends to reach these goals. Mr. Wehner responded that we will do so by marketing our strengths; namely, excellent customer service, the lowest possible rates, discounts when justified by good experience, safety programs, early return-to-work and fraud prevention. When questioned by Commissioner O'Loughlin as to how we accomplish the mandate in the Fund's written mission statement to drive down the rates, given that we are not the regulatory body for workers compensation, Mr. Wehner responded that it is these strengths which enable us to do so. Commissioner Bowen added that our most effective tool for lowering the rates is fraud prevention with the companion activities of arresting the perpetrators and seeking monetary recovery, all of which serves as a deterrent.

The Underwriting Outlook for 2007 (addendum 3) was distributed which consisted of statistical charts for 2006 as follows:

- premium by industry
- policies by premium range
- pricing (standard, differentials and discount)
- general group vs. safety groups (separate charts for policyholders and premium)
- our market share in terms of premium, policies and small businesses

## Economic Report

Ms. Martinez stated that Federal Reserve Board Chairman Ben Bernanke's testimony of February 14 and 15 regarding "Tentative Signs of Stabilization" in the housing market was dealt a blow on February 16 when it was reported that housing starts for January plunged to a new ten year low. There was now no doubt that the incredibly warm weather in November, December and the first half of January distorted housing statistics upward. It would thus appear that the housing correction to date is worse than the Federal Reserve Board anticipated.

Chairman Bernanke continued to stress the "overall good health of the economy" as it moves from a rapid rate of expansion to a more sustainable pace of growth with inflation "ebbing as oil prices drop" (recent price moderation in rents, although not mentioned, was also a significant factor). He did, however, express the Board's willingness to raise rates if inflation does not subside.

The general consensus is that the Federal Reserve Board's concern with inflation will keep the Federal Fund's rate at 5.25 which is longer than is appropriate. This will result in slower GDP growth and lower inflation which is good news for the bond market.

## Portfolio Report

Ms. Martinez gave the following returns for the month of January:

| January | Portfolio | Index | Excess Returns |
|---|---|---|---|
| WC Surplus | -.022 | -.025 | even |
| WC Asset/Liability | -.215 | -.463 | +25bps |
| DB | +.025 | -.095 | +11bps |
| ATF Surplus | -.082 | -.085 | +1bp |
| ATF Asset/Liability | +.163 | +.222 | -6bps |

## The Non-Conforming List

With respect to the Non-Compliant Securities (addendum 4), Ms. Martinez reported that there were no changes, with all holdings at stable to positive and most at high coupon rates with good cash flows.

## Contract With Morgan Stanley

Ms. Martinez reported that most asset managers continued to demonstrate positive trends, despite a difficult 2006, with the exception of Morgan Stanley. They have been with us since 2002 and only performed well the first year. She recommends a termination of their contract for managing $183 million of our portfolio based on:

        (a) continued underperformance
- relative to both their benchmark and internal and external competitors
- coupled with increased risk (Large Cap 5 stocks equaled 50% of their portfolio)

        (b) a high turnover rate of account managers. Their investment management team has changed virtually every year.

        (c) violation of the contract in that they were not conservative in their investment strategy. They were in the correct sector but chose the wrong stocks. They went with only three listings, looking for an immediate "home run".

Commissioner Carpenter as Chair of the Investment Committee concurred in Ms. Martinez's recommendation that the contract with Morgan Stanley be terminated.

Upon motion by Commissioner Loiodice, duly seconded by Commissioner Halbritter, it was proposed that the contract with Morgan Stanley be terminated effective immediately. The vote:

Chairman Hurlbut – yes
Commissioner Carpenter – yes
Commissioner Halbritter – yes
Commissioner Loiodice – yes
Commissioner Bowen – yes
Commissioner O'Loughlin – yes
Commissioner Ryan – yes
Passed unanimously.

The assets formerly managed by Morgan Stanley will be reallocated to both internal and external managers based on performance.

As a *general* comment on investment managers, Commissioner Halbritter suggested that we do more, if not most, of our investing with in-house managers as they perform so well. Ms. Martinez replied that we need a proper balance between internal and external managers since relying too much on the former will breed insularity. Also, the state salaries and position structure are not conducive to hiring employee-managers with the necessary expertise. One of the first assignments which will be given to the new Investment Advisor will be to evaluate the in-house vs. outside split in terms of both expertise and performance.

## Wellington Asset Management

Ms. Martinez advised of the reallocation of Wellington small cap to large cap to move us closer to the Russell Index of 9% to 91%, respectively. This reallocation will leave the investment at 15% to 85%.

## BlackRock Capital Management

Upon motion by Commissioner Bowen, duly seconded by Commissioner Carpenter, it was proposed that the contract with BlackRock Capital Management be extended for one year through May 14, 2008.
The vote:

Chairman Hurlbut – yes
Commissioner Carpenter – yes
Commissioner Halbritter – yes
Commissioner Loiodice – yes
Commissioner Bowen – yes
Commissioner O'Loughlin – yes
Commissioner Ryan – yes
Passed unanimously.

**Bullard McLeod**

Upon motion by Commissioner Halbritter, duly seconded by Commissioner Loiodice, it was proposed that the contract with Bullard McLeod be extended for one year through March 13, 2008.

The vote:

Chairman Hurlbut – yes
Commissioner Carpenter – yes
Commissioner Halbritter – yes
Commissioner Loiodice – yes
Commissioner Bowen – yes
Commissioner O'Loughlin – yes
Commissioner Ryan – yes

Passed unanimously.

**Strategic Investors**

Commissioner Carpenter and Ms. Martinez advised the Board that the resolution to hire a new asset manager, Strategic Investors, will be deferred until after the Investment Committee considers the issue at its March meeting and makes its recommendation.

**Bank Balances**

Ms. Martinez gave the following bank balances:

|  | As of January 31, 2007 |
|---|---|
| Workers Compensation: | $37,796,569.36 |
| Aggregate Trust: | (2,600,998.98) |
| Disability Benefits: | (175,353.56) |

**Investment Report**

Ms. Martinez gave the report of buys and sells for the period January 1, 2007 to January 31, 2007 as follows:

Buys –

Workers Compensation Surplus:
100 for $1,007,027,681.20
Workers Compensation A/L:
89 for $960,212,111.43
Disability Benefits:
25 for $40,769,501.23
WCPSF:
17 for $9,214,656.96
Workers Compensation Equity:
69 for $293,295.73

Workers Compensation Equity II:
   23 for $20,151,623.06
WCMCQF:
   72 for $28,629,322.97
WCSOF:
   24 for $512,941.49


Sells –
   Workers Compensation Surplus:
      45 for $439,523,274.33
   WCPSF:
      2 for $500,384.63
   Workers Compensation A/L:
      58 for $582,041,839.81
   DBEF:
      24 for $4,067,858.73
   Disability Benefits:
      3 for $11,122,574.64
   WCMCQF:
      44 for $6,565,924.34
   WCSOF:
      9 for $22,816.86
   Workers Compensation Equity:
      45 for $34,784,233.97
   Workers Compensation Equity II:
      7 for $1,671,248.00
   ATF Surplus:
      2 for $4,011,038.97
   ATF A/L:
      6 for $33,747,497.61

The total par value with respect to commitment positions is as follows:

Month Ended January 31, 2007

| Fund | |
| --- | --- |
| WCF (Surplus) | $55,000,000 |
| WCF (A/L) | $116,207,698 |
| ATF (Surplus) | -0- |
| DB Equity | -0- |
| ATF (A/L) | $14,500,000 |
| DB | $29,000,000 |
| WC (Preferred) | $30,000 |
| WCEF | $245,101 |
| WCEFII | $5,000 |

Page 8

WC Mid-Cap Quan    $64,501

Upon motion by Commissioner Carpenter, duly seconded by Commissioner Loiodice, it was proposed that all of the above agreements of buys and sells for the period January 1 to January 31, 2007 be approved.

