E X H I B I T    " I "

RECEIVABLES AGREEMENT

This Receivables Agreement (this "Agreement") is made as of December 31, 2005 by and among Stonehedge Acquisition Chittenango I, LLC and Stonehedge Acquisition Rome I, LLC (hereinafter collectively referred to as the "Operators") and Chittenango II, LLC and Stonehedge Acquisition Rome II, LLC ("Buyers"), and Jane A. Halbritter and Marc A. Rossi (hereinafter collectively referred to as the "Sellers") (each individually a "Party" and collectively, the "Parties")

WHEREAS, as of December 31, 2005, Sellers sold all of their capital stock in Stonehedge Nursing Home Chittenango, Inc. (the "Chittenango Nursing Company") and Stonehedge Nursing Home Rome, Inc. (the "Rome Nursing Company") (hereinafter collectively referred to the as the "Acquired Corporations") to Stonehedge Acquisition Chittenango II, LLC and Stonehedge Acquisition Rome II, LLC; and

WHEREAS, the Acquired Corporations collectively, as of December 31, 2005, carried on their books approximately $2,469,163.50 in accounts receivable (the "Gross Accounts Receivable Amount"), such amount includes the Estimated RIPAF Adjustment (as defined below in Paragraph 4).

WHEREAS, Operators maintain that $657,229.00 of those accounts receivable are uncollectible (hereinafter referred to as the "Disputed Receivables," which are itemized on **Schedule A** of this Agreement) and, therefore, insisted that the purchase price for the Sellers' capital stock be reduced by $657,229.00; and

WHEREAS, Sellers are willing to agree to this purchase price reduction on the conditions that the Operators: (i) pay the face value for those accounts receivables that are not in dispute (*i.e.*, $1,810,034.50), (ii) convey to the Sellers any and all amounts that are collected from time to time in the future with respect to the Disputed Receivables, (iii) hereby appoint the Sellers and their designated agents, individually and collectively, as agents for the Operators for purposes of collecting the Disputed Receivables, and (iv) shall fully cooperate with, and assist, the Sellers in their collection efforts; and

WHEREAS, Sellers are in possession of $107,000.00 collected after the effective date of this Agreement which belongs to the Operators; and

WHEREAS, Operators are willing to agree to Sellers' proposal regarding the Disputed Receivables as provided for herein.

NOW, THEREFORE, in consideration of the mutual agreements, covenants and representations contained herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Sellers and Operators agree as follows:

1.    Appointment of Sellers as Agents.

    (a).    The Operators hereby nominate and appoint the Sellers and their designated agents as the Operators' agents and attorneys-in-fact for the sole purpose of collecting the Disputed Receivables (the "Agency Relationship"). The Sellers shall have the authority, jointly and severally and at the Sellers' sole cost and expense, to take any and all actions, that in the opinion of the Sellers ought to be taken, to collect the Disputed Receivables, including but not limited to:

        (i).    Demanding, suing for, receiving and collecting the Disputed Receivables;

        (ii).    Making, signing, acknowledging, endorsing or delivering any instruments of any nature whatsoever required for the collection of, or to facilitate the collection of, the Disputed Receivables;

        (iii).    Compromising, settling or submitting to arbitration any claims associated with the Disputed Receivables and giving releases in connection with such Receivables; and

        (iv).    Without limiting the above powers, generally performing any other acts of any nature whatsoever that in the opinion of the Sellers are reasonably necessary for the collection of the Disputed Receivables.

    (b).    Any person, firm or corporation shall be fully protected in relying upon this delegation of legal authority.

    (c).    The Operators hereby ratify and confirm all actions which may be taken by the Sellers with respect to the Disputed Receivables so long as such actions do not interfere with the operation of the business of the Operators or their respective tenants.