The vote:

    Chairman Hurlbut – yes
    Commissioner Carpenter – yes
    Commissioner Halbritter – yes
    Commissioner Loiodice – yes
    Commissioner Bowen – yes
    Commissioner O'Loughlin – yes
    Commissioner Ryan – yes

Passed unanimously. Certified copy by the Assistant Secretary is addendum 5.

Upon motion by Commissioner Bowen, duly seconded by Commissioner Halbritter, it was proposed that the Investment Department be given the authority to trade the following amounts by Fund in the month of March 2007:

| Workers Compensation | $800,000,000 |
|---|---|
| Disability Benefits | $ 20,000,000 |
| Aggregate Trust | $ 5,000,000 |

The vote:

    Chairman Hurlbut – yes
    Commissioner Carpenter – yes
    Commissioner Halbritter – yes
    Commissioner Loiodice – yes
    Commissioner Bowen – yes
    Commissioner O'Loughlin – yes
    Commissioner Ryan – yes

Passed unanimously.

Commissioner O'Loughlin expressed concern about the return rates that the Fund is receiving on its bonds. Commissioner Carpenter replied that the issue will be initially addressed by the Investment Committee.

## Relationship With Investment Brokers

Commissioner Carpenter led the Board in a discussion on tracking the amount of business each internal portfolio manager conducts with individual investment brokers. He asked if a report of such activity could be prepared on a monthly basis (Ms. Martinez having pointed out that such reports are presently prepared at the end of each calendar year). He wondered if this is an issue of concern to the Chief Compliance Officer, Michael Miliano.

Page 9

Commissioner O'Loughlin inquired as to how much broker commission we pay. Ms. Martinez replied that it averages $.02 per transaction.

Mr. Barclay will have internal staff study both issues and make recommendations to the Board.

## Meeting of the Investment Committee

Commissioner Carpenter and Ms. Martinez advised the Commissioners that there will be a meeting of the Investment Committee on Tuesday, March 20, at 3 P.M. The agenda will include a presentation by LSV Asset Management and the consideration of a non-disclosure agreement for the investment managers. Michael Miliano, Chief Compliance Officer, will be present.

## Report of the Chief Fiscal Officer

Ms. Sharp presented the financial statements for the Workers Compensation and Disability Benefits Funds as of December 31, 2006 (addendum 6). She explained that this is the first time the financials were done in time for the February meeting of the Board. The Actuarial Department, using statistics from NCCI and AM Best, will compile benchmarking statistics at a later date.

The financial numbers will be filed electronically with the Insurance Department by February 28. They then become the backbone of the annual report along with the footnotes. Deloitte and Touche will return in March and complete their audit by the end of May.

For the Workers Compensation Fund, cash and invested assets for the year increased $762 million, or 8%, from 2005 to 2006, primarily due to an increase in reserve requirements and surplus.

The fair value of investments increased $681 million or 7% when compared to December 2005. The increase is comprised of $526 million in fixed income securities and $155 million in equities

The yield for the bond portfolio excluding realized gains and losses was 4.4% and 4.8% for the years 2006 and 2005, respectively.

The balance of the premiums receivable increased $2 million, or 3% from the beginning of the year primarily due to the timing of premium billed and collected on policyholders' balances.

The non-admitted premium balance as of December 31 is $123 million, which is an $8 million increase from the end of 2005. The aging of this balance is as follows:

2005 through current = 70.6%
2004 and 2003 = 16.4%

2002 and earlier = 13%.

Of this balance, Group 90 policyholders represent 82.2%; safety groups, 17% and the remaining .8% is attributed to retros.

Loss and loss adjustment expense reserves increased $393 million or 5% since year end 2005 primarily due to increased premiums. The increase occurred in pension reserves of $144 million, medical reserves of $85 million, non-pension reserves of $62 million, assessment reserves of $92 million and loss adjustment expense reserves of $10 million.

The balance of contingent policyholder dividends represents the sum of the safety group contingent balances ultimately available for dividends and includes an estimate to update the balances through December 31. The balance increased $43 million, or 6%, since December 2005, which is consistent with increased premium. Dividends paid during 2006 were $141 million which is $15 million more than paid in 2005.

Total surplus increased $220 million, or 10%. The increase is attributed to $149 million of net income and $77 million of unrealized capital gains on investments. Recommended allocations of surplus remain at $300 million for Security Fluctuation and $1 billion for Catastrophe Surplus. Foreign Terrorism Catastrophe Surplus and Domestic Terrorism Catastrophe Surplus, as a result of TRIA, ended the year with a balance of $94 million and $9 million, respectively.

Net written premium increased $111 million, or 7%, during the year 2006. The number of policyholders decreased from 194,567 at December 2005 to 194,473 at December 2006, a decrease in policyholders of 94 or .05%. The average premium per policy increased from $7,437 at December 31, 2005 to $8,259 at December 31, 2006, an increase of $822 average premium per policy or 11%.

Net earned premium increased $106 million, or 7%, which is consistent with the increase in written premium.

Losses incurred increased $200 million, or 16%, when comparing the year 2006 to 2005.

Loss adjustment expenses incurred decreased $11 million, or 6.5%, when comparing the year 2006 to 2005.

Net investment income decreased $24 million, or 5%, when comparing the year 2006 to 2005. The decrease is caused by a reduction in realized investment gains of $89 million and an increase in investment expenses of $5 million offset by an increase in investment income of $70 million.

Other expense decreased $2 million, or 1 %, when comparing the year 2006 to 2005. The decrease is due to an increase in incurred dividends to policyholders of $4 million, offset by an increase in miscellaneous income of $6 million.

Net income of $149 million is comprised of an underwriting loss of $125 million, net investment income of $458 million and other expenses of $184 million.

Ms. Sharp closed her presentation on the Workers Compensation Fund, by presenting select financial ratios (also contained in addendum 6) for the years ending December 31, 2002 to 2006. This report also listed the number of policies in force, the number of accidents reported and the open claim count with the latter two excluding figures for New York State.

For the Disability Benefits Fund, the yield for the bond portfolio, excluding realized gains and losses, was 4.8% for the years 2006 and 2005, respectively.

Earned premiums increased $2.3 million, or 14%, when comparing the year 2006 to 2005.

Net investment income decreased $2.2 million, or 27%, when comparing the year 2006 to 2005.