    (d).    Pursuant to the Agency Relationship and for a period of eighteen (18) months following the Closing Date, Operators shall provide Jane Halbritter upon prior notice with reasonable access to:

        (i).    reasonable office space at the Rome Nursing Company;

        (ii).    those employees of the Rome Nursing Company and Chittenango Nursing Company as Jane Halbritter shall deem necessary to assist her with the collection of the Disputed Receivables, subject to the consent of the Operator which shall not be unreasonably withheld;

        (iii).    any and all information relating to the Disputed Receivables, including but not limited to, financial records, claims forms, remittance, bank records, notes, documents and correspondence.

2. <u>Payment to Sellers of Disputed Receivables.</u>

    (a). All payments, whether partial or in full, received by Operators on or after the date of this Agreement with respect to any Disputed Receivable shall be the sole and exclusive property of the Sellers, and Operators hereby wave any and all rights and, shall make no claim against Sellers, with respect to such payments. No collections of Disputed Receivables shall be subject to any claim of offset, withhold, or other deduction; including but not limited to, any claims, actions, suits, costs, damages, expenses or liabilities of any nature whatsoever, including any withhold imposed by the New York State Medicaid program or any other governmental agency relating to acts of the Operator and unrelated to the Disputed Receivables or any pre-closing Medicaid claims. Operators shall notify Sellers immediately upon receipt of any payment on a Disputed Receivable, and Operators shall remit any and all such payments to Sellers within three (3) business days of their receipt.

    (b). All collections relating to the accounts reported on **Schedule A**, shall be applied as follows:

        (i). Medicare, Medicaid and Third Party Insurance collections shall be applied to the dates of service specified on the applicable remittance advice relating to such collections.

        (ii). collections from private pay sources, NAMI and any other amounts not specifically identified as related to a specific date of service (the "Private Pay Collections") shall be applied consistent with the historical accounting practices of the Acquired Corporations. As a result, any and all Private Pay Collections shall be applied to the oldest amounts owed on the accounts, i.e., on a first in–first out basis.

    (c). Notwithstanding the foregoing, and to the extent applicable all collections of Disputed Receivables after the Closing Date shall be subject to a deduction for any government assessment, including the six (6%) percent cash assessment, not otherwise accounted for in the applicable account receivable as reported on **Schedule A** or not otherwise paid or reimbursed to Seller.

3. <u>Summary of Disputed Receivables.</u>

    Within ten days (10) after the close of each month, Operators shall provide to Sellers a list of the outstanding Disputed Receivables (the "Monthly Disputed Receivables Schedule"). The Monthly Disputed Receivables Schedule shall provide a detailed list of each Disputed Receivable account by name, claim and date of service, payor source, and include a detailed explanation of the status of each claim, the reason it remains uncollected, the payments received on any such Disputed Receivable during the preceding month, the date of receipt of any such payments, and such other information as is normally reported on the Nursing Company's A/R Aging Report.

From time to time or upon Operators' written request (which request shall not be made more than once per fiscal quarter), Sellers shall provide to Operators, in writing, a list of any Disputed Receivables: (a) that have been collected since the date of the last update and (b) which Sellers have determined to be uncollectible and with respect to which Sellers have ceased all collection efforts. Such Receivables shall no longer be considered outstanding.

4.    Treatment of Estimated RIPAF Adjustment

Operators and Sellers have included in the Gross Accounts Receivable Amount at Closing and therefore Operators have paid Sellers on the Closing Date the amounts of $45,427.55 relating to the Rome facility and $15,507.03 relating to the Chittenango facility (collectively, the "Estimated RIPAF Adjustment"). These amounts are estimated amounts due an owing to each facility from the New York State Medicaid program as a result of litigation that Sellers participated in relating to Sellers pre-closing Medicaid Rate years. Sellers and Operators have agreed that the actual adjustment due from the Medicaid program (the "Actual RIPAF Adjustment") is expected to be received by the Nursing Companies on or before February 28, 2006 (the "Final Remit Date"). In connection with the Estimated RIPAF Adjustment and the Actual RIPAF Adjustment, Sellers and Operators have agreed as follows:

(a).    Sellers are entitled to the entire Actual RIPAF Adjustment whether or not it is received on or after the Final Remit Date and such monies shall not be subject to any claim of offset, withhold, or other deduction; including but not limited to, any claims, actions, suits, costs, damages, expenses or liabilities of any nature whatsoever, including any withhold imposed by the New York State Medicaid program or any other governmental agency relating to acts of the Operators and unrelated to any pre-closing Medicaid claims;

(b).    To the extent that the Actual RIPAF Adjustment is not received by the Nursing Companies on the Final Remit Date, Sellers shall promptly remit the Estimated RIPAF Adjustment monies to Operators within three (3) business days;

(c).    To the extent that the Actual RIPAF Adjustment received on or after the Final Remit Date is less than the Estimated RIPAF Adjustment, Sellers shall promptly remit any such difference to the Operators within three (3) business days;

(d).    To the extent that the Actual RIPAF Adjustment is received after the Final Remit Date, Operators shall promptly remit the entire Actual RIPAF Adjustment Amount to Sellers within three (3) business days so long as the Sellers have complied with subparagraph (b), above; and

(e).    To the extent that the Actual RIPAF Adjustment is received prior to the Final Remit Date and the amount of the adjustment exceeds the Estimated RIPAF Adjustment, Operators shall promptly remit the difference to the Sellers within three (3) business days; and

(f).    To the extent future class action law suits or other litigation results in the payment to Operators of an adjustment similar to the RIPAF Adjustment and such payment pertains to a period prior to January 1, 2006, any and all amounts paid to

Operators as a result of the resolution or settlement of such law suits or litigation shall be the property of, shall be promptly paid to, the Sellers and Operators hereby waive any rights or claims thereto.

5.   Audit of Books and Records.

Sellers shall have the right, upon ten (10) days prior written notice to Operators, to conduct an audit of Operators' books and records to insure compliance with the terms of this Agreement so long as such audits shall only cover one (1) time per fiscal quarter.

6.   Promises and Covenants of Operators. Operators make the following promises and covenants to Sellers:

(a).   To take any additional actions and do anything else that may be required to constitute Sellers and their designated representatives as Operators' agents and attorneys-in-fact for purposes of collecting the Disputed Receivables;

(b).   To act in good faith and reasonably cooperate with the Sellers in their efforts to collect the Disputed Receivables;

(c).   To provide Sellers, upon Sellers' request, with specific information necessary for the collection of the Disputed Receivables to the extent that such information is in Operators' control or possession or with respect to which Operators have knowledge; and

(d).   To make commercially reasonable efforts to assist Sellers with collection of the Disputed Receivables.

7.   Promises and Covenants of Sellers. The Sellers make the following promises and covenants to Operators.

(a).   To act professionally, responsibly and in keeping with accepted business practices in collecting the Disputed Receivables;

(b).   To act in good faith and reasonably cooperate with Operators in Operators' efforts to collect all receivables *other than* the Disputed Receivables;

(c).   To provide Operators, upon Operators' request, with any information, known to the Sellers and not otherwise known or reasonably available to the Operators, necessary for the collection of receivables *other than* the Disputed Receivables.

(d).   To immediately remit to Operators the $107,000.00 collected after the effective date of this Agreement.

8.    Indemnification Obligations in Stock Purchase Agreement.

Seller acknowledges that the Rome Nursing Company received a letter from Empire Medicare Services dated March 25, 2005 relating to a prepayment audit of certain Medicare claims (the "Existing Medicare Audit"). The Operator and the Buyer acknowledge that the Existing Medicare Audit was disclosed to them previously, including, but not limited to, in Schedule 5.15(a) of the Stock Purchase Agreement as of the Closing. Seller acknowledges that any final determination of liability of any future or existing Medicare audit including but not limited to the Rome Nursing Company audit shall be subject to the Indemnification Obligations under Article XII of the Stock Purchase Agreement entered into between the Parties on August 27, 2004 (the "Indemnification Obligations"). This Agreement is being delivered subject to the terms and conditions of the Stock Purchase Agreement and the rights and obligations of the Seller and the Buyer set forth in the warranties, representations, covenants, indemnifications, agreements and other terms and provisions of the Stock Purchase Agreement and shall be neither limited, altered or impaired, nor enhanced or enlarged by this Agreement.