Net income of $7.2 million is an increase of $769,000 when comparing the year 2006 to 2005 which is attributable to a $1.7 million increase in underwriting income and a $1.3 million decrease in other expense offset by a $2.2 million decrease in investment income.

Unassigned surplus increased $9.7 million, or 15%, from December 2005, with total surplus of $76.8 million at December 31, 2006.

Echoing what was said by Commissioner O'Loughlin earlier in the meeting on the seeming contradiction between the Fund's written mission statement to drive down the rates and the fact that we are not the regulatory body for workers compensation, Commissioner Carpenter said that we should pay more attention to the assessments as a way of, perhaps, influencing premium. To this end, he wants the assessments listed as a separate line (note a footnote) in the annual statement with changes tracked from year-to-year. Ms. Sharp responded that she will discuss the Commissioner's proposal with Deloitte and Touche.

Chairman Hurlbut asked for Ms. Sharp's best educated predictions for 2007. She replied that the numbers will remain more or less the same subject to three variables: investment income, the effects of workers compensation reform and the outcome of the extension of TRIA alluded to by Mr. Wehner at the beginning of the session.

Commissioner Halbritter was curious as to the number of individuals the Fund actually covers through its policyholders. Ms. Sharp cited the figure of 1.2 million statewide which is what the Fund estimated for reinsurance purposes last year. Commissioner Carpenter retorted that a more accurate gauge is the reports filed by employers with the Department of Labor as they take into account both part-time and seasonal workers.

**Resolutions to Maintain Surplus Allocations for Catastrophe and Security Fluctuation**

Ms. Sharp drew the attention of the Commissioners to the letter from David Mohrman of Tillinghast, dated February 14, which is part of the agenda, on the catastrophe allocation of surplus. Mr. Mohrman's letter supports management's recommendation to maintain this allocation at $1 billion.

Upon motion by Commissioner Carpenter, duly seconded by Commissioner Bowen, it was proposed to maintain the surplus allocation to the Catastrophe Surplus at $1 billion. The vote:

      Chairman Hurlbut – yes
      Commissioner Carpenter – yes
      Commissioner Halbritter – yes
      Commissioner Loiodice – yes
      Commissioner Bowen – yes
      Commissioner O'Loughlin – yes
      Commissioner Ryan – yes
Passed unanimously.

Ms. Sharp advised the Board that it was management's recommendation that the Security Fluctuation Surplus be maintained at $300 million based on the historical review of the differences between the book and market values.

Upon motion by Commissioner Carpenter, duly seconded by Commissioner Bowen, it was proposed to maintain the surplus allocation to the Security Fluctuation Surplus at $300 million.
The vote:

      Chairman Hurlbut – yes
      Commissioner Carpenter – yes
      Commissioner Halbritter – yes
      Commissioner Loiodice – yes
      Commissioner Bowen – yes
      Commissioner O'Loughlin – yes
      Commissioner Ryan – yes
Passed unanimously.

**Marketing Report**

The printed Marketing report was distributed with the agenda.

Commissioner Halbritter informed the Board that newly incorporated businesses are on file with the Secretary of State. She suggested an electronic interface between the Secretary of State and the Fund so that we might send workers compensation and disability benefits marketing material to all newly incorporated entities.

**Report of the General Attorney**

The printed report of the General Attorney was distributed with the agenda.

One issue which was not in the report: Mr. Allen advised the Commissioners that, on the advice of the Governor's Counsel, the implementation of the Governor's Executive Order on changes to the Ethics Law (which was discussed at the January meeting) should await passage of the Ethics Reform bill.

Commissioner Carpenter cited the four high-reserve 1B cases contained in the General Attorney's report as appropriate metaphors for both the ongoing conflict between workers compensation and general liability and the enormous sums of money involved.

Commissioner Bowen complimented Mr. Allen on the report, both its format and content, and said that it would assist him in his role as Chair of the Legal and Legislative Affairs Committee.

**Report of the Director of Claims**

Before his presentation, Mr. Hiller distributed to the Commissioners a handout (addendum 7) which was comprised of the following:
   a.  summary of the functions of the Claims Department
   b.  organizational chart of claims and medical operations
   c.  two reserve comparisons, each incorporating charts and statistics, with the main difference being that the second includes New York State and Third Party Administrator (TPA) claims
   d.  a statistical chart showing loss reserve stratification for the Workers Compensation Fund at September 30, 2006 and December 31, 2005
   e.  the Medical Reserving Chart which is intended to be used by employees as a reference when setting both compensation and medical reserves

Mr. Hiller began by giving the grim picture of the old Claims Department. It teetered on an unsteady triangle which had as its three sides:
   -  heavy backlog of unpaid medical bills [at one time, in the early 1990's, as high as 600,000]
   -  paper files, without which nothing could be done, notwithstanding that the files could rarely be found
   -  (automatic) step reserves

The first step taken in revolutionizing the department was to eliminate the paper files. All cases had to be summarized in the electronic Claims Handling System. A deadline of June 1, 2001 was set for accomplishing this task (with the ultimately prophetic and unfortunate moniker of "Ground Zero") at which point all of the files would be locked

Page 14

away in the cabinets. The long range benefits of going paperless were obvious but there were two immediate ones:

1. Since each case had to be reviewed prior to summarizing in the electronic system, in doing so, it was discovered that one third of the cases should have been closed which they then were.

2. Following the attacks of September 11 and the closing of Downtown Manhattan for two weeks, the paperless system enabled the Fund to continue processing and paying claims on time. Had we still been dependent on the paper folders, this would have been impossible since, even if we had access to the Church Street building (which we did not), we would never have been able to truck all of the necessary files to the alternate locations where the employees had been diverted in the wake of the attacks.

Over a relatively short period of time, into mid-2002 at the latest, the use of the paperless on-line system, along with other electronic innovations, reduced the backlog of unpaid bills to zero.

Concerning the step reserves, Mr. Hiller initiated a major (and ongoing) educational program to train employees to use a reserve system which looks at each case individually and to set realistic reserves based on the actual facts of the case. This caused a temporary bulge in the reserves which have now leveled off to where they should be, more or less. Mr. Hiller contends that certain reserves are still 20% too high. However, they will never be perfect because reserving is a science AND an art. As part of their audit of claims operations in the business offices, statewide Claims will be taking a close look at reserving practices.

Chairman Hurlbut asked about the integration of fraud detection and claims. Mr. Hiller responded that he and his staff repeatedly stress to the case managers the importance of looking for red flags which might give the slightest hint of fraud. An integral part of managing a case is the use of outside vendors for surveillance and activity checks of claimants. Commissioner Loiodice suggested that perhaps we should increase the number of employees in Confidential Investigations. In response, Mr. Wehner pointed out that the fraud investigations go nowhere unless the local district attorney is willing to prosecute the cases. Without the prosecutions, the Fund would then have the expenses without a chance of achieving any results. Chairman Hurlbut said that he recently had met with the Monroe County District Attorney who was highly complimentary of the Fund's efforts in handling workers compensation fraud. Consequently, he has one attorney on his staff solely for handling fraud cases.