9.    Consultant Relationship

In consideration of the agreements contained herein, Operators have agreed to engage Jane Halbritter on a consultant basis pursuant to an agreement to be entered into between the Parties whereby Jane Halbritter shall assist the Acquired Companies in the collection of the Gross Accounts Receivable Amount.

10.    Notices.

Any communication or notice required or permitted hereunder shall be in writing and conclusively deemed to have been delivered and effective as of the date it was actually delivered, if hand delivered; the date of confirmed answer, if sent by fax; or on the date it was received, if mailed in a sealed envelope, postage prepaid, by certified or registered mail; all addressed to such party at the following address or fax number (or such other address or fax number as either party may subsequently add or substitute by proper notice hereunder to the other party):

The Operator: Stonehedge Acquisition Rome II, LLC
801 North James Street
Rome, New York 13440
Attn: Joseph Kazarnovsky, Managing Member


copy to:    Abrams, Fensterman, Fensterman, Flowers,
Greenberg & Eisman, LLP
1111 Marcus Avenue, Suite 107
Lake Success, New York 11042
Attn: Mark Zafrin, Esq.

The Sellers:    Jane Halbritter
100 West Garden Street
Rome, New York 13440

Marc Rossi
6866 Stokes Westernville Road
Ava, New York 13303

copy to:    Epstein, Becker & Green, P.C.
250 Park Avenue
New York, New York 10021
Attn: Jay Gerzog, Esq.

11.    Severability.

If any part or provision of this Agreement shall be determined to be invalid or unenforceable under the laws of New York, the remaining portions of this Agreement that can be given effect shall nevertheless continue in full force and effect.

12.    Modification.

This Agreement may not be changed orally, and any modification hereto must be in writing signed by all parties.

13.    Binding Effect.

This Agreement shall be binding upon and inure to the benefit of the Parties to this Agreement, their legal representatives, successors and assigns.

14.    Entire Agreement; Counterparts.

This Agreement constitutes the entire agreement between the parties with respect to the Disputed Receivables. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement may be executed and delivered by exchange of facsimile copies showing the signatures of the parties hereto, and those signatures need not be affixed to the same copy. The facsimile copies showing the signatures of the parties will constitute originally signed copies of the same agreement requiring no further execution.

15.    Non-waiver.

No delay or failure by a party to exercise any right under this Agreement and no partial or single exercise of that right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein. Nothing herein contained shall be construed to be a waiver of any rights of any party under any of the transaction documents previously entered into by the parties hereto.

16.    Assignment.

The rights and interests of the parties may not be sold, transferred, assigned, pledged, encumbered or hypothecated by them, unless expressly permitted in writing by the other party, which permission may be withheld for any or no reason.

17.    Headings.

Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

18.    Governing Law.

This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

[continued on next page]

-8-

19.    <u>Term.</u>

This Agreement shall be in full force and effect for so long as there are any outstanding Disputed Receivables.

IN WITNESS WHEREOF the parties hereto have signed and sealed this Agreement this 3rd day of January, 2006.

<u>BUYERS:</u>

Stonehedge Acquisition Chittenango II, LLC

By: _____

Stonehedge Acquisition Rome II, LLC

By: _____

<u>SELLERS:</u>

_____
Jane A. Halbritter

_____
Marc A. Rossi

-9-

Jan 10 06 03:41p     STONEHEDGE HEALTH&REHAB      3153377359          p.1
  Jan 10 06 04:19p      Stonehedge Chittenango     (315)697-9169       p.11
    01/10/2006  14:25    212-661-0089          EBG            PAGE  11/11

OPERATORS:

Stonehedge Acquisition Chittenango I, LLC

By: _____
    Joseph Zupnik

Stonehedge Acquisition Rome I, LLC

By: _____
    Joseph Zupnik

-10-