Commissioner Halbritter complimented Mr. Hiller on having done an amazing job in revolutionizing the operations of the department. However, she still feels that there is a disconnect between employees who are absent on compensation leave and their willingness to seek the necessary medical care which could perhaps return them to work earlier. Mr. Hiller responded that as the carrier, absent the necessary legislation, we may not interfere in the doctor/patient relationship.

When questioned by Commissioner Ryan, Mr. Hiller indicated that we do have an automatic diary built into the electronic handling system which prompts the case managers to do certain tasks at the appropriate time.

The Commissioners praised Mr. Hiller on both the job he has done in running the Claims Department and in his presentation to the Board.

## Renovation of the Albany Offices

Commissioner Carpenter distributed the report of the special Board appointed committee, composed of Commissioner Loiodice and himself, to review the renovations of the Fund's offices in Albany (addendum 8).

Based upon their review of the bids, cost breakdowns, invoices, change orders and other documentation, the committee felt that proper procedures were followed in executing the Albany renovation project. Commissioner Loiodice felt that the architectural fee was high but Mr. Barclay pointed out that the architect was also the construction manager. The Commissioner also said that, in the future, more cost information should be line itemed out although he added that the cost per square foot was definitely consistent for a project of the magnitude of the Albany renovation.

Commissioner Carpenter said that the special committee recommends that, in the future, for a large real estate project, one Commissioner should be designated as the liaison between the Board and the project. Chairman Hurlbut asked what dollar amount triggers Board review and involvement. Mr. Barclay responded that he will advise the Board as to the appropriate parameters for such.

Commissioner Carpenter thanked Mr. Barclay for the outstanding job that he did in compiling the two volumes of documentation for review by the committee.

## Commissioners' Travel Reimbursement

Mr. Barclay asked the Board for a motion authorizing him, in his capacity as Secretary to the Board, to approve the travel vouchers for the Commissioners. In this way, their reimbursement will be expedited by him via the Oracle Financials system. A motion is necessary as the statute specifically limits travel approval to the Chairman and the Vice Chairman.

Upon motion by Commissioner Carpenter, duly seconded by Commissioner Halbritter, it was proposed that the Secretary of the Board, along with the Chairman and the Vice Chairman, be authorized to approve travel vouchers for the Commissioners.
The vote:
   Chairman Hurlbut – yes
   Commissioner Carpenter – yes
   Commissioner Halbritter – yes

Commissioner Loiodice – yes
Commissioner Bowen – yes
Commissioner O'Loughlin – yes
Commissioner Ryan – yes
Passed unanimously.

## Rules of the Board of Commissioners

Mr. Allen suggested that the Commissioners adopt "Rules of the Board". In that way, a
degree of certainty will exist about what is permissible procedurally and what is not.

## Open Meetings Law

In accordance with the Open Meetings Law, Mr. Allen advised the Commissioners that
our plan for broadcasting the Board sessions will be filed with the Secretary to the
Governor by March 1. Although we are required to broadcast by July 1, we plan on
doing so beginning with the June session.

## Executive Session

The Board ended the meeting by going into executive session. Only Mr. Wehner was
present.

## Schedule of Meetings

The schedule of future meetings is:

- March 21, preceded by a meeting of the Budget and Audit Committee at 9:30
  A.M. and by a meeting of the Investment Committee at 3 P.M. on March 20
- April 18, tentatively scheduled for Albany

---

The meeting adjourned at 1 P.M.

Respectfully submitted,

Albert K. DiMeglio
Assistant Secretary

Addendum 1 – Agenda with attachments
Addendum 2 – Schedule of Regional Policyholders' Educational Forums
Addendum 3 – Underwriting Outlook for 2007

Addendum 4 – List of Non-Compliant Securities
Addendum 5 – Certified Investment Resolution
Addendum 6 – Financial Statements for the Workers Compensation and Disability
        Benefits Funds as of December 31, 2006
Addendum 7 – Presentation of the Director of Claims
Addendum 8 - Report of the Special Committee on the Renovations to the Albany
        Offices

MINUTES OF THE REGULAR MEETING
OF THE COMMISSIONERS OF THE STATE INSURANCE FUND
HELD ON MARCH 21, 2007 AT 10 A.M.
AT 199 CHURCH STREET, NEW YORK CITY

## PRESENT
### Board

Robert Hurlbut, Chairman
Donald DeCarlo, Vice Chairman
John Carpenter
Jane Halbritter*
Charles Loiodice
C. Scott Bowen
Dennis Ryan, *ex officio*
Albert K. DiMeglio, Assistant Secretary

### Executive Staff

David P. Wehner, Executive Director
Christopher G. Barclay, First Deputy
   Executive Director & Secretary
Gregory J. Allen, General Attorney
Susan D. Sharp, Chief Fiscal Officer &
   Actuary
Kurt Rumpler, Assistant Director
Miriam Martinez, Chief Investment Officer
Joseph Mullen, Director of Administration

### Other Staff

Laurence LaPointe
   Confidential Investigations
Jeffrey Ritter
   Legal
John Mesagno
   Media & Publications
Meghan Dobroski
   Office of the Secretary

Chairman Hurlbut presided.

The complete agenda with all attachments (except for Investments) is addendum 1.

### Absence of Commissioners

Upon motion by Commissioner Ryan, duly seconded by Commissioner Bowen, the
absence of Commissioners Halbritter, Loiodice and O'Loughlin was excused.
The vote:
    Chairman Hurlbut – yes

              Vice Chairman DeCarlo – yes
              Commissioner Bowen – yes
              Commissioner Carpenter – yes
              Commissioner Ryan – yes

Passed unanimously. Commissioners Halbritter (by telephone) and Loiodice subsequently arrived late.

## Minutes of the February 21, 2007 Regular Meeting

Upon motion by Commissioner Bowen, duly seconded by Commissioner Loiodice, it was proposed that the minutes for the February 21, 2007 meeting be accepted and filed as the official minutes of the Board.
The vote:

              Chairman Hurlbut – yes
              Vice Chairman DeCarlo - yes
              Commissioner Carpenter – yes
              Commissioner Halbritter – yes
              Commissioner Loiodice – yes
              Commissioner Bowen – yes
              Commissioner Ryan – yes

Passed unanimously.

## Report of the Executive Director

Mr. Wehner advised on the following:

### 2007 NYSIF Policyholders' Educational Forums
Mr. Wehner reminded the Commissioners that they were cordially invited to all of the regional policyholders' educational forums to be held in eight locations across the state, beginning next week, on March 28, in Buffalo.

### Workers Compensation Reform
The Governor signed into law the comprehensive Workers Compensation reform bill on Tuesday, March 13. It includes various provisions of importance to the New York State Insurance Fund and its policyholders [details are contained in the General Attorney's monthly report to the Board below]. A meeting was immediately convened on Wednesday morning, March 14, to plan for full implementation. All progress reports are to be forwarded directly to the Governor on a confidential basis with copies, of course, to the Commissioners. An implementation outline is due by Friday, March 23. Thereafter, progress reports are to be compiled and forwarded on a monthly basis.

In response to a question from Chairman Hurlbut, Mr. Wehner stated that the two most important pieces of the reform package are the increase in the Fund's investment authority and the authorization of the Fund to enter into contracts with Preferred Provider Organizations (PPO's) to deliver medical services to injured

employees. Edward Obertubbesing, Albany Business Manager, who is also an attorney, will spearhead the Fund's entrée into the use of PPO's. The procurement process will of course be handled by the Contracts Division of the Department of Administration under Mr. Mullen.

The Fund is moving forward on implementation of all parts of the reform package and will make necessary adjustments following the promulgation of the regulations by the Workers Compensation Board.

### Benchmarking
On the advice of Commissioner Halbritter and with input from Robert Verhayden, Director of Internal Audit, operational benchmarking standards will be established for the business offices. Such standards will fully reflect the reform law and will be data driven. Quality assessment reviews will be conducted on a regular basis.

### Information Technology Services
Because ITS impacts all departments and business offices of the Fund, a governance group consisting of Mr. Wehner, Mr. Barclay, Mr. Allen (legal), Ms. Sharp (fiscal), Mr. Mullen (personnel, contracts and budget) and Sean O'Brien (Chief Information Office) has been established to prioritize projects and to insure the proper allocation of resources. This group will then, in turn, communicate the priorities to the Project Management Group.

### Web Casting
The plan and the timetable for the web casting of the regular meetings of the Board have been submitted to the Governor. All sessions will have to be held in conference room B on the 15th floor which is appropriately equipped. While the implementation date for the web casting is the July meeting, a practice run will be conducted at the June meeting.

## Underwriting Report

The printed report of workers compensation underwriting activity for February, distributed with the agenda, is as follows:

| Workers Compensation | February 2007 |
| --- | --- |
| New Business | |
| a. Number | 1,857 |
| b. Premium | $12,837,142 |
| Cancellations | |
| a. Number | 2,167 |
| b. Premium | $24,285,660 |
| Net Difference | |
| a. Number | (310) |

|                  |                |
|------------------|----------------|
| b. Premium       | ($11,448,518)  |

The printed report of disability benefits underwriting activity for February, distributed with the agenda, is as follows:

| Disability Benefits | February 2007 |
|---------------------|---------------|
| New Business        |               |
|   a. Number | 665         |
|   b. Premium | $105,436   |
| Cancellations       |               |
|   a. Number | 523         |
|   b. Premium | $315,292   |
| Net Difference      |               |
|   a. Number | 142         |
|   b. Premium | ($209,856) |

The printed report for disability benefits, distributed with the agenda, also included for each year 2005, 2006 and 2007 (through February only) monthly comparisons for:

- number of applications received
- number of policies renewed
- total premium for renewed policies
- number of new claims processed

Mr. Wehner pointed out that the reform package did not address any disability benefits issues.

### Economic Report

The printed economic report, distributed with the agenda, stated that volatility continues to be a major factor in the markets. Initially, it was driven by macro concerns due to the policies of the Federal Reserve Board to constrain inflation. Currently, the volatility is rooted in expectations of an economic deceleration, if not an outright recession.

The economic data as of March 19 may provide the Federal Reserve Board support in continuing its recent actions of not changing its current Fund Rate of 5.25%. The reported housing data was much stronger than the expected consensus, with overall housing starts recouping the decline in January. The majority of the increase was in the single family category (10%). Multi-family residences also advanced 4%. The combination of these two segments supplies evidence that the housing market has not cratered, thereby preventing a downturn in the entire economy. The caveat that must be mentioned is that the sub-prime sector threat has been substantially increased, with banks and mortgage lenders consequently increasing their lending standards for *all* borrowers.

Consumer spending remains resilient, buoyed by favorable assessments of the job market and income growth. Housing demand needs to remain strong, working in tandem with the current inventory correction, before it may be stated that the economy will strengthen towards year-end. It appears that lower prices, low financing costs and a strong job market are reducing the stock of unsold homes.

The Fund's portfolio is still buffeted by the impact of actual and potential leveraged buyouts, inverted yield curve and inflationary pressures. The combination of these factors will continue to require dexterous execution when making fixed income and equity portfolio decisions.

## Portfolio Report

The printed portfolio report, distributed with the agenda, indicated the following returns for the month of February:

| February | Portfolio | Index | Difference |
|---|---|---|---|
| WC Surplus | 1.418 | 1.468 | -0.050 |
| WC Asset/Liability | 1.990 | 2.533 | -0.543 |
| DB | 1.814 | 1.664 | 0.150 |
| ATF Surplus | 2.200 | 1.664 | 0.536 |
| ATF Asset/Liability | 1.631 | 0.811 | 0.820 |

## The Non-Compliant Securities List

The Non-Compliant Securities list was distributed with the agenda. All holdings were rated Baa 1, 2 or 3 (Moody's) and BBB (+, - or neither, according to Standard and Poor's).

## Reallocations Following Termination of Contract With Morgan Stanley

As a follow-up to the termination of the contract with Morgan Stanley, approved at the February meeting, Ms. Martinez advised of the following reallocation of assets formerly managed by that company:

|  | Increase by |
|---|---|
| (a) External Managers – | |
| 1. LSV Asset Manager | $60 million |
| 2. Gifford Fong Associates | $30 million |
| (b) Internal Managers – | |
| 1. MidCap Quant | $30 million |
| 2. WCEF | $50 million |
| 3. WCEF2 | $7.5 million |

Page 5

Upon motion by Commissioner Carpenter, duly seconded by Commissioner Bowen, it
was proposed that the above reallocation of assets, formerly managed by Morgan Stanley,
be approved.
The vote:

      Chairman Hurlbut – yes
      Vice Chairman DeCarlo - yes
      Commissioner Carpenter – yes
      Commissioner Halbritter – yes
      Commissioner Loiodice – yes
      Commissioner Bowen – yes
      Commissioner Ryan – yes

Passed unanimously.

### Strategic Investors

As reported at the February meeting of the Board by Commissioner Carpenter, in his
capacity as chairman, and by Ms. Martinez, the decision to hire a new asset manager,
Strategic Investors, was to be considered by the Investment Committee at its meeting on
March 20.  Having met on that day, the Committee did in fact recommend the hiring of
Strategic.

Upon motion by Commissioner Carpenter, duly seconded by Vice Chairman DeCarlo, it
was proposed that a new equity asset manager, Strategic Investment Advisors, be retained
for $15 million allocation in a Large Cap Investment Strategy (Quality Core Equity
Strategy Fund) adjusted for the State Insurance Fund's statutory guidelines.
The vote:

      Chairman Hurlbut – yes
      Vice Chairman DeCarlo - yes
      Commissioner Carpenter – yes
      Commissioner Halbritter – yes
      Commissioner Loiodice – yes
      Commissioner Bowen – yes
      Commissioner Ryan – yes

Passed unanimously.

### Bank Balances

The bank balances, distributed with the agenda, were as follows:

|  | As of February 28, 2007 |
|---|---|
| Workers Compensation: | $22,177,193.46 |
| Aggregate Trust: | 1,387,256.57 |
| Disability Benefits: | 648,595.52 |

**Investment Report**

The report of buys and sells for the period February 1, 2007 to February 28, 2007,
distributed with the agenda, is as follows:

Buys –
> Workers Compensation Surplus:
>> 84 for $716,004,422.81
>
> Workers Compensation A/L:
>> 105 for $1,229,551,500.99
>
> Disability Benefits:
>> 27 for $46,220,564.22
>
> WCPSF:
>> 14 for $8,640,996.94
>
> Workers Compensation Equity:
>> 65 for $35,083,764.11
>
> Workers Compensation Equity II:
>> 18 for $18,311,682.69
>
> WCMCQF:
>> 52 for $37,311,017.80
>
> WCSOF:
>> 26 for $12,880,911.51
>
> ATF A/L:
>> 22 for $37,709,278.32
>
> ATF Surplus:
>> 12 for $16,201,640.07
>
> DBEF:
>> 30 for $25,788,261.84

Sells –
> Workers Compensation Surplus:
>> 48 for $356,886,075.49
>
> WCPSF:
>> 1 for $250,492.30
>
> Workers Compensation A/L:
>> 66 for $690,355,051.66
>
> DBEF:
>> 14 for $2,215,340.28
>
> Disability Benefits:
>> 4 for $16,259,925.07
>
> WCMCQF:
>> 46 for $5,119,303.50
>
> WCSOF:
>> 8 for $19,250.54

Workers Compensation Equity:
    41 for $25,605,157.69
Workers Compensation Equity II:
    1 for $548,219.15
ATF A/L:
    2 for $14,000,000

The total par value with respect to commitment positions, distributed with the agenda, is as follows:

Month Ended February 28, 2007

| Fund | |
|---|---|
| WCF (Surplus) | $64,299,999 |
| WCF (A/L) | $108,750,000 |
| ATF (Surplus) | -0- |
| DB Equity | -0- |
| ATF (A/L) | -0- |
| DB | $23,000,000 |
| WC (Preferred) | -0- |
| WCEF | $59,800 |
| WCEFII | -0- |
| WC Mid-Cap Quan | $49,201 |
| WC Strategic Optimization | -0- |

Upon motion by Commissioner Carpenter, duly seconded by Commissioner Bowen, it was proposed that all of the above sales, purchases and/or repurchase agreements for the period February 1 to February 28, 2007, made within the purview of section 87 of the Workers Compensation Law and authorized by the Board of Commissioners at the February 21, 2007 meeting, be, in all manner and respects, approved, confirmed and ratified.
The vote:
    Chairman Hurlbut – yes
    Vice Chairman DeCarlo - yes
    Commissioner Carpenter – yes
    Commissioner Halbritter – yes
    Commissioner Loiodice – yes
    Commissioner Bowen – yes
    Commissioner Ryan – yes
Passed unanimously. Certified copy by the Assistant Secretary is addendum 2.

Upon motion by Commissioner Carpenter, duly seconded by Commissioner Bowen, it was proposed that the Investment Department be given the authority to trade the following amounts by Fund until the next meeting:

| Workers Compensation | $800,000,000 |
|---|---|
| Disability Benefits | $ 20,000,000 |
| Aggregate Trust | $ 5,000,000 |

The vote:

        Chairman Hurlbut – yes
        Vice Chairman DeCarlo - yes
        Commissioner Carpenter – yes
        Commissioner Halbritter – yes
        Commissioner Loiodice – yes
        Commissioner Bowen – yes
        Commissioner Ryan – yes

Passed unanimously.

### Class Action Recoveries Report

Commissioner Carpenter and Ms. Martinez presented to the Board the subject report for 2006 (addendum 3), contained in a memo from Michael Miliano, Chief Compliance Officer, dated January 23, 2007. The report had originally been given to the members of the Investment Committee at a meeting on March 20.

For 2006, the aggregate total for Securities Class Action recoveries was $627,645.09 inclusive of the $611,170.70 Worldcom payments. At the meeting, Mr. Miliano had explained that the Fund is currently pursuing 38 claims, a very important process to insure that all money owed us is paid to us. He added that 2006 was the first year of consistent and organized recovery.

### External Managers Database

Commissioner Carpenter and Ms. Martinez presented to the Board the subject report (addendum 4) which is a joint effort between the Investment Department and the Chief Compliance Officer, Michael Miliano. The report had originally been given to the members of the Investment Committee at a meeting on March 20.

For each external manager, the report indicates disciplinary history, criminal, regulatory and civil judicial actions, litigation and administrative proceedings, investigative reports, pending securities class actions, mergers and acquisitions and insider trading. The information in the report is entered daily and monthly.

External managers tracked were:
1. Ark Asset Management
2. BlackRock Capital Management
3. Merrill Lynch Investment Management
4. Bullard, McLeod & Associates
5. Conning Asset Management
6. Goldman Sachs Asset Management

7.  LSV Asset Management
8.  Morgan Stanley Investment Management
9.  Peter B Cannell
10. Wellington Management

## Proxy Voting Procedures and Guidelines

Commissioner Carpenter and Ms. Martinez presented to the Board the proposed 2007
amendments to the Department of Investment's Proxy Voting Procedures and Guidelines
(addendum 5). These amendments are contained in a memo from Michael Miliano, Chief
Compliance Officer, dated March 20, and had been given to the members of the
Investment Committee on that date.

In his presentation to the Committee on March 20, Mr. Miliano indicated that the
amendments are:

(1) designed to ensure that proxies for securities within the Fund's portfolio are
voted in the best interests of shareholders and reflect industry efforts to
promote exemplary corporate citizenship.

(2) an enhancement of areas which are not addressed in the existing Guidelines.

(3) a reflection of the Fund's continual commitment to corporate governance in
such areas as analyst, auditor and director independence, establishment of
Board committees, increased operational transparency for shareholder
disclosures, expensing of stock options and increased disclosure for executive
compensation.

(4) consistent with both industry standards and the proxy policies of the New
York State Common Retirement Fund as administered by the State
Comptroller.

In light of Mr. Miliano's presentation to the Investment Committee, Commissioner
Carpenter asked the Commissioners to read the amendments and be prepared to vote on
them at the April meeting.

## Investment Guidelines and Compliance Checklist

Commissioner Carpenter and Ms. Martinez presented to the Commissioners the
Investment Guidelines (amended September 2004) and the Guidelines Compliance
Checklist (revised December 4, 2001) – (addendum 6).

Commissioner Carpenter asked the Board members to read both documents with a critical
eye. The former will have to be revised to reflect the recent authorization given to the
Fund, as part of the comprehensive workers compensation reform bill, to invest up to
10% of its reserves and surplus in equity or debt securities of American companies,
without regard to the rating of that company's obligations. Both documents will also
have to be scrutinized, and perhaps updated, to, in the words of Commissioner Carpenter,
iterate accurately those tasks which are actually performed by all components of the

investment process rather than just listed and/or indicated in the Guidelines. These revisions will be made over the next several months.

### Investment Advisor

As discussed at the March 20 meeting of the Investment Committee, Commissioner Carpenter advised the Board members that the Investment Advisor will be voted on at the June meeting to be in place July 1. Ideally, there should be one advisor to handle both equities and fixed income although separate advisors for each investment area were not ruled out.

### Annual Statements and Report

Ms. Sharp informed the Commissioners that the 2006 Annual Statements for the Workers Compensation and Disability Benefits funds had been filed with the Insurance Department. Vice Chairman DeCarlo asked that each Commissioner be given copies.

In response to a question from Chairman Hurlbut, Mr. Wehner said that a draft of the 2006 Annual Report will be available for the Board at the April meeting.

### Reports from Outside Actuary

Ms. Sharp stated that the Fund has received the following reports as of December 31, 2006 from the outside actuary, David Mohrman of Towers Perrin Tillinghast:

- for the Workers Compensation Fund, Analysis of Loss and LAE Liabilities
- for the Disability Benefits Fund, Loss Reserve Analysis

Vice Chairman DeCarlo asked that any narratives and executive summaries be forwarded to the whole Board. Additionally, Commissioner Carpenter requested that both reports, in their entirety, be given to the Vice Chairman in his capacity as Chair of the Budget and Audit Committee. He in turn would read them on behalf of the Commissioners and advise them of any salient points or issues.

Ms. Sharp reminded the Board that Mr. Mohrman had made a presentation on the reserves at the January meeting but would of course be available for any future meeting to discuss the 2006 results.

With respect to the reserves, Chairman Hurlbut and Commissioner Halbritter wondered about the affect of the limitations on awards for permanent partial disability contained in the workers compensation reform bill. In a similar vein, Vice Chairman DeCarlo asked about the financial implications of the closure of the Second Injury Fund, also in the reform bill; specifically, who will finance the future payments for existing second injury cases? Mr. Allen responded that the bill authorizes the issuance of bonds by the Dormitory Authority. To pay the bonds, the Special Disability Fund assessment of the carriers shall include an amount sufficient to cover the debt service charges.

Page 11

## CAMRA

As reported at the March 20 meeting of the Investment Committee, Ms. Sharp said that
CAMRA (Complete Asset Management Reporting and Accounting) should be fully
operational by mid-April.

## Number of Employees Covered

As a follow-up to a question raised by Commissioner Halbritter at the February meeting
as to the number of individuals the Fund actually covers through its policyholders,
Ms. Sharp presented a chart of select financial data (addendum 7) which highlighted the
years 1999 and 2006. It showed that the Fund covered approximately 1.3 million
employees in 2006. The methodology for arriving at this figure is estimated by the total
payroll of the in-force policies divided by the New York State average weekly wage.

## Assessments – The Annual Statement

Ms. Sharp reported on the issue raised by Commissioner Carpenter at the February
meeting relative to the listing of the assessments as a separate line (not a footnote) on the
income statement with changes tracked from year-to-year.

Deloitte and Touche advised her that this is an unusual request and that they are not
aware of any carrier which follows such a practice. To achieve what the Commissioner
wants, the breakout must be done from the earned and unearned premium figures for
2005 and 2006 on the income statement. Commissioner Carpenter explained that he feels
strongly about this issue because he contends that any decrease in rates is overshadowed
by [increases in] the assessments (for example, the increase in assessments by the Special
Disability Fund to cover the debt service charges necessitated by the issuance of bonds
for the closure of the Second Injury Fund raised by Vice Chairman DeCarlo above). That
being said, he does not want to complicate matters as regards to the annual report. He
thus requested, as a compromise, an internal document, segregating the assessments, for
review by the Board and then, using the format, for possible inclusion in a future annual
statement.

In closing the discussion, Ms. Sharp pointed out that assessments may change on
October 1 of this year.

## AM Best

Ms. Sharp drew the attention of the Commissioners to three documents, distributed with
the agenda, relative to the AM Best report on State Funds and other insurance carriers
who have NR (not rated) designations. The first is a written report prepared by the
Fund's Research and Analysis Unit while the second is the unit's summary spreadsheet
which lists operating performance, liquidity and capitalization measurements for the
Fund and ten other non-rated State Workers Compensation Funds. The third is the

special report from AM Best, dated October 2006, on the key measures for non-rated
property and casualty companies. While AM Best initially planned to rate the Fund,
consistent with voluntarily rated companies, Ms. Sharp explained that this report
represented the sum total of their efforts.

On the suggestion of Commissioner Carpenter, Chairman Hurlbut asked each Board
member to read the three documents before the April meeting at which time Ms. Sharp
would answer any questions.

### Budget and Expense Reports

Mr. Mullen briefed the Commissioners on the budget and expense results for the year
ending December 31, 2006 (addendum 8).

For the Workers Compensation Fund, the administrative expenses were $355 million.
This was 4.7% less than the approved figure but 8% higher than the comparable figure
for the year ending December 31, 2005. Earned premium for 2006 was approximately
$1.7 billion, resulting in a 15.40% administrative expense ratio, net exclusions. The Fund
finished the year with 2,644 FTE's (full time equivalents) which was 111 less than the
approved number of 2,755. This savings resulted in personal service being under budget
by approximately $8 million. We continue to take a conservative approach to hiring
while committing resources to critical areas such as Underwriting and Premium Audit.

Non-personal service was under budget by approximately $11 million. This was
primarily attributed to the following savings in Information Technology:
  (a) The acquisition of new computers and accessories was delayed for at least a
      year. Instead, extended warranties on existing equipment were purchased for
      an additional year.
  (b) The upgrade of the data storage and back-up facility has been placed on hold
      pending an additional in-depth architectural analysis.
  (c) The use of outside consultants has been reduced with in-house personnel
      doing more system development and implementation.

Other items which contributed to non-personal service being under budget were:
  (a) Savings in telecommunications brought about by –
      1. the implementation of NYSIF owned PBX switches in each location
      2. voice over IP lines. Currently, we use our network lines to call from
         New York to Albany and vice versa. This initiative will eventually be
         rolled out to all offices.
      3. an audit of all Fund lines to identify over billings
  (b) Travel – in lieu of trips, telephone and video conferencing is being utilized
  (c) Professional services – the timing of the Oracle upgrade and business
      intelligence projects has left money unspent in this category

On the other hand, real estate was over budget by approximately $3.5 million due to:

(a) the timing of the installation of the blast proof doors at the Church Street building
(b) the removal of the security barriers at the Church Street building – since this action was unanticipated, no money was budgeted
· (c) construction of the Syracuse disaster recovery server room which was unbudgeted
(d) a change in how the $1.7 million credit for the buyout of the lease for the 111 8th Avenue, New York, building was accounted for [2006 was the last year of the credit]

Taxes also came in over budget due to an $8 million write off in the liability account.

Mr. Mullen drew the attention of the Commissioners to page 3 of his handout which, for each year since 1998, has separate charts for:
1. full time equivalent counts
2. earned premium in millions
3. earned premium per full time equivalent

For the Disability Benefits Fund, the administrative expenses, before adjustments, were $4.0 million. Earned premium was approximately $18 million, resulting in a 26.16% administrative expense ratio, net of adjustments. This is 1.16% over the statutory cap of 25%. The Fund continues to expend every effort to increase premium and, at the same time, to make the most efficient use of resources. For example, in 2006, the ITS staff assigned to Disability Benefits was reduced by 4 FTE's. Increases in taxes and assessments were due to correcting journal entries.

Chairman Hurlbut asked if problems could result from Disability Benefits being over the statutory cap. Mr. Mullen responded that he thought exceeding the statutory cap could result in an audit finding. At that point, we would then place it in the context of the business issues.

## Marketing Report

The printed Marketing report was distributed with the agenda.

## Report of the General Attorney

The printed report of the General Attorney was distributed with the agenda. The report is a detailed compendium of all the changes resulting from the comprehensive workers compensation reform bill.

One issue which was not in the report: Mr. Allen was pleased to advise the Board that

an administrative law judge had ruled in the Fund's favor that the fees for extended payment plans are not taxable. Mr. Allen credited Ms. Sharp with this victory since it was she who had complied the necessary data and justification. Going back to 1999,

Page 14

approximately $400,000 per year is involved and the amount will grow significantly in the future.

## Acceptance of the Written Reports

Upon motion by Commissioner Bowen, duly seconded by Commissioner Loiodice, it was proposed that the written reports for Underwriting, Disability Benefits, Marketing and the General Attorney be accepted.
The vote:

>Chairman Hurlbut – yes
>Vice Chairman DeCarlo - yes
>Commissioner Carpenter – yes
>Commissioner Halbritter – abstain
>Commissioner Loiodice – yes
>Commissioner Bowen – yes
>Commissioner Ryan – yes

Passed 6-0-1.

## Report of the Director of Confidential Investigations

Mr. LaPointe began his presentation by advising the Commissioners that the overall success rate for investigations for 2006 was 29.4%. Previously, it had been approximately 10%. This is due to the work of the business office employees in the disciplines of Claims, Underwriting and Premium Audit who have been trained by his staff and, accordingly, have been given the necessary tools to detect fraudulent practices and behavior. On the other hand, hotline, Internet and Inspector General referrals do not lead to many successful investigations.

In looking at the statistics from the Frauds Bureau of the Insurance Department, which tabulates fraud reports and arrests for all lines of insurance, the Fund's share is very high, especially in light of the fact that we are primarily only a workers compensation carrier. This, of course, does not speak well for the entire insurance industry in the state. Since 1998, Mr. LaPointe indicated, as a direct result of aggressive fraud detection and prosecution, the Fund has realized $124.5 million in savings. Commissioner Bowen added that considerably more money has been indirectly saved, given that the promulgation of the arrests serves as a deterrent to the committing of future crimes.

In response to a question from Commissioner Bowen as to what resources Confidential Investigations needs to continue to do its job as effectively as it has, Mr. LaPointe responded:

>(1) Stop work orders and arrests, when issued to companies by the Workers Compensation Board, should be made available upfront to the Fund. These companies, so cited, then come to NYSIF looking for insurance. The burden is on Underwriting to ferret out their questionable activities and to deny coverage.

(2) Similarly, when in the course of an audit, a premium auditor finds either a deficient certificate or an incomplete or dishonest payroll, there should be a mechanism for him/her to forward that information to the Workers Compensation Board.

Commissioner Bowen asked if local property departments help with restitution issues. Mr. LaPointe responded that only in the smaller counties upstate. Vice Chairman DeCarlo asked if we are given enough publicity for our fraud successes. Mr. LaPointe responded affirmatively but, at the same time, the Fund does not want overexposure in the media.

With reference to point (1) above, Commissioner Loiodice asked how we deal with fraudulent policyholders who are "resurrected" under a new name. Mr. LaPointe stated that Underwriting always had the job to detect such companies and was quite successful in doing so.

Commissioner Bowen wondered if the Attorney General will pick up the slack for the local district attorneys in prosecuting fraud. Mr. LaPointe responded that the money involved is not large enough for the Attorney General to handle. Chairman Hurlbut advised Mr. LaPointe that the Monroe County District Attorney told him that, because of the Fund's impressive efforts in handling fraud, he has one individual on his staff for whom prosecuting fraud is the sole responsibility.

Chairman Hurlbut and the other Board members congratulated Mr. LaPointe on his outstanding record. Mr. LaPointe in turn thanked the Board, Mr. Wehner and former Executive Directors Neal Conolly and Kenneth Ross for all of the support they have given him and his staff.

## Reports of the Standing Committees

The reports of the standing Committees were as follows:

*Budget and Audit* – Vice Chairman DeCarlo reported that the Committee had met with Robert Verhayden, Director of Internal Audit, before the regular meeting. Mr. Verhayden was asked for a timetable of audits which will be completed by his staff on the Fund's implementation of the relevant parts of the workers compensation reform package.

*Investments* – With respect to the March 20 meeting of the committee, in addition to the investment resolutions and information above which were made part of the agenda of the regular meeting, Commissioner Carpenter advised the Board that LSV Asset Management had given an excellent presentation (addendum 9). The next meeting is scheduled for either July or September.

*Policyholder and Claims Services* – Commissioner Loiodice wants this committee to meet next with Underwriting.

Page 16

*Legal and Legislative Affairs* – Commissioner Bowen stated that the Rules of the Board of Commissioners, once drawn up by the Legal Department and approved by the Executive Director and the General Attorney, will be presented to the committee before submission to the entire Board.

## Resignation of Commissioner Ryan

Chairman Hurlbut informed the Board that Commissioner Ryan's services with the Department of Labor were ending shortly and, with it, his ex officio role representing the Commissioner of Labor on the Fund's Board.

On behalf of the Commissioners, the Chairman thanked Commissioner Ryan for his services both at the Fund and at Labor and said that it was a privilege to know him.

## Next Meeting

The next meeting will be in Albany on April 18.

## Executive Session

Upon motion by Commissioner Ryan, duly seconded by Commissioner Carpenter, it was proposed that the Board move into executive session.
The vote:

      Chairman Hurlbut – yes
      Vice Chairman DeCarlo - yes
      Commissioner Carpenter – yes
      Commissioner Halbritter – abstain
      Commissioner Loiodice – yes
      Commissioner Bowen – yes
      Commissioner Ryan – yes
Passed 6-0-1. Mr. Wehner remained.

## Adjournment of Meeting

Upon motion by Commissioner Loiodice, duly seconded by Vice Chairman DeCarlo, it was proposed that the Board adjourn.
The vote:

      Chairman Hurlbut – yes
      Vice Chairman DeCarlo - yes
      Commissioner Carpenter – yes
      Commissioner Halbritter – abstain
      Commissioner Loiodice – yes
      Commissioner Bowen – yes
      Commissioner Ryan – yes
Passed 6-0-1.

The meeting adjourned at 12:30 P.M.

Respectfully submitted,

Albert K. DiMeglio
Assistant Secretary

Addendum 1 – Agenda with attachments

Addendum 2 – Certified Investment Resolution

Addendum 3 – Class Action Recoveries Report

Addendum 4 – External Managers Database

Addendum 5 – Proxy Voting Procedures and Guidelines

Addendum 6 – Investment Guidelines and Compliance Checklist

Addendum 7 – Number of Employees Covered – select financial data

Addendum 8 – Budget and expense results for the year ending December 31, 2006

Addendum 9 – presentation by LSV Asset Management at the meeting of the Investment
    Committee on March 20